1  GRODSKY, OLECKI & PURITSKY LLP
   Allen B. Grodsky (SBN 111064)
2  *allen@thegolawfirm.com*
   John J. Metzidis (SBN 259464)
3  *john@thegolawfirm.com*
   11111 Santa Monica Boulevard, Suite 1070
4  Los Angeles, California 90025
   Telephone:   (310) 315-3009
5  Facsimile:   (310) 315-1557

6  Attorneys for Defendants
   Katherine Von Drachenberg, Kat Von D, Inc.,
7  and High Voltage Tattoo, Inc.

8

9               UNITED STATES DISTRICT COURT

10              CENTRAL DISTRICT OF CALIFORNIA

11                    WESTERN DIVISION

12
   JEFFREY B. SEDLIK, an individual;        Case No. 2:21-cv-01102-DSF-MRWx
13
          Plaintiff,                        Before the Hon. Dale S. Fischer,
14                                          U.S. District Judge
      vs.
15                                          **MEMORANDUM OF POINTS &**
   KATHERINE VON                            **AUTHORITIES IN SUPPORT OF**
16 DRACHENBERG (a.k.a. "KAT                 **DEFENDANTS' MOTION FOR**
   VON D"), an individual; KAT              **SUMMARY JUDGMENT AND**
17 VON D., INC., a California               **PARTIAL SUMMARY JUDGMENT**
   corporation; HIGH VOLTAGE
18 TATTOO, INC., a California               [*Filed concurrently with Notice of*
   corporation; and DOES 1 through 10,      *Motion, Separate Statement, Appendix*
19 inclusive,                               *of Declarations and Exhibits, Notice of*
                                            *Lodging, and Proposed Judgment*]
20        Defendants.
                                            Hearing
21                                          Date:    April 18, 2022
                                            Time:    1:30 p.m.
22                                          Place:   Courtroom 7D
                                                     First Street Courthouse
23                                                   350 West 1st Street
                                                     Los Angeles, CA 90012
24
25                                          Action filed:  February 7, 2021
                                            FPTC:          June 27, 2022
26                                          Trial:         July 26, 2022
27
28

# **TABLE OF CONTENTS**

1.   INTRODUCTION ............................................................................... 7

2.   SUMMARY OF UNDISPUTED FACTS ...................................... 8

    A.   Kat Von D and Her Companies ............................................... 8

    B.   The Miles Davis Tattoo Inked on Blake Farmer's Body ..................... 9

        (1)   The Impetus for the Tattoo ........................................... 9

        (2)   Kat's Process for Inking the Tattoo on Mr. Farmer ................... 9

    C.   The Purpose and Meaning of Mr. Farmer's Tattoo ........................... 10

        (1)   Mr. Farmer's Intended Meaning of His Tattoo ....................... 10

        (2)   Kat's Artistic Intent in Creating the Tattoo ............................ 10

    D.   Social Media Posts of the Tattoo ........................................... 11

    E.   Customs and Practices within the Tattoo Profession .......................... 11

    F.   Plaintiff's "Silence" Photograph and its Meaning ............................ 12

    G.   Plaintiff's Claimed Single Instance of Licensing Tattoo Use ........... 12

3.   FAIR USE BARS ALL OF THE INFRINGEMENT CLAIMS ................... 13

    A.   Summary of Fair Use Principles ........................................... 13

    B.   First Factor (Purpose and Character of the Use):  Like Nearly All Tattoos, Farmer's Tattoo Conveys a Different Meaning Than the Photograph That Was Used to Create It ............... 14

        (1)   The Use Here is Highly Transformative ............................. 15

        (2)   The Use Here Was Not Commercial ................................. 17

    C.   Second Factor (Nature of the Copyrighted Work):  The "Silence" Photograph Has Been Widely Published for Over 30 Years ............. 18

    D.   Third Factor (Amount and Substantiality of the Use):  The Photograph Is Not Meaningfully Divisible and Kat's Use Was Tethered to a Valid and Transformative Purpose ........................... 19

    E.   Fourth Factor (Effect of the Use on the Market for the Work): The Tattoo is Not a Market Substitute for the Photograph, and There is No Market for Licensing Copyrighted Materials to Be Used As Tattoos ............................................................... 20

    F.   Non-Statutory Factor:  Fundamental Rights of Bodily Integrity And Personal Expression ................................................... 22

**TABLE OF CONTENTS**
(Continued)

G.  Balancing the Factors Confirms that the Tattoo is a Fair Use ............ 23

H.  Balancing the Factors Confirms that the Social Media Posts Are Also Protected by Fair Use ........................................... 24

4.  ALL INFRINGEMENT CLAIMS AGAINST DEFENDANT KVD INC. MUST FAIL .................................................. 25

A.  There Is No Evidence that KVD Inc. is Responsible for Direct Copyright Infringement ......................................... 25

B.  KVD Inc. Had No Right or Ability to Supervise the Alleged Infringement and Is Thus Not Vicariously Liable .............. 25

C.  KVD Inc. Did Not Contribute To or Induce the Alleged Infringement and Is Thus Not Contributorily Liable ........... 27

5.  THE FOURTH CLAIM UNDER 17 U.S.C. § 1202 MUST FAIL ............. 27

A.  Plaintiff Cannot Prove His Claim for Removal of CMI .................... 27

B.  Plaintiff Cannot Prove His Claim For Falsification of CMI .............. 28

6.  IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT IS PROPER AS TO REMEDIES ..................................... 29

A.  Plaintiff Has No Evidence of Actual Damages .................................. 29

B.  Plaintiff Has No Evidence of Defendants' Profits ............................ 30

7.  CONCLUSION ......................................................... 31

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF AUTHORITIES</u>

<u>CASES:</u>                                                                        <u>PAGES:</u>

*A&M Records, Inc. v. Napster, Inc.*,
    239 F.3d 1004 (9th Cir. 2001) ...............................................25, 27

*Anderson v. City of Hermosa Beach*,
    621 F.3d 1051 (9th Cir. 2010) ...................................................... 16

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994) ........................................13, 14, 18, 19, 20

*Eldred v. Ashcroft*,
    537 U.S. 186 (2003) ....................................................................... 22

*Ellison v. Robertson*,
    357 F.3d 1072 (9th Cir. 2004)...................................................... 26

*Elvis Presly Enters., Inc. v. Passport Video*,
    349 F.3d 622 (9th Cir. 2003) ........................................................ 18

*Falkner v. Gen. Motors LLC*,
    393 F. Supp. 3d 927, 938 (C.D. Cal. 2018)................................... 28

*Folkens v. Wyland Worldwide, LLC*,
    882 F.3d 768 (9th Cir. 2018)........................................................ 18

*Fox Broad. Co. v. Dish Network LLC*,
    747 F.3d 1060 (9th Cir. 2014)...................................................... 25

*Google LLC v. Oracle Am., Inc.*,
    141 S. Ct. 1183 (2021) ...........................13, 14, 15, 17, 18, 19, 21, 23, 24, 30

*Griffo v. Oculus VR, Inc.*,
    2018 WL 6265067 (C.D. Cal. Sept. 18, 2018).............................. 30

*Harper & Row Publishers, Inc. v. Nation Enters.*,
    471 U.S. 539 (1985) ............................................................13, 18

*Hendricks v. DreamWorks, LLC*,
    2007 WL 9705916 (C.D. Cal. Nov. 20, 2007)............................... 29

*Jarvis v. K2 Inc.*,
    486 F.3d 526 (9th Cir. 2007)........................................................ 30

*Kelly v. Ariba Soft Corp.*,
    336, F.3d 811 (9th Cir. 2003) ................................................18, 19

*Mackie v. Rieser*,
    296 F.3d 909 (9th Cir. 2002)........................................................ 30

*Matthew Bender & Co. v. West Publ'g Co.*,
    158 F.3d 693 (2d Cir. 1998)......................................................... 27

1
2

## <u>TABLE OF AUTHORITIES</u>
(Continued)

3
4

*MGM Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005) ..................................................................... 27

*New London Assocs., LLC v. Kinetic Soc. LLC*,
    384 F. Supp. 3d 392 (S.D.N.Y. 2019).......................................... 26

*Oracle Am., Inc. v. Google Inc.*,
    131 F. Supp. 3d 946 (N.D. Cal. 2015) .......................................... 30

*Oracle Corp. v. SAP AG*,
    765 F.3d 1081 (9th Cir. 2014)............................................. 29, 30,

*Perfect 10, Inc. v. Giganews, Inc.*,
    847 F.3d 657 (9th Cir. 2017)......................................................... 26

*Perfect 10, Inc. v. Visa Int'l Service Ass'n*,
    494 F.3d 788 (9th Cir. 2007)......................................................... 26

*Polar Bear Prods. v. Timex Corp.*,
    384 F.3d 700 (9th Cir. 2004).......................................................... 31

*Ringgold v. Black Entm't Television, Inc.*,
    126 F.3d 70 (2d Cir. 1997) ........................................................... 21

*Sega Enters. Ltd. v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1992)....................................................... 13

*Seltzer v. Green Day*,
    725 F.3d 1170 (9th Cir. 2013).......................14, 15, 17, 18, 19, 20, 21, 23, 24

*Sid Avery & Assoc., Inc. v. Pixels.com, LLC*,
    479 F. Supp.3d 859 (C.D. Cal. 2020)......................................28, 29

*SOFA Entm't, Inc. v. Dodger Prods., Inc.*,
    709 F.3d 1273 (9th Cir. 2013)........................................................ 19

*Stevens v. Corelogic, Inc.*,
    899 F.3d 666 (9th Cir. 2018)......................................................... 28

*Telemasters, Inc v. Vintage Club Master Ass'n*,
    2007 WL 9706067 (C.D. Cal. May 11, 2007) ............................... 26

*VHT, Inc. v. Zillow Grp., Inc.*,
    918 F.3d 723 (9th Cir. 2019)......................................................... 27

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ..................................................................... 22

*Worldwide Church of God v. Phila. Church of God, Inc.*,
    227 F.3d 1110 (9th Cir. 2000) ...................................................... 13

1

## **TABLE OF AUTHORITIES**
(Continued)

2

3   **STATUTES:**

4   17 U.S.C. § 107(1) .................................................................................. 14

5   17 U.S.C. § 107(2) .................................................................................. 18

6   17 U.S.C. § 107(3) .................................................................................. 19

7   17 U.S.C. § 107(4) .................................................................................. 20

8   17 U.S.C. § 1202 ..................................................................................... 27

9   17 U.S.C. § 1202(a) ........................................................................... 27, 28

10   17 U.S.C. § 1202(b) ........................................................................... 27, 28

11   17 U.S.C. § 1202(b) ........................................................................... 27, 28

12   17 U.S.C. § 1202(c) .................................................................................. 29

13

14   **OTHER:**

15   M. Nimmer & D. Nimmer, *Nimmer on Copyright* (2019) ..................................... 21

16   V. Vale & A. Juno, *Modern Primitives* (Re/Search Publ'n 1989) .......................... 17

17

18

19

20

21

22

23

24

25

26

27

28

1    **1.    INTRODUCTION**

2        This is a case of first impression.  It raises an issue concerning the tattoo

3    profession that has never been decided before:  does a tattoo artist commit

4    copyright infringement when she uses copyrighted material as a reference for

5    creating a tattoo for her client; or is such use a fair use?  Despite the broad

6    implications a ruling in this case may have, fair use requires a case-by-case

7    analysis.  The undisputed facts of *this case* show that the use here was a fair use.

8    The Court should grant summary judgment for Defendants.

9        Here, Defendant Katherine Von Drachenberg ("Kat") inked a black-and-gray

10   portrait tattoo of the jazz musician Miles Davis for her client, non-party Blake

11   Farmer.  To create the tattoo, Mr. Farmer found online a photograph of Miles

12   Davis, and gave it to Kat to use as a reference.  Unbeknownst to them, that

13   photograph – what we refer to as the "Silence" Photograph – happened to be

14   copyrighted by Plaintiff Jeffrey Sedlik.  Consideration of the fair use factors shows

15   that Kat's use of the Photograph to create this tattoo was indeed a fair use:

16       • Kat's tattoo for Mr. Farmer was transformative because it is imbued with

17           a "new expression, meaning or message" that is particular to Mr. Farmer.

18           By having this image permanently imprinted on his body, Farmer

19           intended to evoke personal memories of his college years studying jazz,

20           and the personal significance to him of Miles Davis, with whom he shares

21           a "rebellious spirit."  Like nearly all tattoos, *this* tattoo is part of the

22           "visible inventory" of Mr. Farmer's life story.  Its meaning and purpose

23           are different than the original "Silence" Photograph.

24       • Kat's creation of this tattoo was actually non-commercial:  she stopped

25           charging for tattoos over a decade ago, and did this tattoo for free.  Her

26           related social media posts were, at most, only incidentally commercial.

27       • Kat's tattoo is in no way a market substitute for Plaintiff's "Silence"

28           Photograph.  Nor is there a current or traditional market within the tattoo

profession for licensing copyrighted materials to be used as references for tattoos. To the contrary, using copyrighted or copyrightable material as references for tattoos is ubiquitous throughout the profession; and the custom and practice is that tattoo artists ***do not*** seek licenses for such uses.

- Plaintiff's "Silence" Photograph has been widely published for over 30 years, affording Plaintiff ample control over the work's first appearance.
- The "Silence" Photograph's image is not meaningfully divisible, and Kat's using it as reference was for a valid and transformative purpose.

Balancing the fair use factors on the undisputed facts, the Court should grant this motion and rule that Kat's tattoo and related social media posts are fair uses.

This motion also seeks partial summary judgment for Defendant Kat Von D, Inc. (an entity that had nothing to do with the creation of the tattoo here) and on Plaintiff's claims under 17 U.S.C. § 1202 and for certain types of monetary relief (claims which he cannot prove). The Court should grant this motion in its entirety.

## 2.   SUMMARY OF UNDISPUTED FACTS

### A.   Kat Von D and Her Companies.

Defendant Katherine Von Drachenberg is professionally known as "Kat Von D." UF 1. She is a renowned tattoo artist, and has special expertise in inking "black and gray" style portrait tattoos. UFs 2-3. She hasn't charged a client for inking a tattoo since at least 2012. UF 4. Nowadays, she only inks tattoos for her friends and close acquaintances. UFs 5-6.

Defendant High Voltage Tattoo, Inc. ("High Voltage") was the operating company for Kat's tattoo shop in West Hollywood. UF 7. The shop closed in November 2021. UF 8. The shop was a passion project for Kat and its purpose was not to generate revenue. UFs 9-10. She created it just to have a space for her to tattoo. UF 11. The other tattoo artists at the shop would contribute a small percentage of their fees to cover the shop's rent and keep the majority of whatever they earned. UFs 12-13.

Defendant Kat Von D, Inc. ("KVD Inc.") is a another company owned by Kat.  UF 14.  This company has nothing to do with tattooing.  UF 15.  Instead, it is involved in all of Kat's commercial enterprises outside of tattooing, such as television appearances and film.  UF 16-17.  KVD Inc. holds no ownership interest in High Voltage.  UF 18-19.

### B.    The Miles Davis Tattoo Inked on Blake Farmer's Body.

#### (1)    The Impetus for the Tattoo.

Non-party Blake Farmer is a lighting technician who once worked on a film project with Kat.  UF 20.  During one of the breaks, Farmer chatted with Kat and mentioned that he had many tattoos.  UF 21.  Kat asked him if he wanted to get a tattoo from her, and he said yes.  UF 22.  Farmer told her that it would be really awesome to get a tattoo of the jazz musician Miles Davis, and that she would be the perfect person to do it.  UF 23.

Farmer had ideas of getting a portrait tattoo of Miles Davis ever since he was in college.  UF 24.  Farmer considered Miles Davis an important figure to him, personally.  UF 25.  Farmer began playing trumpet in 6th grade, and played all through middle school, high school, and college.  UF 26.  He began developing a particular appreciation for Miles Davis while studying jazz in college.  UF 27.  Davis played the trumpet, as did Farmer.  UF 28.  In Farmer's view, he and Davis also shared a "rebellious spirit."  UF 29.  Finally, as a jazz enthusiast and amateur historian, Farmer just always identified with Miles Davis.  UF 30.

As was her practice in 2017, neither Kat nor High Voltage charged Farmer for inking his Miles Davis tattoo; Kat did the tattoo for free.  UF 31.

#### (2)    Kat's Process for Inking the Tattoo on Mr. Farmer.

The tattoo was inked over the course of at least two sessions in 2017.  UF 32.  Mr. Farmer found a photograph of Miles Davis online by doing a Google search.  UF 33.  He texted the photo to Kat's assistant in advance of the first session, and he brought in a printout of the photo when he came to High Voltage for the first

session.  UFs 34-35.  The photograph that Mr. Farmer found online did not contain a copyright symbol or anything else indicating it was copyrighted.  UF 36.

To ink the tattoo, Kat took a number of steps.  As preliminary steps, she created a "line drawing" and a "stencil" based on the photograph that showed broad outlines of the tattoo.  UFs 40-51.  Her main work – that is, the permanent tattooing – was done in the "freehand" method, using the photograph as a reference.  UF 53.  Her interpretation added the appearance of movement by adding and shading waves of smoke around the perimeter of Miles Davis's hair and hand.  UFs 59-60, 74-76.  This smoke also created a sentiment of melancholy.  UF 77.  Her interpretation also eliminated the stark, black background that dominates the Photograph.  UFs 68-70.  Instead, during the shading process she created a lighter and softer image in which Miles Davis's face stands out from the skin and maps onto the contours of Farmer's arm.  UFs 70-71.  Finally, her interpretation added additional shading, highlights, and texture to parts of Miles Davis's face and hand.  UF 78-81.

## C.   The Purpose and Meaning of Mr. Farmer's Tattoo.

### (1)   Mr. Farmer's Intended Meaning of His Tattoo.

To Mr. Farmer, the meaning of his tattoo is two-fold.  First, it is a callback to the times in his life when he studied and played jazz, particularly his college years.  UF 83.  Second, it represents the fact that he is still an avid listener of jazz and of Miles Davis's music in particular.  UF 84.

Mr. Farmer considers his Miles Davis tattoo part of a "visible inventory" of himself.  UF 85.  He has many other tattoos, and nearly every one of them has some personal meaning to him.  UF 86.

### (2)   Kat's Artistic Intent in Creating the Tattoo.

When Kat does portrait tattoos in general, she attempts to get a feel for who the subject of the portrait is and what the subject means to the client on whose body

1  the portrait tattoo will be inked.  UF 87.  Her goal is to have her interpretation of

2  the tattoo fit her client as an individual.  UF 88.

3      Here, Kat understood that Miles Davis was a figure who meant a lot to

4  Mr. Farmer.  UF 89.  Her goal was to create a sentiment on Mr. Farmer's body that

5  both evoked melancholy and had movement in it.  UF 90.  She achieved this

6  through her artistic skills with shading, texture, and adding movement around

7  Davis's hair and other parts of the tattoo.  UF 91.

8      **D.    <u>Social Media Posts of the Tattoo</u>.**

9      Kat and High Voltage posted three photographs of the tattoo among certain

10  of their social media accounts.  The first was a photo showing Kat in the middle of

11  inking the tattoo, with a printout of the Photograph in the background hanging from

12  a lamp.  UF 95; Exs. 203-04, 212-13.  The second was a "messy" progress photo of

13  a portion of the tattoo, with ink running down Mr. Farmer's skin.  UF 96; Exs. 207-

14  08.  The third was a photo of the completed tattoo.  UF 97; Exs. 209-11, 214-16.

15  Kat also posted a short video to her Instagram "highlights" of her in the process of

16  inking the tattoo.  UFs 98-99; Ex. 218.

17      **E.    <u>Customs and Practices within the Tattoo Profession</u>.**

18      Using copyrighted or copyrightable source materials as reference materials

19  for creating tattoos is a common practice within the tattoo profession.  UF 109.  The

20  range of such materials is vast, and includes without limitation photographs,

21  paintings, drawings, sketches, album covers, cartoon characters, lines of poetry,

22  lines of prose, excerpts from plays, short poems, quotations, sheet music, still-

23  frames from film, famous art works, and other fine arts.  UF 110.

24      Further, it is a common practice for the client to select and provide these

25  source materials to the tattoo artist, for inking the tattoo that the client wants.

26  UF 113.  As a matter of current and historical practice, tattoo artists do not check to

27  determine if the client-provided source material is protected by copyright.  UF 114.

28

1    There is no market in the tattoo industry for licensing copyrighted or
2    trademarked materials to be used as reference materials for tattoos.  UF 104.
3    Rather, as a matter of both current and historical practice, tattoo artists have *not*
4    sought licenses from the owners of source materials when they create tattoos that
5    are based on those source materials.  UFs 105-06.  This practice is ubiquitous
6    throughout the industry.  UF 108.  There is no indication that a market for such
7    licenses is even likely to develop.  UF 107.

8            **F.      Plaintiff's "Silence" Photograph and its Meaning**.

9        The "Silence" Photograph is a photograph, not a tattoo design.  UF 136.
10   Sedlik took the photograph in 1989, in connection with a photo shoot for Jazziz
11   magazine.  UF 137.  One of the meanings that Sedlik intended to convey in the
12   Photograph was a comment on Miles Davis's use of "negative space" in his musical
13   works – referring to Davis's groundbreaking use of silence, low volumes, and
14   pauses in between notes, and how the silent spaces between notes can be just as
15   important as the notes themselves.  UF 138.

16       The "Silence" Photograph was published in the August / September 1989
17   issue of Jazziz magazine, which was widely published throughout the United
18   States.  UFs 142-43.

19           **G.      Plaintiff's Claimed Single Instance of Licensing Tattoo Use**.

20       Sedlik "believes" he licensed the "Silence" Photograph for use in a tattoo on
21   one occasion that "could be between six to ten years ago."  UF 144.  There was
22   only one such occasion.  UF 145.  He doesn't know the name of the person to
23   whom he supposedly granted this license.  UF 146.  While his licenses for the
24   "Silence" Photo are normally in writing, Sedlik was unable to find this claimed
25   license.  UFs 147-48.  He did not produce it in discovery.  UF 149.  He does not
26   recall the price of the license, whether it was more or less than $100, or whether he
27   even received any consideration for it.  UFs 150-52.

28

**3.     FAIR USE BARS ALL OF THE INFRINGEMENT CLAIMS.**

The first three of Plaintiff's claims are for direct, vicarious, and contributory copyright infringement.  All of these claims are barred by the fair use defense.

**A.     Summary of Fair Use Principles.**

The fair use doctrine "permits and requires courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994).  As the Supreme Court affirmed last year, the basic purpose of the doctrine is "providing a context-based check that can help to keep a copyright monopoly within its lawful bounds." *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1198 (2021).

Section 107 of the Copyright Act sets out four statutory factors that the Court must consider.  "All [four statutory factors] are to be explored, and the results weighted together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578.  "The task is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis." *Id*. at 577.

Section 107's "list of factors is not exhaustive," "the examples it sets forth do not exclude other examples," and "some factors may prove more important in some contexts than others." *Google*, 141 S. Ct. at 1197.  "Rather, the doctrine of fair use is in essence 'an equitable rule of reason.'" *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1522 (9th Cir. 1992) (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985)).

"Fair use is a mixed question of law and fact.  If there are no genuine issues of material fact, or if, even after resolving all issues in favor of the opposing party, a reasonable trier of fact can reach only one conclusion, a court may conclude as a matter of law whether the challenged use qualifies as a fair use of the copyrighted work." *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110,

1115 (9th Cir. 2000).  Where the material, historical facts are not in dispute, there is

no "right to have a jury resolve a fair use defense."  *Google*, 141 S. Ct. at 1200.

**B.**     **First Factor (Purpose and Character of the Use):  Like Nearly All Tattoos, Farmer's Tattoo Conveys a Different Meaning Than the Photograph That Was Used to Create It.**

The first factor is "the purpose and character of the use, including whether

such use is of a commercial nature or is for nonprofit educational purposes."  17

U.S.C. § 107(1).  The "central purpose" of this factor is to determine "whether and

to what extent the new work is transformative."  *Campbell*, 510 U.S. at 579.

Transformative works "lie at the heart of the fair use doctrine's guarantee of

breathing space within the confines of copyright, and the more 'transformative' the

new work, the less will be the significance of other factors."  *Id*. (cleaned up).

*Campbell* holds that a new work transforms a prior work when "the new

work . . . ***adds something new, with a further purpose or different character,***

***altering the first with new expression, meaning or message***."  *Campbell*, 510 U.S.

at 579 (emphasis added); *cf. Seltzer v. Green Day*, 725 F.3d 1170, 1176 (9th Cir.

2013) (describing this statement as "the most definitive formulation of the test"); *cf.*

*Google*, 141 S. Ct. at 1202-03 (also affirming this language in *Campbell*).

The Ninth Circuit's most recent and leading fair use case in the context of

pictorial and graphic works, *Seltzer v. Green Day*, also described what it means to

be "transformative" as follows:

> The use must be productive and must employ the quoted
>
> material in a different manner or for a different purpose
>
> from the original. . . .  If . . . the secondary use adds value
>
> to the original – if the quoted matter is used as raw
>
> material, transformed in the creation of new information,
>
> new aesthetics, new insights and understandings – this is

1    the very type of activity that the fair use doctrine intends

2    to protect for the enrichment of society.

3    *Seltzer*, 725 F.3d at 1176 (quoting P. Leval, *Toward a Fair Use Standard*, 103

4    Harv. L. Rev. 1105, 1111 (1990)).

5        "In the typical 'non-transformative' case, the use is one which makes no

6    alteration to the **expressive content or message** of the original work." *Seltzer*, 725

7    F.3d at 1177 (emphasis original). "In contrast, an allegedly infringing work is

8    typically viewed as transformative as long as new expressive content or message is

9    apparent." *Id*. "This is so even where . . . the allegedly infringing work makes few

10   physical changes to the original or fails to comment on the original." *Id*. at 1177-

11   78; *cf. Google*, 141 S. Ct. at 1203 ("An artistic painting might, for example, fall

12   within the scope of fair use even though it precisely replicates a copyrighted

13   advertising logo to make a comment about consumerism.") (cleaned up).

14           **(1)    The Use Here is Highly Transformative.**

15       Here, Mr. Farmer's tattoo is transformative for at least three reasons.

16       First, Farmer's tattoo presents "new expression, meaning, or message" that is

17   personal to Mr. Farmer and arises by virtue of the image being tattooed on his

18   living body. The meaning he intended to convey is two-fold: the tattoo is a

19   personal callback to his years in college when he studied and played jazz, and a

20   symbol of the fact that he remains an avid listener of jazz and Miles Davis's music.

21   UFs 82-84. The tattoo also represents the personal significance of Miles Davis to

22   Mr. Farmer, in that Farmer personally identifies with Davis and finds in Davis a

23   similar "rebellious spirit." UFs 24-30. Finally, the upper-right arm of Mr.

24   Farmer's body cannot be considered in isolation. Mr. Farmer's tattoo of Miles

25   Davis is but a part of a "visible inventory" of himself, consisting of multiple tattoos

26   that each have personal significance. UFs 85-86.

27       This is flatly different from the message of the original "Silence"

28   Photograph. While Sedlik may have intended many messages, the "Silence"

-15-

Photograph clearly says nothing about Blake Farmer or his life's story. UF 139. Rather, Sedlik sought to comment on Davis's use of silence and "negative space" in his music. UF 138. And despite Sedlik's intended "purpose" of maximizing his ability to commercially exploit the legal monopoly conferred by the Photograph, UF 141, his work is a photograph and not a tattoo design. UF 138.

Kat's artistic intent is also relevant, and the meaning she intended to convey was consistent with Farmer's meaning. She understood that Miles Davis was a figure who meant a lot to Farmer, and her goal was to create a sentiment of Davis on Farmer's body that evoked melancholy and had movement in it. UFs 89-90. This is also different from the message of the "Silence" Photograph.

Second, *by their very nature*, nearly all tattoos create "new expression, meaning, or message" as a result of being permanently imprinted onto a living human's body. A tattoo's meaning is something deeply personal to the particular individual who wears it. UF 119. Tattoo artists strive to fulfill their client's desires by tattooing imagery that is representative of their client's identity. UF 118. Both the client's choice of source material, and the tattoo artist's specific way of rendering the tattoo, blend together into a unique work. UF 122. This creates new meaning in the resulting tattoo – precisely as a result of the tattoo's being imprinted onto the skin of a living human's body. UF 121. In addition to being personal, that meaning may also be deeply private and not immediately obvious to an observer. UF 126.

As a matter of law, the Ninth Circuit has expressly recognized that "a permanent tattoo often carries a message quite distinct from displaying the same words or picture through some other medium, and provides information about the identity of the speaker." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1067 (9th Cir. 2010) (cleaned up). "A tattoo suggests that the bearer of the tattoo is highly committed to the message he is displaying: by permanently engrafting a phrase or image onto his skin, the bearer of the tattoo suggests that the phrase or

-16-

1  image is so important to him that he has chosen to display the phrase or image

2  every day for the remainder of his life." *Id.*

3      Tattoos are certainly works of art.  But they are not *pieces* of art, like

4  paintings or sculptures, which can be bought and sold on the open market, or

5  displayed in museums, private salons, or one's home.  Nor are they transformative

6  merely because they take an image and depict it in the different medium of skin.

7  Rather, an individual's decision to have an image permanently imprinted onto her

8  body imbues the resulting tattoo with a new and different meaning – one that is

9  personal to the tattoo's bearer.[1]

10      Third, Kat did not just Xerox a copy of the Photograph onto Farmer's arm.

11  As set forth in Part 2.B(2) above, while she used the Photograph as a reference, she

12  inked the tattoo in the "freehand" method and engrafted her own interpretation –

13  one that added the appearance of *movement* by adding and shading waves of smoke

14  around the perimeter of Miles Davis's hair and hand; created a sentiment of

15  melancholy; and eliminated the stark, black background that dominates the

16  Photograph.  She instead created a lighter and softer image in which Miles Davis's

17  face stands out from the skin and maps onto the contours of Farmer's arm.  UFs 51-

18  81.  In this way, the reference material was transformed in the process of creating a

19  "new aesthetic." *Seltzer*, 725 F.3d at 1176.

20          **(2)    The Use Here Was Not Commercial.**

21      The first factor includes an analysis of "whether such use is of a commercial

22  nature."  17 U.S.C. § 107(1).  "There is no doubt that a finding that copying was not

23  commercial in nature tips the scales in favor of fair use." *Google*, 141 S. Ct. at

24  1204.  "***But the inverse is not necessarily true, as many common fair uses are***

25  _____

26  [1]     As one influential text puts it: "a tattoo is more than a painting on skin; its
meaning and reverberations cannot be comprehended without a knowledge of the
27  history and mythology of its bearer.  Thus it is a true poetic creation, and is always
more than meets the eye.  As a tattoo is grounded on living skin, so its essence
28  emotes a poignancy unique to the mortal human condition."  V. Vale & A. Juno,
*Modern Primitives* 5 (Re/Search Publ'n 1989) (cited in Ex. 224 at 8).

1     ***indisputably commercial.***"  *Id.* (emphasis added).  Rather, "the degree to which the

2     new user exploits the copyright for commercial gain – as opposed to ***incidental use***

3     as part of a commercial enterprise – affects the weight we afford to commercial

4     nature as a factor."  *Elvis Presly Enters., Inc. v. Passport Video*, 349 F.3d 622, 627

5     (9th Cir. 2003) (emphasis added).

6        Here, neither Kat nor High Voltage charged Mr. Farmer for inking the tattoo;

7     they did it for free.  UF 31.  She stopped tattooing for payment in approximately

8     2012, and only tattoos for friends and close acquaintances.  UFs 4-6.  So the use

9     here was simply not commercial at all, and not even incidentally commercial.

10      **C.**     **Second Factor (Nature of the Copyrighted Work):  The "Silence"**

11          **Photograph Has Been Widely Published for Over 30 Years.**

12        The second factor is "the nature of the copyrighted work."  17 U.S.C.

13     § 107(2).  This factor requires consideration of two aspects.  First, it recognizes that

14     "some works are closer to the core of intended copyright protection than others."

15     *Campbell*, 510 U.S. at 586.  While the "Silence" Photograph is indeed a creative

16     work, "copyright protection is 'thin'" when "copyrightable material is bound up

17     with uncopyrightable material."  *Google*, 141 S. Ct. at 1198; *cf. Folkens v. Wyland*

18     *Worldwide, LLC*, 882 F.3d 768, 770 (9th Cir. 2018) ("a collection of unprotectible

19     elements – pose, attitude, gesture, muscle structure, facial expression, coat, and

20     texture – may earn 'thin copyright' protection").

21        Second, this factor considers "the extent to which a work has been

22     published."  *Seltzer*, 725 F.3d at 1178.  "The fact that a work is ***unpublished*** is a

23     ***critical element*** of its 'nature.'"  *Harper & Row*, 471 U.S. at 564 (emphasis added).

24     Conversely, "[p]ublished works are more likely to qualify as fair use because the

25     first appearance of the artist's expression has already occurred."  *Kelly v. Ariba Soft*

26     *Corp.*, 336, F.3d 811, 820 (9th Cir. 2003).  The copyright holder can thus "control

27     the first public appearance of his work."  *Seltzer*, 725 F.3d at 1178 (cleaned up).

28

Here, the "Silence" Photograph was widely published throughout the United States, and has been so since 1989.  UFs 142-43.  Sedlik thus had control over the first public appearance of his work, and has had that control for over three decades.  The published nature of the Photograph thus "mitigat[es]" any weight due to the Photograph's being a creative work.  *See Seltzer*, 725 F.3d at 1178.

### D. Third Factor (Amount and Substantiality of the Use):  The Photograph Is Not Meaningfully Divisible and Kat's Use Was Tethered to a Valid and Transformative Purpose.

The third factor is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole."  17 U.S.C. § 107(3).  This factor "looks to the quantitative amount and qualitative value of the original work used in relation to the justification for that use."  *Seltzer*, 725 F.3d at 1178 (citing *SOFA Entm't, Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1279 (9th Cir. 2013).  However, this factor is mitigated when the original work is "not meaningfully divisible."  *Seltzer*, 725 F.3d at 1178.  The factor "will not weigh against an alleged infringer, even when he copies the whole work, if he takes no more than is necessary for his intended use."  *Id*. (citing *Kelly*, 336 F.3d at 820-21).

This factor also overlaps somewhat with the first factor:  the "extent of permissible copying varies with the purpose and character of the use."  *Campbell*, 510 U.S. at 586-87.  Where "use of the entire work was necessary to achieve" the accused infringer's "new expression, meaning or message," then the third factor does not weigh against the accused infringer.  *Seltzer*, 725 F.3d at 1178-79; *cf. Google*, 141 S. Ct. at 1205 ("The 'substantiality' factor will generally weigh in favor of fair use where . . . the amount of copying was tethered to a valid, and transformative, purpose.").

Here, the "Silence" Photograph's image of Miles Davis posed with his index finger to his lips is not meaningfully divisible.  To the extent this pose is even a protectible element, Kat use this image of Davis's face and hand, and not more, as a

-19-

1    necessary reference to create her tattoo.  She did not incorporate other elements of

2    the Photograph, such as the stark, black background.  UFs 68-73.  But most

3    important, her use of this reference material was tethered to a valid and

4    transformative purpose in creating the tattoo.  Given their permanence on the body,

5    tattoo artists generally ***need*** to have references to create tattoos.  UF 135.

6        **E.**    **<u>Fourth Factor (Effect of the Use on the Market for the Work):</u>**

7        **<u>The Tattoo is Not a Market Substitute for the Photograph, and</u>**

8        **<u>There is No Market for Licensing Copyrighted Materials to Be</u>**

9        **<u>Used As Tattoos</u>.**

10   The fourth factor asks what effect the allegedly infringing use has on the

11   "potential market for or value of the copyrighted work."  17 U.S.C. § 107(4).  This

12   factor has been described as considering three issues.

13   <u>First</u>, this factor considers "the extent of market harm caused by the

14   particular actions of the alleged infringer [and] also whether unrestricted and

15   widespread conduct of the sort engaged in by the defendant would result in a

16   substantially adverse impact on the potential market for the original."  *Campbell*,

17   510 U.S. at 590.  "Where the allegedly infringing use does not substitute for the

18   original and serves a 'different market function,' such factor weights in favor of fair

19   use."  *Seltzer*, 725 F.3d at 1179 (quoting *Campbell*, 510 U.S. at 591).

20   Here, the tattoo Kat inked for Mr. Farmer is in no way a substitute for the

21   primary market for Sedlik's "Silence" Photograph.  There is no evidence any

22   consumer would decline to buy a print or poster of Sedlik's Photograph because of

23   Kat's tattoo.  The Photograph and the tattoo serve completely different market

24   functions.  Sedlik even admitted that no one ever told him that they would not buy a

25   copy of his "Silence" Photograph as a result of having seen Kat's tattoo or the

26   social media posts of the tattoo.  UFs 153-54; *cf. Seltzer*, 725 F.3d at 1179 (plaintiff

27   "admitted that no one had ever told him that he would not buy his work as a result

28   of Green Day's use").

1    Second, this factor also "considers any impact on 'traditional, reasonable, or
2    likely to be developed markets.'" *Seltzer*, 725 F.3d at 1179 (quoting *Ringgold v.*
3    *Black Entm't Television, Inc.*, 126 F.3d 70, 81 (2d Cir. 1997)).  However, the
4    Supreme Court has cautioned that considering "unrealized licensing opportunities"
5    poses a "danger of circularity," because "it is a given in every fair use case that
6    plaintiff suffers a loss of a *potential* market if that potential is defined as the
7    theoretical market for licensing the very use at bar."  *Google*, 141 S. Ct. at 1207
8    (quoting 4 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 13.05[A][4] (2019)).

9        The expert testimony is undisputed that there is no market in the tattoo
10   industry for licensing copyrighted images to be used as reference materials for
11   tattoos.  UF 104.  Nor is such a market currently likely to develop.  UF 107.
12   Instead, the current and historical practice of the tattoo industry is that tattooists
13   have not sought licenses from the owners of source materials used to create tattoos.
14   UFs 105-06.

15       Sedlik offered no industry expert of his own on the subject, and could
16   identify *only one* instance in which he "believes" he licensed the "Silence"
17   Photograph to be used in a tattoo.  He couldn't find that supposed license; he
18   couldn't identify the name of the licensee; and he couldn't remember the price of
19   the license or if he even received *any* consideration for it.  UFs 144-52.  Even if this
20   fact is accepted as true, it "does not suffice to show that [Kat's] use harmed any
21   existing market or market that [Sedlik] was likely to develop."  *Seltzer*, 725 F.3d at
22   1179 (finding the same with respect to plaintiff's argument that his copyrighted
23   "Scream Icon" image was once used in a video by another band though he couldn't
24   provide any information about the licensing including revenue supposedly earned).

25       Third, this factor requires "tak[ing] into account the public benefits the
26   copying will likely produce," and whether those public benefits are "related to
27   copyright's concern for the creative production of new expression."  *Google*, 141 S.

28

Ct. at 1206; *see also id*. at 1208 (identifying the "risk of creativity-related harms to the public" as a consideration on the fourth factor that weighs in favor of fair use).

Here, the use of copyrighted and copyrightable source materials as reference materials for creating tattoos is pervasive within the tattoo profession.  UF 109. The range of such source materials is vast (UF 110), and they are often provided by the client to the tattooist without anyone checking first to determine if they are protected by copyright.  UFs 113-14.  It would impede and disrupt the settled practices of the tattoo profession, and stifle the creativity of tattoo artists, if they were required – under threat of civil liability – to obtain licenses for the source materials that are used as references in creating tattoos.  UF 115.

**F.**     **Non-Statutory Factor:  Fundamental Rights of Bodily Integrity and Personal Expression.**

This unique case presents good cause to consider a non-statutory factor:  an individual's fundamental rights to bodily integrity and personal expression.  The Ninth Circuit has expressly held that both "the tattoo itself" and "the process of tattooing" are "forms of pure expression fully protected by the First Amendment." *Anderson*, 621 F.3d at 1068 (9th Cir. 2010).  And the right to "bodily integrity" is long-recognized as one of the fundamental rights and liberty interests protected by the Due Process Clause.  *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). The fair use doctrine permits consideration of these fundamental rights.  *See Eldred v. Ashcroft*, 537 U.S. 186, 219-20 (2003) (identifying fair use as one of two "built-in First Amendment accommodations" contained within copyright law).

This case implicates not just the rights of Kat as a tattoo artist, but also the fundamental rights of her client – Mr. Farmer – to make decisions about how to express himself through *permanent markings on his body*.  A body tattoo is far more significant than a bumper sticker on one's car, or a button on one's lapel.  *See Anderson*, 621 F.3d at 1067.  Holding tattoo artists civilly liable for copyright infringement will necessarily expose the *clients* of these artists to the same civil

1  liability anytime they choose to get tattoos based on copyrighted source material,

2  display their tattooed bodies in public, or share social media posts of their tattoos.

3  That is not the law and cannot be the law.

4        **G.**    **Balancing the Factors Confirms that the Tattoo is a Fair Use.**

5        While all factors must be considered, "factor one and factor four have

6  'dominated the case law' and are generally viewed as the most important factors."

7  *Seltzer*, 725 F.3d at 1179.  On the first factor, Kat's tattoo for Mr. Farmer is

8  transformative because it conveys a new and different message than the "Silence"

9  Photograph.  The tattoo's message is unique to Mr. Farmer – a memory of his

10  college years and his personal identification with Miles Davis's "rebellious spirit" –

11  and results in part from being permanently engrafted onto Farmer's body.  Kat's

12  distinct interpretation of the tattoo also helped convey this message, and her

13  creation of this tattoo was non-commercial because she did it for free.  On the

14  fourth factor, Kat's tattoo is simply no substitute for the primary market for

15  Sedlik's Photograph; the two serve different market functions.  Nor is there a

16  traditional market in the tattoo industry for licensing copyrighted materials to be

17  used as references for tattoos.  In contrast, an adverse court ruling would cause

18  "creativity-related harms to the public" and undermine "copyright's concern for the

19  creative production of new expression."  *Google*, 141 S. Ct. at 1206, 1208.  On the

20  second factor, the fact that the Photograph was widely published and has been so

21  for over 30 years mitigates the import of this factor.  And on the third factor, the

22  Photograph's image of Davis's face and hand are not meaningfully divisible, and

23  Kat's use of the Photograph as a reference was nonetheless tethered to a valid and

24  transformative purpose.

25        Based on the undisputed facts, the Court should conclude after balancing the

26  fair use factors that the tattoo at issue is a fair use as a matter of law.

27

28

**H.** **Balancing the Factors Confirms that the Social Media Posts Are Also Protected by Fair Use.**

The social media posts depicting the tattoo in various states of progress – three distinct photographs, and one video – are also protected by fair use.

On the first factor, if the tattoo itself is transformative, then so are photographs and videos of the tattoo.  Moreover the social media posts are independently transformative.  The first photo (Exs. 203-04, 212-13), second photo (Ex. 207-08), and video (Ex. 218) do not depict the completed tattoo, but only part of the tattoo in progress.  UF 100.  And while the first photo (Exs. 203-04, 212-13) also depicts the "Silence" Photograph itself, this is clearly done for a different purpose of comparing the Photograph with Kat's progress on the tattoo.  UF 101. (The use of the Photograph here is also de minimis, constituting at most 10% of the total social media photograph and an even smaller portion of the full social media post.)  Finally, even if, *arguendo*, these posts are vaguely seen as Kat somehow "promoting her brand" or High Voltage promoting the shop, such use is "only incidentally commercial" and is not sufficient to tilt the first factor against fair use. *Seltzer*, 725 F.3d at 1178.

On the fourth factor, social media photographs and videos of the tattoo in various states of progress are not remotely substitutes for the primary market for Sedlik's Photograph.  Imposing civil liability for these social media posts also risks imposing "creativity-related harms to the public" and undermines "creative production of new expression." *Google*, 141 S. Ct. at 1206, 1208.

On the second factor, this analysis is no difference because it is concerned with the nature of the "Silence" Photograph itself.  And on the third factor, the progress photographs and video of Kat creating the tattoo are similarly tethered to a valid and transformative purpose.

Based upon the undisputed facts, the Court should conclude that the social media posts of the tattoo are also fair uses as a matter of law.

1                              *      *      *

2        For all these reasons, fair use bars Plaintiff's first claim for direct

3   infringement based on the tattoo and the social media posts.  The second and third

4   claims for contributory and vicarious infringement are consequently also so barred.

5   *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 n.2 (9th Cir. 2001).

6   **4.      ALL INFRINGEMENT CLAIMS AGAINST DEFENDANT KVD INC.**

7   **MUST FAIL.**

8        Even if Plaintiff could show a material dispute of fact on fair use, his claims

9   for direct, contributory, and vicarious infringement all fail against KVD Inc.

10       **A.      There Is No Evidence that KVD Inc. is Responsible for Direct**

11       **Copyright Infringement.**

12       Plaintiff's first claim for direct infringement alleges each of the Defendants

13  "creat[ed] infringing derivative works" by "reproducing [the Photograph] in the

14  form of a tattoo" and "publish[ed] [the Photograph by] using, reproducing,

15  displaying, and distributing [the Photograph] online and on websites. . . ."  Compl.

16  (Dkt. 1) ¶¶ 89-90.

17       There is no evidence KVD Inc. did any such thing.  To the contrary, the

18  evidence establishes KVD Inc. is a company that Kat uses for her non-tattoo-related

19  pursuits.  UFs 15-19.  Plaintiff will be unable to present any evidence that KVD

20  Inc. had any involvement in creating the tattoo or publishing the social media posts.

21  KVD Inc. is thus entitled to summary judgment on the direct infringement claim.

22  *See Fox Broad. Co. v. Dish Network LLC*, 747 F.3d 1060, 1067 (9th Cir. 2014)

23  (infringement "requires 'copying by the defendant,' . . . which comprises a

24  requirement that the defendant cause the copying").

25       **B.      KVD Inc. Had No Right or Ability to Supervise the Alleged**

26       **Infringement and Is Thus Not Vicariously Liable.**

27       To prove Plaintiff's second claim for vicarious infringement, Plaintiff "must

28  prove 'the defendant has (1) the right and ability to supervise the infringing conduct

and (2) a direct financial interest in the infringing activity.'" *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 670, 673 (9th Cir. 2017) (quoting *Perfect 10, Inc. v. Visa Int'l Service Ass'n*, 494 F.3d 788, 802 (9th Cir. 2007)).  Plaintiff can prove neither element.

Plaintiff cannot establish that KVD Inc. had the right and ability to supervise the alleged infringing conduct.  KVD Inc. is the entity used by Kat for non-tattoo-related pursuits and it has and had no ownership interest in High Voltage, the entity through which Kat pursued her tattooing activities and at which the tattoo was created.  UFs 11, 15-19.  The mere fact Kat is the owner of both High Voltage and KVD Inc. isn't sufficient to establish that KVD Inc. had the right or ability to supervise the creation of the tattoo or the social media posts.  *See New London Assocs., LLC v. Kinetic Soc. LLC*, 384 F. Supp. 3d 392, 410 (S.D.N.Y. 2019) (plaintiff's "allegations that certain individuals who were affiliated with the [defendant] Financing Entities also had roles in the management and operation of [the defendants accused of direct copyright infringement] are insufficient to state a claim for vicarious liability").

For the same reasons, Plaintiff cannot create a dispute of fact as to whether KVD Inc. had a direct financial benefit in the alleged infringing activity.  "The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits." *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) (emphasis added).  Because Kat received no compensation at all for creating the tattoo and for years has not charged for doing so, and because KVD Inc. is unrelated to Kat's activities in the field of tattooing, there is no direct financial interest received by KVD Inc.  *See Telemasters, Inc v. Vintage Club Master Ass'n*, 2007 WL 9706067, at *11 (C.D. Cal. May 11, 2007) ("Plaintiff has failed to raise a triable issue as to whether [Defendant] received a direct financial benefit from

1   another's infringing activity and Defendant is entitled to summary judgment on

2   Plaintiff's claim for vicarious copyright infringement").

3   **C.    KVD Inc. Did Not Contribute To or Induce the Alleged**

4   **Infringement and Is Thus Not Contributorily Liable.**

5   To prove Plaintiff's third claim for contributory infringement, Plaintiff must

6   prove KVD Inc. "(1) has knowledge of another's infringement and (2) either (a)

7   materially contributes to or (b) induces that infringement." *Perfect 10*, 847 F.3d at

8   870 (9th Cir. 2017).  To prove inducement liability, Plaintiff must present evidence

9   of "active steps . . . taken to encourage direct infringement." *VHT, Inc. v. Zillow*

10  *Grp., Inc.*, 918 F.3d 723, 745 (9th Cir. 2019) (quoting *MGM Studios Inc. v.*

11  *Grokster, Ltd.*, 545 U.S. 913, 936 (2005)) (citation and quotation omitted).  "Put

12  differently, liability exists if the defendant engages in 'personal conduct that

13  encourages or assists the infringement.'" *A&M Records*, 239 F.3d at 1019 (quoting

14  *Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 693, 706 (2d Cir. 1998)).

15  Again, KVD Inc. is Kat's entity for non-tattoo-related businesses, like film or

16  TV appearances.  UFs 15-17.  Plaintiff cannot create a material dispute of fact that

17  KVD Inc. materially contributed to, or induced, the alleged infringement.

18  **5.    THE FOURTH CLAIM UNDER 17 U.S.C. § 1202 MUST FAIL.**

19  Plaintiff's fourth claim for violation of 17 U.S.C. § 1202 alleges two separate

20  claims:  removal or alteration of copyright management information ("CMI") in

21  violation of Section 1202(b), and falsification of CMI in violation of

22  Section 1202(a).  Both claims fail as a matter of law.

23  **A.    Plaintiff Cannot Prove His Claim for Removal of CMI.**

24  Plaintiff alleges in conclusory fashion that Defendants "knowingly removed,

25  altered and falsified [CMI] with the intent to induce, enable, facilitate, or conceal

26  infringement. . . ."  Compl. (Dkt. 1) ¶ 120.  In essence, Plaintiff is quoting from 17

27  U.S.C. § 1202(b)(1), which provides "No person shall, without the authority of the

28  copyright owner or the law . . . intentionally remove or alter any [CMI]. . .

knowing, or . . . having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any" copyright.

To prove a violation of Section 1202(b)(1), Plaintiff must first prove that Defendants removed or altered CMI. *Falkner v. Gen. Motors LLC*, 393 F. Supp. 3d 927, 938 (C.D. Cal. 2018). Plaintiff must then also prove that Defendants "possess the mental state of knowing, or having a reasonable basis to know, that [their] actions 'will induce, enable, facilitate, or conceal' infringement." *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 673 (9th Cir. 2018). Plaintiff can prove neither.

First, the evidence is undisputed that Kat did not remove any CMI. The version of the photograph that was provided to her by Blake Farmer indisputably did not contain Sedlik's name, a copyright symbol, or any watermark. UFs 34-38. There was no CMI for Kat to remove and she did not do so. UF 39. That alone is sufficient to defeat the claim. *See Sid Avery & Assoc., Inc. v. Pixels.com, LLC*, 479 F. Supp.3d 859, 870 (C.D. Cal. 2020) (granting summary judgment on CMI claim where there is no evidence that defendant removed CMI).

Second, even if arguendo he could prove that Kat removed CMI, Plaintiff will be unable to point to any evidence that Kat had the requisite mental state of knowing or having reason to know that her actions would induce, enable, facilitate or conceal infringement. *See Stevens*, 899 F.3d at 673 (affirming grant of summary judgment on 1202(b) claim in part because plaintiffs "have not offered any evidence to satisfy that mental state requirement").

**B.     Plaintiff Cannot Prove His Claim For Falsification of CMI.**

Plaintiff also alleges Defendants "knowingly provided and/or distributed false [CMI] with the intent to induce, enable, facilitate, or conceal infringement in violation of 17 U.S.C. § 1202(a)." Compl. (Dkt. 1) ¶ 122.

To establish liability under Section 1202(a), Plaintiff must show Defendants "knowingly and with the intent to induce, enable, facilitate, or conceal infringement" either (1) "provide[d] [CMI] that is false," or (2) "distribute[d] or

import[ed] for distribution [CMI] that is false." *Sid Avery & Assocs.*, 479 F. Supp. 3d at 870.  Plaintiff cannot prove any of these elements.

First, Defendants didn't provide false CMI.  Section 1202(c) defines CMI as the following kinds of information:  the work's title, the name of the work's author and the copyright owner, terms and conditions for use of the work, and identifying numbers or symbols referring to such information.  17 U.S.C. § 1202(c)(1)-(8). Neither the tattoo itself nor the social media posts contain any of this information regarding Plaintiff's Photograph, UFs 95-98, so Defendants didn't "falsify" anything.  Plaintiff's claim must fail for this reason alone.

In addition, even if Plaintiff could prove Defendants provided false CMI, Plaintiff must also put forth evidence showing that Defendants – and each of them – did so knowingly and with the intent to induce, enable, facilitate or conceal infringement.  Plaintiff cannot provide any such evidence.  His fourth claim for violation of 17 U.S.C. § 1202 must fail in its entirety.

## 6.   **IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT IS PROPER AS TO REMEDIES.**

In the alternative, partial summary judgment should be granted that Plaintiff cannot prove any actual damages or Defendants' profits.

### A.   **Plaintiff Has No Evidence of Actual Damages.**

On a copyright infringement claim, "[a]ctual damages represent the extent to which infringement has injured or destroyed the market value of the copyrighted work at the time of infringement." *Hendricks v. DreamWorks, LLC*, 2007 WL 9705916, at *2 (C.D. Cal. Nov. 20, 2007) (citation omitted).  In addition, a plaintiff may recover "hypothetical-license damages" based on "the amount a willing buyer would have been reasonably required to pay a willing seller at the time of the infringement for the actual use made by [the infringer] of the plaintiff's work." *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1087 (9th Cir. 2014).  The question "is not what the owner would have charged, but rather what is the fair market value."

1  *Oracle*, 765 F.3d at 1088 (quoting *Jarvis v. K2 Inc.*, 486 F.3d 526, 534 (9th Cir.
2  2007)).

3        Here, when asked at his deposition if the market value of the "Silence"
4  Photograph had decreased as a result of the alleged infringements, Plaintiff
5  conceded that he had not had the Photograph appraised before or after the alleged
6  infringements, and that he couldn't quantify any decrease.  UFs 155-56.   Moreover,
7  though Plaintiff designated ***himself*** as his own rebuttal expert witness in this case,
8  his rebuttal report did not discuss any decrease in the market value of the
9  Photograph.  UF 157.  Nor did his report say anything about the fair market value
10  of a license to use the Photograph on a tattoo.  UF 158.  Nor would Plaintiff have
11  the basis to provide an opinion on this subject:  he claims to have licensed the
12  Photograph for tattoo use only once, but can't find any documentation reflecting
13  that license, can't remember name of licensee, and can't recall whether he even
14  received any consideration.  UFs 144-52.

15        Therefore, based on the undisputed facts, Plaintiff will not be able to carry
16  his burden of proving actual damages.

17        **B.**    **Plaintiff Has No Evidence of Defendants' Profits.**

18        Plaintiff will also be unable to establish a claim for Defendants' profits.
19  There are two kinds of profits that can be recovered for copyright infringement.
20  "Direct profits are 'those that are generated by selling an infringing product.'"
21  *Griffo v. Oculus VR, Inc.*, 2018 WL 6265067, at *8 (C.D. Cal. Sept. 18, 2018)
22  (quoting *Mackie v. Rieser*, 296 F.3d 909, 914 (9th Cir. 2002)).   The only potential
23  direct profits in this case would be if Kat received payment for creating the tattoo;
24  but the evidence is undisputed that she didn't.  UF 31.

25        That leaves indirect profits, and to obtain such profits, "it is the copyright
26  owner's burden to present proof of the infringer's gross revenue from the infringing
27  product."  *Oracle Am., Inc. v. Google Inc.*, 131 F. Supp. 3d 946, 949 (N.D. Cal.
28  2015); *see also Griffo*, 2018 WL 6265067 at *10 ("a plaintiff seeking to recover

1   indirect profits must 'formulate the initial evidence of gross revenue duly

2   apportioned to relate to the infringement' and may not simply 'toss up an

3   undifferentiated gross revenue number'") (quoting *Polar Bear Prods. v. Timex*

4   *Corp.*, 384 F.3d 700, 711 (9th Cir. 2004)).

5        Plaintiff cannot put on any evidence of Defendants' respective gross

6   revenues ***because he doesn't have that evidence***.  Plaintiff never requested that

7   information during discovery and it was never provided.  UF 159.  Therefore,

8   unable to prove any of the Defendants' gross revenues, Plaintiff cannot prove

9   entitlement to Defendants' profits.

10  **7.     CONCLUSION**

11       This case is a stark reminder that "over-protecting" intellectual property –

12  and thereby stifling the creative expression that copyright seeks to promote – can be

13  just as harmful as under-protecting it.  For all the reasons herein, Defendants

14  respectfully request summary judgment in their favor.

15

16  Dated:  March 16, 2022       Respectfully submitted,

17                       GRODSKY, OLECKI & PURITSKY LLP
                      Allen B. Grodsky
                      John J. Metzidis

18

19                    By:  ___/s/ Allen B. Grodsky_____
                         Allen B. Grodsky

20

21                    Attorneys for Defendants Katherine Von
                  Drachenberg, Kat Von D, Inc., and High Voltage
                  Tattoo, Inc.

22

23

24

25

26

27

28