1  GRODSKY, OLECKI & PURITSKY LLP
   Allen B. Grodsky (SBN 111064)
2  *allen@thegolawfirm.com*
   John J. Metzidis (SBN 259464)
3  *john@thegolawfirm.com*
   11111 Santa Monica Boulevard, Suite 1070
4  Los Angeles, California 90025
   Telephone:   (310) 315-3009
5  Facsimile:   (310) 315-1557

6  Attorneys for Defendants
   Katherine Von Drachenberg, Kat Von D, Inc.,
7  and High Voltage Tattoo, Inc.

8

9                   UNITED STATES DISTRICT COURT

10                   CENTRAL DISTRICT OF CALIFORNIA

11                        WESTERN DIVISION

12
   JEFFREY B. SEDLIK, an individual;        Case No. 2:21-cv-01102-DSF-MRWx
13
          Plaintiff,                        Before the Hon. Dale S. Fischer,
14                                          U.S. District Judge
       vs.
15                                          **SEPARATE STATEMENT OF
   KATHERINE VON                            UNCONTROVERTED FACTS AND
16  DRACHENBERG (a.k.a. "KAT                CONCLUSIONS OF LAW IN
   VON D"), an individual; KAT              SUPPORT OF DEFENDANTS'
17  VON D., INC., a California              MOTION FOR SUMMARY
   corporation; HIGH VOLTAGE                JUDGMENT AND PARTIAL
18  TATTOO, INC., a California              SUMMARY JUDGMENT**
   corporation; and DOES 1 through 10,
19  inclusive,                              [*Filed concurrently with Notice of
                                            Motion, Memorandum, Appendix of
20          Defendants.                     Declarations and Exhibits, Notice of
                                            Lodging, and Proposed Judgment*]
21
                                            Hearing
22                                          Date:      April 18, 2022
                                            Time:      1:30 p.m.
23                                          Place:     Courtroom 7D
                                                       First Street Courthouse
24                                                     350 West 1st Street
                                                       Los Angeles, CA 90012
25

26                                          Action filed:  February 7, 2021
                                            FPTC:          June 27, 2022
27                                          Trial:         July 26, 2022

28

Pursuant to this Court's standing Order Re Motions for Summary Judgment, Defendants Katherine Von Drachenberg, Kat Von D, Inc., and High Voltage Tattoo, Inc. (together, "Defendants") submit the following Separate Statement of Uncontroverted Facts and Conclusions of Law in support of their Motion for Summary Judgment and Partial Summary Judgment.

## UNCONTROVERTED FACTS

| Defendants' Undisputed Fact | Supporting Evidence |
| --- | --- |
| **1.** Defendant Katherine Von Drachenberg is professionally known as "Kat Von D." | Ex. 26 (Kat Depo.) at 13:14-20. |
| **2.** Defendant Katherine Von Drachenberg (hereafter "Kat") is a renowned tattoo artist. | Ex. 26 (Kat Depo.) at 15:7-19, 26:24-27:18. |
| **3.** Kat has special expertise in inking "black and gray" style portrait tattoos. | Ex. 26 (Kat Depo.) at 20:19-21:16. |
| **4.** Kat hasn't charged a client for inking a tattoo since at least 2012. | Ex. 26 (Kat Depo.) at 24:1-3. |
| **5.** Nowadays, Kat only inks tattoos for her friends and close acquaintances. | Ex. 26 (Kat Depo.) at 24:4-25:3. |
| **6.** Kat considers these tattoos a gift she gives people. | Ex. 26 (Kat Depo.) at 24:4-25:3. |

| **Defendants' Undisputed Fact** | **Supporting Evidence** |
|---|---|
| **7.** Defendant High Voltage Tattoo, Inc. ("High Voltage") was the operating company for Kat's tattoo shop in West Hollywood. | Ex. 26 (Kat Depo.) at 20:12-18. |
| **8.** The tattoo shop closed in November 2021. | Ex. 26 (Kat Depo.) at 25:17-26:23. |
| **9.** The purpose of the shop was not to generate revenue. | Ex. 26 (Kat Depo.) at 32:7-33:4. |
| **10.** Rather, the tattoo shop was a passion project for Kat. | Ex. 26 (Kat Depo.) at 32:7-33:4. |
| **11.** She created the tattoo shop just to have a space for her to tattoo. | Ex. 26 (Kat Depo.) at 32:7-33:4. |
| **12.** The other tattoo artists at the shop would contribute a small percentage of their fees and keep the majority of whatever they earned. | Ex. 26 (Kat Depo.) at 32:20-25. |
| **13.** These contributions were used to cover the shop's rent. | Ex. 26 (Kat Depo.) at 32:20-25. |
| **14.** Defendant Kat Von D, Inc. ("KVD Inc.") is a another company owned by Kat. | Ex. 26 (Kat Depo.) at 73:4-8. |
| **15.** KVD Inc. has nothing to do with tattooing. | Ex. 26 (Kat Depo.) at 25:17-26:23 & 72:12-16. |

| **Defendants' Undisputed Fact** | **Supporting Evidence** |
| --- | --- |
| **16.** Instead, KVD Inc. is involved in all of Kat's commercial enterprises outside of tattooing. | Ex. 26 (Kat Depo.) at 25:17-26:23 & 72:12-16. |
| **17.** For example, KVD Inc. handled television and film appearances for Kat. | Ex. 26 (Kat Depo.) at 71:25-72:11. |
| **18.** KVD Inc. currently holds no ownership interest in High Voltage. | Ex. 26 (Kat Depo.) at 73:9-12. |
| **19.** KVD Inc. has not ever held an ownership interest in High Voltage. | Ex. 26 (Kat Depo.) at 73:9-12. |
| **20.** Blake Farmer is a lighting technician who once worked on a film project with Kat. | Farmer Decl. ¶ 10. |
| **21.** During one of the breaks, Farmer chatted with Kat and mentioned that he had many tattoos. | Farmer Decl. ¶ 11. |
| **22.** Kat asked Farmer if he wanted to get a tattoo from her, and he said yes. | Farmer Decl. ¶ 12. |
| **23.** Farmer told Kat that it would be really awesome to get a tattoo of the jazz musician Miles Davis, and that she would be the perfect person to do it. | Farmer Decl. ¶ 12. |

| **Defendants' Undisputed Fact** | **Supporting Evidence** |
|---|---|
| **24.** Farmer had ideas of getting a portrait tattoo of Miles Davis ever since he was in college. | Farmer Decl. ¶ 7. |
| **25.** Farmer considered Miles Davis an important figure to him, personally. | Farmer Decl. ¶ 8. |
| **26.** Farmer began playing trumpet in 6th grade, and played all through middle school, high school, and college. | Farmer Decl. ¶¶ 3-6. |
| **27.** He began developing a particular appreciation for Miles Davis while studying jazz in college. | Farmer Decl. ¶ 6. |
| **28.** Davis played the trumpet, as did Farmer. | Farmer Decl. ¶ 8. |
| **29.** In Farmer's view, he and Davis also shared a "rebellious spirit." | Farmer Decl. ¶ 8. |
| **30.** As a jazz enthusiast and amateur historian, Farmer just always identified with Miles Davis. | Farmer Decl. ¶ 9. |
| **31.** As was her practice in 2017, neither Kat nor High Voltage charged Farmer for inking his Miles Davis tattoo; Kat did the tattoo for free. | Ex. 26 (Kat Depo.) at 118:25-119:2. |

| **Defendants' Undisputed Fact** | **Supporting Evidence** |
|---|---|
| **32.** Farmer's tattoo was inked over the course of at least two sessions in 2017. | Farmer Decl. ¶ 13; Ex. 26 (Kat Depo.) at 149:2-7. |
| **33.** Mr. Farmer found a photograph of Miles Davis online by doing a Google search. | Farmer Decl. ¶ 14. |
| **34.** Farmer texted the photo of Miles Davis to Kat's assistant in advance of the first session. | Ex. 26 (Kat Depo.) at 122:20-123:1, 130:3-9, 133:12-16, 134:4-135:5; Ex. 201. |
| **35.** Farmer brought in a printout of the photo of Miles Davis when he came to High Voltage for the first session. | Ex. 26 (Kat Depo.) at 122:20-123:1, 130:3-9, 133:12-16, 134:4-135:5; 137:6-8; Ex. 201. |
| **36.** The photograph that Mr. Farmer found online did not contain a copyright symbol or anything else indicating it was copyrighted. | Farmer Decl. ¶¶ 14-15. |
| **37.** The photograph that Mr. Farmer brought into the shop did not have Sedlik's name on it. | Ex. 26 (Kat Depo.) at 109:19-110:1; Farmer Decl. ¶ 15; *see also*, *e.g.*, Ex. 203 (depicting printout of Photograph in the background), Ex. 26 (Kat Depo.) at 140:22-141:8. |
| **38.** The photograph that Mr. Farmer brought into the shop did not have a watermark on it. | Ex. 26 (Kat Depo.) at 136:2-8. |

| **Defendants' Undisputed Fact** | **Supporting Evidence** |
| --- | --- |
| **39.** Kat did not remove any copyright management information ("CMI") from any version of the Photograph in connection with creating the tattoo. | Ex. 26 (Kat Depo.) at 136:15-137:1. |
| **40.** Kat's first preliminary step in creating the tattoo was to create a "line drawing" on tracing paper. | Kat Decl. ¶ 6. |
| **41.** One purpose of the line drawing was to map out the placement of things, such as the eyes, nose, and mouth. | Kat Decl. ¶ 6. |
| **42.** In this way, the line drawing served as a guide or map as Kat did her freehand work later in the process. | Kat Decl. ¶ 6. |
| **43.** The other main purpose of the line drawing was to help show the client the size of the tattoo and locate a place for it on the client's body. | Kat Decl. ¶ 6. |
| **44.** Exhibit 202 is a true and correct copy of the line drawing Kat created for Mr. Farmer's tattoo. | Kat Decl. ¶ 7; Ex. 202. |

| **Defendants' Undisputed Fact** | **Supporting Evidence** |
|---|---|
| **45.** Kat created this line drawing by placing the photograph of Miles Davis and the tracing paper on a light box, and tracing out the broad outlines and contours that appear in the line drawing. | Kat Decl. ¶ 7; Ex. 202. |
| **46.** Kat's second preliminary step was to create a "stencil" using a different kind of paper. | Kat Decl. ¶ 8. |
| **47.** Kat used a thermal-fax machine to essentially transfer the contents of her line drawing onto the tissue-paper portion of the thermal-fax paper, which constituted her "stencil." | Kat Decl. ¶ 8. |
| **48.** Kat then applied a special transfer liquid on Mr. Farmer's arm, placed the tissue paper (now containing her stencil) onto this portion of his arm, let it sit, then peeled it off. | Kat Decl. ¶ 9. |
| **49.** This process temporarily transferred the drawing of Kat's line drawing onto Mr. Farmer's skin. | Kat Decl. ¶ 9. |
| **50.** This transfer was not a permanent transfer. | Kat Decl. ¶ 9. |

| **Defendants' Undisputed Fact** | **Supporting Evidence** |
|---|---|
| **51.** After allowing the transfer to dry for a few minutes, she began the tattooing. | Kat Decl. ¶ 9. |
| **52.** The actual tattooing consisted of two main steps. | Kat Decl. ¶ 10. |
| **53.** During this portion of the tattooing process, Kat inked the tattoo in the "freehand" method, which means that she was not following a tracing on Mr. Farmer's skin, but that she instead drew her own interpretation. | Kat Decl. ¶ 11. |
| **54.** While Kat used the photograph of Miles Davis as a reference, her goal was not to try to make a photocopy of that image onto Mr. Farmer's skin. | Kat Decl. ¶ 11. |
| **55.** Rather, Kat sought to do her own interpretation of a tattoo that would be appropriate and meaningful for Mr. Farmer. | Kat Decl. ¶ 11. |
| **56.** Kat's first main step was to use a skin pen to draw her composition of the tattoo on Mr. Farmer's arm. | Kat Decl. ¶ 12. |

| **Defendants' Undisputed Fact** | **Supporting Evidence** |
| --- | --- |
| **57.** The use of the skin pen was not Kat merely re-tracing the lines of the line drawing that were temporarily transferred onto Mr. Farmer's skin. | Kat Decl. ¶ 12. |
| **58.** Rather, Kat was using her own artistic judgment to lay the groundwork for her composition of the tattoo on Mr. Farmer's skin. | Kat Decl. ¶ 12. |
| **59.** For example, during this step Kat added the outlines of the flowing smoke that circles the perimeter of Miles Davis's hair and his hand. | Kat Decl. ¶ 13. |
| **60.** This addition gave the tattoo a sense of motion. | Kat Decl. ¶ 13. |
| **61.** Kat's work with the skin pen also laid the groundwork for changes in the texture of certain elements of the tattoo. | Kat Decl. ¶ 13. |
| **62.** Kat did all of these alterations before beginning the permanent tattooing. | Kat Decl. ¶ 13. |
| **63.** Once the groundwork was laid with the skin pen, Kat used a liner machine to permanently set that groundwork onto Mr. Farmer's arm. | Kat Decl. ¶ 14. |

| **Defendants' Undisputed Fact** | **Supporting Evidence** |
|---|---|
| **64.** Kat's second main step was doing the shading. | Kat Decl. ¶ 15. |
| **65.** The shading work constituted most of the work for Mr. Farmer's tattoo. | Kat Decl. ¶ 15. |
| **66.** Shading work generally constitutes most of the work for black-and-gray style portrait tattoos. | Kat Decl. ¶ 15. |
| **67.** During the shading process, Kat took a number of steps to bring the tattoo to life and apply her own interpretation onto Mr. Farmer's skin. | Kat Decl. ¶ 15. |
| **68.** One aspect of Kat's interpretation was the amount of blackness in the tattoo. | Kat Decl. ¶ 16. |
| **69.** The original photograph had a stark, black background, and this blended into the black clothing that Miles Davis was wearing. | Kat Decl. ¶ 16; *cf.* Ex. 201. |
| **70.** Kat chose not to have a stark, black background in her tattoo, and instead used the shading process to create dimension, shadows, and highlights, and create an altogether lighter and softer image. | Kat Decl. ¶ 16. |

| Defendants' Undisputed Fact | Supporting Evidence |
|---|---|
| **71.** In this way, Miles Davis's face seems to stand out from the skin and maps onto the contours of Mr. Farmer's upper arm. | Kat Decl. ¶ 16; *cf.* Exs. 203, 30, 217 (clear photos and video of the tattoo). |
| **72.** If Kat had merely tried to replicate the photograph onto Mr. Farmer's arm, there would have been whole swaths of black background or even worse, a black, rectangular shape. | Kat Decl. ¶ 17. |
| **73.** In Kat's judgment, this would not have looked appropriate on Mr. Farmer. | Kat Decl. ¶ 17. |
| **74.** Another aspect of Kat's interpretation was the addition of a sense of movement. | Kat Decl. ¶ 18. |
| **75.** Kat accomplished this through adding waves of shading in the lines of smoke that circle the perimeter of Miles Davis's hair and hand. | Kat Decl. ¶ 18; *cf.* Exs. 203, 30, 217 (clear photos and video of the tattoo). |
| **76.** The smoke swirls through Miles Davis's hair and hand, creating a kind of "visual noise" that flies all around the tattoo and gives the sense of movement. | Kat Decl. ¶ 18; *cf.* Exs. 203, 30, 217 (clear photos and video of the tattoo). |
| **77.** The smoke also adds to a sentiment of melancholy. | Kat Decl. ¶ 18; *cf.* Exs. 203, 30, 217 (clear photos and video of the tattoo). |

| **Defendants' Undisputed Fact** | **Supporting Evidence** |
|---|---|
| **78.** Kat's interpretation of the tattoo also added shading, highlights, and texture to a number of parts of Miles Davis's face and hand. | Kat Decl. ¶ 18; *cf.* Exs. 203, 30, 217 (clear photos and video of the tattoo). |
| **79.** Kat's interpretation added texture to the fingers on Miles Davis's hand. | Kat Decl. ¶ 19; *cf.* Exs. 203, 30, 217 (clear photos and video of the tattoo). |
| **80.** Kat's interpretation added texture to the vein on Miles Davis's forehead. | Kat Decl. ¶ 19; *cf.* Exs. 203, 30, 217 (clear photos and video of the tattoo). |
| **81.** Kat's interpretation added texture to the details on Miles Davis's shirt and sleeves. | Kat Decl. ¶ 19; *cf.* Exs. 203, 30, 217 (clear photos and video of the tattoo). |
| **82.** To Mr. Farmer, the meaning of his tattoo is two-fold. | Farmer Decl. ¶ 19. |
| **83.** First, Farmer's Miles Davis tattoo represents a callback to the times in Farmer's life when he studied and played jazz, particular his college years. | Farmer Decl. ¶ 19. |
| **84.** Second, Farmer's Miles Davis tattoo represents the fact that he is still an avid listener of jazz and of Miles Davis's music in particular. | Farmer Decl. ¶ 19. |

| **Defendants' Undisputed Fact** | **Supporting Evidence** |
|---|---|
| **85.** Mr. Farmer considers his Miles Davis tattoo part of a "visible inventory" of himself. | Farmer Decl. ¶ 19. |
| **86.** Mr. Farmer has many other tattoos, and nearly every one of them has some personal meaning to him. | Farmer Decl. ¶¶ 18, 20-28. |
| **87.** When Kat does portrait tattoos in general, she attempts to get a feel for who the subject of the portrait is and what the subject means to the client on whose body the portrait tattoo will be inked. | Ex. 26 (Kat Depo.) at 21:25-22:9, 85:15-86:1. |
| **88.** Kat's goal is to have her interpretation of the tattoo fit her client as an individual. | Ex. 26 (Kat Depo.) at 21:25-22:9, 85:15-86:1; Kat Decl. ¶ 20. |
| **89.** Kat understood that Miles Davis was a figure who meant a lot to Mr. Farmer. | Ex. 26 (Kat Depo.) at 181:11-23. |
| **90.** Kat's goal was to create a sentiment on Mr. Farmer's body that both evoked melancholy and had movement in it. | Ex. 26 (Kat Depo.) at 181:11-23; *see also id.* at 86:5-87:7. |
| **91.** Kat achieved this goal through her artistic skills with shading, texture, and adding movement around Davis's hair and other parts of the tattoo. | Kat Decl. ¶¶ 13, 18; Ex. 26 (Kat Depo.) at 181:11-23, 182:13-183:10; *see also id.* at 86:5-87:7. |

| Defendants' Undisputed Fact | Supporting Evidence |
|---|---|
| **92.** Kat further understood that Mr. Farmer initially intended to get a whole sleeve of Miles Davis-inspired tattoos on his arm, of which her tattoo would be but one. | Ex. 26 (Kat Depo.) at 86:5-87:7; *cf.* Farmer Decl. ¶ 17. |
| **93.** To accommodate this, Kat designed the perimeter of the tattoo in such a way so that it could more easily be joined with other tattoos that a subsequent tattoo artist might ink. | Ex. 26 (Kat Depo.) at 86:5-87:7. |
| **94.** Kat and High Voltage posted three distinct photographs of the tattoo among certain of their social media accounts. | *Compare* Exs. 203-04, 212-13 (first photograph) *with* Exs. 207-08 (second photograph) *with* Exs. 209-11, 214-16 (third photograph). |
| **95.** The first was a photo showing Kat in the middle of inking the tattoo, with a printout of the Miles Davis photograph in the background, hanging from a lamp. | Ex. 203 (3/18/17 Kat Instagram post); Ex. 204 (3/18/17 Kat Facebook post); Ex. 212 (3/17/17 HVT Instagram post); Ex. 213 (3/17/17 HVT Facebook post); *see also* Ex. 26 (Kat Depo.) at 140:6-21, 142:17-143:5, 162:14-20, 163:13-25. |
| **96.** The second was a "messy" progress photo of a portion of the tattoo, with ink running down Mr. Farmer's skin. | Ex. 207 (5/16/17 Kat Instagram post); Ex. 208 (5/16/17 Kat Facebook post); *see also* Ex. 26 (Kat Depo.) at 149:22-150:14, 151:18-22. |

| Defendants' Undisputed Fact | Supporting Evidence |
|---|---|
| **97.** The third was a photo of the completed tattoo. | Ex. 209 (5/16/17 Kat Instagram post); Ex. 210 (5/16/17 Kat Facebook post); Ex. 211 (5/16/17 Kat Twitter post); Ex. 214 (4/15/17 HVT Instagram post); Ex. 215 (4/15/17 HVT Facebook post); Ex. 216 (4/26/18 HVT Instagram post); *see also* Ex. 26 (Kat Depo.) at 158:8-22, 159:11-18, 160:9-21, 164:3-12, 165:19-166:5, 166:21-167:6. |
| **98.** Kat also posted a short video to her Instagram "highlights" of her in the process of inking the tattoo. | Ex. 218 (undated Kat Instagram video post); *see also* Ex. 26 (Kat Depo.) at 171:21-172:13. |
| **99.** The video in Exhibit 218 was posted to Kat's Instagram "highlights" for tattoos, which is a compilation of many videos of various tattoos Kat has made over the years. | Ex. 26 (Kat Depo.) at 172:18-173:5. |
| **100.** The first photo (Exs. 203-04, 212-13), second photo (Ex. 207-08), and video (Ex. 218) do not depict the completed tattoo, but only part of the tattoo in progress. | Exs. 203, 204, 212, 213, 207, 208, 218. |

| Defendants' Undisputed Fact | Supporting Evidence |
|---|---|
| **101.** While the first photo (Exs. 203-04, 212-13) also depicts the "Silence" Photograph itself, this is clearly done for a different purpose of comparing the Photograph with Kat's progress on the tattoo. | Exs. 203-04, 212-13. |
| **102.** As of January 2022, there had been at least 4,442 posts to Kat's personal Instagram account. | Ex. 26 (Kat Depo.) at 44:16-22. |
| **103.** As of January 2022, there had been approximately 7,774 posts to the High Voltage Instagram account. | Ex. 26 (Kat Depo.) at 34:7-14. |
| **104.** There is no market in the tattoo industry for licensing copyrighted or trademarked materials to be used as reference materials for tattoos. | Ex. 28 (Lane Expert Report) at 2, 12-27; Ex. 29 (Montie Expert Report) at 1-2. |
| **105.** As a matter of current industry custom and practice, tattooists do not seek licenses from owners of source materials in the process of creating tattoos that are based on those source materials. | Ex. 28 (Lane Expert Report) at 12; Ex. 29 (Montie Expert Report) at 1-2. |

| **Defendants' Undisputed Fact** | **Supporting Evidence** |
|---|---|
| **106.** As a matter of historical industry custom and practice, tattooists have not sought licenses from owners of source materials in the process of creating tattoos that are based on those source materials. | Ex. 28 (Lane Expert Report) at 12; Ex. 29 (Montie Expert Report) at 1-2. |
| **107.** As of now, there is no indication that a market for licensing copyrighted materials to be used as source materials for tattoos is likely to develop. | Ex. 29 (Montie Expert Report) at 2. |
| **108.** The custom and practice of *not* seeking licenses for use of source materials is ubiquitous throughout the tattoo industry. | Ex. 28 (Lane Expert Report) at 12; Ex. 29 (Montie Expert Report) at 1-2. |
| **109.** It is a common practice among tattooists to use copyrighted or copyrightable source materials as reference materials to create tattoos. | Ex. 28 (Lane Expert Report) at 2, 12-25; Ex. 29 (Montie Expert Report) at 2; Ex. 224 (Friedman Expert Report) at 2. |

| Defendants' Undisputed Fact | Supporting Evidence |
|---|---|
| **110.** There is a wide range of copyrighted or copyrightable source materials that tattooists use as references to create tattoos, including without limitation: photographs, paintings, drawings, sketches, album covers, cartoon characters, lines of poetry, lines of prose, excerpts from plays, short poems, quotations, sheet music, still-frames from film, famous art works, and other fine arts. | Ex. 28 (Lane Expert Report) at 12-25; Ex. 29 (Montie Expert Report) at 2; Ex. 224 (Friedman Expert Report) at 2-7. |
| **111.** It is a common practice among tattooists to use trademarked or trademarkable source materials as reference materials to create tattoos. | Ex. 28 (Lane Expert Report) at 12-14; Ex. 29 (Montie Expert Report) at 2. |
| **112.** It is a common practice among tattooists to use the likenesses of celebrities as source materials to create tattoos. | Ex. 28 (Lane Expert Report) at 2; Ex. 29 (Montie Expert Report) at 2-6. |
| **113.** It is a common practice for clients of tattooists to provide the tattooist with the source material that the client wants to be used to create the tattoo. | Ex. 28 (Lane Expert Report) at 19-20, 21; Ex. 29 (Montie Expert Report) at 2; Ex. 224 (Friedman Expert Report) at 2. |

| Defendants' Undisputed Fact | Supporting Evidence |
|---|---|
| **114.**  The current and historical practice of tattooists is that they do not check to determine if the client-provided source material is protected by copyright. | Ex. 28 (Lane Expert Report) at 20; Ex. 29 (Montie Expert Report) at 2; *see also* Ex. 26 (Kat Depo.) at 65:3-7, 130:24-131:6, 131:17-22, 132:6-10, 132:19-133:2. |
| **115.**  It would impede and disrupt the current and historical practices of a large profession if tattoo artists were required – under threat of civil liability – to verify whether their source materials are protected by copyright. | Ex. 28 (Lane Expert Report) at 20. |
| **116.**  Even with regard to *tattoo designs*, the tattoo profession has historically and traditionally operated in the absence of state-based solutions – such as civil liability for copyright infringement – for regulating the use of such designs. | Ex. 28 (Lane Expert Report) at 25-27. |
| **117.**  The replication of one tattooist's *tattoo design* by another tattooist is often seen within the profession as paying an homage to the designer, rather than copying, ripping off, or stealing. | Ex. 28 (Lane Expert Report) at 27. |

| Defendants' Undisputed Fact | Supporting Evidence |
|---|---|
| **118.**  Tattoo artists frequently strive to fulfill their client's desires by tattooing imagery that is representative of their client's identity. | Ex. 28 (Lane Expert Report) at 19; Ex. 224 (Friedman Expert Report) at 13. |
| **119.**  Tattoos inherently have meanings that are deeply personal and distinct to the particular individuals who wear them. | Ex. 28 (Lane Expert Report) at 2, 3-8; Ex. 224 (Friedman Expert Report) at 8, 13. |
| **120.**  Tattoos inherently have distinct meanings that can vary with the contextual in which the tattoo is displayed. | Ex. 28 (Lane Expert Report) at 2, 3-8. |
| **121.**  In general, tattoos that are based on source material create new meaning in the resulting tattoo as a result of the tattoo's being imprinted on the skin of a living human's body. | Ex. 224 (Friedman Expert Report) at 8. |
| **122.**  Both the tattoo client's choice of source material, and the tattoo artist's specific way of rendering that image, blend together in a unique work. | Ex. 224 (Friedman Expert Report) at 8, 13. |

| Defendants' Undisputed Fact | Supporting Evidence |
|---|---|
| **123.** Two people with the exact same tattoo can convey vastly different meanings through their respective tattoos. | Ex. 28 (Lane Expert Report) at 4-5; Ex. 224 (Friedman Expert Report) at 8. |
| **124.** Unlike a piece of art on display in a museum, the meaning of a single tattoo can also change depending on the context in which it is displayed. | Ex. 28 (Lane Expert Report) at 5-7. |
| **125.** For example, a tattoo of a spider web with a black widow can convey one meaning outside of prison (an innocuous passion for venomous insects), but a very different meaning inside of prison (an affiliation with a white supremacist prison gang). | Ex. 28 (Lane Expert Report) at 6. |
| **126.** Tattoos can be used to convey multiple narratives of private meanings that are not immediately obvious, allowing the tattoo wearer to control those to whom the full meaning of the tattoo is revealed. | Ex. 28 (Lane Expert Report) at 7-8; Ex. 224 (Friedman Expert Report) at 8. |

| Defendants' Undisputed Fact | Supporting Evidence |
|---|---|
| **127.** In general, portrait tattoos of public figures are mainly used as forms of expressing the wearer's admiration for the figure, or for channeling the public figure's desired qualities. | Ex. 224 (Friedman Expert Report) at 2. |
| **128.** The process of tattooing requires different artistic skills and techniques than photography. | Ex. 28 (Lane Expert Report) at 2; Ex. 224 (Friedman Expert Report) at 8-9. |
| **129.** Tattooing also requires different and specialized artistic skills to work with the three main types of equipment: rotary, coil, and pneumatic tattoo machines or "guns." | Ex. 28 (Lane Expert Report) at 11-12. |
| **130.** Tattooing involves injecting pigment into the dermis, which lies between the epidermis and the subcutaneous layers of the skin. | Ex. 28 (Lane Expert Report) at 9. |
| **131.** The process involves tens or even hundreds of thousands of punctures, in which the tattoo artist builds up an image millimeter-by-millimeter at a time. | Ex. 224 (Friedman Expert Report) at 9. |
| **132.** Tattoos are created on the three-dimensional surface of a living human's skin. | Ex. 28 (Lane Expert Report) at 8-9; Ex. 224 (Friedman Expert Report) at 9. |

| **Defendants' Undisputed Fact** | **Supporting Evidence** |
|---|---|
| **133.** Every tattoo client's skin is different, and tattooists must use their artistic skills to adjust for differences in their client's skin. | Ex. 28 (Lane Expert Report) at 9-10; Ex. 224 (Friedman Expert Report) at 9. |
| **134.** Due to the differences in each person's skin and the painstaking, millimeter-by-millimeter tattooing process, no two tattoos are ever truly alike. | Ex. 224 (Friedman Expert Report) at 9. |
| **135.** Given the permanence of the tattoo on human skin, tattooists almost always need to use some kind of reference materials to create tattoos. | Ex. 28 (Lane Expert Report) at 20. |
| **136.** Plaintiff's "Silence" Photograph is a photograph, not a tattoo design. | Ex. 7 (certificate of registration); Ex. 8 at JSP002528 (deposit copy); Ex. 27 (Sedlik Depo.) at 56:17-23, 58:17-59:8 (authenticating same). |
| **137.** Sedlik took the Photograph in 1989, in connection with a photo shoot for Jazziz magazine. | Ex. 27 (Sedlik Depo.) at 18:13-23; Ex. 7; Ex. 8. |

| **Defendants' Undisputed Fact** | **Supporting Evidence** |
|---|---|
| **138.**  One of the meanings that Sedlik intended to convey in the Photograph was a comment on Miles Davis's use of "negative space" in his musical works – referring to Davis's groundbreaking use of silence, low volumes, and pauses in between notes, and how the silent spaces between notes can be just as important as the notes themselves. | Ex. 27 (Sedlik Depo.) at 23:17-18 & 23:22-24:9; Ex. 3; Ex. 27 (Sedlik Depo.) at 41:16-42:6 & 39:10-41:1 (authenticating Ex. 3); Ex. 27 (Sedlik Depo.) at 38:9-25 & 45:9-46:22; *see generally* Ex. 27 (Sedlik Depo.) at 23:17-34:15 (Sedlik's discussion of meanings of the Photograph). |
| **139.**  The meaning of the "Silence" Photograph says nothing about Blake Farmer or his life's story. | Ex. 27 (Sedlik Depo.) at 23:17-34:15 (Sedlik's general discussion of meanings of the Photograph). |
| **140.**  Sedlik believes that the "meaning" and the "purpose" of his Photograph are intertwined and cannot be separated. | Ex. 27 (Sedlik Depo.) at 29:11-22; *see also id.* at 117:25-118:2. |
| **141.**  In this regard, Sedlik's primary "purpose" in creating the Photograph was to create a copyrighted work that could be commercially exploited – through licenses for reproduction, distribution, display, and the creation of derivative works – throughout the work's copyright life. | Ex. 27 (Sedlik Depo.) at 23:17-21, 24:10-13, 31:3-7. |

| **Defendants' Undisputed Fact** | **Supporting Evidence** |
|---|---|
| **142.**  The "Silence" Photograph was published in the August / September 1989 issue of Jazziz magazine. | Ex. 7; Ex. 8 at JSP002528; Ex. 27 (Sedlik Depo.) at 56:17-23, 58:17-59:8 (authenticating same). |
| **143.**  This issue of Jazziz magazine was widely published through the United States. | Ex. 27 (Sedlik Depo.) at 60:16-19. |
| **144.**  Sedlik "believes" he licensed the "Silence" Photograph for use in a tattoo on one occasion that "could be between six to ten years ago." | Ex. 27 (Sedlik Depo.) at 106:21-107:3. |
| **145.**  There was only one such occasion in which Sedlik believes he licensed the Photograph for use in a tattoo. | Ex. 27 (Sedlik Depo.) at 121:15-19, 109:12-18. |
| **146.**  Sedlik doesn't know the name of the person to whom he supposedly granted this license. | Ex. 27 (Sedlik Depo.) at 107:11-14. |
| **147.**  Sedlik's licenses for the "Silence" Photograph are normally in writing. | Ex. 27 (Sedlik Depo.) at 110:25-111:6. |
| **148.**  But Sedlik was unable to find a copy of this claimed license. | Ex. 27 (Sedlik Depo.) at 108:8-22, 110:25-111:6. |
| **149.**  Sedlik did not produce in discovery in this case a copy of this claimed license. | Grodsky Decl. ¶¶ 3-6. |

| **Defendants' Undisputed Fact** | **Supporting Evidence** |
|---|---|
| **150.** Sedlik does not recall the price of this claimed license. | Ex. 27 (Sedlik Depo.) at 113:22-24. |
| **151.** Sedlik does not recall whether this claimed license was for more or less than $100. | Ex. 27 (Sedlik Depo.) at 113:25-114:4. |
| **152.** Sedlik does not recall whether he even received any consideration in exchange for this claimed license. | Ex. 27 (Sedlik Depo.) at 116:23-117:2. |
| **153.** No one has ever told Sedlik that they would not buy a copy of his "Silence" Photograph as a result of having seen Kat's tattoo. | Ex. 27 (Sedlik Depo.) at 117:7-10. |
| **154.** No one has ever told Sedlik that they would not buy a copy of his "Silence" Photograph as a result of having seen the social media posts of the tattoo. | Ex. 27 (Sedlik Depo.) at 117:11-14. |
| **155.** When asked whether the market value for his "Silence" Photograph had decreased after Kat's inking of the tattoo, Sedlik responded that he had not had the Photograph's market value appraised either before or after the infringing uses. | Ex. 27 (Sedlik Depo). at 120:6-10. |

| **Defendants' Undisputed Fact** | **Supporting Evidence** |
|---|---|
| **156.** Sedlik was not able to quantify any decrease in market value of his "Silence" Photograph as a result of the alleged infringement. | Ex. 27 (Sedlik Depo.) at 120:16-17, 122:9-16. |
| **157.** The "Rebuttal Expert Report of Professor Jeffrey Sedlik" submitted February 8, 2022 did not discuss any decrease in market value of the "Silence" Photograph. | Grodsky Decl. ¶ 17. |
| **158.** The "Rebuttal Expert Report of Professor Jeffrey Sedlik" submitted February 8, 2022 did not say anything about the fair market value of a license to use the "Silence" Photograph as a tattoo. | Grodsky Decl. ¶ 17. |
| **159.** Plaintiff never requested in discovery information concerning any of Defendants' gross revenues, and such information was not produced. | Grodsky Decl. ¶¶ 8-10; *see also* Ex. 31. |

1

## **CONCLUSIONS OF LAW**

2

3      1.     The fair use doctrine "permits and requires courts to avoid rigid

4  application of the copyright statute when, on occasion, it would stifle the very

5  creativity which that law is designed to foster." *Campbell v. Acuff-Rose Music,*

6  *Inc.*, 510 U.S. 569, 577 (1994).

7      2.     The basic purpose of the doctrine is "providing a context-based check

8  that can help to keep a copyright monopoly within its lawful bounds."

9  *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1198 (2021).

10      3.     Section 107 of the Copyright Act sets out four statutory factors that the

11  Court must consider.

12      4.     "All [four statutory factors] are to be explored, and the results

13  weighted together, in light of the purposes of copyright." *Campbell*, 510 U.S. at

14  578.

15      5.     "The task is not to be simplified with bright-line rules, for the statute,

16  like the doctrine it recognizes, calls for case-by-case analysis." *Id*. at 577.

17      6.     Section 107's "list of factors is not exhaustive," "the examples it sets

18  forth do not exclude other examples," and "some factors may prove more important

19  in some contexts than others." *Google*, 141 S. Ct. at 1197.

20      7.     "Rather, the doctrine of fair use is in essence 'an equitable rule of

21  reason.'" *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1522 (9th Cir. 1992)

22  (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560

23  (1985)).

24      8.     "Fair use is a mixed question of law and fact.  If there are no genuine

25  issues of material fact, or if, even after resolving all issues in favor of the opposing

26  party, a reasonable trier of fact can reach only one conclusion, a court may

27  conclude as a matter of law whether the challenged use qualifies as a fair use of the

28

copyrighted work." *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1115 (9th Cir. 2000).

9.      Where the material, historical facts are not in dispute, there is no "right to have a jury resolve a fair use defense." *Google*, 141 S. Ct. at 1200.

10.     The first factor is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1).

11.     The "central purpose" of this factor is to determine "whether and to what extent the new work is transformative." *Campbell*, 510 U.S. at 579.

12.     Transformative works "lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright, and the more 'transformative' the new work, the less will be the significance of other factors." *Id*. (cleaned up).

13.     *Campbell* holds that a new work transforms a prior work when "the new work . . . ***adds something new, with a further purpose or different character, altering the first with new expression, meaning or message***." *Campbell*, 510 U.S. at 579 (emphasis added); *cf. Seltzer v. Green Day*, 725 F.3d 1170, 1176 (9th Cir. 2013) (describing this statement as "the most definitive formulation of the test"); *cf. Google*, 141 S. Ct. at 1202-03 (also affirming this language in *Campbell*).

14.     The Ninth Circuit's most recent and leading fair use case in the context of pictorial and graphic works, *Seltzer v. Green Day*, also described what it means to be "transformative" as follows:

> The use must be productive and must employ the quoted material in a different manner or for a different purpose from the original. . . .  If . . . the secondary use adds value to the original – if the quoted matter is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings – this is

1          the very type of activity that the fair use doctrine intends

2          to protect for the enrichment of society.

3    *Seltzer*, 725 F.3d at 1176 (quoting P. Leval, *Toward a Fair Use Standard*, 103

4    Harv. L. Rev. 1105, 1111 (1990)).

5          15.    "In the typical 'non-transformative' case, the use is one which makes

6    no alteration to the ***expressive content or message*** of the original work." *Seltzer*,

7    725 F.3d at 1177 (emphasis original).

8          16.    "In contrast, an allegedly infringing work is typically viewed as

9    transformative as long as new expressive content or message is apparent." *Id.*

10         17.    "This is so even where . . . the allegedly infringing work makes few

11   physical changes to the original or fails to comment on the original." *Id.* at 1177-

12   78; *cf. Google*, 141 S. Ct. at 1203 ("An artistic painting might, for example, fall

13   within the scope of fair use even though it precisely replicates a copyrighted

14   advertising logo to make a comment about consumerism.") (cleaned up).

15         18.    The tattoo here is highly transformative as a matter of law.

16         19.    First, Farmer's tattoo presents "new expression, meaning, or message"

17   that is personal to Mr. Farmer and arises by virtue of the image being tattooed on

18   his living body.

19         20.    Second, by their very nature, nearly all tattoos create "new expression,

20   meaning, or message" as a result of being permanently imprinted onto a living

21   human's body.

22         21.    As a matter of law, the Ninth Circuit has expressly recognized that "a

23   permanent tattoo often carries a message quite distinct from displaying the same

24   words or picture through some other medium, and provides information about the

25   identity of the speaker." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1067

26   (9th Cir. 2010) (cleaned up).

27         22.    "A tattoo suggests that the bearer of the tattoo is highly committed to

28   the message he is displaying:  by permanently engrafting a phrase or image onto his

-31-

skin, the bearer of the tattoo suggests that the phrase or image is so important to him that he has chosen to display the phrase or image every day for the remainder of his life." *Id.*

23.     Third, Kat's interpretation of the tattoo transformed the reference material she used in the process of creating a "new aesthetic." *Seltzer*, 725 F.3d at 1176.

24.     The first factor includes an analysis of "whether such use is of a commercial nature." 17 U.S.C. § 107(1).

25.     "There is no doubt that a finding that copying was not commercial in nature tips the scales in favor of fair use." *Google*, 141 S. Ct. at 1204.

26.     "***But the inverse is not necessarily true, as many common fair uses are indisputably commercial.***" *Id.* (emphasis added).

27.     Rather, "the degree to which the new user exploits the copyright for commercial gain – as opposed to ***incidental use*** as part of a commercial enterprise – affects the weight we afford to commercial nature as a factor." *Elvis Presly Enters., Inc. v. Passport Video*, 349 F.3d 622, 627 (9th Cir. 2003) (emphasis added).

28.     The use here with respect to the tattoo was simply not commercial at all, and not even incidentally commercial.

29.     The second factor is "the nature of the copyrighted work." 17 U.S.C. § 107(2).

30.     This factor requires consideration of two aspects.

31.     First, it recognizes that "some works are closer to the core of intended copyright protection than others." *Campbell*, 510 U.S. at 586.

32.     "[C]opyright protection is 'thin'" when "copyrightable material is bound up with uncopyrightable material." *Google*, 141 S. Ct. at 1198; *cf. Folkens v. Wyland Worldwide, LLC*, 882 F.3d 768, 770 (9th Cir. 2018) ("a

collection of unprotectible elements – pose, attitude, gesture, muscle structure, facial expression, coat, and texture – may earn 'thin copyright' protection").

33.    This factor also considers "the extent to which a work has been published." *Seltzer*, 725 F.3d at 1178.

34.    "The fact that a work is **unpublished** is a **critical element** of its 'nature.'" *Harper & Row*, 471 U.S. at 564 (emphasis added).

35.    Conversely, "[p]ublished works are more likely to qualify as fair use because the first appearance of the artist's expression has already occurred." *Kelly v. Ariba Soft Corp.*, 336, F.3d 811, 820 (9th Cir. 2003).

36.    The copyright holder can thus "control the first public appearance of his work." *Seltzer*, 725 F.3d at 1178 (cleaned up).

37.    The published nature of the Photograph thus "mitigat[es]" any weight due to the Photograph's being a creative work.  *See Seltzer*, 725 F.3d at 1178.

38.    The third factor is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole."  17 U.S.C. § 107(3).

39.    This factor "looks to the quantitative amount and qualitative value of the original work used in relation to the justification for that use." *Seltzer*, 725 F.3d at 1178 (citing *SOFA Entm't, Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1279 (9th Cir. 2013).

40.    However, this factor is mitigated when the original work is "not meaningfully divisible." *Seltzer*, 725 F.3d at 1178.

41.    The factor "will not weigh against an alleged infringer, even when he copies the whole work, if he takes no more than is necessary for his intended use." *Id.* (citing *Kelly*, 336 F.3d at 820-21).

42.    This factor also overlaps somewhat with the first factor:  the "extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586-87.

43.     Where "use of the entire work was necessary to achieve" the accused infringer's "new expression, meaning or message," then the third factor does not weigh against the accused infringer. *Seltzer*, 725 F.3d at 1178-79; *cf. Google*, 141 S. Ct. at 1205 ("The 'substantiality' factor will generally weigh in favor of fair use where . . . the amount of copying was tethered to a valid, and transformative, purpose.").

44.     Here, the "Silence" Photograph's image of Miles Davis posed with his index finger to his lips is not meaningfully divisible.

45.     To the extent this pose is even a protectible element, Kat use this image of Davis's face and hand, and not more, as a necessary reference to create her tattoo.

46.     Kat's use of this reference material was tethered to a valid and transformative purpose in creating the tattoo.  Given their permanence on the body, tattoo artists generally ***need*** to have references to create tattoos.

47.     The fourth factor asks what effect the allegedly infringing use has on the "potential market for or value of the copyrighted work."  17 U.S.C. § 107(4).

48.     This factor has been described as considering three issues.

49.     First, this factor considers "the extent of market harm caused by the particular actions of the alleged infringer [and] also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original."  *Campbell*, 510 U.S. at 590.

50.     "Where the allegedly infringing use does not substitute for the original and serves a 'different market function,' such factor weights in favor of fair use." *Seltzer*, 725 F.3d at 1179 (quoting *Campbell*, 510 U.S. at 591).

51.     Second, this factor also "considers any impact on 'traditional, reasonable, or likely to be developed markets.'"  *Seltzer*, 725 F.3d at 1179 (quoting *Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 81 (2d Cir. 1997)).

-34-

52.     However, the Supreme Court has cautioned that considering "unrealized licensing opportunities" poses a "danger of circularity," because "it is a given in every fair use case that plaintiff suffers a loss of a *potential* market if that potential is defined as the theoretical market for licensing the very use at bar." *Google*, 141 S. Ct. at 1207 (quoting 4 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 13.05[A][4] (2019)).

53.     Even if it is true that Sedlik licensed the Photograph for tattoo use on one occasion, it "does not suffice to show that [Kat's] use harmed any existing market or market that [Sedlik] was likely to develop." *Seltzer*, 725 F.3d at 1179 (finding the same with respect to plaintiff's argument that his copyrighted "Scream Icon" image was once used in a video by another band though he couldn't provide any information about the licensing including revenue supposedly earned).

54.     Third, this factor requires "tak[ing] into account the public benefits the copying will likely produce," and whether those public benefits are "related to copyright's concern for the creative production of new expression." *Google*, 141 S. Ct. at 1206; *see also id*. at 1208 (identifying the "risk of creativity-related harms to the public" as a consideration on the fourth factor that weighs in favor of fair use).

55.     It would impede and disrupt the settled practices of the tattoo profession, and stifle the creativity of tattoo artists, if they were required – under threat of civil liability – to obtain licenses for the source materials that are used as references in creating tattoos.

56.     This unique case presents good cause to consider a non-statutory factor:  an individual's fundamental rights to bodily integrity and personal expression.

57.     The Ninth Circuit has expressly held that both "the tattoo itself" and "the process of tattooing" are "forms of pure expression fully protected by the First Amendment." *Anderson*, 621 F.3d at 1068 (9th Cir. 2010).

58.     The right to "bodily integrity" is long-recognized as one of the fundamental rights and liberty interests protected by the Due Process Clause. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

59.     The fair use doctrine permits consideration of these fundamental rights. *See Eldred v. Ashcroft*, 537 U.S. 186, 219-20 (2003) (identifying fair use as one of two "built-in First Amendment accommodations" contained within copyright law).

60.     A body tattoo is far more significant than a bumper sticker on one's car, or a button on one's lapel. *See Anderson*, 621 F.3d at 1067.

61.     Holding tattoo artists civilly liable for copyright infringement will necessarily expose the *clients* of these artists to the same civil liability anytime they choose to get tattoos based on copyrighted source material, display their tattooed bodies in public, or share social media posts of their tattoos.  That is not the law and cannot be the law.

62.     While all fair use factors must be considered, "factor one and factor four have 'dominated the case law' and are generally viewed as the most important factors." *Seltzer*, 725 F.3d at 1179.

63.     Based on the undisputed facts, the Court conclude after balancing the fair use factors that the tattoo at issue is a fair use as a matter of law.

64.     Even if, *arguendo*, the social media posts are vaguely seen as Kat somehow "promoting her brand" or High Voltage promoting the shop, such use is "only incidentally commercial" and is not sufficient to tilt the first factor against fair use. *Seltzer*, 725 F.3d at 1178.

65.     Imposing civil liability for the social media posts also risks imposing "creativity-related harms to the public" and undermines "creative production of new expression." *Google*, 141 S. Ct. at 1206, 1208.

66.     Based upon the undisputed facts, the Court conclude that the social media posts of the tattoo are also fair uses as a matter of law.

**67.**     Plaintiff's second and third claims for contributory and vicarious infringement are consequently also so barred by the fair use defense. *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 n.2 (9th Cir. 2001).

**68.**     Plaintiff's first claim for direct infringement alleges each of the Defendants "creat[ed] infringing derivative works" by "reproducing [the Photograph] in the form of a tattoo" and "publish[ed] [the Photograph by] using, reproducing, displaying, and distributing [the Photograph] online and on websites. . . ." Compl. (Dkt. 1) ¶¶ 89-90.

**69.**     There is no evidence KVD Inc. did any such thing.

**70.**     Plaintiff has not presented any evidence that KVD Inc. had any involvement in creating the tattoo or publishing the social media posts.

**71.**     KVD Inc. is thus entitled to summary judgment on the direct infringement claim. *See Fox Broad. Co. v. Dish Network LLC*, 747 F.3d 1060, 1067 (9th Cir. 2014) (infringement "requires 'copying by the defendant,' . . . which comprises a requirement that the defendant cause the copying").

**72.**     To prove Plaintiff's second claim for vicarious infringement, Plaintiff "must prove 'the defendant has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity.'" *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 670, 673 (9th Cir. 2017) (quoting *Perfect 10, Inc. v. Visa Int'l Service Ass'n*, 494 F.3d 788, 802 (9th Cir. 2007)).

**73.**     Plaintiff can prove neither element against Defendant KVD Inc.

**74.**     Plaintiff cannot establish that KVD Inc. had the right and ability to supervise the alleged infringing conduct.

**75.**     The mere fact Kat is the owner of both High Voltage and KVD Inc. isn't sufficient to establish that KVD Inc. had the right or ability to supervise the creation of the tattoo or the social media posts. *See New London Assocs., LLC v. Kinetic Soc. LLC*, 384 F. Supp. 3d 392, 410 (S.D.N.Y. 2019) (plaintiff's "allegations that certain individuals who were affiliated with the [defendant]

1   Financing Entities also had roles in the management and operation of [the

2   defendants accused of direct copyright infringement] are insufficient to state a

3   claim for vicarious liability").

4         76.    Plaintiff cannot create a dispute of fact as to whether KVD Inc. had a

5   direct financial benefit in the alleged infringing activity.

6         77.    "The essential aspect of the 'direct financial benefit' inquiry is whether

7   there is a causal relationship between the infringing activity and any financial

8   benefit a defendant reaps, regardless of how substantial the benefit is in proportion

9   to a defendant's overall profits." *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th

10  Cir. 2004) (emphasis added).

11        78.    There is no evidence of direct financial interest received by KVD Inc.

12  *See Telemasters, Inc v. Vintage Club Master Ass'n*, 2007 WL 9706067, at *11

13  (C.D. Cal. May 11, 2007) ("Plaintiff has failed to raise a triable issue as to whether

14  [Defendant] received a direct financial benefit from another's infringing activity and

15  Defendant is entitled to summary judgment on Plaintiff's claim for vicarious

16  copyright infringement").

17        79.    To prove Plaintiff's third claim for contributory infringement, Plaintiff

18  must prove KVD Inc. "(1) has knowledge of another's infringement and (2) either

19  (a) materially contributes to or (b) induces that infringement." *Perfect 10*, 847 F.3d

20  at 870 (9th Cir. 2017).

21        80.    To prove inducement liability, Plaintiff must present evidence of

22  "active steps . . . taken to encourage direct infringement." *VHT, Inc. v. Zillow Grp.,*

23  *Inc.*, 918 F.3d 723, 745 (9th Cir. 2019) (quoting *MGM Studios Inc. v. Grokster,*

24  *Ltd.*, 545 U.S. 913, 936 (2005)) (citation and quotation omitted).

25        81.    "Put differently, liability exists if the defendant engages in 'personal

26  conduct that encourages or assists the infringement.'" *A&M Records*, 239 F.3d at

27  1019 (quoting *Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 693, 706 (2d

28  Cir. 1998)).

82.     Plaintiff has not created a material dispute of fact that KVD Inc. materially contributed to, or induced, the alleged infringement.

83.     Plaintiff's fourth claim for violation of 17 U.S.C. § 1202 alleges two separate claims:  removal or alteration of copyright management information ("CMI") in violation of Section 1202(b), and falsification of CMI in violation of Section 1202(a).

84.     Both claims under 17 U.S.C. § 1202 fail as a matter of law.

85.     Plaintiff alleges in conclusory fashion that Defendants "knowingly removed, altered and falsified [CMI] with the intent to induce, enable, facilitate, or conceal infringement. . . ."  Compl. (Dkt. 1) ¶ 120.

86.     17 U.S.C. § 1202(b)(1) provides "No person shall, without the authority of the copyright owner or the law . . . intentionally remove or alter any [CMI]. . . knowing, or . . . having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any" copyright.

87.     To prove a violation of Section 1202(b)(1), Plaintiff must first prove that Defendants removed or altered CMI. *Falkner v. Gen. Motors LLC*, 393 F. Supp. 3d 927, 938 (C.D. Cal. 2018).

88.     Plaintiff must then also prove that Defendants "possess the mental state of knowing, or having a reasonable basis to know, that [their] actions 'will induce, enable, facilitate, or conceal' infringement." *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 673 (9th Cir. 2018).

89.     Plaintiff can prove neither.

90.     First, the evidence is undisputed that Kat did not remove any CMI. That alone is sufficient to defeat the claim.  *See Sid Avery & Assoc., Inc. v. Pixels.com, LLC*, 479 F. Supp.3d 859, 870 (C.D. Cal. 2020) (granting summary judgment on CMI claim where there is no evidence that defendant removed CMI).

91.     Second, even if arguendo he could prove that Kat removed CMI, Plaintiff has not pointed to any evidence that Kat had the requisite mental state of

knowing or having reason to know that her actions would induce, enable, facilitate or conceal infringement.  *See Stevens*, 899 F.3d at 673 (affirming grant of summary judgment on 1202(b) claim in part because plaintiffs "have not offered any evidence to satisfy that mental state requirement").

92.    Plaintiff also alleges Defendants "knowingly provided and/or distributed false [CMI] with the intent to induce, enable, facilitate, or conceal infringement in violation of 17 U.S.C. § 1202(a)."  Compl. (Dkt. 1) ¶ 122.

93.    To establish liability under Section 1202(a), Plaintiff must show Defendants "knowingly and with the intent to induce, enable, facilitate, or conceal infringement" either (1) "provide[d] [CMI] that is false," or (2) "distribute[d] or import[ed] for distribution [CMI] that is false."  *Sid Avery & Assocs.*, 479 F. Supp. 3d at 870.

94.    Plaintiff cannot prove any of these elements.

95.    Section 1202(c) defines CMI as the following kinds of information: the work's title, the name of the work's author and the copyright owner, terms and conditions for use of the work, and identifying numbers or symbols referring to such information.  17 U.S.C. § 1202(c)(1)-(8).

96.    In addition, even if Plaintiff could prove Defendants provided false CMI, Plaintiff must also put forth evidence showing that Defendants – and each of them – did so knowingly and with the intent to induce, enable, facilitate or conceal infringement.  Plaintiff cannot provide any such evidence.

97.    Plaintiff's fourth claim for violation of 17 U.S.C. § 1202 fails in its entirety.

98.    Defendants are entitled to partial summary judgment on Plaintiff's claims for actual damages.

99.    Defendants are entitled to partial summary judgment on Plaintiff's claims for Defendants' profits.

100.   On a copyright infringement claim, "[a]ctual damages represent the extent to which infringement has injured or destroyed the market value of the copyrighted work at the time of infringement." *Hendricks v. DreamWorks, LLC*, 2007 WL 9705916, at *2 (C.D. Cal. Nov. 20, 2007) (citation omitted).

101.   In addition, a plaintiff may recover "hypothetical-license damages" based on "the amount a willing buyer would have been reasonably required to pay a willing seller at the time of the infringement for the actual use made by [the infringer] of the plaintiff's work." *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1087 (9th Cir. 2014).

102.   The question "is not what the owner would have charged, but rather what is the fair market value." *Oracle*, 765 F.3d at 1088 (quoting *Jarvis v. K2 Inc.*, 486 F.3d 526, 534 (9th Cir. 2007)).

103.   Based on the undisputed facts, Plaintiff has not carried his burden of adducing any evidence of actual damages.

104.   There are two kinds of profits that can be recovered for copyright infringement.

105.   "Direct profits are 'those that are generated by selling an infringing product.'" *Griffo v. Oculus VR, Inc.*, 2018 WL 6265067, at *8 (C.D. Cal. Sept. 18, 2018) (quoting *Mackie v. Rieser*, 296 F.3d 909, 914 (9th Cir. 2002)).

106.   That leaves indirect profits, and to obtain such profits, "it is the copyright owner's burden to present proof of the infringer's gross revenue from the infringing product." *Oracle Am., Inc. v. Google Inc.*, 131 F. Supp. 3d 946, 949 (N.D. Cal. 2015); *see also Griffo*, 2018 WL 6265067 at *10 ("a plaintiff seeking to recover indirect profits must 'formulate the initial evidence of gross revenue duly apportioned to relate to the infringement' and may not simply 'toss up an undifferentiated gross revenue number'") (quoting *Polar Bear Prods. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir. 2004)).

107.   Plaintiff has not carried his burden of producing evidence any of the Defendants' gross revenues, and cannot carry his burden of producing evidence of Defendants' profits.

108.   This case is a stark reminder that "over-protecting" intellectual property – and thereby stifling the creative expression that copyright seeks to promote – can be just as harmful as under-protecting it.

109.   Defendants are entitled to summary judgment on the entirety of Plaintiff's Complaint.

Dated:  March 16, 2022

GRODSKY, OLECKI & PURITSKY LLP
Allen B. Grodsky
John J. Metzidis

By:   /s/ Allen B. Grodsky
         Allen B. Grodsky

Attorneys for Defendants Katherine Von Drachenberg, Kat Von D, Inc., and High Voltage Tattoo, Inc.