Gary S. Sedlik, Esq. (CA Bar No. 181192)
SEDLIKGROUP, P.C.
P.O. Box 3238
Manhattan Beach, CA 90266
Phone: (310) 439-9986 | Fax: (844) 320-8044
Email: gary@sedlikgroup.com

Attorneys for Plaintiff Jeffrey B. Sedlik

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| JEFFREY B. SEDLIK, an individual;<br><br>Plaintiff,<br><br>vs.<br><br>KATHERINE VON DRACHENBERG (a.k.a. "KAT VON D"), an individual; KAT VON D., INC., a California corporation; HIGH VOLTAGE TATTOO, INC., a California corporation; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 2:21-cv-01102-DSF-MRWx<br><br>Before the Honorable Dale S. Fischer, U.S. District Judge<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR ORDER TO EXCLUDE REPORTS AND TESTIMONY OF DEFENDANTS' PROFFERED EXPERT WITNESSES ANNA FELICITY FRIEDMAN, DAVID C. LANE AND CATHERINE MONTIE**<br><br><u>Hearing</u><br>Date:    April 18, 2022<br>Time:    1:30 p.m.<br>Place:   First Street Courthouse<br>          350 West 1st Street, Crtrm 7D<br>          Los Angeles, California<br><br>Trial:    July 26, 2022 |

TO THE HONORABLE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on April 18, 2022, at 1:30 p.m. or as soon thereafter as counsel may be heard, in Courtroom 7D of the First Street Courthouse, located at 350 West 1st Street, Los Angeles, California 90012, before the Hon. Dale S. Fischer, United States District Judge, Plaintiff Jeffrey B. Sedlik ("Plaintiff") will and hereby does move this Court for an order, pursuant to Fed. R. Evid. 104(a), 403 and 702, and pursuant to the Court's gatekeeping obligation to screen expert evidence for relevancy and reliability, to exclude the testimony and reports of Anna Felicity Friedman, David C. Lane and Catherine Montie, whom Defendants have designated as their expert witnesses in this matter. This Motion is based upon the papers filed herein, including the following Memorandum, and Exhibits identified in the contemporaneously-filed Declaration of Gary S. Sedlik and attached thereto. A proposed order is submitted for consideration by the Court.

Dated:  March 16, 2022          SEDLIKGROUP, P.C.
                                Gary S. Sedlik, Esq.


                                By:   /s/ Gary S. Sedlik
                                       Gary S. Sedlik

                                Attorneys for Plaintiff Jeffrey B. Sedlik

1

2

# <u>TABLE OF CONTENTS</u>

3

Memorandum of Points and Authorities    1

I. Introduction    1

II. Background    1

III. Legal Standard    3

IV. Argument    5

     a.   The Court should exclude the proffered expert testimony of    5
Anna Felicity Friedman due to flawed methodology and lack
of relevant training, education, experience and qualifications.

     b.   The Court should exclude the proffered expert testimony of    13
Anna Felicity Friedman regarding the state of mind,
intentions or desires of Blake Farmer.

     c.   The Court should exclude the proffered expert testimony of    14
Anna Felicity Friedman regarding other tattooists who have
created tattoos based on the works of photographers and
other artists.

     d.   The Court should exclude the proffered expert testimony of    15
David C. Lane

     e.   The Court should exclude the proffered expert testimony of    19
Catherine Montie

V. Conclusion    20

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **TABLE OF AUTHORITIES**

2

3

City of Pomona v. SQM N. Am. Corp., 750 F.3d 1036 (9th Cir.                    3, 4
4
2014)

Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993)              3, 4, 12, 13,
5
                                                                                 21
6
General Elec. Co. v. Joiner, 522 U.S. 136 (2007).                                5

In re Rezulin Prod. Liab. Lit., 309 F. Supp. 2d 531 (S.D.N.Y.          4, 13, 14, 16,
7
2004)                                                                    17, 19, 20
8
Kennedy v. Collagen Corp., 161 F.3d 1226 (9th Cir. 1998)                         5

Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999)                            4, 12
9
McKendall v. Crown Control Corp., 122 F.3d 803 (9th Cir.                         3
10
1997)

Moses v. Payne, 555 F.3d 742 (9th Cir. 2009)                           4, 12, 19, 20
11
United States v. Alatorre, 222 F.3d 1098 (9th Cir. 2000)                         4
12
United States v. Hanna, 293 F.3d 1080 (9th Cir. 2002)                     5, 19, 20

United States v. Morales, 108 F.3d 1031 (9th Cir. 1997)                   5, 19, 20
13
United States v. Vallejo, No. 99-50762, 2001 U.S. App. LEXIS           5, 15, 16, 17,
14
7367 (9th Cir. Jan. 16, 2001).                                           19, 21

Fed. R. Evid. 104                                                      1, 3, 6, 15, 18,
15
                                                                            10, 21
16
Fed. R. Evid. 403                                                      1, 6, 15, 18,
                                                                         19, 20, 23
17
Fed. R. Evid. 702                                                    1, 3, 5, 6, 13,
18
                                                                       15, 16, 20

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Plaintiff seeks an order excluding the reports and all testimony from Defendants' proffered expert witnesses Anna Felicity Friedman, David C. Lane and Catherine Montie because each of these witnesses: (1) lacks the requisite scientific, technical, or other specialized knowledge to help the trier of fact to understand the evidence or to determine a fact in issue; (2) failed to provide sufficient facts or data in their respective expert reports to support the proffered testimony; (3) failed to apply reliable principles and methods in reaching the proffered opinions; and (4) offers improper, duplicative, unnecessarily cumulative, and/or inadmissible testimony. For these reasons, each of these experts, along with their proffered reports and testimony do not satisfy Fed. R. Evid. 104(a) and 702 and the Daubert requirements for relevancy and reliability, and would not assist the Court or the jury in addressing any material issue. Plaintiff also seek exclusion of these experts under Fed. R. Evid. 403 because certain portions of their proffered testimony would be more prejudicial than probative.

## II.    BACKGROUND

This is a straightforward copyright infringement action based on Defendants' willful and unauthorized reproduction, display, distribution and creation of derivative works of Plaintiff's world-famous photograph of jazz legend Miles Davis (the "Iconic Miles Davis Portrait"). To avoid liability for their clear-cut copyright infringement, Defendants are attempting to divert the Court's attention away from their unlawful acts by introducing irrelevant, unscientific and improper "expert" testimony belaboring the history and culture of tattoos and tattooist. Apparently, Defendants' legal theory ─which they are seeking to introduce under the guide of expert testimony ─ is that tattoos and tattooists should be exempt from federal

copyright law because tattooists have been stealing others' copyrighted works for many years.

As part of this strategy of distraction and diversion, Defendants found three "experts" willing to offer testimony that the tattoo industry, tattooists, and tattoos all are somehow historically and culturally "special" as compared to other artists because tattooists have allegedly been stealing and exploiting copyright-protected photographs for years and, for the most part, getting away with it. Further, bereft of any underlying scientific, technical, or other specialized knowledge, and without providing any scientific, technical, or other supporting scientific facts, data or reliable methods of analysis, these same experts also seek to usurp the role of both the judge and jury with ipse dixit opinions by proclaiming that Defendants' near-exact duplication of the Iconic Miles Davis Portrait in the form of a derivative tattoo is "substantially different" from Mr. Sedlik's Iconic Miles Davis Portrait.

None of these experts has any specialized qualifications, training or experience that would support an "expert" opinion relating to the exemption of tattoos from federal copyright law (which would obviously be improper on its face), nor an opinion that tattooists are somehow entitled to steal and exploit copyright-protected photographs without permission, license or authorization. Allowing any of the three proffered experts to present such improper and misleading testimony to the jury in this case under the imprimatur of an "expert" would leave the jury with a dangerously false impression that tattoos and tattooists are a privileged class of works and creators exempt from federal law, and that Defendants' conduct in stealing Plaintiff's Iconic Miles Davis Portrait and blatantly exploiting that work for Defendants' commercial gain is a perfectly acceptable activity, not subject to copyright law.

Because (1) Defendants cannot establish that their proffered experts are qualified to offer the opinions in their respective reports, (2) each experts' opinion lacks the requisite scientific, technical, or other specialized knowledge to help the

trier of fact to understand the evidence or to determine a fact in issue, (3) the experts each failed to provide sufficient scientific facts or data in their respective expert reports to support the proffered testimony, (4) each expert failed to apply reliable principles and methods in reaching the proffered opinions, and (5) the information in each expert's report is unsupportable and contrary to federal law, this Court should exclude all three experts' testimony as well as their reports in their entirety.

### III.   LEGAL STANDARD

The testimony and opinions of an expert witness must satisfy Fed. R. Evid. 702 requirements, which govern the admissibility of expert testimony. Rule 702 provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The trial court "must determine whether the expert witness is qualified and has specialized knowledge that will assist a trier of fact to understand the evidence or determine a fact in issue." McKendall v. Crown Control Corp., 122 F.3d 803, 805-06 (9th Cir. 1997) (internal quotes and citation omitted); Accord, City of Pomona v. SQM N. Am. Corp., 750 F.3d 1036, 1043 (9th Cir. 2014). Rule 702 also requires trial judges to ensure that "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993). Thus, the Court must screen the proffered evidence to ensure it is not only relevant but reliable, which the testimony's proponent must establish. Id.

Further, the Court is required to assess, under Fed. R. Evid. 104(a), whether the expert is proposing to testify to "specialized knowledge that will help the

-3-

1   factfinder understand or decide a fact in issue." United States v. Alatorre, 222 F.3d

2   1098, 1102-03 (9th Cir. 2000), citing Daubert, 509 U.S. at 592. In exercising

3   discretion under Rule 702 to allow expert testimony to assist the trier of fact to

4   understand the evidence or determine a fact in issue, the Court is to determine

5   whether it is based upon sufficient facts or data, is the product of reliable principles

6   and methods, and that the expert has reliably applied the principles and methods to

7   the facts of the case. Id.

8        Expert testimony is relevant only if the knowledge underlying it has a valid

9   connection to the pertinent inquiry, and is reliable only if that knowledge has a

10   reliable basis in the knowledge and experience of the relevant discipline. City of

11   Pomona, 750 F.3d at 1043-44. The basic purpose of a trial court's "gatekeeping

12   requirement" is to ensure that the expert "employs in the courtroom the same level

13   of intellectual rigor that characterizes the practice of an expert in the relevant field."

14   Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). This gatekeeping

15   requirement applies not only to scientific knowledge, but also to testimony based

16   on technical and specialized knowledge. Id. at 141. Although the inquiry is "a

17   flexible one," the Supreme Court suggested specific factors likely to help trial

18   courts evaluate whether expert testimony is reliable, including testing, peer review,

19   error rates, and acceptance in the relevant scientific community. Daubert, 509 U.S.

20   at 593-94.

21        The requirement of specialized knowledge means "more than subjective

22   belief or unsupported speculation." Daubert, 509 U.S. at 590. Thus, "the opinions

23   of [expert] witnesses on the intent, motives or states of mind of corporations,

24   regulatory agencies and others" should be excluded because these opinions "have

25   no basis in any relevant body of knowledge or expertise." In re Rezulin Prod. Liab.

26   Lit., 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004). An expert also should not

27   "supplant the role of counsel in making argument at trial, and the role of the

28   [decision maker] in interpreting the evidence." Id.; see also Moses v. Payne, 555

-4-

F.3d 742, 756 (9th Cir. 2009) ("Under Rule 702, expert testimony is helpful . . . if it concerns matters beyond the common knowledge of the average layperson and is not misleading."); <u>United States v. Hanna</u>, 293 F.3d 1080, 1086 (9th Cir. 2002); <u>United States v. Morales</u>, 108 F.3d 1031, 1039 (9th Cir. 1997) (en banc). The Court "may reject expert testimony also where the 'analytical gap' between the data and the expert's conclusion is too great." <u>Kennedy v. Collagen Corp.</u>, 161 F.3d 1226, 1228 (9th Cir. 1998), <u>citing</u> <u>General Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (2007).

"Even when expert testimony is otherwise admissible, the district court may exclude it under Rule 403." <u>United States v. Vallejo</u>, No. 99-50762, 2001 U.S. App. LEXIS 7367, at *31 (9th Cir. Jan. 16, 2001). Thus, if the Court finds that the testimony would waste time, confuse, or not materially assist the trier of fact, it has discretion to exclude the expert's testimony. <u>Id.</u> at *12-15.

## IV.   **ARGUMENT**

### a.   **The Court should exclude the proffered expert testimony of Anna Felicity Friedman due to flawed methodology and lack of relevant training, education, experience and qualifications.**

Defendants disclosed Dr. Anna Felicity Friedman ("Dr. Friedman") as one of their three proffered experts. Dr. Friedman prepared a written report offering two primary expert opinions relating to this litigation:

> It is my opinion that this tattooed artwork is significantly different from the photographic inspiration and that this tattooed artwork is a form of personal expression that the client sought to have inscribed on their body.

<u>See</u> Expert Report of Anna Felicity Friedman ("Friedman Report"), attached as Exh. A to Declaration of Gary S. Sedlik ("Sedlik Decl."), p. 1.

Nothing in Dr. Friedman's background, experience or training provides any indication that she is qualified to offer either of these opinions. Further, and perhaps more importantly, each of these opinions fails to satisfy the minimum legal requirements for expert opinions under Rule 702 and this Court should exclude her entire report, along with her proffered opinions, as improper.

1     As discussed in more detail below, most of the opinions in Dr. Friedman's
2  report are not only irrelevant to the issues in the case, but also improperly and
3  dangerously seek to usurp the role of both the judge and jury, and to confuse,
4  mislead and falsely instruct the jury that tattoos, tattooists, and the entire tattoo
5  industry are, or should be, exempt from copyright law. This Court should exclude
6  all of this proffered improper testimony under Fed. R. Evid. 104(a), 403 and 702.

7     Dr. Friedman describes herself as a "scholar and professor of art history and
8  the history of culture with a specialization in tattoo history and culture…" Friedman
9  Rep. at 1. She further states that she is "one of the world's most foremost experts on
10  tattooing[.]" Id. Her CV includes a list of history and culture courses that she has
11  taught, as well as publications on the topic of the history and culture of tattoos. Id.

12     Notwithstanding Dr. Friedman's background and experience relating to the
13  history and culture of tattoos, the background and experience that she lacks is much
14  more important in assessing the validity of her proffered testimony in this case. As
15  noted above, Dr. Friedman's primary proffered expert opinions relating to this case
16  are that: (1) "this tattooed artwork is significantly different from the photographic
17  inspiration"; and (2) "this tattooed artwork is a form of personal expression that the
18  client sought to have inscribed on their body." Friedman Rep. at 1.

19     In evaluating Dr. Friedman's qualifications to offer her first opinion
20  comparing the "tattooed artwork" and the "photographic inspiration," the Court
21  should consider Dr. Friedman's training, experience, and qualifications to perform a
22  forensic comparative analysis of the tattoo and photograph at issue in this case, and
23  the reliability of methodology and principles employed by Dr. Friedman in that
24  analysis.

25     Shockingly, nowhere in Dr. Friedman's report does she mention having
26  viewed the actual tattoo, nor does she describe the use of any forensically-sound
27  methodology to create or obtain accurate photographs of the tattoo suitable for
28  performing such an analysis. In fact, during Dr. Friedman's recent deposition, she

readily admitted that <u>she had never personally examined the tattoo at issue in this</u> <u>case</u>. Transcript of Deposition of Anna Friedman ("Friedman Depo.") at p. 9:4-6, attached as Exhibit B to Sedlik Decl.

Friedman further admitted that she had never even <u>asked</u> to view the tattoo in person nor to photograph the tattoo. Friedman Depo. at p. 9:7-10; p. 76:23-25, p. 78:18-22. Instead, Dr. Friedman chose to base her entire analysis on looking at copies of screenshot reproductions of web browser displays of Defendants' social media posts depicting photographs of the subject tattoo originally captured by Defendants in uncontrolled circumstances on cell phone cameras. Friedman Depo. at p. 78:12-25.

Friedman has no knowledge – and never even inquired – to attempt to determine if the screenshot of the web browser page displaying the web page containing the Instagram post which included a photo of the tattoo had been altered at any stage or was an otherwise unreliable or inaccurate depiction of the tattoo. Friedman Depo at p. 79:1 through p. 80:3. Friedman does not know if the individual(s) who captured the screenshots altered those screenshots. Friedman Depo at p. 79:1-8. Friedman does know who captured the photographs of the tattoo (Friedman Depo at p. 80:25 through p. 82:4), nor whether the settings and features of the cell phone camera used the capture the photographs altered the appearance of the tattoo in the photographs, nor whether anyone in the chain of custody of the photographs applied "filters" to the photographs or retouched the photographs or the tattoo as it appeared in the photographs – such as by making local or global alterations to color, shape, size, texture, contrast, tone, highlights, shadows, mid-tones, lines, texture, or other elements, features and characteristics – before uploading the photographs to Instagram, Facebook or Twitter. Friedman Depo at p. 79:1:7. Friedman does not know if Instagram's (or Facebook's or Twitter's) systems modified the color, contrast, sharpness or other characteristics of the photographs of the tattoo. Friedman Depo at p.79:1 through p. 80:2. Friedman did

1   not use a color accurate monitor or perform a monitor calibration prior to
2   examining the photographs on her computer. Friedman Depo. at p. 87:1-21.
3   Friedman had no knowledge of – and never even inquired about – the lighting
4   conditions under which the photographs of the tattoo were captured, the type of
5   camera used, the settings of that camera, the location or position of the subject in
6   the photo relative to the camera, lighting conditions at the scene, nor any other
7   factor that may have influenced the appearance of the tattoo in the photograph.
8   Friedman Depo. at p. 92:21 through p. 93:3.

9       In summary, Friedman has no idea who took the photographs, who uploaded
10  them to the social media platforms, who took the screenshots of the websites on
11  which the posts were displayed, what controls (if any) were in place to ensure an
12  accurate reproduction of the tattoo, and whether any modifications were made to
13  the images of the tattoo throughout the long chain of custody preceding her receipt
14  of copies of the photographs and her display and evaluation of those photographs
15  on her computer.

16      Standing alone, Dr. Friedman's failure to examine, or even view, the tattoo at
17  issue in this case (other than through multiple third parties' uncontrolled and
18  snapshots, posts and screenshots), should disqualify all of her opinions arising from
19  her purported comparison of the tattoo and the Iconic Miles Davis Portrait. Dr.
20  Friedman cannot possibly establish that she has conducted an expert analysis of a
21  tattoo using any reliable methodology or principles. For this reason, the Court
22  should find that Friedman is not qualified to offer opinions on or relating to a
23  comparison of the tattoo and the Iconic Miles Davis Photograph, and should
24  exclude all of Dr. Friedman's report and any opinions therein that purport to relate
25  to an evaluation or analysis of the tattoo at issue in this case, or how that tattoo
26  compares to Mr. Sedlik Iconic Miles Davis Portrait.[1]

27
28
[1] Dr. Friedman claims in her report that one of the core fundamental differences between photographs is how they are perceived in person: "At the level of dimensionality, a photograph such as that at the center of this case is intended to be printed on photographic paper and is a 2-dimensional artwork. A tattoo on the other hand, as rendered onto the

In addition, in proffering the Friedman Report, Defendants seek to introduce a laundry list of reasons that Dr. Friedman thinks the tattoo at issue in this case is "significantly different" than Mr. Sedlik's Iconic Miles Davis Portrait. Friedman Rep. at p. 1, p. 10 through p. 13.[2] Putting aside the objective absurdity of Dr. Friedman's claim that the tattoo is "significantly different" from Mr. Sedlik's Iconic Miles Davis Portrait, nothing in Dr. Friedman's report or credentials indicates that she has <u>any</u> "specialized knowledge that will help the factfinder understand or decide" any purported differences between the tattoo and Mr. Sedlik's work. Dr. Friedman's CV contains no evidence that she has ever received any training in the comparative analysis of photographs and tattoos, any education or training in forensic photographic analysis, nor that Dr. Friedman has any "specialized knowledge" of <u>any</u> kind that might reasonably establish that she is any more qualified than any member of the public (or the jury) to look at a tattoo and a photograph to discern whether they are "significantly different." Put a different way, while Dr. Friedman claims to be an expert in the history and culture of tattoos, she has demonstrated <u>no</u> legitimate basis to claim to be an expert in comparing a tattoo to a photograph, and she has failed to employ any reliable methodology to compare Mr. Sedlik's Iconic Miles Davis Portrait to a photograph of a tattoo.

This is further evidenced by Dr. Friedman's demonstration of a complete lack of skill or knowledge underlying her asserted analysis of the tattoo and Mr. Sedlik's Iconic Miles Davis Portrait, and on Dr. Friedman's reliance on unsound principles and methods, as described in detail above.

Dr. Friedman further demonstrates a lack of education, experience, training and rigor by failing to establish and employ controls for the range of variance in the

___

human body, can be nothing but 3-dimensional, and when the wearer of the tattoo moves through space, the tattoo becomes 4-dimensional." Friedman Rep. at p. 8. As such, Friedman's own expert report and opinion shows that she is not qualified to render an expert opinion regarding a tattoo that she has only seen third hand, and certainly never in three (or four) dimensions, as she claims is critical to evaluating a tattoo.

[2] See Nimmer on Copyright § 13.03[B] [1][a] ("It is entirely immaterial that, in many respects, plaintiff's and defendant's works are dissimilar, if in other respects, similarity as to a substantial element of plaintiff's work can be shown.").

appearance of any photograph – including the Iconic Miles Davis Portrait – that can and does result from any of the following occurrences.

While these controls need not be present to identify similarities as to details in a photograph as compared with a tattoo, the controls are necessary to confirm that any apparent differences between works are in fact actual differences between the works, and have not been introduced by issues such as camera angle, camera distance, lens focal length, exposure, depth of field, camera condition (such as a smudge on a lens), lighting type, lighting intensity, lighting temperature (color), lighting position, lighting distance, the presence of mixed light sources (daylight, tungsten, florescent, LED, flash), any automated processing performed by the camera software (to adjust contrast, color, tonality, shadows, highlights, etc.) at the moment of capture, any later processing, adjustments or manipulation performed by anyone in the chain of custody (such as using software a phone or other computer to adjust contrast, color, tonality, shadows, highlights, add or remove details of the tattoo or scene, file compression, etc.), adjustments made to the tattoo photograph by software employed by Instagram upon receiving the uploaded file (such as color, contrast, tonality, color space, color profile, file type, compression, etc.), lotions or oils applied to the skin in the tattoo area affecting reflectivity, the settings and calibration of the computer monitor one which a photograph is viewed, the settings of the computer and graphics card used to display the photograph on the monitor, the lighting conditions of the room in which the photograph is viewed on the monitor, the settings of the web browser used to create the screenshot of the photograph of the tattoo, the settings of the screenshot software used to create the screenshot, the settings of the software used to view the screenshot. Not only did Dr. Friedman fail to consider this issue in performing her review, but she also failed to disclose this issue in her report, instead assuming (and thus misleading the reader to assume) that in performing her analysis, she reviewed an accurate depiction of the tattoo. Friedman Depo at p. 80:4-8

In addition, Dr. Friedman failed to investigate or even consider the possibility that the visual appearance of the copy of the Iconic Miles Davis Portrait inspected by Dr. Friedman in her analysis was not identical to the visual appearance of the copy used by Defendants to produce their derivative tattoo. Friedman Depo at p. 88:9-13, p. 89:8 through p. 92:20.

A particular digital copy of the Iconic Miles Davis Portrait may have originated from any of a wide array of printed copies of that photograph, each of which may have substantially different appearance, as each copy printed in a darkroom is unique (a particular copy may be lighter, darker, have different contrast, different tone, different color, different adjustments to local areas (cheeks, hair, forehead, hand, jacket, etc.) than other copies of the same photograph. Variations in the digital scanning process may introduce additional differences in appearance of a digital file, and each digital file may be processed, adjusted or altered to a different extent, with different results. The factors described above that may impact the appearance of a photograph of a tattoo (monitor, browser, processing, alterations after uploads, filters, manipulations, etc.) also apply to the appearance of each digital copy of the Iconic Miles Davis Portrait. Not only did Dr. Friedman fail to consider this issue in performing her review, but she failed to disclose this issue in her report, instead assuming (and thus misleading the reader to assume) that in performing her analysis, she reviewed a copy of the Iconic Miles Davis Portrait  matching the copy of that photograph used by Defendants to create their derivative tattoo. Friedman Depo at p. 88:9-13

Setting aside the variables applicable to the digital file, the process of printing the file on a computer printer introduced alterations to the appearance of the printed copy, affecting contrast, color, tonality, detail, highlights, shadows and other aspects.

As Dr. Friedman failed to implement any controls in her analysis, all or nearly all Dr. Friedman's assertions as to alleged differences between the tattoo and

the Iconic Miles Davis Portrait may be illusory, resulting only from Dr. Friedman's comparison of an inaccurate photograph of the tattoo to a copy of the Iconic Miles Davis portrait that was not identical to the copy actually used by Defendants to create the derivative tattoo. Freidman Rep p. 9 through p. 13.

As stated above, the most basic role of the Court as "gatekeeper" is to ensure that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., 526 U.S. at 152. Dr. Friedman not only fails to provide any basis in her report or CV that would qualify her as an expert in comparing a photograph and tattoo, but also demonstrates that employed no "intellectual rigor" in making her comparison between the tattoo and Mr. Sedlik's Iconic Miles Davis Portrait. Id. She also failed to describe any reliable methodology or principles employed in conducting her comparison, and failed to confirm that her comparison was based on any qualified external source that could or would validate her proffered testimony as compliant with procedures and standards normally employed by qualified experts when conducting expert-level comparisons of photographs and other works. In addition, nothing in Dr. Friedman's CV or report contains any indication that her review of the photograph and tattoo is based on anything other "subjective belief or unsupported speculation." Daubert, 509 U.S. at 590. Further, Dr. Friedman's proffered analysis, which is not based on any specialized training or education, improperly seeks to "supplant the role of counsel in making argument at trial, and the role of the [decision maker] in interpreting the evidence." Moses, 555 F.3d at 756. Dr. Friedman's proffered testimony is not "helpful," because it does not concern "matters beyond the common knowledge of the average layperson," who can easily look at a photograph and tattoo and decide whether they look similar or not. Id.

For all of these reasons, the Court should find that Dr. Friedman is not qualified as an expert to offer any opinions comparing or analyzing the tattoo and

Mr. Sedlik's Iconic Miles Davis Portrait because she does not meet the minimum legal standards to provide such expert opinions, and that Dr. Friedman's opinions as to any alleged difference/s between the tattoo and the Iconic Miles Davis Portrait were founded on flawed methodology and are excluded.

### b. The Court should exclude the proffered expert testimony of Anna Felicity Friedman regarding the state of mind, intentions or desires of Blake Farmer

Dr. Friedman's second proffered expert opinion claims to establish the state of mind of the individual who received the tattoo at issue, in this case, Blake Farmer. Specifically, Dr. Friedman opines that: "this tattooed artwork is a form of personal expression that the client sought to have inscribed on their body." Friedman Rep. at p. 1.

This proffered opinion is plainly improper under Rule 702 and the Court should exclude it, along with any related testimony from Dr. Farmer. As noted above, the requirement of specialized knowledge means "more than subjective belief or unsupported speculation." Daubert, 509 U.S. at 590. Thus, "the opinions of [expert] witnesses on the intent, motives or states of mind of corporations, regulatory agencies and others" should be excluded because these opinions "have no basis in any relevant body of knowledge or expertise." In re Rezulin., 309 F. Supp. 2d at 546.

Here, Dr. Friedman's opinion is bare, unsupported speculation. Dr. Friedman admitted at her deposition that she never had any contact with the "client" in this case, Blake Farmer. Friedman Depo. at p. 62:16 through 63:2. She also admitted that she never asked Mr. Farmer about his supposed "personal expression" or what he "sought" in terms of the tattoo at issue.[3] Friedman Depo. at p. 62:1 through p. 66:16. Obviously, the proper – and only appropriate – source for what Mr. Farmer

---

[3] Dr. Friedman also admitted that she never spoke with Defendant Katherine Von Drachenberg nor anyone else associated with the creation of the tattoo at issue in this case, and thus could not possibly have any basis for expressing an opinion regarding the purpose, intention, state of mind or other motives of anyone connected with the creation of the tattoo. Friedman Depo. at p. 62:16 through p. 63:2, p. 71:24 through p. 72:1, p. 114:14-24.

1   may have been thinking at the time he received the tattoo is Mr. Farmer himself, not

2   Dr. Friedman's subjective and unfounded speculation. In re Rezulin, 309 F. Supp.

3   2d at 546 ("Inferences about the intent or motive of parties or others lie outside the

4   bounds of expert testimony."). As such, Dr. Friedman's attempt to provide an

5   expert opinion about Mr. Farmer's "intent, motives or state of mind" has no basis in

6   any relevant body of knowledge or expertise and this Court should exclude it as

7   improper.

8           **c. The Court should exclude the proffered expert testimony of Anna
               Felicity Friedman regarding other tattooists who have created
9              tattoos based on the works of photographers and other artists.**

10          Like Defendants' other experts, Dr. Friedman includes in her report multiple

11  instances and examples of different tattooists who have apparently stolen other

12  famous photographs and copied them in the form of tattoos. Friedman Rep. at p. 3

13  through p. 6. Dr. Friedman readily admits that she has no information about

14  whether any of the featured tattoos copying famous photographs in her report were

15  licensed, authorized or otherwise permitted by the photographers. Friedman Depo.

16  at p. 39:19 through p. 55:21. She also admits that she has no information about

17  whether any of the authors of the photographers in her report filed copyright

18  infringement actions against the tattooists, objected to the tattoos, or otherwise

19  claimed infringement of their works. Id.

20          None of these other purported examples of apparent copyright infringement

21  could possibly support any of Defendants' defenses to Plaintiff's claims, nor do

22  they have any relevance to this case, but it appears to be part of Defendants' overall

23  campaign to mislead the jury by falsely implying that tattooists are (or should be)

24  exempt from federal law, and more specifically, copyright law. This dangerous and

25  improper strategy. Dr. Friedman's logic, as reflected in her examples and opinions

26  can summed up as "other tattooists steal artists' works with impunity, so

27  Defendants in this case should be allowed to steal Mr. Sedlik's copyrighted Iconic

28  Miles Davis Portrait with impunity and without repercussion." Such an argument in

a federal copyright lawsuit is preposterous. It is nothing more than a flawed, unsupported litigation posture dangerously camouflaged under the guise of "expert opinion," with no relationship to Dr. Friedman's training, qualifications or experience. Further, not only is the inference highly improper, it is exceptionally prejudicial, not probative of any fact in the case and will not materially assist the trier of fact in any way. <u>Vallejo</u>, 2001 U.S. App. LEXIS 7367 at *12-15. For all of these reasons, this Court should exclude Dr. Friedman's report and proffered testimony regarding the supposed customs or history of tattoo industry in relation to the unauthorized copying of other artists' works.

In addition, as much of Dr. Friedman's testimony is duplicative and unnecessarily cumulative of the testimony of Defendants' other experts Mr. Lane and Ms. Montie, the Court should exercise its gatekeeper role and exclude Ms. Friedman's report and testimony based on Rules 104(a) and 403.

### d. The Court should exclude the proffered expert testimony of David C. Lane

Defendants also offer the expert testimony of David Lane in support of their case. Mr. Lane offers five opinions, each of which should be excluded in this case. These opinions are not only improper and inadequately-supported under Rule 702, but they also are duplicative and unnecessarily cumulative of the proffered opinions of Defendants' other expert witnesses, and would waste the Court's time and the jury's time at the trial of this matter.

Specifically, Mr. Lane seeks to offer opinions that: (1) tattoos inherently have distinct meanings that are both personal and contextual; (2) the process of tattooing requires different artistic skills and techniques than photography; (3) there is no market in the tattoo industry for licensing or copyrighted or trademarked materials to be used as reference materials for tattoos; (4) the use of reference materials in that are copyrighted or copyrightable is commonplace among tattooists; and (5) the tattoo industry has its own internal norms and practices concerning

1   unauthorized copying of tattoo designs. See Expert Report of David C. Lane ("Lane

2   Rep."), attached as Exhibit C to Sedlik Decl.

3         Mr. Lane's first two opinions are plainly obvious, do not require expert

4   opinion, and could not be helpful to the jury in this case. The jury does not need an

5   "expert" to opine that tattoos have meaning or that tattoos are not made with

6   cameras.

7         Further, as discussed above with respect to Dr. Friedman, Mr. Lane has

8   provided no basis in his CV or report to testify about the meaning (personal or

9   contextual) of the tattoo in this case since nothing in his report indicates that he has

10  ever spoken with or communicated with Mr. Farmer (or anyone else connected with

11  the creation of the tattoo at issue in this case) and therefore could not possibly have

12  any basis to provide an opinion about the meaning of the subject tattoo to Mr.

13  Farmer or anyone else. Mr. Lane should be precluded from offering supposed

14  "expert" testimony on this topic because "Inferences about the intent or motive of

15  parties or others lie outside the bounds of expert testimony." In re Rezulin, 309 F.

16  Supp. 2d 531 at 546. Similarly, Mr. Lane's proffered "expert" opinion that

17  photographs and tattoos are different or that the process of making these distinct

18  forms of artwork are not the same is not proper expert testimony under Rule 702.

19  This is common sense, not the product of specialized training or education and

20  generally not "helpful" in any to the trier of fact. Rule 702. Pursuant to the Court's

21  basic gatekeeping function under Rules 403 and 702, the Court should exclude such

22  testimony because it would waste time and either confuse or not materially assist

23  the trier of fact. Vallejo, 2001 U.S. App. LEXIS 7367 at *12-15.

24        Mr. Lane spends a considerable amount of time in his report discussing

25  people who have "received tattoos in relation to traumatic events in their lives," a

26  narrative which appears to have been cut and pasted from other publications or

27  reports prepared by Mr. Lane. Lane Rep. at p.1, p. 3 through p. 4, p. 7 through p. 8.

28  It is not clear why this information dominates Mr. Lane's report as there is nothing

-16-

1  in the record in this case (and Mr. Lane has no basis on which to opine) relating to

2  why Mr. Farmer received the tattoo that is the subject of this lawsuit. There is

3  certainly no indication or evidence whatsoever that would permit Mr. Lane to offer

4  an opinion that the tattoo at issue in this case related in any way to "traumatic

5  events." Again Mr. Lane appears to be seeking to legitimize Defendants' theft of

6  Mr. Sedlik's Iconic Miles Davis Portrait by implying that the tattoo was created for

7  some higher purpose. As noted above, any proffered testimony about the "intent or

8  motive of parties or others" is improper and this Court should not permit Mr. Lane

9  to testify about these matters in this case. <u>In re Rezulin,</u> F. Supp. 2d 531 at 546.

10      Mr. Lane next presents with a long discussion about various symbols (stars,

11  spider webs, swastikas and signatures) that others have tattooed over the years and

12  the potentially different meaning(s) associated with the symbols and the resulting

13  tattoos. Lane Rep. at p. 4 through p. 6. Not a single item in Mr. Lane's report

14  relates to a copied photograph, and, most importantly, all but two relate to

15  trademarks, not copyrights (an MC Escher drawing and a quote from a movie). <u>Id.</u>

16  Mr. Lane provides no basis or explanation for why any of this discussion, which

17  also appears to have been cut and pasted from one of his other publications, could

18  possibly have any relevance to this case or be helpful to the jury. It is not.

19      Further, Lane spends a large portion of his report discussing how tattooists

20  "shun" each other and otherwise punish other tattooists for stealing tattoo designs

21  from <u>other tattooists</u>. See Lane Rep. at p. 25 through p. 27. This proffered

22  testimony, like the testimony described above, has no legitimate relationship to this

23  case. This case is about a tattooist stealing a <u>photographer's</u> work, not about a

24  tattooist stealing the work of another tattooist. At best, Mr. Lane's testimony is

25  completely irrelevant, and it would serve only to waste the Court's time, confuse

26  the jury about the issues in this case, and would not materially assist the trier of

27  fact. <u>Vallejo</u>, 2001 U.S. App. LEXIS 7367 at *12-15. All of this proffered

28

testimony and the corresponding portions of Mr. Lane's report therefore should be excluded under Rules 104(a) and 403.[4]

The remaining opinions proffered by Mr. Lane are much more nefarious and, if admitted, would dangerously confuse and mislead the jury as to the applicability or federal law to tattoos and tattooists or, even worse, suggest to the jury that federal law does not apply to the theft of other artists' works as long as the person committing the theft is a tattooist. Specifically, Mr. Lane argues that:

- One industry norm is that as a matter of practice, tattooists do not seek licenses from owners of course materials in the process of creating individual tattoos. Lane Rep. at p. 12.
- This custom of not seeking licenses is so ubiquitous in the industry that there are many types of copyrightable and trademarkable materials that are reproduced as tattoos. Lane Rep. at p. 12.
- Tattooists have traditionally worked without the additional constraint of seeking licenses for source materials. Lane Rep. at p. 19.
- The current and historical practice of tattooists is not to check if the source materials are copyrighted, and not to seek a license from the copyright owner to create a tattoo based off the source materials. Lane Rep. at p. 20.
- Based on my experience having studied the tattoo industry, to impose such an obligation on tattooists under the threat of legal liability would impede and dispute a large industry. Lane Rep. at p. 20.
- Tattooists do not rely on copyright law to police their industry. Lane Rep at p.25 through p. 27.
- The [tattoo] industry has traditionally operated in the absence of state-based solutions – such as legal actions for copyright infringement – in favor of resolving issues of conflict informally and within the community. Lane Rep. at p. 25.

Like the analogous testimony offered by Defendants' other proffered experts, this testimony appears to be intended to falsely instruct the jury that tattooists and tattoos are exempt from federal copyright law and, because it is a "custom and practice" of tattooists and others in the tattoo industry to steal copyrighted works of art from other artists without authorization, and therefore Defendants in this case should not be liable to Mr. Sedlik for stealing his Iconic Miles Davis Portrait.

---

[4] Mr. Lane also offers opinions, photos and commentary relating to the unlawful copying of trademarks, which are not at issue in this case. See e.g., Lane Rep. at p. 2, p. 12 through p. 17, and p. 25. Plaintiff has not made a claim of trademark infringement in this case and Defendants have not asserted a defense relating to trademarks. As such, this testimony is entirely irrelevant and should be excluded under Rules 104(a) and 403.

Each of these opinions is improperly designed to supplant the role of trial counsel making arguments at trial as well as to usurp the role of the judge in instructing the jurors as to the applicability of copyright law to Defendants and Defendants' actions, and should therefore be excluded. In re Rezulin, 309 F. Supp. 2d at 546; Moses, 555 F.3d at 756; Hanna, 293 F.3d at 1086; Morales, 108 F.3d at 1039. Even if this testimony may be peripherally admissible in support of one of Defendants' affirmative defenses in this action, this Court should exclude it under Rule 403 as highly prejudicial. Vallejo, 2001 U.S. App. LEXIS 7367, at *31.

In addition, as Mr. Lane's testimony is duplicative and unnecessarily cumulative of the testimony of the testimony of Defendants' other experts, Dr. Friedman and Catherine Montie, the Court should exercise its gatekeeper role and exclude Mr. Lane's report and testimony based on Rules 104(a) and 403.

For all of these reasons, as well as the reasons provided above with respect to the proffered testimony of Dr. Friedman, this Court should exclude the testimony and proffered expert report of David C. Lane.

### e. The Court should exclude the proffered expert testimony of Catherine Montie

Catherine Montie, another of Defendants' proffered "experts," seeks to offer two opinions:

> (1) Based on my extensive experience in the tattoo industry, it is my educated opinion and conclusion that there is currently and historically no market in the tattoo industry for licensing copyrighted materials or trademarked materials to be used as tattoos.
> (2) Simply put, licensing of such material is not done in the tattoo industry, and traditionally, in the past it has not been done.

Expert report of Catherine Montie ("Montie Rep.") at p. 1, attached as Exhibit D to Sedlik Decl. An examination of Ms. Montie's qualifications as presented in her CV, however, demonstrates that she has absolutely no basis whatsoever to hold herself out as an "expert" on the topics of licensing, the historical "market" for licensing, or the extent to which licensing "is done" in the tattoo industry. Almost every

single line item listed in Ms. Montie's CV relates solely to the health or medical effects of tattoos and bloodborne pathogens. Montie Rep., Exhibit A at p. 1 through p. 4. Nowhere in Ms. Montie's CV, background, training or experience do the words "license" or "licensing" appear. Montie Rep. at pp. 3-8. On that basis alone, Ms. Montie has failed to provide any basis for her to offer either of these expert opinions regarding the licensing of tattoos.

The mere statement that Ms. Montie has been "in the tattoo industry" for a number of years does not provide any "scientific, technical, or other specialized knowledge" on the issue of licenses that could help the trier of fact to understand the evidence or to determine a fact in issue. See Rule 702(a) and (b) (requiring both "scientific, technical, or other specialized knowledge" and a showing that a proffered opinion is "based upon sufficient facts or data"). Based on these failures alone, this Court should exclude Ms. Montie's opinions for failure to meet the minimum requirements of Rule 702.

In addition Ms. Montie's report and proffered testimony suffers from the same fatal defects as Defendants' other expert witnesses in that her claims that tattooists have been brazenly and unlawfully copying other artists' works for many years are both irrelevant and dangerously misleading to the jury. According to Ms. Montie, tattooist regularly and habitually use copyrighted works without authorization, and on that basis alone, she infers, tattooists should be exempt from federal copyright law.

Each of these opinions is improperly designed to supplant the role of trial counsel making arguments at trial as well as to usurp the role of the judge in instructing the jurors as to the applicability of copyright law Defendants and Defendants' actions and should therefore be excluded. In re Rezulin, 309 F. Supp. 2d at 546; Moses, 555 F.3d at 756; Hanna, 293 F.3d at 1086; Morales, 108 F.3d at 1039. Even if this testimony may be peripherally admissible in support of one of

Defendants' defenses in this action, this Court should exclude it under Rule 403 as highly prejudicial. <u>Vallejo</u>, U.S. App. LEXIS 7367, at *31.

Lastly, Ms. Montie's opinions and proffered testimony are almost entirely duplicative and unnecessarily cumulative of the opinions and testimony of David Lane and Ann Friedman. For this additional reason, the Court should exercise its gatekeeper role and exclude Ms. Montie's report and testimony based on Rules 104(a) and 403 and pursuant to <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993).

For all of these reasons, and for the reasons stated above with the similarly improper, unreliable, irrelevant, and unsupported testimony of Defendants' other expert witnesses, the Court should exclude the proffered expert testimony and report of Catherine Montie in its entirety.

## V.    <u>CONCLUSION</u>

For all of these reasons, Plaintiff respectfully requests that this Court grant Plaintiff's motion in its entirety and issue an order excluding the testimony and proffered expert reports of Anna Felicity Friedman, David C. Lane and Catherine Montie.

This motion is made following the conference of counsel pursuant to L.R. 37-1, which took place on March 9, 2022. Sedlik Decl. ¶7.

Dated:  March 16, 2022          SEDLIKGROUP, P.C.
                                Gary S. Sedlik, Esq.


                                By:   /s/ Gary S. Sedlik
                                         Gary S. Sedlik

                                Attorneys for Plaintiff Jeffrey B. Sedlik