```
 1              UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF CALIFORNIA
 2                  WESTERN DIVISION

 3

 4   JEFFREY B. SEDLIK,           )         Case No.
                                  )    2:21-cv-01102-DSF-MRWx
 5              Plaintiff,        )
                                  )
 6   -vs-                         )
                                  )
 7   KATHERINE VON DRACHENBERG    )
     (a.k.a. "KAT VON D"), an     )
 8   individual; KAT VON D, INC., )
     a California corporation;    )
 9   HIGH VOLTAGE TATTOO, INC.,   )
     a California corporation;    )
10   and DOES 1 through 10,       )
     inclusive,                   )
11                                )
                Defendants.       )
12

13

14                 DEPOSITION OF

15                JEFFREY B. SEDLIK

16        TAKEN ON BEHALF OF THE DEFENDANTS

17             VIA VIDEOCONFERENCE

18             ON JANUARY 11, 2022

19

20

21

22

23

24

25           REPORTED BY:  TRENA K. BLOYE, CSR
```

Page 1

Exhibit 27
Sedlik Depo

1    that term.  It's not an official title or exclusive

2    title that I've assigned to the image.

3        Q    Okay.  Just so that we are clear there are

4    times in the deposition where I may refer to "the

5    photograph" or I may refer to it as "the silence

6    photograph."  Either way, I just want it to be clear

7    that when I use those words, I'm referring to the

8    photograph that is at issue in this case.  Is that clear

9    to you?

10       A    Yes, that's less of a mouthful than the iconic

11   Miles Davis portrait, which I'm sure you don't want to

12   say a thousand times today.

13       Q    Okay.  So am I correct that your taking of the

14   silence photograph was done in connection with a photo

15   shoot for Jazziz magazine?

16       A    Just in terms of the language that we use here

17   today, you know, that amateurs tend to take photos and

18   professionals tend to create photos.  It's true that

19   some professional photographers take photos of just what

20   happens in front of them.  But I create a scenario and

21   then capture it, so I would say create or create the

22   photo.  And I did create that photo to fulfill a request

23   by Jazziz magazine for a cover shoot.

24       Q    And how were you compensated for creating that

25   photo for Jazziz magazine's cover shoot?

                                               Page 18

Exhibit 27
Sedlik Depo

1    interrupt the testimony.

2            MR. METZIDIS:  I appreciate that.  And

3    that's no problem.  So sounds good.

4        Q   (By Mr. Metzidis)  Okay.  So back to Exhibit 1.

5    Mr. Sedlik, this may be kind of a theoretical question,

6    but I presume you consider yourself an artist; correct?

7        A   Yes.

8        Q   Would you agree with the general proposition

9    that at least sometimes artists intend to convey a

10   meaning through their work?

11           MR. SEDLIK:  Objection; vague.

12   Objection; calls for expert conclusion.

13       A   I can answer that in the first person.  I can't

14   speak for other artists.  So among other things -- among

15   other purposes for creating a work, I intend to convey

16   various meanings.

17       Q   (By Mr. Metzidis) And did you intend to convey

18   any particular meaning through the silence photograph?

19       A   The purpose for which I licensed this work was

20   to license my copyright in the work throughout the

21   copyright life of the photograph.  Number one purpose.

22   I wanted to capture Miles Davis, you know, in a

23   photograph in which I -- for this particular -- for this

24   particular image wanted to comment on the -- his use of

25   negative space in his musical performances and

                                           Page 23

Exhibit 27
Sedlik Depo

1    arrangements.  Negative space meaning silence, pauses

2    between notes, because he had been quoted as saying that

3    the notes are as important -- the pauses between the

4    notes are as important as the notes themselves.

5         He also had a masterpiece called "In a Silent

6    Way."  And he played with a muted horn.  He also played

7    kind of a low volume on occasion to make the audience or

8    the listener strain to hear the note and, thus, perhaps

9    appreciate the note more, subtleties in his playing.

10        But the primary purpose was to license this

11   work for reproduction, distribution, display, and the

12   creation of derivative works by others throughout the

13   copyright life of the work by me and by my heirs.

14   Q    That's fair enough.  I want to be clear that my

15   question was asking about the meaning that you intended

16   to convey and not the purpose of creating the work.  I

17   think that you said some things in your response that my

18   touch upon the meaning.  I just want to be clear that

19   you're answering that question, that you're telling me

20   what is the meaning that you intended to convey and not

21   your purpose for creating the work.

22             MR. SEDLIK:  I'm going to object that

23   that's a vague question.

24   A    I can only answer that by saying that visual

25   artists create works both to convey ideas, in other

                                             Page 24

Exhibit 27
Sedlik Depo

1    words to create original expression that conveys ideas

2    and concepts, but also, by necessity, to see those works

3    used and to garner benefit from the licensing of those

4    works so as to support themselves to be able to create

5    new works and to give them a reason to -- or let's say

6    an incentive to create works.

7         And so that -- it lines right up with the

8    purpose.  The meaning is to -- the meaning of the work

9    and what I was conveying is one of the purposes.  But I

10   intended to license this work for all different types of

11   usages.  I also intended to see it used for -- you know,

12   for it to create an esthetically pleasing depiction of

13   Miles Davis that challenged the viewer, an image that

14   is -- I don't know if decorative is the right word, but

15   an image that you could -- that the viewer -- in which

16   the viewer could perceive Miles Davis' appearance in a

17   way that embodied my original expression.

18   Q   (By Mr. Metzidis) Okay.  Thank you.  Other than

19   what you've testified to today, are there any other

20   meanings that you intended to convey in the silence

21   photograph?

22        MR. SEDLIK:  Objection; vague.

23   A   Meaning is a nuanced term.  The way that I used

24   my control over the lighting in this particular instance

25   and my selection of his wardrobe and his pose and my

Page 25

Exhibit 27
Sedlik Depo

1    direction of his expression, his eye direction

2    controlling every aspect of this in order to express

3    what I wanted to express was really intended to create

4    an iconic representation of the true master of his

5    medium.

6         Q    (By Mr. Metzidis) Are there any other meanings

7    that you intended to convey?

8                   MR. SEDLIK:   Objection; vague.

9         A    I believe that I wanted -- well, I know that I

10   wanted to convey the intensity of this individual.  And

11   in order to be able to achieve original expression

12   conveying that intensity I used my lighting, suggested

13   that he tense up his facial muscles and, you know, I

14   positioned his fingers and asked him to do certain

15   things, as well as speaking to him about various topics

16   during the shoot and reviewing my sketches of this idea

17   to be able to achieve this expression.  And by

18   expression I'm not talking about his expression,

19   although that's part of it, it's my original expression

20   and interpretation of Miles Davis.

21        Q    (By Mr. Metzidis) Other than everything that

22   you've already said so far in the deposition, are there

23   any other meanings that you intended to convey with the

24   silence photograph?

25                   MR. SEDLIK:   Objection; vague.

Veritext Legal Solutions
866 299-5127

Exhibit 27
Sedlik Depo

```
 1        A    When I create a portrait of someone, and this

 2   might differentiate me from some other photographer, but

 3   I do aim at creating the ultimate interpretation of that

 4   individual.  In reality, there is no such thing because

 5   individuals have many facets.  But I try, through

 6   research and just experiencing the creations of that

 7   person and learning the history of that person, to

 8   develop concepts that will result from which I can shape

 9   visual expression that communicates something in an

10   original way about that person, so that when the public

11   thinks of Miles Davis my image appears in their mind's

12   eye.

13        And that's a lofty goal and it's not often

14   achieved, but it's a good goal to keep in mind when

15   you're creating concepts or pre-visualizing what an

16   image is going to be.  I really focus on that through a

17   number of creative techniques in advance of creating a

18   photograph so that I can arrive at concepts that I can

19   then tangibly fix in original photographic expression.

20        And so an image that is -- that really comes to

21   represent that individual when -- and that the public

22   will want to see and use in various ways, this is my

23   goal.

24        Q    (By Mr. Metzidis) Are there any other meanings

25   that you intended to convey through the silence
```

Page 27

Exhibit 27
Sedlik Depo

1    photograph?

2              MR. SEDLIK:  Objection; vague.

3        A    There are likely others that I -- that don't

4    come to mind sitting here at this moment.  Those were a

5    good selection of my -- of the purposes of my creation

6    of this particular portrait.

7        Q    (By Mr. Sedlik) At least as far as what does

8    come to your mind today in the moment as you sit in this

9    deposition, have you told me all the different meanings

10   that you intended to convey in the silence photograph?

11             MR. SEDLIK:  Objection; vague.

12       A    I want to make sure that I'm accurately

13   communicating the fact that conveying meaning is one

14   purpose, one of the purposes of creating a photograph.

15   There are other purposes.  And, as I mentioned, one of

16   my primary purposes was to create a photograph, you

17   know, let's say if we say that I -- I want to create an

18   artwork, a visual artwork that represented Miles Davis

19   in an iconic way, that's one of the purposes.

20             But I also wanted to see this work used and to

21   benefit personally and financially from the exploitation

22   of my copyrights, by licensing the others, the right to

23   exploit my work and copyright in any and all media,

24   using any and all mediums using my original photograph

25   and creating derivative works under license from me for

                                              Page  28

Exhibit 27
Sedlik Depo

```
 1    use, you know, for example, on shirts and posters and in

 2    advertising and various representations including

 3    engravings and charcoal drawings and, for that matter,

 4    tattoos; whereby other artists would be driven by the

 5    power and effect of my original expression to want to

 6    create derivative works under license from me, to use my

 7    expression in different media.

 8         Q    (By Mr. Metzidis) Is that the end of your

 9    answer?

10         A    Yes.

11         Q    Okay.  I want to be clear, I'm not asking about

12    your purpose in creating the photograph.  I'm asking you

13    about the meaning that you intended to convey in

14    creating the photograph.  And I just want to be clear

15    and confirm that at least as far as what comes to your

16    mind as you sit here today, have you told me all the

17    meanings that you intended to convey in creating the

18    photograph?

19              MR. SEDLIK:  Objection; vague.

20         A    My answer is that meaning and purpose are

21    intertwined and cannot be -- at least for me are not

22    distinct concepts.  And so my whole answer, as it has

23    built across several attempts to respond in full to your

24    question, stands.

25         Q    (By Mr. Metzidis) Okay.  Then in that case if
```

Page 29

Exhibit 27
Sedlik Depo

```
 1    you believe that meaning and purpose are intertwined,

 2    have you told me all the meanings and purposes that you

 3    intended to convey or for which you created the

 4    photograph in your answer so far in the deposition?

 5               MR. SEDLIK:   Objection; vague.

 6    Objection; compound.

 7      A    One of my references during the various

 8    responses today was that my intent was to license the

 9    work for use in any and all different media, in addition

10    to licensing others the right to make derivatives of the

11    work.  And I didn't give you a full and complete list of

12    all of my intentions.  For example, to see the work

13    licensed to be used on book covers and book interiors,

14    in editorials, you know, used for decorative purposes,

15    used to -- to have the work collected by institutions,

16    to have individuals purchase posters that are created by

17    me through my company, as well as to license others the

18    right to make posters, to sell all fine art prints.  And

19    by fine art prints, it's not a great term.  It's more

20    like to sell original -- original high-quality prints to

21    collectors and to institutions and organizations.

22               And that's, by no means, a comprehensive list

23    of all the different types of media and work that there

24    can be.  You know, there is a -- significant among the

25    various intended purposes was commercial use of my
```

Page 30

Exhibit 27
Sedlik Depo

```
 1    photograph by others and the intent to have that be

 2    licensed work, licensed use.  And I'll stop there.

 3        Q   (By Mr. Metzidis) It certainly suffices to say

 4    that one of the purposes of creating the photograph was

 5    to create a copyrightable material that you could

 6    commercially exploit; is that right?

 7        A   Yes.

 8        Q   And aside from commercial exploitation of the

 9    copyrighted photograph, have you told me all the other

10    meanings that you intended to convey in creating the

11    photograph?

12            MR. SEDLIK:  Objection; vague.

13        A   I've told you all that came to mind.  I mean,

14    one additional meaning relates to jazz music being a --

15    an American art form, one of the few art forms that

16    actually originated in the United States and the

17    importance to African American culture to that art form,

18    basically as the originators of that art form, and Miles

19    Davis' role in caring on that tradition and in pushing

20    the boundaries of that position -- of pushing the

21    boundaries of that art form.

22        Q   (By Mr. Metzidis) Are there any other meanings

23    that you can think of as you sit here today, other than

24    what you've already testified to that you intended to

25    create in creating the silence photograph?
```

Page 31

Exhibit 27
Sedlik Depo

```
 1                    MR. SEDLIK:  Objection; vague.

 2       A    There are I -- I think I would frame it as

 3   symbolic references within the photograph intended to

 4   support, in a subtle way, other meanings that I have

 5   described here.  And a good example of that is the

 6   cascade of his fingers, which I positioned.  That's not

 7   the actual natural position that his fingers fell into.

 8   I repositioned his fingers.  I wanted them to represent

 9   musical notation and also a cascade of notes.

10            And, you know, I'm not saying that somebody

11   looking at this photograph would immediately think of

12   that.  But in all of my photographs I add symbolic

13   references to support my overall expression.  And

14   whether that comes through as a meaning that's

15   interpreted as I intended, I suppose doesn't -- it might

16   not always come through, but it's there.

17       Q    (By Mr. Metzidis) Are there any other meanings

18   that you intended to convey in the silence photograph

19   other than everything you have told me today in the

20   deposition?

21                    MR. SEDLIK:  Objection; vague.

22       A    Another one that might seem obvious is I wanted

23   to create a beautiful, meaningful image using just the

24   head and shoulders of an individual, which I have

25   challenged myself throughout my career to do, often
```

Page 32

Exhibit 27
Sedlik Depo

```
 1    without using props.  Although I'm using his hand and
 2    his expression and other aspects here, certainly the
 3    wardrobe that I selected, but to create a beautiful
 4    image not only limited to just head and shoulders, but
 5    also without color, or without color other than the
 6    range, the gray scale from white to black and all the
 7    grays in between, to execute this image in such a way
 8    that it was boldly represented in black and white and
 9    limited to head and shoulders was one of the purposes
10    and meanings that I intended to convey.
11         Q   (By Mr. Metzidis) Are there any other meanings
12    that you intended to convey other than everything that
13    you've already testified to so far?
14              MR. SEDLIK:  Objection; vague.
15         A   I also intended to create a low-key image in
16    which the subject is sculpted out of shadows using
17    light-shaping techniques to achieve a desired expression
18    where the subject, Miles Davis, in certain parts of
19    his -- of this depiction blends into the background and
20    seems to emerge out of the darkness.  And it just seemed
21    fitting to me, with my interpretation of his character
22    and all of my work with this, both in the selection of
23    the lens to use to compress the visual representation
24    and the way I shaped the line and the way I handled the
25    shadows and the a way I used the background and my
```

Page 33

Exhibit 27
Sedlik Depo

```
 1    selection of his wardrobe was all intended to result in

 2    the ultimate original expression of this person, this

 3    icon of a human being, being sculpted out of the

 4    darkness.

 5        Q   (By Mr. Metzidis) Are there any other meanings

 6    that you intended to convey in the silence photograph

 7    other than everything you've already testified to today?

 8            MR. SEDLIK:  Objection; vague.

 9        A   I believe that there were, but I can't recall

10    them sitting here today.  I've gone on for a while

11    answering your question.  I'm happy to answer further

12    questions.  I believe that there were intended

13    additional meanings that I just might not be thinking of

14    sitting here at this moment.  If I recognize any I will

15    attempt to bring them to your attention.

16            MR. METZIDIS:  Thank you.  I appreciate

17    that.  Okay.  Bear with me.  I'm going to mark a new

18    exhibit.  Hold on just a moment.

19            THE WITNESS:  Is this a good time, as

20    we're one hour in, to pause briefly for a bathroom

21    break?

22            MR. METZIDIS:  Sure, of course.  Is five

23    minutes okay?

24            THE WITNESS:  Yes.

25            (A break was had from 11:05 to 11:13
```

Page 34

Exhibit 27
Sedlik Depo

```
 1    his publicity shot for a time.

 2          I did shoot him playing a red horn.  He did

 3    stop and said something to the effect of the quote

 4    there.

 5          So this is not a complete representation of the

 6    purpose and the meaning that I intended to convey, but

 7    my testimony just now addresses the meaning of this

 8    text.

 9      Q    Okay.  It's true that Miles Davis recognized

10    that in jazz spaces between notes are just as important

11    as the notes themselves; correct?

12            MR. SEDLIK:  Objection; vague, calls for

13    speculation.

14      A    He described that to me.

15      Q    (By Mr. Metzidis) And it's true that that was

16    one of the concepts that you attempted to translate into

17    a single visual image when you created the silence

18    photograph.  Is that fair?

19      A    One of the -- I think I testified earlier that

20    it was one of the meanings that I intended to convey.

21    All of those concepts, you know, I select from them, I

22    arrange the visual elements and control and combine the

23    visual elements to achieve the desired expression that

24    has all of these different things wrapped up in it, no

25    one standing out from the other.
```

Page 38

Exhibit 27
Sedlik Depo

```
 1                    (Defendant's Exhibit 3 was marked for

 2                    identification and made a part of the

 3                    record.)

 4         Q    Okay.  Thank you.  Bear with me, please.

 5              I've marked as Exhibit 3 a document bearing

 6    Bates numbers JSP 411.  It may take a second to load,

 7    but let me know when you've got Exhibit 3 in front of

 8    you.

 9         A    I have it.

10         Q    Do you recognize Exhibit 3?

11         A    Yes.

12         Q    What is Exhibit 3?

13         A    Collectors who purchase my prints sometimes

14    appreciate or ask for the story behind -- or have

15    interest in the story behind the creation of the

16    photograph.  And I used this description to, on

17    occasion, to close the sale of fine art prints to

18    collectors who might appreciate it.

19              So, in other words, I might offer to say I will

20    sign a description of the story behind this session if

21    you purchase this print.  And that's what this is

22    intended to do.  It's a sales piece.

23         Q    And despite it's being a sales piece, does

24    Exhibit 3 contain an accurate statement of the story

25    behind the creation of the photograph?
```

Page 39

Exhibit 27
Sedlik Depo

```
 1        A    I would need to read the entire thing to answer

 2    that question, which I'm happy to do.  I would say that

 3    my response, my supplemental response to especially

 4    interrogatory 8 has more detail, is more -- addresses

 5    the facts of the creation from a different -- from a

 6    different angle, in other words providing a factual

 7    description of the creation, which this is intended to

 8    help me sell a print.

 9            And so there are some -- first of all, it's not

10    a complete description of all of the creative effort

11    that went into that original expression, the creation of

12    the image.  It is a story intended to sell a print.

13            I'm just going to look in here and see if there

14    is anything that is, I guess, hyperbole.  If you would

15    like me to look through that, I can do it.

16        Q    Yeah, I guess that is my question.  Please read

17    Exhibit 3 yourself and let me know if there is anything

18    in Exhibit 3 that is actually inaccurate.

19        A    It's accurate, but, again, not a complete

20    description of all of the purposes or meanings or the

21    intent of the photograph.  One part that is not -- let's

22    say it's inartfully stated is that the second sentence

23    doesn't really give -- provide the whole story of our

24    initial interactions, but I would say that it's accurate

25    that he was wary of me.  Other than that it's an
```

Page 40

Exhibit 27
Sedlik Depo

1    accurate representation, while incomplete.

2        Q    Let me ask you what is inartful or what doesn't

3    convey the whole story about the second sentence?

4        A    Well, if I was to provide a step by step or

5    blow-by-blow description of all the interactions that

6    went into making this shoot happen, that would be a book

7    in and of itself.  And trying to -- the way that it

8    reads, it reads as if he was wary of me in his backyard

9    in Malibu.  I mean, it could be read in that way, but he

10   wasn't wary of me at that time.

11       Q    I see.

12       A    There were initial interactions and

13   discussions, both with his representatives and with him

14   about my intentions and some logistical issues and

15   things like that that broke the ice.

16       Q    I see.  With regard to the second paragraph

17   that begins with the words, "My concepts for the

18   session," do you see that?

19       A    Yes.

20       Q    Does the written narrative in the second

21   paragraph on Exhibit 3 contain an accurate statement of

22   what you understand to be one of the meanings that you

23   intended to convey in the silence photograph?

24            MR. SEDLIK:  Objection; vague and

25   compound.

                                          Page 41

Exhibit 27
Sedlik Depo

1    A    Counsel, are you referring to that entire

2    second paragraph?

3    Q    (By Mr. Metzidis) Yes.

4    A    It's an accurate paragraph, while not providing

5    all of the meanings and purposes for which the work was

6    created.

7    Q    Right.  And just to be clear, my question

8    wasn't whether the second paragraph expresses all of the

9    meanings you intended to convey.  My question is just

10    whether the second paragraph recounts at least one of

11    the meanings that you intended to convey.

12         And am I correct in understanding that second

13    paragraph does, indeed, express one of the meanings you

14    intended to convey in the silence photograph?

15              MR. SEDLIK:  Objection; vague and

16    compound.

17    A    Yes.  And please understand, Counselor, that

18    I'm trying to avoid any ambiguity in my testimony.  And

19    so I'm -- some of my testimony here might be repetitive

20    as I stress that a lot went into this photograph, very

21    broad purposes, innumerable meanings to be conveyed.

22    And I've covered some of those in my previous testimony

23    but they are even broader than that.

24    Q    (By Mr. Metzidis) Understood.  Okay.  Bear with

25    me, please.

                                        Page 42

Exhibit 27
Sedlik Depo

1    questions that we would get over the phone when people

2    would call, and I have coded them there -- or they have

3    been coded by someone here to refer back to the

4    information on the preceding pages.

5        Q    Okay.  Thank you.  Could you please turn to

6    page JSP 2297 and look at the text in item 4G under the

7    heading "Description of the photograph of Miles Davis."

8        A    I see 4G.

9        Q    Yes.  Thank you.  Do you see where it says, and

10   I quote, "This photograph with Miles holding his finger

11   to his lips symbolizes Miles' muted horn sound and

12   Miles' philosophy that the silent spaces between notes

13   are just as important as the notes themselves"?

14       A    I see that.

15       Q    Does that sentence that I just read contain an

16   accurate statement of what you understand to be one the

17   meanings that you intended to convey in the silence

18   photograph?

19              MR. SEDLIK:  Objection; vague.

20       A    I would point out again that this is

21   advertising copy.  Every word on every page is intended

22   to, number one, close a sale to collect money from the

23   person on the phone and, No. 2, to up sell that person

24   to buying either a signed version of the poster or more

25   than one poster.  And so it's advertising copy that is

                                              Page 45

Exhibit 27
Sedlik Depo

1    designed to -- for sales purposes.

2         It does not provide a complete description of

3    the purposes, nor of the meanings, and especially not

4    the subtle symbolic references as I testified about

5    earlier.  It is an accurate representation of a subset

6    of the meanings that I intended to convey.  And it, of

7    course, does not represent the purpose of the image,

8    which was to license it for use in any and all media

9    throughout the copyright life of the image.

10        Q   (By Mr. Metzidis) So, in other words, the

11   answer to my question is yes.  Is that fair?

12              MR. SEDLIK:  Objection; misstates

13   testimony, vague.

14        A   It's an incomplete description of the meanings

15   that were intended to be conveyed and of the purpose of

16   the photograph and its text that's intended to result in

17   a -- not only in the sale of the poster, but in

18   maximizing the amount of the sale.

19        Q   Is it an accurate statement even if it's

20   incomplete?

21        A   Yes.

22        Q   Thank you.

23              (Defendant's Exhibit 5 was marked for

24              identification and made a part of the

25              record.)

                                    Page 46

Exhibit 27
Sedlik Depo

```
 1    actual images in the possession of people, like a print
 2    or so to speak.
 3          But, again, as with my previous testimony, I
 4    set the bar high for myself and try to convey all the
 5    meanings and concepts that I described in my earlier
 6    testimony in accordance with the purposes that I intend
 7    for the image that I described in my previous testimony.
 8    Q   (By Mr. Metzidis) Okay.  Thank you.
 9              (Defendant's Exhibit 7 was marked for
10              identification and made a part of the
11              record.)
12    Q   I'm going to mark as Exhibit 7 a document
13    bearing Bates Nos. JSP 2520 through 21.  And,
14    Mr. Sedlik, let me know when you've got Exhibit 7 in
15    front of you.
16    A   I have it.
17    Q   Is Exhibit 7 a true and correct copy of the
18    copyright registration that covers the silence
19    photograph at issue in this lawsuit?
20    A   Technically it's the Certificate of
21    Registration, and it appears be to a true and correct
22    copy of that certificate.  I believe that I had a
23    separate registration of the poster.
24    Q   Okay.  And Exhibit 7 is a Certificate of
25    Registration that you obtained in July of 1994; is that
```

Veritext Legal Solutions
866 299-5127

Exhibit 27
Sedlik Depo

```
 1    on the form.
 2                    (Defendant's Exhibit 8 was marked for
 3                    identification and made a part of the
 4                    record.)
 5        Q    Okay.  Let mark as Exhibit 8 a document bearing
 6    Bates numbers JSP 2524 through 29.  Bear with me just a
 7    moment.  Give me a moment.
 8        A    Counsel, would you like me to close Exhibit 7?
 9    I don't have a way of looking at two at once that I know
10    of.
11        Q    Yeah.  I think I'll have you do that.  I'm
12    going to have you come back to Exhibit 7 in a moment.
13    But for now why don't you just let me know when you get
14    Exhibit 8 in front of you.  And if you have to close
15    Exhibit 7, that's fine.
16        A    Okay.  I've got Exhibit 8 open.
17        Q    To your knowledge is Exhibit 8 a true and
18    correct copy of the deposit copy -- (Audio interruption)
19    -- of Jazziz magazine that contain the photographs
20    covered by the registration, the Certificate of
21    Registration that appears in Exhibit 7?
22        A    I have no reason to believe that it's not.
23    It's consistent with what the deposit copy would have
24    been.
25        Q    Okay.  And if we look at the page of Exhibit 8
```

                                                Page 58

Exhibit 27
Sedlik Depo

1    that has the Bates number JSP 2528, do you see that?

2        A    Yes.

3        Q    Do you see that that is, on the left, page 46

4    of Jazziz magazine?

5        A    Yes.

6        Q    And this page, JSP 2528, contains the silence

7    photograph on it; is that right?

8        A    Yes.

9        Q    And then if I could have you open Exhibit 7

10   now.

11       A    Yes.

12       Q    Do you see that page 46 of this edition of

13   Jazziz magazine is one of the pages that is claimed as

14   containing one of the photographs covered by the

15   Certificate of Registration?

16       A    Yes.

17       Q    Okay.  Thank you.  To your knowledge, this

18   August, September 1989 edition of Jazziz magazine was

19   first published on July 20th of 1989?

20       A    That is the date that appears in section 3B of

21   the registration.  So my assumption would be that's when

22   this occurred.  I believe that this registration was

23   submitted by my counsel and completed by my counsel at

24   the time.  So I'm not sure -- normally what -- well,

25   I'll stop there and let you ask the questions.

Veritext Legal Solutions
866 299-5127

Exhibit 27
Sedlik Depo

```
 1        Q    Okay.  Do you know of any other reason why a

 2   date of first publication of July 28, 1989, was listed

 3   other than that -- that was the date that the August,

 4   September 1989 edition of the magazine was published?

 5        A    I could think of numerous scenarios, but I

 6   wouldn't want to speculate.

 7        Q    Okay.  Do you have any knowledge of how widely

 8   Jazziz magazine was circulated?

 9        A    I don't have that current knowledge.  But as

10   part of our barter arrangement I would have seen at the

11   time publication statistics.  It's a -- published in the

12   United States and abroad, primarily in the United

13   States.  And it's my recollection that distribution

14   was -- I don't -- I actually don't recall the

15   circulation at the time.

16        Q    Is it your understanding that Jazziz magazine

17   was widely published in the United States as of August,

18   September 1989?

19        A    Yes.

20        Q    What prompted you to seek a copyright

21   registration for the silence photograph, as well as

22   other photographs, in 1994?

23        A    My training, my education about the purpose of

24   copyright registration through the College of Arts

25   Design, and then knowledge I gained as a volunteer for,
```

Page 60

Exhibit 27
Sedlik Depo

1   documentary, MGM for use in -- it might have been a PBS

2   series called Party of Five or something like that.

3   Licensed it to Sony -- oh, no, no.  Sony was Party of

4   Five, which was a television program, great show back in

5   the day.  MGM was some other film.

6         I licensed it to a city in France to make a

7   statue of my photograph, like a derivative work of the

8   photograph, to celebrate Miles Davis.  For some reason

9   he has a tie-in with that city.  Licensed it to UC Press

10   for use on a book, to Disney for some use, Matters Of

11   the Heart, various record companies and publishers.

12         I mean, I've licensed the image quite a bit and

13   that's all that comes to mind.  I'm sure there's a lot

14   more.

15   Q   As you sit here just right now is there any

16   other licensing uses that you can think of for which you

17   have authorized the silence photograph to be licensed?

18   A   I'm sure I've licensed it for use on various

19   domains on the web.  I just can't think of them at the

20   moment.  I don't have the top of mind.

21   Q   Do you ever licensed the silence photograph to

22   be used in the making of a tattoo?

23   A   I believe that I have at some point or another.

24   I know people have contacted me to request permission.

25   I believe that I've licensed it on at least one

Page 106

Exhibit 27
Sedlik Depo

1    illustrator to make a derivative work on a tattoo.

2        Q    When was that?

3        A    Could be between six and ten years ago.

4        Q    So sometime between 2012 and 2016 you believe

5    that you licensed the silence photograph to be used by

6    an illustrator for work on the tattoo?

7        A    I believe so.  I mean, it might have been

8    earlier than that.  I don't have specific recollection

9    of the time period.  I was just trying to give you a

10   time period.

11       Q    Who is the illustrator?

12       A    It's a tattoo artist on the east coast.

13       Q    Do you know his or her name?

14       A    No.

15       Q    Did you have any writings that memorialized the

16   license?

17       A    I am in the habit of providing licenses in

18   writing, so I would say that it's likely, but I don't

19   know.

20       Q    If you did have any kind of the writings

21   memorializing the documents you would have produced them

22   in the case?

23       A    I would have produced materials described in

24   the request for production.

25       Q    So are you saying it's possible that if you had

Page 107

Exhibit 27
Sedlik Depo

```
 1    a writing evidencing a license for use of the silence

 2    photograph as a tattoo, you would not have produced it

 3    in this litigation if there was not a document request

 4    covering it?

 5                MR. SEDLIK:  Objection; argumentative,

 6    vague.

 7        A    I can't say that.

 8        Q    (By Mr. Metzidis) Do you recall if in the

 9    course of searching for documents responsive to the

10    document request in this case, if you searched for this

11    writing memorializing this license that you issued with

12    regard to the use of the silence photograph as a tattoo?

13        A    I searched in concert with counsel for all

14    documents relevant to the case and we would have

15    searched for documents such as licenses and produced

16    whatever we found.

17        Q    And if you had found a writing for a license

18    from you to a tattoo artist that licensed the tattoo

19    artist to use your silence photograph as a tattoo, you

20    would have produced that writing in this case; is that

21    right?

22        A    I believe so, if I had found it.

23        Q    And if you didn't produce it, fair to say you

24    did not find such a writing; is that right?

25                MR. SEDLIK:  Objection; vague,
```

Page 108

Exhibit 27
Sedlik Depo

```
 1    argumentative.

 2        A    That's correct.

 3        Q    (By Mr. Metzidis) Thank you.  Other than this

 4    instance with the illustrator who is a tattoo artist on

 5    the east coast, what are the other instances in which

 6    you have licensed the silence photograph to be used in

 7    the making of a tattoo are?

 8        A    I know that I have been approached by tattoo

 9    artists and/or their clients.  That's the only license

10    that I mentioned is the only one that I can recall

11    sitting here today where I granted a license.

12        Q    So there is only one instance you can recall in

13    which you granted a license for a tattoo artist to use

14    your silence photograph to be used in the making of a

15    tattoo; is that right?

16        A    That I can recall.

17        Q    That you can recall; is that right?

18        A    That's right.

19        Q    If you wanted to try to find out the name of

20    the tattoo artist to whom you issued this license, how

21    would you go about doing that?

22        A    If I had a responsive document that I located I

23    would have produced it and that would have the name on

24    it.  And I produced all responsive documents after

25    conducting a search with counsel for those documents.
```

Page 109

Exhibit 27
Sedlik Depo

1    So I'm not quite sure.

2        Q   As you sit here today can you think of any way

3    in which it would be possible for you to go into your

4    files or emails and do searches to try to uncover the

5    name of the tattoo artist on the east coast to whom you

6    believe you grant the license?

7            MR. SEDLIK:   I'm going to object that

8    that's vague, calls for speculation.

9        A   I mean, I conducted a diligent and thorough

10   search for responsive documents with counsel and

11   produced anything responsive that we found.  So I can't

12   think of another way that I would identify that person.

13       Q   (By Mr. Metzidis) How did the tattoo artist on

14   the east coast first come into contact with you?

15       A   I don't recall the specifics of that.

16       Q   Did you speak on the phone or communicate with

17   email or discuss in person?

18       A   It would not have been in person.  It could

19   have been by phone, and I didn't find any responsive

20   documents in our diligent search.

21       Q   You did not, in fact.  Find any communications

22   in email with this personal on the east coast; is that

23   correct?

24       A   Correct.

25       Q   So it's fair to say that, to the extent you

                                        Page 110

Exhibit 27
Sedlik Depo

1    granted this persona a license, you did not do so in

2    writing; is that correct?

3        A    My testimony was that it would have likely

4    been in writing, as of I am prone to put licenses in

5    writing, and that I did not find a license in my

6    diligent search.

7        Q    You agree with me that if that license in

8    writing exists somewhere, that's an important document

9    in this case; correct?

10            MR. SEDLIK:   Objection; argumentative,

11   vague, calls for speculation.

12       A    Well, Counselor, I would let you be the judge

13   as to whether or not it's important to you.  Each

14   potential licensee, even if they are in the same

15   category of creator or user, the fees that would apply,

16   or the considerations in licensing are different based

17   on exposure that that derivative work will get.

18            For example, you have a person like the

19   Defendant in this case with combined 20 million

20   followers between her social media platforms for her

21   company and herself, and then you have a little shop

22   somewhere in New Jersey, you know, with, I don't know,

23   one follower.  And so I'm just saying it's -- whether or

24   not that's important to you is your call.

25       Q    (By Mr. Metzidis) Are you saying that the price

Page 111

Exhibit 27
Sedlik Depo

1    small corner shop tattoo place.

2        Q    So you don't recall whether you asked the

3    person with the small corner shop tattoo place on the

4    east coast whether they intended to post images of the

5    of tattoo on social media before you granted the

6    license?

7        A    That's something that I would -- that I would

8    ask, but I don't recall whether or not I asked that.  I

9    would ask that -- I would ask where are you going to use

10   this?  I would ask for -- or insist on attribution, et

11   cetera.

12       Q    Do you recall if the person was a man or a

13   woman?

14       A    I believe it was a man, but I don't have

15   specific recollection.

16       Q    You mentioned New Jersey.  Do you, in fact,

17   recall that the tattoo shop was in New Jersey or do you

18   just generally remember it being somewhere in the

19   northeast?

20       A    Somewhere in the northeast.  I don't know why

21   New Jersey came to mind.

22       Q    Do you recall the price of the license that you

23   granted?

24       A    No.

25       Q    Do you recall if it was more than $100?

                                          Page 113

Exhibit 27
Sedlik Depo

1      A   I don't have specific recollection other than

2   that I granted a license for a tattoo on that occasion,

3   and that on other occasions I have not granted a

4   license.

5      Q   Let's talk about those other occasions now.  On

6   how many other occasions have you been approached by

7   tattoo artists or their clients to request a license or

8   permission to use the silence photograph as a tattoo?

9      A   I don't have specific recollection of the

10   quantity, nor do I keep track.  But it would be safe to

11   say less than 20.

12      Q   And on all these other occasions you declined

13   to grant a license; right?

14      A   I don't have specific recollection of each

15   instance, but I would either quote a fee and the person

16   wouldn't want to pay the fee, or I would ask to see

17   their work so I can make a determination as to whether

18   I'm going to allow them to make a derivative work based

19   on the quality of their -- their technical abilities in

20   replicating my photograph in a tattoo using ink and

21   tattoo gun, and so I might reject them or their idea or

22   not come to terms with them.

23      Q   Are there any writings, including emails, that

24   evidence your communications with these, safe to say,

25   less than 20 people who requested licenses from you.

Page 114

Exhibit 27
Sedlik Depo

1    works is important to me and was one of my intentions in

2    creating this work.

3        Q    Other than the silence photograph, have you

4    ever licensed any of your other copyrighted photographs

5    to be used in the making of tattoos?

6        A    I'm not certain of that.  I mean, I -- one of

7    my portraits of Dizzy Gillespie blowing a bubble comes

8    to mind that I potentially licensed that use as a

9    tattoo, but I don't have specific recollection.  It's

10   been a long stretch of 30 years since I created that

11   photograph, so.

12       Q    Let me go back to the illustrator on the east

13   coast to whom you licensed the silence photograph to be

14   used as a tattoo.  Do you recall if the license involved

15   the payment of money to you?

16       A    I don't recall that.

17       Q    Do you recall if it involved any consideration

18   whatsoever paid to you or was it done for free?

19       A    I don't know, Counselor.  I just -- you know,

20   some of those years and some of those conversations of

21   the tens of thousands of conversations and situations

22   are a blur because of passage of time.

23       Q    So you don't recall as you sit here today

24   whether you received any consideration for licensing the

25   silence photograph to be used in a tattoo to this one

                                              Page 116

Exhibit 27
Sedlik Depo

1   person on the east coast; is that right?

2       A    That's right.

3       Q    If you had received money in connection with

4   that license would you have paid a portion of it to the

5   Miles Davis estate?

6       A    No.

7       Q    Has anyone ever told you that they would not

8   buy a copy of your silence photograph as a result of

9   having seen Kat von D's tattoo?

10      A    No.

11      Q    Has anyone ever told you that they would not

12  buy a copy of your silence photograph as a result of the

13  social media posts about the tattoo?

14      A    No.

15      Q    Do you believe that the use of the silence

16  photograph in Kat von D's tattoo somehow taints or

17  corrupts the original meaning of your work?

18              MR. SEDLIK:   Objection; vague.

19      A    The original meaning.   I just don't understand

20  that question.   Can you use another phrase other than

21  original meaning, or is that what you intended to ask?

22      Q    (By Mr. Metzidis) It is what I intended to ask.

23      A    All right.   I'll give it my best shot.

24      Q    Sure.

25      A    I am going to, in my head, substitute purpose

                                        Page 117

Exhibit 27
Sedlik Depo

1    for that, because purpose and meaning are fairly

2    intertwined, as I testified earlier.

3         So the purpose that I created the photograph

4    for, as I mentioned earlier, was to see the photograph

5    used in any and all media, including the creation of

6    derivative works, and to generate revenue from the

7    creation of those works in the form of distribution and

8    display of reproductions of those works.

9         And so the distribution of pictures of an

10   unauthorized derivative, unauthorized reproductions of

11   my original photograph not only infringe on my

12   copyright, but encourage others, other tattoo artists to

13   similarly infringe, believing that they can do it with

14   impunity, because your client apparently believes that

15   she can.

16   Q    Do you believe that Kat's basing a tattoo off

17   of your silence photograph changes the meaning of the

18   silence photograph?

19        MR. SEDLIK:   Objection; vague.

20   A    I don't really understand the question because

21   it's my view she copied my photograph onto someone's

22   skin in the same way, or almost the same as putting my

23   photograph in a Xerox copy machine and making a copy of

24   my photograph.  So she used her own technical

25   capabilities to make the most accurate possible copy of

Page 118

Exhibit 27
Sedlik Depo

```
 1      that they can steal any photograph and copy it and
 2      monetize it without the permission of the creator.
 3                  MR. METZIDIS:  I'm going to move to
 4      strike as non-responsive.  Mr. Sedlik, I'm going to try
 5      to ask the question again.
 6          Q   (By Mr. Metzidis) To your knowledge, has the
 7      market value for your silence photograph decreased after
 8      Kat von D inked the tattoo in 2017?
 9          A   I haven't had the market value appraised either
10      before or after the infringing usages.
11          Q   So you have no knowledge one way or the other
12      whether the market value has decreased after Kat Von D
13      inked the tattoo in 2017?
14                  MR. SEDLIK:  Objection; vague and asked
15      and answered.
16          A   It's my position that the market value -- I
17      can't quantify it, but it's my position that the market
18      value has decreased because of effect of her brazen and
19      reckless use of my photograph in creating a derivative
20      work and then distributing it to all of her followers.
21      In fact, I do recall a comment made by her peers saying,
22      "Let's all make tattoos of this photograph," in other
23      words, encouraging others to make similarly unauthorized
24      tattoos.
25          Q   (By Mr. Metzidis) Other than what you described
```

                                                    Page 120

Exhibit 27
Sedlik Depo

```
 1    as the effect of her brazen and reckless work using your
 2    photograph, is there any other facts that you're aware
 3    of that leads you to believe that the market value for
 4    your silence photograph has decreased after Kat's having
 5    inked the tattoo in 2017?
 6              MR. SEDLIK:  Objection; vague, asked and
 7    answered.
 8        A   Her creation and distribution and display of
 9    the derivative usurped the market for my licensing
10    efforts for the photograph to the tattoo industry by
11    giving the tattoo industry further reason to believe,
12    incorrectly, that they can make use of photographs,
13    exploit them for their monetary gain without the
14    permission of the photographers.
15        Q   (By Mr. Metzidis) Prior to Kat's inking the
16    tattoo in 2017, you had only granted one license for use
17    of the tattoo -- for use of the silence photograph as a
18    tattoo; is that correct?
19        A   Yes.
20        Q   What do you believe is the market value of the
21    silence photograph now after the Defendant's conduct in
22    2017?
23              MR. SEDLIK:  Objection; vague.
24        A   I already testified that I did not have the
25    photograph -- the market value of the photograph
```

Page 121

Exhibit 27
Sedlik Depo

1      appraised prior to the infringement or after the

2      infringement.  I think this word after -- this phrase

3      "after the infringement" is incorrect both when you say

4      it and when I say it, because she has chosen to leave up

5      the ongoing willful infringements.  After I notified her

6      and gave her constructive notice in writing, after my

7      attorney notified her attorney, and after I filed the

8      lawsuit.

9          Q   So are you not able to say what you believe the

10     market value of the silence photograph is now after the

11     Defendant's initial conduct in 2017?

12             MR. SEDLIK:  Objection; vague.

13         A   As I testified, I didn't have the photograph

14     appraised before, or I guess it would be correct to say

15     during the infringement, as it is ongoing.  And so I

16     can't quantify decrease in market value, but I can

17     testify, as I did a few minutes ago, that her use

18     usurped the market for my licensing efforts.

19             And whether I choose to grant a license for a

20     particular type of use or choose to withhold that right

21     from the marketplace and let the value accrue is my

22     choice, my ultimate choice as the exclusive copyright

23     owner until the image becomes owned by the public 75

24     years after my death.

25             I'm sorry, Counselor.  I think I said 75.  It's

                                            Page 122

Exhibit 27
Sedlik Depo

```
 1              C E R T I F I C A T E

 2

 3    STATE OF OKLAHOMA    )

 4                         ) SS:

 5    COUNTY OF OKLAHOMA   )

 6           I, Trena K. Bloye, Certified Shorthand Reporter

 7    within and for the State of Oklahoma, certify that

 8    JEFFREY B. SEDLIK was by me first duly sworn to testify

 9    the truth, the whole truth, and nothing but the truth,

10    in the case aforesaid; that the witness chooses to read

11    and sign the deposition; that the above and foregoing

12    deposition was taken by me in shorthand and thereafter

13    transcribed; that the same was taken on January 11,

14    2021, at 10:11 a.m. PT, via video conference; that I am

15    not an attorney for, nor a relative of any of said

16    parties or otherwise interested in the event of said

17    action.

18           IN WITNESS WHEREOF, I have hereunto set my hand

19    and official seal this 19th day of January, 2022.

20

21

22

23

24           Trena K. Bloye, CSR

25           State of Oklahoma CSR No. 1522
```

Page 188

Exhibit 27
Sedlik Depo