1  SEDLIKGROUP, P.C.
2  Gary S. Sedlik, Esq. (CA Bar No. 181192)
   P.O. Box 3238
3  Manhattan Beach, CA 90266
   Phone: (310) 439-9986 | Fax: (844) 320-8044
4  Email: gary@sedlikgroup.com

5  Attorneys for Plaintiff Jeffrey B. Sedlik

6              UNITED STATES DISTRICT COURT
             CENTRAL DISTRICT OF CALIFORNIA
7

8  JEFFREY B. SEDLIK, an individual;        Case No. 2:21-cv-01102-DSF-MRWx

9              Plaintiff,                    **PLAINTIFF'S OPPOSITION TO
                                             DEFENDANTS' MOTION FOR
10             v.                            SUMMARY JUDGMENT OR
                                             PARTIAL SUMMARY JUDGMENT**
11 KATHERINE VON DRACHENBERG
   (a.k.a. "KAT VON D"), an individual;     <u>Hearing</u>
12 KAT VON D., INC., a California           Date: April 18, 2022
   corporation; HIGH VOLTAGE               Time: 1:30 p.m.
13 TATTOO, INC., a California               Place: Courtroom 7D
   corporation; and DOES 1 through 10,            First Street Courthouse
14 inclusive,                                      350 West 1st Street
                                                   Los Angeles, CA 90012
15             Defendants.
                                             Action filed: February 7, 2021
16                                           FPTC: June 27, 2022
                                             Trial: July 26, 2022
17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## CASES

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001)                    8

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006)        11

*Blanch v. Koons,* 467 F.3d 244 (2d Cir. 2006)                              5, 21

*Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 23 S. Ct. 298, 47 L. Ed. 460 (1903)                                16

*Burrow-Giles Lithographing Co.* v. *Sarony*, 111 U. S. 53, 4 S. Ct. 279, 28 L. Ed. 349 (1884)                                13, 14

*Campbell v. Acuff-Rose Music*, 510 U.S. 569, 114 S. Ct. 1164, 127 L. Ed. 2d 500 (1994)                                  passim

*Cariou v. Prince*, 784 F. Supp. 2d 337 (S.D.N.Y. 2011)                       passim

*Columbia Pictures, Inc. v. Miramax Films Corp.*, 11 F. Supp. 2d 1179 (C.D. Cal. 1998)                                    5

*Comedy III Productions, Inc. v Gary Saderup, Inc.*, 25 Cal. 4th 387, 21 P.3d 797 (Cal. 2001)                                9

*Dauman v. Andy Warhol Foundation for the Visual Arts*, 43 U.S.P.Q.2d 1221 (S.D.N.Y. 1997)                               10

*Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*,109 F.3d 1394 (9th Cir. 1997)                                5, 7, 9, 12

*Elvis Presley Enterprises, Inc. v. Passport Video*, 349 F.3d 622 (9th Cir. 2003)   11, 12

*Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068 (9th Cir. 2000)                  13

*Friedman v. Guetta*, Case No. CV 10-00014, 2011 U.S. Dist. LEXIS 66532 (C.D. Cal. May 27, 2011)                           passim

*L.A. Printex Indus. v. Aeropostale, Inc*, --- F.3d ---, 2012 U.S. App. LEXIS 12033 (9th Cir. June 13, 2012)                        5, 18, 19

*Leibovitz v. Paramount Pictures, Inc.*, 137 F.3d 109 (2d Cir. 1998)              14

*Mannion v. Coors Brewing Co.*, 377 F. Supp. 2d 444 (S.D.N.Y. 2005)              13

*Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 2012 U.S. App. LEXIS 16947 (9th Cir. 2012)                               6, 18, 21

*NXIVM Corp. v. Ross Institute*, 364 F.3d 471 (2004)                         17

*Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70 (2d Cir. 1997)    7, 18

*Rogers v. Koons*, 960 F.2d 301 (2d Cir. 1992) *cert. denied,* 506 U.S. 934, 113 S. Ct. 365, 121 L. Ed. 2d 278 (1992) ............................................................ passim

*S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081 (9th Cir. 1989) ........................ 4

*United Feature Syndicate v. Koons*, 817 F. Supp. 370 (S.D.N.Y. 1993) ...... 2, 6

*Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110 (9th Cir. 2000) ............................................................................................ 6, 7, 18

**STATUTES**

17 U.S.C. § 106 ............................................................................................ 4, 6

17 U.S.C. § 107 ................................................................................................ 5

1

**TABLE OF CONTENTS**

I. INTRODUCTION                                                                                    1

II. FACTS                                                                                               2

III. DEFENDANTS DO NOT CONTEST                                                    5
INFRINGEMENT

IV. DEFENDANTS HAVE NOT MET THEIR BURDEN                         6
TO PROVE FAIR USE

V. DEFENDANTS PRESENT NO VALID LEGAL                                   20
ARGUMENT AS TO THEIR UNAUTHORIZED
LITERAL COPYING OF THE ICMDP

VI. DEFENDANTS HAVE NOT MET THEIR BURDEN                        21
REGARDING KVD, INC.

VII. DEFENDANTS HAVE NOT MET THEIR BURDEN                       22
REGARDING PARTIAL SUMMARY JUDGMENT ON
DAMAGES

VIII. DEFENDANTS HAVE NOT MET THEIR BURDEN                      23
REGARDING DEFENDANTS' VIOLATIONS OF 17 USC
1202

IX. CONCLUSION                                                                                  25

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

At its core, before this Court is a garden variety case of copyright infringement. Plaintiff is the author of the Iconic Miles Davis Portrait ("ICMDP"), a work protected by a federally-registered copyright, and Defendants knowingly and willfully reproduced, distributed, copied and displayed Plaintiff's work and an unauthorized derivative work without a license or permission. None of these facts is in dispute. This is Hornbook copyright infringement.

Despite Defendants' somewhat desperate attempts to dress up their admitted infringement as somehow "special" or noteworthy, it is not. Defendants cannot cite to a single case declaring that tattoos or tattooists are exempt from federal copyright law, a single case declaring that tattooists may steal other artists' work because tattooists (or their clients) have a purportedly unique opinion about their resulting infringing content, or a single case supporting their outrageous proposition that tattooists have always stolen artists' works and therefore should be able to continue to steal protected works with legal impunity because (according to Defendants) tattooists have historically "self-regulated" their unlawful activity by "shunning" or tattooists who copy other tattooists' works.

In short, in terms of the <u>law</u>, there is nothing "novel" or exceptional about Defendants' theft and commercial exploitation of the ICMDP. If this Court were to adopt the unsupported legal theories proffered in Defendants' Motion for Summary Judgment, tattooists and other artists could then freely steal and exploit any other artist's protected creations merely by declaring an opinion or feeling about their resulting derivative copy. Tantamount to declaring "open season" on the creative works of all artists, such a finding would release infringers from liability for their exploitative acts, eviscerating the fundamental exclusive rights afforded creators under the Copyright Act. Defendants' outlandish legal

1

1    proposition has no support in any statute or federal copyright case law.

2         Further, Defendants' Motion only addresses one of the numerous

3    infringements that Defendants' committed with respect to the ICMDP. As stated

4    in the complaint, in addition to making and displaying unauthorized derivative

5    works of the ICMDP in the form of a tracing, a thermal transfer and a tattoo,

6    Defendants also <u>literally</u> copied the ICMDP (both in digital form and through

7    multiple printed copies) and then prominently displayed and distributed these

8    copies (along with copies of their unauthorized derivatives) for commercial

9    purposes to millions of social media followers without license or permission from

10   Plaintiff. Defendants also allowed, facilitated, enabled, and induced each other, as

11   well as third parties, to reproduce, distribute, display, share, and otherwise exploit

12   these photos depicting infringing copies and derivatives of the ICMDP, as well as

13   videos including the ICMDP and Defendant's derivatives, thus committing further

14   acts of infringement. Not only do Defendants fail to rebut Plaintiff's claims

15   related to these separate infringements in their Motion, they readily <u>admit</u> all of

16   these infringements, and supply significant evidence conclusively establishing

17   that they have repeatedly and extensively infringed Plaintiff's copyright directly,

18   vicariously and contributorily.

19        Lastly, Defendants arguments regarding damages, Kat Von D, Inc. and

20   liability pursuant to 17 U.S.C. 1202 are either unsupported by the cited facts or

21   are inappropriate for decision on summary judgment. For all of these reasons,

22   Defendants have failed to meet their high burden of proof on summary judgment,

23   and Plaintiff urges this Court to deny Defendants' Motion in its entirety.

24   **II.    <u>FACTS</u>**

25        The Court has already been provided the basic background facts regarding

26   Defendants' unlawful reproduction of the ICMDP, and Plaintiff will not re-hash

27   that information again here. Nevertheless, there are important facts specific to this

28   Opposition that must be presented.

First, with respect to Defendants' arguments relating to Plaintiff's claims pursuant to 17 U.S.C. § 1202 for removal, alteration or falsification of Plaintiff's Copyright Management Information (CMI), Defendants fail to acknowledge critical facts regarding Defendants' conduct throughout the pendency of this case, which  bears directly on the arguments presented by Defendants in their Motion.

Plaintiff served each of the three defendants with document demands pursuant to Fed. R. Civ. P., Rule 34. Declaration of Gary S. Sedlik ("GS Decl."), ¶12. Among the approximately 57 separate demands served by Plaintiff on each Defendant were multiple demands specifically requesting all electronic files relating to creation of the tattoo. GS Decl., ¶12. In response to Plaintiff's 57 document demands, Plaintiff produced a grand total of 17 documents, including 16 PDFs and one video file depicting Defendants' infringing derivative work. GS Decl., ¶13. One of these PDFs shows a small snippet of a text exchanged between Defendants and the recipient of the tattoo, Blake Farmer, which appears to include an image file of Mr. Sedlik's ICMDP. GS Decl., ¶13.

On January 11, 2022, Plaintiff's counsel wrote to Defendants' counsel and demanded the production of the unaltered, native file depicted in the converted PDFs produced by Defendants. GS Decl., ¶14. Following a telephonic meet and confer, instead of producing the actual native files in Defendants' possession, Defendants' counsel emailed Plaintiff's counsel a single, miniscule 16 kb file in JPG format, representing to Plaintiff that this file was "the .jpeg image files that my office used to render those into PDFs." GS Decl., ¶15.

Having still not received the original files, Plaintiff questioned Defendants during their deposition regarding the native files of the ICMDP used by Defendants, and Defendants' access to such files. GS Decl., ¶16. Within a few seconds of Plaintiff's counsel's mention of the missing files during the deposition, Ms. Von Drachenberg was able to pull up and open a copy of the ICMDP on her personal computer that she described as being "the actual image" that is in the text

thread between Defendants and Blake Farmer. GS Decl., ⁋16. Ms. Von Drachenberg also testified that it would be "no problem" to provide "the other ones" (presumably referring to additional copies of the ICMDP) that she could easily obtain from her assistant's phone. GS Decl., ⁋16.

On March 10, 2022, Plaintiff's counsel wrote another meet and confer letter to Defendants' counsel again demanding production of the native files of the ICMDP in Defendants' custody. GS Decl., ⁋17. Defendants' counsel never responded to Mr. Sedlik's letter and never produced the original, native files as demanded. As of this filing, Defendants still have not produced the native files of Mr. Sedlik's ICMDP received from Mr. Farmer or the other copies of Mr. Sedlik's ICMDP in their possession, custody or control. GS Decl., ⁋18.[1]

Additional facts are also required to evaluate Defendants' arguments with respect to defendant Kat Von D, Inc. ("KVD, Inc."). Defendants argue in their motion that "the evidence establishes KVD, Inc. is a company Kat used for her non-tattoo-related pursuits." Motion at 25. Defendants then build on this "evidence" to claim that Plaintiff's cannot prove that KVD, Inc. had any relationship to the tattoo in this case. Motion at 25-27. Unfortunately, Defendants' statement is demonstrably false based on the <u>actual</u> evidence produced in this litigation, rendering their entire argument as to KVD, Inc. moot.

Although Defendants did not produce many documents in discovery, they did produce an official government document filed with the California Secretary of State by KVD, Inc. known as a "Statement of Information." GS Decl., ⁋5. In this document, filed in November 2008, KVD, Inc. informs the State of California that KVD, Inc. is in the business of "Personal Services - Body Art." GS Decl., ⁋5. This is nearly identical to the "Business Type" description used by tattoo parlor defendant High Voltage Tattoo, Inc. in their official California Secretary of State

---

[1] Of course, Defendants are legally obligated to self-produce each of these files without ever having received Plaintiff's document demands or other requests from Plaintiff pursuant to Fed. R Civ. P. 26(a)(1)(A)(ii), but have refused to do so.

Statement of Information filing of the same year. GS Decl., ¶6.[2]

Lastly, with respect to Defendants' claims regarding Plaintiff's ability to prove damages in this matter, Defendants have made the perplexing contention that Plaintiff failed to demand documents and information from Defendants regarding their revenues relating to Defendants' exploitation of the ICMDP. Motion at 29-31. In fact, Plaintiff demanded exactly these documents and information from Defendants, but Defendants refused to provide it during discovery, although directly responsive to Plaintiff's demands.

In Plaintiff's First Set of Document Demands to each of the three Defendants referenced above and served on September 29, 2021, Plaintiff demanded documents that Defendants produce documents "evidencing, reflecting or referring to any monetary payment, in-kind consideration or other compensation YOU have received relating to YOUR publication of the TATTOO on SOCIAL MEDIA. GS Decl, ¶10. Each of the Defendants responded to this request by stating that they had "no documents." GS Decl., ¶10.

For Defendants to falsely claim in their Motion that "Plaintiff <u>never requested that information during discovery</u> and it was never provided" is both troubling and contrary to the actual evidence provided above and in the discovery demands and responses attached to the concurrently-filed declaration of Plaintiff's counsel, Gary Sedlik. GS Decl., ¶10. Plainly, this evidence undercuts Defendants' entire argument that Plaintiff cannot prove damages "because he never asked for them" and, standing alone, is sufficient to defeat Defendants' Motion for Partial Summary Judgment on Plaintiff's damages.

## III.   DEFENDANTS DO NOT CONTEST INFRINGEMENT

It is important to note that Defendants do not contest infringement for the

---

[2] Curiously, during the pendency of this litigation, In August 2021, KVD, Inc. went to the trouble of filing a new Statement of Information with the California Secretary of State -- its first and only change from the 2008 filing referenced above -- altering its purported Business Type to "Artist/Actress," which makes little sense as KVD, Inc. is a corporation and cannot be an "actress." G. Sedlik Decl, ¶8. In any regard, this change was made well after the events that are at issue in this case, and while Plaintiff's claims against KVD. Inc. were pending.

purposes of this Motion. In ruling upon the instant Motion, it is taken as true that Plaintiff owns the copyright to the image and that Defendant copied it.

To establish copyright infringement a plaintiff must show (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. *Feist Publications, Inc., v. Rural Telephone Service Company, Inc.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000), cert. denied, 531 U.S. 1126, 121 S.Ct. 881, 148 L.Ed.2d 790 (2001). On this Motion, there is no dispute that the ICMDP is entitled to copyright protection, that he owns the copyright and that Defendants copied the work. The only question is whether Defendants' copyright infringement was protected by the affirmative defense of fair use.

## IV.   DEFENDANTS HAVE NOT MET THEIR BURDEN TO PROVE FAIR USE

Much of Defendants' Opposition is spent arguing matters that are legally irrelevant to established infringement and fair use standards. These matters include:

1.   That This Case Presents Issues Unique To The Tattoo Industry: Defendants' Motion begins: "This is a case of first impression.  It raises an issue concerning the tattoo profession that has never been decided before. . . "  Motion p. 7:2-5. However, the Copyright Act does not state that its provisions do not apply to tattooists and their businesses, and Defendants have presented no legal authority which permits this Court to make such a finding. Indeed, by making this argument Defendants are tacitly admitting that a standard judicial Copyright analysis requires a determination of infringement.

2.   That There Is No Custom And Practice Of Paying For Licenses In The Tattoo Industry: Defendants argue, through their proffered experts, that as "using copyrighted or copyrightable source materials as reference materials for creating tattoos is a common practice within the tattoo profession," Defendants should be absolved of liability for their copyright infringements and DMCA violations. See

Motion, p. 11:17-12:7. This argument seeks to use Defendants' proffered experts to improperly and unlawfully usurp the role of the judge in instructing the Court on the legal standard applicable to Defendants' conduct and falsely instruct the jury that copyright law does not apply to tattooists because stealing protected works has been a "common practice" within their industry for many years. Further, even if these improper opinion statements were admissible, the customs and practices of fellow infringers cannot absolve an infringer of liability. See *Dun & Bradstreet Software Servs., Inc, v. Grace Consulting, Inc.*, 307 F.3d 197, 211 (3d Cir. 2002) ("A defense of industry custom and practice in the face of the protective provisions of the Copyright Act could undermine the purposes and objectives of the statute and reduce it to rubble."); *Weinstein Co. v. Smokewood Entm't Grp., LLC*, 664 F. Supp. 2d 332, 348 (S.D.N.Y. 2009) ("[N]otwithstanding plaintiff's claims about 'custom and practice' in the entertainment industry, federal copyright law dictates the terms by which an exclusive license can be granted."); *Palmer/Kane LLC v. Rosen Book Works LLC*, 204 F. Supp.3d 565 (S.D.N.Y. 2016)("Infringement is infringement, regardless of what [Defendants] may have chosen to call it."); *Famous Music Corp. v. Seeco Records, Inc.*, 201 F.Supp. 560, 566 (S.D.N.Y. 1961) ("Custom and usage may not be invoked to receive defendant of the clear-cut obligations imposed by the application of the statute.").  Defendants' testimony on that topic is inadmissible under Fed. Rules of Evid., Rule 702 and Rule 403.

　　　　3.　　That Defendants (and/or Other Non-parties) Were Motivated By A Love Of Miles Davis: Defendants' papers focus extensively on attempting to establish that their infringing actions were motivated by a love for Miles Davis. See e.g., SUF 83 – 91. This testimony is irrelevant to a fair use analysis and has no bearing on Defendants' copyright infringement. To find otherwise would mean that anyone could escape liability for stealing and exploiting a protected work simply by claiming to admire the subject matter, or by claiming that the subject matter holds special meaning to the infringer. This would obviously create an absurd result.

An analysis of the law in opposition to Defendants' Motion is below.

### A.   DEFENDANTS' BURDEN

Fair use is an affirmative defense. *Dr. Seuss Entprs., L.P. v. ComicMix LLC*, 983 F.3d 443, 452–53 (9th Cir. 2020). Accordingly, Defendants bear the burden of proof on all factors. *Id. at* 1403 (9th Cir. 1997); *Columbia Pictures, Inc. v. Miramax Films Corp.*, 11 F.Supp.2d 1179, 1187 (C.D. Cal. 1998). This means that Defendants' burden on this Motion is particularly steep. On summary judgment: "[w]here the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986). Fair use "may be resolved on summary judgment if a reasonable trier of fact could reach only one conclusion." *Narell v. Freeman*, 872 F.2d 907 (9th Cir. 1989).

### B.   LEGAL STANDARD FOR FAIR USE

In determining whether the affirmative defense of fair use applies, the following factors, set forth in 17 USC § 107, are considered:

> (1) the purpose and character of the use, including whether the use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

These statutory factors are not exhaustive, as other factors may be considered, and all factors must be assessed in conjunction with each other, rather than in isolation from one another. See *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 627 (9th Cir. 2003) ("[W]e may not treat the [fair use] factors in isolation from one another."), overruling on other grounds recognized by *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1177 (9th Cir. 2013); *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1399 (9th Cir. 1997). Each factor is addressed in turn below.

1

**1.      First Factor: Purpose and Character**

2       The first statutory fair use factor is the purpose and character of the use,

3  including whether the use is of a commercial nature or is for nonprofit educational

4  purposes. As set forth below, Defendants cannot meet their burden of showing that

5  no reasonable trier of fact could find other than for the moving party." *Calderone v.*

6  *United States*, 799 F.2d 254, 259 (6th Cir. 1986). With regard to this first factor, as

7  the Supreme Court said in *Campbell*, 510 U.S. 579, '[t]he central purpose of this

8  investigation is to see … whether the new work merely 'supersede[s] the objects' of

9  the original creation… or instead adds something new, with a further purpose or

10  different character, altering the first with new expression, meaning, or message; it

11  asks, in other words, whether and to what extent the new work is 'transformative.'"

12  As Justice Story put it: 'There must be real, substantial condensation of the

13  materials, and intellectual labor and judgment bestowed thereon; and not merely the

14  facile use of the scissors; or extracts of the essential parts, constituting the chief

15  value of the original work.' [Citation]".  *Worldwide Church of God v. Philadelphia*

16  *Church of God, Inc.*, 227 F.3d 1110, 1117 (9th Cir. 2000).

17       While Defendants employ flowery and self-important language, waxing

18  poetically about the subjective meanings or purposes of the infringing tattoo from

19  various perspectives, none of these claims is relevant to  this analysis. If we accept

20  that Defendants' purpose was to inspire listeners of jazz or "create a sentiment . . .

21  that evoked melancholy and had movement in it" (See Motion p. 11:4-5), the same

22  can be said of Plaintiff's photograph, copied by Defendants. As such, Defendants

23  have not established any material difference between the "purpose" of their

24  infringing copy, and the purpose of Plaintiff's photograph.

25       As set forth above, this factor "asks. . . whether and to what extent the new

26  work is 'transformative.'" *Campbell*, 510 U.S. 579. Transformative is,

27  unfortunately, an often misunderstood word in the context of copyright. *Andy*

28  *Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26 (2d Cir. 2021)("As

-9-

used in copyright law, the words "transformative" and "derivative" are legal terms of art that do not express the simple ideas that they carry in ordinary usage."). Specifically, confusion can arise because the same word -- "transform" -- is used in both the derivative work standard and the fair use standard, though in one case it means the use is infringing and the other it means that it is not. A copyright owner has the fundamental exclusive right to create "derivative works," 17 U.S.C. § 106(2), which includes "any form in which a work may be recast, <u>transformed</u> or adapted." Thus, where an unauthorized third party prepares a derivative work without authorization, the copyright owner of the underlying work can sue for infringement. See *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 885 (9th Cir.2005). When an infringer makes a work that is <u>truly</u> transformative, that factor may weigh in the infringer's favor in the fair use analysis.

Clarifying this "potential source of confusion," the Second Circuit explained, in *Castle Rock Entertainment, Inc. v. Carol Pub. Group. Inc.*, 150 F.3d 132 (2nd Cir. 1998), that a derivative work transforms an original work into a new mode of expression but without the transformative purposes of fair use. To identify true transformative purposes, the inquiry here is guided by the examples in the preamble to § 107, looking to whether "whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 579 (internal quotation marks and citations omitted)."

If the terminology is ambiguous, a review of the relevant cases is instructive in infringement determinations. For example, making a two dimensional photograph of a three dimensional sculpture is copyright infringement because it creates an unauthorized derivative work, even though it requires new artistic expression and is executed in an entirely different medium, using entirely different skills, techniques and tools. *Gaylord v. United States*, 595 F.3d 1364, 1372-73 (Fed. Cir. 2010) (photograph of Korean War Memorial statute unauthorized derivative

-10-

1    work, even though the photograph involved new artistic expression). Legally (and

2    logically), the converse is true as well -- making a three dimensional sculpture

3    based upon a two dimensional photograph is copyright infringement by creating an

4    unauthorized derivative work, even though it requires new artistic expression and is

5    executed in an entirely different medium, using entirely different techniques and

6    tools.  *Rogers v. Koons*, 751 F.Supp. 474 (S.D.N.Y.1990), aff'd, 960 F.2d 301 (2d

7    Cir.1992) (sculpture made based upon a photograph is not an authorized derivative

8    work, even though the sculpture involved new artistic expression).

9         In this case, Defendants made a drawing (tattoo) based upon Plaintiff's

10   photograph. While Defendant goes on at great length in her declaration about the

11   purported skill and effort required to copy Plaintiff's photograph  - - See Docket

12   No. 35-1, Declaration of Katherine Von Drachenberg, ¶5-19 - - the application of

13   her skills and effort do not render the result a fair use of Plaintiff's photograph and

14   copyright. A tattoo or drawing based upon a photograph is by definition a

15   derivative work, and falls squarely within the definition of copyright infringement.

16   See e.g., United States Copyright Office, Circular 14, Copyright In Derivative

17   Works and Compilations ("The following are examples of the many different types

18   of derivative works: . . . A drawing based on a photograph."); *Time, Inc. v. Bernard*

19   *Geis Assocs.*, 293 F. Supp. 130 (S.D.N.Y 1968) (charcoal sketches based upon film

20   stills).  Defendants have presented no valid legal authority to support their claim

21   that employing some level of artistic skill in transferring Plaintiff's copyrighted

22   photograph into another medium wipes away their infringing acts.

23        Further, nothing about Defendants' unauthorized reproduction, distribution,

24   display or adaptation of the ICMDP comes close to meeting Defendants' high

25   burden to prove fair use. 17 USC § 107 presents numerous examples of

26   transformative uses, including: "criticism, comment, news reporting, teaching . . . ,

27   scholarship, or research." None of these cited categories of transformative use have

28   any relation to Defendant's exploitation of Plaintiff's photograph. Moreover,

although these examples are "illustrative and not limitative," *Campbell*, 510 U.S. 577, they should "not be ignored" since a use that is "not remotely similar to any of the listed categories" likely lacks a transformative purpose. *Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70 (2nd. Cir. 1997).

The commercial character of Defendants' use must also be considered, that is, "whether the original was copied in good faith to benefit the public or primarily for the commercial interests of the infringer." *Rogers*, 960 F.2d 309. Defendants claim that the tattoo was "non-commercial" because Defendants did not charge for the tattoo. See Motion p. 7:24-26. However, "[d]irect economic benefit is not required to demonstrate a commercial use." *Napster*, 239 F.3d 1015. Given that Defendant's repeatedly published depictions of the infringing tattoo to Defendants' social media platforms to promote their businesses, they received and enjoyed indirect economic benefit in the form of advertising, promotion and goodwill.

More importantly, notwithstanding Defendants' contentions regarding their claimed "innocent" usage of the ICMDP, both directly and through their unauthorized derivative work, the facts demonstrate otherwise. Defendants readily admit that they used Plaintiff's copyrighted work in a brazenly commercial way -- by prominently displaying and distributing images of the ICMDP and their derivative work to <u>tens of millions</u> of social media followers on corporate social media accounts intended to promote Defendants' various brands. SUF 94, 95, 96, 97 98, 99, 100. Defendants did not commercially exploit the ICMDP once, twice, three times, or ten times. By their own admission, they made at least TWELVE <u>separate</u> social media posts (to their corporate Instagram, Facebook and Twitter accounts) over a span of more than a year.[3] *Id*. These posts have been viewed, liked and shared by millions of Defendants' social media followers, in a viral pattern of infringing activity. In addition, Defendants published videos to their corporate

---

[3] As far as Plaintiff and Plaintiff's counsel can determine, although Defendants have made many thousands of social media posts, Defendants have never posted so many distinct times depicting a single tattoo as they made depicting the tattoo based on Plaintiff's ICMDP.

social media accounts, reproducing, displaying and distributing Mr. Sedlik's ICMDP in the form of a tattoo. Id.

Defendants' claim to have received no financial benefit from purposefully and intentionally displaying the ICMDP and their unauthorized derivative work to millions of followers, fans and customers is both false and disingenuous. License-free exploitation of the ICMDP for advertising and promotion of Defendants' businesses and brands is as commercial and profit-driven as a use could be.

While Defendants claim that their use was not profitable, "the mere fact that a use is … not for profit does not insulate it from a finding of infringement, any more than the commercial character of a use bars a finding of fairness." *Campbell*, 510 U.S. 584. The crux of the inquiry is "not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. 562. In this case, for the reasons discussed above, the answer is unquestionably yes. Defendants have failed to provide sufficient evidence to meet their burden to prove that their use was for "nonprofit educational purposes."

### 2.   Second Factor: Nature

The second statutory factor is the "nature of the copyright work" which recognizes that "some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 520 U.S. 586. The basic distinction here is whether the work is factual or creative. Defendants cannot meet their burden of showing that no reasonable trier of fact could find other than for the moving party." *Calderone, supra.* Defendants recognize, as they must, that the ICMDP is a creative work. See Motion p.18:15-16. "[P]hotographs taken for aesthetic purposes, are creative in nature and thus fit squarely within the core of copyright protection." *Elvis Presley*, 349 F.3d. 629.  Thus, Plaintiff's work is entitled to strong protection.

Defendants nevertheless, make the curious claim that Plaintiff's photograph

is entitled only to "thin" copyright protection. See Motion p. 18:15-20.  However, the "thin" copyright doctrine applies only in a determination of whether an infringement occurred. *Satava v. Lowry*, 323 F.3d 805 (9th Cir. 2003). As discussed above, Defendants have conceded that determination. The "thin" copyright doctrine has no relation to a fair use analysis, and no relevance in this matter.

Further, in making their arguments with respect to this factor, Defendants ignore and trivialize the substantial original expression in the Iconic Miles Davis Photograph, described in great detail in Plaintiff's Second Supplemental Response to Defendants' First Set of Interrogatories, attached as Exh. M to GS.

A photographer's selection and arrangement of the subject can itself be an original work.  E.g., *Rogers v. Koons*, supra, 960 F.2d 301 (arrangement of puppies).  In *Burrow-Giles*, the copyright included "arranging the subject so as to present graceful outlines."  *Burrow-Giles*, supra, 111 U.S. at 60. In this case, Plaintiff conceived, pre-visualized, determined, arranged, coordinated and controlled every aspect of the ICMDP, making numerous subjective artistic choices to achieve his desired expression. *Id.* Plaintiff exercised his artistic discretion to imbue the ICMDP with layer upon layer of meaning and original expression, both literal and symbolic. See Sedlik Depo. at 23:23-24:9 (discussing some of these meanings); also *see* Sedlik Depo. at 25:1-34:15, attached as Exh. F to GS Decl.

Defendants directly copied the ICMDP in the process of making Defendants' work, and as such copied the original expressive elements (and Plaintiff's creative combinations thereof)  from Plaintiff's work. The point is this: one cannot trivialize the complex array of original aesthetic choices Plaintiff made when making his work. These choices become inherent in the original expression embodied in the Photograph.   When Defendants copied Plaintiff's photograph, they copied all of this.   For all of these reasons, this factor clearly weighs in favor of Plaintiff.

**C.** **Third Factor: Amount**

The third factor asks whether "the amount and substantiality of the portion

-14-

used in relation to the copyrighted work as a whole … are reasonable in relation to the purpose of the copying." Campbell, 510 U.S. 586. This factor "has both a quantitative and a qualitative component, [and] favors copyright holders where the portion used by the alleged infringer is a significant percentage of the copyrighted work, or where the portion used is 'essentially the heart of' the copyrighted work." *NXIVM Corp. v. Ross Institute*, 364 F.3d 471, 480 (2004). On this factor as well, Defendants have failed to meet their burden of showing that no reasonable trier of fact could find other than for the moving party. *Calderone, supra.*

In this case, Defendants used Plaintiff's photograph as is, with only small modifications either necessitated by utilitarian practicality (such as the application of Plaintiff's photograph to Defendants' client's skin using ink), or where Defendants' tools or skills fell short in Defendants' effort to replicate every detail of Plaintiff's photograph. Not only is this obvious from a side by side comparison of Plaintiff's photograph and Defendants' tattoo (See side-by-side comparisons, Exhs. F and G to J. Sedlik Decl.), but Defendants filed a declaration providing a step-by-step accounting of their painstaking replication of Plaintiff's copyright protected photograph. See Docket No. 35-1, Declaration of Katherine Von Drachenberg, ¶5-19. Defendants copied the vast majority of Plaintiff's work (omitting only portions of the photograph's black background and black border by necessity), a minimum stealing the "heart" of Plaintiff's copyrighted work.

"While wholesale copying does not preclude fair use per se, copying an entire work militates against a finding of fair use. Moreover, 'the fact that a substantial portion of the infringing work was copied verbatim is evidence of the qualitative value of the copied material, both to the originator and to the plagiarist who seeks to profit from marketing someone else's copyrighted expression." *Worldwide Church of God v. Philadelphia Church of God*, 227 F.3d 1110, 1118 (9th Cir. 2000) (internal citation omitted).

Defendants attempt to excuse their copying by arguing that Plaintiff's

-15-

photograph is "not meaningly divisible" and that therefore they had to copy the entire image. This strange claim is entirely irrelevant to the fair use analysis and boldly misstates copyright law as it applies to copying another's protected work. Importantly,  Defendants did not need to use <u>any</u> portion of Plaintiff's photograph in order to create a tattoo of Miles Davis. They could have used any one of hundreds of thousands of photographs of Miles Davis (or combinations or interpretations of multiple images), or, more appropriately, actually created their own portrait of Miles Davis freehand, from scratch. Instead, they chose to trace and steal the ICMDP, and now have the audacity to claim that -- because Plaintiff's photograph was so perfect -- they had no choice but to copy nearly every detail of Plaintiff's creation, and should therefore be exempt from a finding of infringement. Such a position is so legally tortured, that it borders on the ridiculous.

Defendants' self-indulgent testimony regarding the claimed minor differences between their tattoo and Plaintiff's photograph is misplaced given that the amount and substantiality factor weighs in favor of the copyright holder "where the portion used was essentially the heart of the copyrighted work." *Wright v. Warner Books, Inc.*, 953 F.2d 731, 738 (2d Cir. 1991) (quoting *Harper & Row*, 471 U.S. at 565) (internal quotations omitted). The taking here was substantial and included the "heart" of Plaintiff's copyrighted work. For all of these reasons, this factor clearly weighs in favor of Plaintiff.

### D.  **Fourth Factor: Effect Of The Use Upon The Potential Market**

The fourth fair use factor "consider[s] not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. 590. It also "takes account ... of harm to the market for derivative works," which includes those markets "that creators of original works would in general develop or license others to develop." *Id.* at 592.

Defendants argue: "There is no evidence any consumer would decline to buy a print or a poster of Sedlik's Photograph because of Kat's tattoo."  See Motion p. 20:21-23. Defendants, however, have the law backwards. It is <u>Defendants</u>' burden to prove, not Plaintiff's burden to disprove, this fact to support Defendants' claim of fair use. As Defendants' failed to submit admissible evidence to prove this element, they failed to meet their burden.  *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1399 (9th Cir. 1997):

More importantly, under the Copyright Act, Plaintiff retains the ability to control how, when, where, and by whom his photograph is reproduced, distributed, displayed or altered.  Plaintiff specifically wanted to commercially exploit the image and for him and his heirs to benefit from the licensing. <u>See</u> Sedlik Depo p. 24:10-13, Exh. F to GS Decl. To this end, he has a long history of licensing the ICMDP photograph to all manner of clients for all manner of uses (such as magazines, books, newspapers, album covers, statues, museum exhibitions, shirts, posters, clothing, etc.), as well as offering and selling fine art prints directly and through galleries. <u>See</u> Sedlik Depo 104:2-106:20, Exh. F to GS Decl. As Plaintiff testified, he wanted the image to be used broadly under license. <u>See</u> Sedlik Depo. 30:7-31:2, Exh. F to GS Decl.; Sedlik Depo. 24:24-25:11, Exh. F to GS Decl. And the converse is true. Plaintiff retains the right to elect not to license to any potential client, or for any particular use, at any particular time, for any reason, or for no reason. <u>See</u> Sedlik Depo. 122:17-123:1, Exh. F to GS Decl.

This factor also "considers any impact on 'traditional, reasonable, or likely to be developed markets.'" *Seltzer*, 725 F.3d at 1179.  Defendants argue that this favors them because they allege that Plaintiff cannot prove that he has licensed the photo for use on tattoos. However, there are multiple critical flaws with Defendants' position. First, Plaintiff's unopposed testimony in this case is that he <u>has</u> licensed the Iconic Miles Davis Photo for use as a tattoo, and that he has had other inquiries from potential licensees seeking to use his photograph as a tattoo.

-17-

See Sedlik Depo. 114:5 - 22 and 106:21-107, Exh. F to GS Decl. Second, Plaintiff testified (and offered evidence) that he has publicly offered his work for licensed use in the tattoo marketplace, for many years. See Exh. E to Sedlik Expert Rebuttal Report, attached as Exh. A to J. Sedlik Decl. Third, Defendants have provided no authority to support their extraordinarily narrow contention that the relevant licensing marketplace is limited to "licensing for tattoos" rather than licensing in general, of which there is ample evidence in the record. See Sedlik Expert Rebuttal Report,, pp. 29-32 attached as Exh. A to J. Sedlik Decl. Fourth, even if it were true that Plaintiff had not previously licensed to a particular narrowly-defined "market," that determination would  not be dispositive. "It would ... not serve the ends of the Copyright Act, i.e., to advance the arts - if artists were denied their monopoly over derivative versions of their creative works merely because they made the artistic decision not to saturate those markets with variations of their original." *Castle Rock*, 150 F.3d 146.  If the purpose of the new work is commercial in nature, "the likelihood [of market harm] may be presumed." *Napster*, 239 F.3d 1016. Fifth, and most importantly, the Copyright Act specifically grants Plaintiff the right to control his image and have it used or not used as he sees fit. All of these choices are Plaintiff's to make, at Plaintiff's sole discretion, pursuant to the exclusive rights afforded Plaintiff under the basic tenets of the Copyright Act, and are not Defendants' choices.

The third consideration noted by Defendants requires "tak[ing] into account the public benefits the copying will likely produce," and whether those public benefits are "related to copyright's concern for the creative production of new expression." *Google*, 141 S. Ct. at 1206. While Defendants belabor this argument in their brief, they fail to explain why the public must be allowed to create free tattoos of this particular photograph of Miles Davis without a license from Plaintiff, when skilled tattoo artists could easily make their own freehand drawings of Miles Davis. Indeed, by using Plaintiff's image without authorization

-18-

or attribution, and by posting it on their very popular social media platforms to support and promote their commercial interests, Defendants have caused market harm by giving the public in general, and tattoo artists in particular, the mistaken belief that the ICMDP may be used without permission, without a license, without payment to Plaintiff, and with impunity from copyright law. See Sedlik Depo p. 119:12-120:2; 121:8-121:14, attached as Exh. F to GS Decl.

Importantly, the fact that Plaintiff may not have already licensed in a particular derivative market is not dispositive. "It would ... not serve the ends of the Copyright Act - i.e., to advance the arts - if artists were denied their monopoly over derivative versions of their creative works merely because they made the artistic decision not to saturate those markets with variations of their original." *Castle Rock Entertainment, Inc. v. Carol Pub. Group Inc.*, 150 F.3d 132, 146 (2d Cir. 1998). If the purpose of the new work is commercial in nature, "the likelihood [of market harm] may be presumed." *Napster*, supra, 239 F.3d at 1016.

For all of these reasons, this factor clearly weighs in favor of Plaintiff.

### 5.    **Additional Factors**

Defendants wax poetic about how much Miles Davis means to them, and argue that, based upon their appreciation for Miles Davis, their unlicensed use of Plaintiff's photograph should be adjudicated as a fair use. See e.g., UF 83-91. However, there are no cases that hold that purported admiration of the subject of a piece of art is a relevant factor to infringement. Indeed, '[i]f an infringement of copyrightable expression could be justified as fair use solely on the basis of the infringer's claim to a higher or different artistic use-without insuring public awareness of the original work, there would be no practicable boundary to the fair use defense." *Rogers*, 960 F.2d. 310. For the purpose of this case, the relevant issue is not Defendants' professed admiration of Miles Davis in general, but rather Plaintiff's copyright in Plaintiff's photograph of Miles Davis. To the extent Defendants poetic submissions show anything, they show that Mr. Farmer

appreciation of Mr. Davis led him to request a tattoo of Plaintiff's photograph on his arm, and that Defendants - who are sophisticated as to copyright and other forms of intellectual property –- failed to serve as gatekeepers, instead willfully copying Plaintiff's photograph onto Mr. Farmer's arm, in what is, for the purposes of this Motion, an established act of copyright infringement.

### 6.    The Combination Of Factors Mitigate Against Fair Use

The fair use doctrine exists to address the "inevitable tension" between the property rights of copyright owners and "the ability of other artists to express themselves by reference to the works of others." *Blanch*, *supra*, 467 F.3d at 250. However, '[i]f an infringement of copyrightable expression could be justified as fair use solely on the basis of the infringer's claim to a higher or different artistic use-without insuring public awareness of the original work, there would be no practicable boundary to the fair use defense." *Rogers*, *supra*, 960 F.2d. at 310. To claim that willful and brazen copying of a protected creative work to express an unarticulated "message" is fair use because the infringement was made by a tattooist is entirely inconsistent with the Copyright Act and the jurisprudence constructing the same.  Because each of the four fair use factors weigh in favor of Plaintiff and against Defendant, this Court should reject Defendants' fair use defense and deny Defendants' Motion based on a defense of fair use.

### V.    Defendants Present No Valid Legal Argument As to Their Unauthorized *Literal* Copying of the ICMDP

While Defendants repeatedly acknowledge (and the unconverted evidence shows) that, in addition to creating an unauthorized derivative work from the ICMDP, Defendants also literally copied and then further reproduced, displayed, distributed, facilitated, and encouraged others to distribute the ICMDP in their promotional social media posts.  Defendants offer almost no argument explaining how or why this separate unauthorized usage of the ICMDP is not copyright infringement. The only reference Defendants make to this unauthorized usage of

Mr. Sedlik's ICMDP is by claiming that it is "de minimis" and thus should be included under their fair use defense. Motion at 24. Specifically, Defendants state:

> And while the first photo (Exs. 203-04, 212-13) also depicts the "Silence" Photograph itself, this is clearly done for a different purpose of comparing the Photograph with Kat's progress on the tattoo. UF 101. (The use of the Photograph here is also de minimis, constituting at most 10% of the total social media photograph and an even smaller portion of the full social media post.)

Motion at 24. First, Defendants have no evidence or (or even supporting citation) for the bald claim that literally copying and displaying the ICMDP at the center of these social media posts "is clearly done for a different purpose of comparing the Photograph with Kat's progress on the tattoo," making such a statement entirely inadmissible on summary judgment.

Second, and perhaps more importantly, Defendants have mis-stated the controlling legal standard. The Ninth Circuit directs that, to the extent the "de minimis" argument may be relevant to a defense to infringement, the use of a copyrighted work "is considered de minimis only if it is so meager and fragmentary that the average audience would not recognize the appropriation." *Fisher v. Dees*, 794 F.2d 432, 434 (9th Cir. 1986). Defendants used Plaintiff's entire copyrighted work and placed it at the center of their social media post. The assertion that other things appeared in the social media post along with Plaintiff's copyrighted work does nothing to make Defendants' use "de minimis." Here, Defendant used the entire photograph in their social media posts, eliminating any potential fair use analysis reliant upon "de minimis" use or otherwise excused or exempted from federal copyright law. Id. Defendants offer no other legal argument or factual basis to excuse their unauthorized exact duplication of the ICMDP in their social media posts and therefore have no basis to obtain summary judgment on Plaintiff's claim for copyright infringement regarding the this unauthorized usage of Plaintiff's copyrighted ICMDP.

## VI. Defendants have not met their burden regarding KVD Inc.

As discussed above, the evidence in this case shows that, just like defendant

High Voltage Tattoo, Inc. and defendant Katherine Von Drachenberg, defendant KVD, Inc. was in the business of "body art" at all times relevant to the creation of the tattoo as issue in this case, and that defendant Katherine Von Drachenberg was KVD, Inc.'s sole employee conducting the business of "body art" (as well as sole owner and shareholder) at the time that she created the tattoo. GS Decl. at 5. KVD, Inc's own official government filings with the California Secretary of State, combined with the deposition testimony of KVD, Inc. (through its corporate representative) that it doesn't even know the business in which it is or was engaged at the time of the tattoo, as well as Ms. Von Drachenberg's testimony that she was an employee of KVD, Inc. at the time she made the tattoo, at a minimum jointly raise a genuine issue of material fact as to whether KVD, Inc. is liable for the copyright infringement created by its employee in creating "body art" on Mr. Farmer. For these reasons, KVD, Inc. cannot meet the required showing that no reasonable trier of fact could find other than for the moving party. *Calderone, supra*.

**VII. Defendants Have Not Met Their Burden Regarding Partial Summary Judgment On Damages**

Defendants also seek partial summary judgment regarding Plaintiff's burden to prove actual damages. This argument is entirely based on the false premise that Plaintiff never sought damages information and documents from Defendants during discovery. Motion at 29-31. As provided above, however, the evidence shows that Plaintiff <u>did</u> seek this information from Defendants in discovery, but that Defendants refused to produce it. See discussion above and GS Decl. at 10. Therefore, the sole basis for Defendants' claim that Plaintiff is "unable" to prove actual damages (which Plaintiff is not required to do in order to recover damages from Plaintiff) is Defendants' own refusal to provide that information to Plaintiff in discovery.

Further, Defendants falsely assert that "The only potential direct profits in

1   this case would be if Kat received payment for creating the tattoo." This is untrue.

2   See Motion at 30. Defendants' own Motion shows that the evidence is

3   uncontroverted that Defendants repeatedly populated and saturated their social

4   media accounts with images of the tattoo and Mr. Sedlik's ICMDP, gifting

5   themselves free advertising and free promotion of their businesses and brands

6   over several years to tens of millions of viewers, customers, fans and others. The

7   fact that Plaintiff has not yet been able to quantify the value of that free

8   advertising does not does bar Plaintiff from presenting trial evidence to permit the

9   jury to determine the correct amount of actual damages to award.

10        Lastly, Defendants have provided no evidence to support an assertion that

11   Plaintiff is or could be prohibited from questioning Defendants at trial regarding

12   their profits, even through Defendants refused to produce the underlying

13   documents relating to their revenues as requested by Plaintiff in discovery. For

14   that reason alone, Defendants cannot meet their burden to show that Plaintiff

15   "cannot put on any evidence" relating to Defendants' profits and this Court should

16   deny the Motion seeking partial summary judgment on this issue.

17        **VIII. Defendants Have Not Met Their Burden Regarding Defendants'**

18   **Violations of 17 U.S.C. 1202**

19        Defendants cannot meet their burden to show that Plaintiff is unable to

20   prove violations of 17 U.S.C. 1202. First and foremost, Defendants claim  that

21   Plaintiff has no evidence that Defendants removed or altered the CMI in the

22   ICMDP. Motion at 27-29. Defendants have omitted critical facts from their

23   analysis, including Defendants' steadfast refusal to produce to Plaintiff the

24   relevant native image files which would allow Plaintiff to make the necessary

25   analysis under 17 U.S.C. 1202 as to Defendants' actions. See discussion above

26   and GS Decl. at ¶¶12-19. Plaintiff made numerous demands to Defendants

27   throughout the pendency of this litigation that Defendants produce the original,

28   unaltered native files that Defendants used to replicate the ICMDP in the form of

-23-

a tattoo. Id. Despite these requests, including formal discovery demands, demands during meet and confer discussions among counsel, demands during Defendants' deposition, and demands leading up to the filing of these summary judgment motions, Defendants failed and refused to produce what are obviously responsive and relevant native files that Defendants admit are in their possession. Id. In fact, Defendants demonstrated during their deposition that these files were readily accessible to them and could easily be located and provided to Plaintiff. Id. Instead of producing the files to Plaintiff, Defendants failed and refused to produce them, instead choosing to hide them from Plaintiff and not allow Plaintiff to conduct the necessary analysis required by 17 U.S.C. 2012. This Court cannot now reward Defendants for their discovery abuses by allowing Defendants to falsely argue that Plaintiff has not produced evidence regarding items within the sole custody and control of Defendants.

Further, the uncontroverted evidence does show that Defendants falsely proclaimed to be the author of the ICMDP to millions of social media followers, replacing Plaintiff's CMI with their own false CMI. To establish falsification of CMI under 17 U.S. Code § 1202 (a)(1), Plaintiff need not prove that CMI was present in the file/s obtained and used by Defendants, Plaintiff need only prove that (1) Defendants provided CMI that is false; and (2) Defendants did so knowingly and with the intent to induce, enable, facilitate, **or** conceal infringement. See, e.g., *EBC Brakes USA, Inc. v. Teagan*, No. 11-CV-12907, 2013 WL 12181866, at *8 (E.D. Mich. Nov. 4, 2013) (finding prima facie claim for DMCA violation where "[defendant] digitally removed the 'EBC' emblem from copyrighted images of EBC products and distributed the altered photographs in advertisements for [defendant's] products"); *Williams v. Cavalli*, No. CV 14-06659-AB JEMX, 2015 WL 1247065, at *1–4 (C.D. Cal. Feb. 12, 2015) (denying motion to dismiss where defendants allegedly photographed a mural and digitally removed the authors' signatures from the image).

1   　　　The evidence produced by <u>Defendants</u> themselves in this action establish

2   that Defendants knowingly and intentionally added false CMI to Defendants'

3   numerous and repeated publications of depictions of the infringing derivative

4   tattoo and of the ICMDP by claiming to be the author of the ICMDP, knowing

5   that they were not the author.[4] In so doing, Defendants substituted their own false

6   CMI (falsely claiming authorship) for Plaintiff's CMI under 17 U.S.C. 1202(a)(1).

7   This act is sufficient to defeat Defendants' attempt to obtain summary judgment

8   on this issue.[5]

9   **IX.   <u>CONCLUSION</u>**

10   　　　There is no reasonable dispute that Plaintiff owns a valid copyright in his

11   Photograph, that Defendant copied substantial original elements of the

12   Photograph without authorization, and that Defendant's use was not fair as a

13   matter of law. Further, Defendants cannot meet their high burden to obtain

14   summary judgment with respect to KVD, Inc., Plaintiff's damages or Plaintiff's

15   claims under 17 U.S.C. 1202. As such, Defendant's motion should be denied in its

16   entirety.

17   Dated:  March 28, 2022　　　　　SEDLIKGROUP, P.C.
　　　　　　　　　　　　　　　　　　Gary S. Sedlik, Esq.

18

19   　　　　　　　　　　　　　　By: ___/s/ Gary S. Sedlik_____
　　　　　　　　　　　　　　　　　　Gary S. Sedlik

20   　　　　　　　　　　　　　　Attorneys for Plaintiff Jeffrey B. Sedlik

21

22

23

24

25

---

26   [4] Plaintiff can still prevail upon a showing that Defendants distributed his work with the knowledge that CMI had been removed, even if Defendants did not remove it. <u>See</u> § 1202(b)(3).

27   [5] Under 1202(c)(2), the term "copyright management information" means "the following information conveyed in connection with copies or phonorecords of a work or performances or displays of a work, including in digital

28   form,...(2) The name of, and other identifying information about, the author of a work."