**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

JEFFREY B. SEDLIK,

*Plaintiff,*

-against-

KATHERINE VON DRACHENBERG,
KAT VON D, INC., HIGH VOLTAGE
TATTOO, INC.

*Defendants.*

Case  No. 2:21-cv-01102-DSF-MRW

Judge: Hon. Dale S. Fischer
Magistrate: Hon. Michael R. Wilner

**REBUTTAL EXPERT REPORT OF PROFESSOR JEFFREY SEDLIK**

Submitted February 8, 2022

CONFIDENTIAL

I have been asked by counsel for plaintiff JEFFREY B. SEDLIK ("Plaintiff") in the above-referenced matter ("Matter") brought by Sedlik against KATHERINE VON DRACHENBERG ("Ms. Von D"), KAT VON D, INC., AND HIGH VOLTAGE TATTOO, INC. (collectively, "Defendants"), to provide rebuttal expert testimony as set forth below.

I have been asked by Plaintiff  to rebut the opinions expressed by Defendants' expert witnesses Anna Felicity Friedman ("Friedman"), David C. Lane ("Lane"), and Catherine Montie ("Montie") in their respective expert reports submitted January 24, 2022 in this Matter. I expect my rebuttal opinions to address practices, standards, and procedures in the visual art industries, both in general and with respect to copyright licensing, business models, business transactions, original expression, creative workflows, similarity of works,  and other topics on which Defendants' experts have opined or may opine.

My opinions are based in part on more than 30 years of service in high-level positions in trade associations and standard-setting bodies in the photography, advertising, product marketing, technology, and design industries. I have been an internationally recognized advertising photographer and commercial director for more than 30 years, working with many clients, observing and interacting with large numbers of professional photographers, videographers, other visual artists, advertising agencies, design firms, corporate clients, stock photography and footage agencies, product manufacturers, and others in the United States and abroad. I have served as Project Manager in projects involving the development, operation, and maintenance of websites, web applications, and other applications. I have also owned and operated a publishing company, producing and selling photography-related products for more than 25 years.

In addition to my personal knowledge, my opinions are based on an examination of documents and materials produced in the Matter to date. Should additional relevant information become available, I respectfully reserve the right to amend or supplement my opinions as necessary.

This Rebuttal Expert Report ("Report") has been prepared in connection with the above-referenced Matter. Section V of the Report outlines my opinions.

If called upon as a witness in this Matter, I could and would provide the following testimony.

## I.    QUALIFICATIONS

I currently serve as the President and CEO of the PLUS Coalition. "PLUS" is an acronym for "Picture Licensing Universal System." The PLUS Coalition is a non-profit, international standards body and trade association representing the shared business interests of all industries involved in the creation, licensing, and use of visual art, including photographers, illustrators, videographers, advertisers, advertising agencies, graphic design studios, publishers, artists' representatives, museums, libraries, stock image agencies, and all other image licensees and licensors. The PLUS Coalition develops, propagates, and maintains universal standards for use by licensees and licensors in transactions involving visual art. As a founding member of the PLUS Board of Directors, I developed the core concept of the Coalition and its copyright licensing standards.

I am the past National President of the Advertising Photographers of America ("APA"), the leading trade association for commercial photographers and videographers in the United States. I also served APA as Chief National Advisor on Licensing and Copyright, and provided leadership level guidance on topics including copyright, photography, videography, advertising, industry standards, contract terms, model release terms, and business practices. I represented the APA in discussions with the United States Copyright Office and worked with organizations around the world to develop and maintain standards for licensing terms, licensing agreements, model releases, and other photography-related business matters. On a local basis, I also served on the Board of Directors and Legal Affairs Committee of the Los Angeles Chapter of the APA, and as Chairman of the Model Release Working Group, charged with developing international standards for model releases, communication of usage rights, and model release workflow.

2

I currently serve on the Photo Metadata Working Group for the International Press Telecommunications Council ("IPTC"), the global standards body for photography metadata, with a particular focus on the news industry. In the past, I have served on the Digital Image Submission Guidelines Working Group for Universal Digital Image Guidelines ("UPDIG"), and as an "Invited Expert" on the Permissions and Obligations Working Group of the World Wide Web Consortium ("W3C"). Until November 2019, I served as a Director of the American Society for Collective Rights Licensing ("ASCRL"), a collective management organization for the visual arts. I also serve as a legal and legislative advisor to the American Society of Media Photographers ("ASMP"), and as a member of the ASMP Copyright Speakers Bureau. I authored the "Photography Licensing" chapter of  "*ASMP Professional Business Practices in Photography*," the predominant business operations reference for professional photographers.

I am a frequent speaker at copyright events hosted by the United States Copyright Office, the United States Patent Office, and the United States Department of Commerce. At the request of the Register of Copyrights, I served as a guest instructor at Stanford Law School in conjunction with a United States Copyright Office-sponsored Copyright Practicum. I have been engaged by the United States Copyright Office to train new Registration Examiners on visual art copyright registration issues from 2010 to present. In 2021, I was appointed by the Librarian of Congress to serve as an advisor to the Librarian on her efforts to modernize the Copyright Office.

I have been a faculty member of the American Law Institute for Continuing Legal Education events, providing instruction on licensing practices and on the practical application of copyright law in the visual arts. I have been a guest speaker and guest instructor on copyright law and licensing for leading institutions and organizations, including Duke University School of Law, New York University School of Law, Oxford University School of Law, American University Washington College of Law, Antonin Scalia George Mason University Law School, Fordham University School of Law, Joint Photographic Experts Group (JPEG), International Federation of Reproduction Rights Organizations, Smithsonian Institution, International

3

Confederation of Societies of Authors and Composers, National Association of Recording Merchandisers, Digital Library Federation, the Copyright Society of the United States, and others.

In addition, I have testified repeatedly before the Judiciary Committees of both the United States Senate and House of Representatives, summoned to advise Congress on copyright law issues and legislative reform. I work closely with legislators, stakeholder groups, and the United States Copyright Office on legislation, regulations, and policy issues related to copyright protections, registration, and remedies. I have assisted legislators and government agencies in drafting and revising federal copyright legislation. I am an active participant in the Copyright Alliance, serving on the Creators Advisory Board, Academic Advisory Board, and the United States Copyright Office Modernization Working Group.

In addition to my work in the United States, I serve on the Advisory Board of the Beijing Intellectual Property Expertise Center of Judicature, a governmental agency overseeing copyright matters before the People's Court of China. I also serve as a founding Director of the Linked Content Coalition ("LCC"), a global non-profit organization dedicated to facilitating and expanding the legitimate use of content through interoperable identifiers and metadata. I have also been a partner in the Rights Data Integration initiative, a European Commission project focusing on the integration of systems that manage and trade intellectual property rights online across all types of content, usage, and media. I was a partner in the Copyright Hub initiative in the United Kingdom, and a participant in the European Commission's Metadata Image Library Exploitation project. I was a partner in the Initiative for a Competitive Online Marketplace, based in Vienna, Austria, and have been an invited speaker on intellectual property law at the House of Lords of the Parliament of the United Kingdom.

Adobe Systems, creator of Photoshop, Lightroom, Premiere, After Effects, and other digital image, video and design software, selected me to be a member of its "Prerelease Team" and its "Adobe Photographers' Council," a group of twelve

leading visual artists who advise the company on trends in digital photography, video, and the visual arts industry at large.

Selected honors include the 2005 Industry Leadership Award from the International Photography Council of the United Nations, the 2006 PhotoMedia Photographer of the Year award, the 2007 APA Industry Advocacy Award, and in 2008, a "Lifetime Achievement Award," a Clio Award (for excellence in directing digital video) and an honorary Master's Degree from the Brooks Institute of Photography, recognizing "Mastery of the Craft and Business of Photography."

I am a long-time faculty member and Professor at the Art Center College of Design in Los Angeles, where I sit on the Intellectual Property Committee and teach advanced courses on the artistic, technical, production, legal, and business aspects of traditional and digital photography and videography. My curriculum includes advanced instruction on legal topics such as copyright law, copyright registration, copyright licensing, and contract interpretation. Technical topics include digital techniques and advanced lighting for photography and video of people, products, and automobiles. I also provide instruction on advertising, marketing, branding, and consumer behavior.

After more than 30 years as an award-winning commercial photographer, videographer, cinematographer, and studio owner, I continue to operate an advertising and entertainment photography and production company in California, creating photography, video, commercials, and design, with a client list that includes such companies as Nike, Federal Express, Farmers Insurance, SBC, GTE, NBC, Sony, AT&T, Blue Cross, Epson, IKEA, United Airlines, Warner Brothers, Toyota, Nestlé, Disney, Bank of America, and others. My publishing company, Mason Editions, produces and distributes fine photographic reproductions.

I frequently provide forensic image analysis in civil and criminal matters, and provide consulting services to organizations and individuals on issues related to copyright, licensing, negotiating, and business practices and procedures related to photography, videography, other visual artworks, advertising, and modeling. I have testified as an expert witness during the period 2002 to present, in litigation

Exh A Page 6

involving visual arts, copyright, metadata, advertising, branding, graphic design,
right of publicity/privacy, model releases, breach of contract, criminal matters, and
other topics. Matters in which I have provided testimony within the last four years
are:

*Laspata Decaro Studio Corporation v. Rimowa GmbH et al.*
United States District Court, Southern District of New York
Case # 16-cv-00934-LGS

*Glen Craig v. UMG Recordings, Inc. et al.*
United States District Court, Southern District of New York
Case # 16 Civ. 5439 (JPO)

*Brittney Gobble Photography, LLC v. WENN Limited et al.*
United States District Court, Eastern District of Tennessee, Knoxville Division
Case # 3:16-cv-00306

*The Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith et al.*
United States District Court, Southern District of New York
Case # 1:17cv2532

*Jason Putsche v. Alley Cat Allies, Inc.*
United States District Court, Southern District of Maryland
Case # 8:17-cv-00255-PWG

*Yves Michel Fontaine v. MMLery LLC, 61-73 Ellwood, LLC, 533 41st Street*
Realty, LLC and Sharp Management Corp.
Supreme Court of the State of New York, County of Kings
Case # 6580/12

*Brittney Gobble Photography, LLC v. Sinclair Broadcast Group, Inc., et al.*
United States District Court, District of Maryland, Baltimore Division
Case # 1:18-cv-03403-RDB

*D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*
United States District Court, District of New Hampshire
Case # 1:17-CV-000747-LM


*Annette Navarro McCall v. The Procter and Gamble Company*
United States District Court, Southern District of Ohio, Western Division
Case # 1:17-cv-00406-TSB


*Optimum Imaging Technologies LLC v. Canon, Inc.*
United States District Court, Eastern District of Texas, Marshall Division
Case # 2:19-CV-246-JRG


*Intersal, Inc., v. Susi H. Hamilton*, *Secretary, North Carolina Department of Natural
and Cultural Resources, in Her Official Capacity, North Carolina Department of
Natural and Cultural Resources, and State of North Carolina*
General Court of Justice, Superior Court Division, North Carolina, Wake County
Case # 115 CVS 9995


*Cora Skinner et al., v. Red Tape, Inc,* d/b/a Stiletto's & Red Tape VI, Inc., d/b/a
Stiletto's
United States District Court, Southern District of Texas, Brownsville Division
Case # 1:19-cv-186


*Mireya Rios v. Fekkai Retail, LLC, Blue Mistral, LLC*
United States District Court, Central District of California
Case # 2:20-cv-08743-PA-MRW


*Evox Productions LLC v. AOL, Inc. Oath, Inc., and Verizon Media, Inc.*
United States District Court, Central District of California, Western Division
Case # 2:20-cv-02907-JWH-JEM

*Michael Gaffney v. Muhammad Ali Enterprises, LLC, Authentic Brands Group LLC, and Roots of, Inc., d/b/a "Roots of Fight"*
United States District Court, Southern District of New York
Case # 1:18-CV-08770, 1:20-CV-07113

*Nicklen et al v. Mashable, Inc. et al*
United States District Court, Southern District of New York
Case #1:20-CV-10300

My publication list is included in my curriculum vitae, a copy of which is attached to the Report as *Curriculum Vitae* (Exhibit A).


## II.   COMPENSATION

My work as a rebuttal expert in the Matter is uncompensated. I am also the Plaintiff in the Matter.


## III.   MATERIALS CONSIDERED

In preparation for the Report and for the expert testimony that I may be called on to provide, I have considered the materials listed in *Materials Considered* (Exhibit B).


## IV.   BACKGROUND

Plaintiff Jeffrey B. Sedlik is a photographer residing in Altadena, operating as a sole proprietor under the name Jeff Sedlik Photography.

Defendant Katherine Von Drachenberg ("Kat Von D") is a well known tattoo artist, social media influencer, reality TV personality, recording artist, TV and film producer, and businesswoman who owns and operates cosmetics, clothing and shoe

companies, among other businesses. As of the date of the Complaint, Kat Von D had 7.4 million Instagram followers, 12 million Facebook followers, and 1.8 million Twitter followers.

Defendant Kat Von D, Inc. ("KVD, Inc.") is a California corporation headquartered in North Hollywood, CA. Upon information and belief, KVD, Inc. is 100% owned and operated by Defendant, its CEO, Secretary and CFO.

Defendant High Voltage Tattoo, Inc. is a California corporation, owned by KVD, Inc., located in West Hollywood, CA. Upon information and belief, Kat Von D is the sole, controlling, and/or majority owner of High Voltage Tattoo and regularly performs tattoo services for and at the company. Like its owner, High Voltage Tattoo is active on social media, with (as of the date of this Complaint) 937,000 Instagram followers, 316,000 Facebook followers, and 250,000 Twitter followers.

Plaintiff created a photograph of Miles Davis in 1989 (the "Photograph"). Without obtaining a license from Plaintiff, Defendants created a tattoo (the "Tattoo") based on the Photograph in 2017, and published reproductions of the Tattoo and Photograph on various websites. Plaintiff attempted to communicate with Defendants regarding the unauthorized use of the Photograph. When Defendants did not respond, Plaintiff filed suit against Defendants on February 7, 2021, alleging copyright infringement and removal of Plaintiff's Copyright Management Information.[1]

## V.   DISCUSSION

### A.   Defendants' Experts Focus on Dissimilarity is Misplaced

Defendants' experts purport to identify significant dissimilarities between the Tattoo and the Photograph from which the Tattoo was derived. Based on my knowledge, training and experience as a visual arts professional and College

---

[1] "Complaint, Jeffrey B. Sedlik v. Katherine Von Drachenberg (a.k.a. "Kat Von D"), an individual; Kat Von D, Inc., a California corporation; High Voltage Tattoo, Inc., a California corporation; and DOES 1-10, inclusive, dated February 7, 2021 ("Complaint").

Professor in the visual arts, I disagree with Defendants' experts opinions as to issues of dissimilarity.

Ms. Von D obtained a copy of the Photograph, placed the Photograph on a lightbox, placed tracing paper over the Photograph, and while viewing the photograph through the tracing paper, carefully traced the essential expression of the Photograph onto the tracing paper.

In the below illustration, captured as a still frame from a video made at High Voltage Tattoo and published to YouTube, Ms Von D can be seen carefully tracing the Photograph on her lightbox, using tracing paper and a pencil.



Below is an enlargement of a still frame captured from the above-described video.



11

Ms. Von D's tracing of the Photograph is depicted below.



In contrast with Defendants' experts assertions, Ms. Von D's tracing of the Photograph is a precise duplication of the essential elements of the Photograph, as is apparent is the comparison depicted below, with the Photograph on the left, the tracing on the right, and a semi-transparent overlay of the tracing juxtaposed with the Photograph at center.



After carefully tracing the Photograph to create a precise, accurate replication of the original expression in that Photograph, Ms. Von D then transferred the Photograph (via the tracing) to Defendants' client's upper arm, using a thermal transfer.

Ms. Von D then used a copy of the Photograph (taped to a lamp positioned immediately adjacent to her client's arm) and replicated the highlights, shadows, midtones, texture, contrast, composition and other elements of the Photograph in fine detail onto her client's skin, using a tattoo gun to perform the replication.

13

In the illustration below. Ms. Von D is seen using the Photograph for reference while using a tattoo gun to replicate the Photograph on her client's skin, after applying her tracing of the Photograph to her client's skin to permit precise replication. A portion of the outline created by the thermal transfer of the tracing can be seen in the lower right portion of the illustration.



14

As is evident in the side-by-side comparison below, the resulting Tattoo is a detailed replication of the Photograph. Even in the event that Plaintiff had not discovered video of Ms. Von D tracing the Photograph on a lightbox, and even in the event that Plaintiff had not discovered a photograph of Ms. Von D referencing the Photograph while applying ink to the outline transferred to Ms. Von D's skin from that tracing, the similarity of the Tattoo to the Photograph is so striking that any reasonable observer could only conclude that the Tattoo was appropriated from the Photograph.



As direct copying is proven by incontrovertible evidence in this Matter, Defendant's experts' focus on issues of similarity is misplaced. However as Defendants' experts purport to identify a number of alleged dissimilarities between the Tattoo and the Photograph, I will rebut their opinions here.

15

Based on my knowledge, training and experience in the visual arts, all of the alleged dissimilarities identified by Defendants' experts are de minimis. Nearly all of the alleged dissimilarities result from Defendants' best attempts to exercise her artisanal skills to precisely replicate the 2-dimensional Photograph onto a 3-dimensional surface.

By the standard practices in the visual arts licensing industries, if Defendants copied the Photograph from its original 2-dimensional form onto a 3-dimensional surface, in a substitute medium, onto a different substrate, using a different tools, at a different size, omitting some of the elements of the Photograph the background, making adjustments to color and detail does not render the Tattoo any less of an unauthorized copy of the Photograph, and would not, in the visual arts licensing industry, relieve Defendants of an obligation to request and obtain a license from Plaintiff prior to reproducing, distributing, displaying, or creating derivative works of the Photograph. To the extent that partial dissimilarity between the Photograph and Tattoo exists, this is entirely immaterial, as direct copying of all essential elements of the Photograph has been shown. There are thousands of photographs of Miles Davis. None depicts Miles Davis in the manner of Plaintiff's original.

As will be established in more detail below, standard practice in the visual art licensing industry dictates that a license for "artist reference" or "art rendering" is required for the use of photographs to create derivative works.

**B.    Defendants' Experts' Opinions Ignore Market Usurpation**

Defendants' experts opine that tattooers need not acquire a license to create derivative works based on photographs. I disagree with Defendants' experts.

The viability of the visual arts licensing marketplace depends on the honesty and integrity of individuals and organizations in seeking and obtaining a license prior to the creation of derivative works based on photographs and illustrations. Photographers and other visual artists rely on revenue earned

16

from licensing their works for secondary uses, including the creation of
derivative works.

Based on my knowledge, training and experience, visual artists, like other
creators, typically rely on both primary and derivative markets for their
works. Visual artists typically retain ownership of the copyrights in the
photographs they create (collectively, "Image" or "Images"), so as to permit
monetization of those Images throughout the lifetime of the copyrights.

The creation of an Image is often only the first event in a long series of
events throughout the copyright life of that Image. Revenue (if any) initially
generated by the visual artist on creation of an Image is often insufficient to
provide an incentive for the visual artist to create new works. Instead, visual
artists and their heirs expect, plan for, and depend upon myriad opportunities
to monetize their works in the diverse, global derivative markets for Images.

As a result, the purpose for which an Image is initially created is rarely
representative of the many purposes the Image may serve during its
copyright life when repeatedly licensed and sold in derivative markets. For
example, an Image initially created for an editorial feature in a particular
magazine article may, at any point during the copyright life of the work, be
licensed by the visual artist for use in other magazine editorials, as well as
book covers, advertisements, product packages, powerpoint presentations,
websites, web advertising, direct mail promotions, billboards, brochures,
documentary films, memes, tattoos, video games, artist reference, and all
manner of uses. That same Image, initially created for editorial purposes,
may at any point during the copyright life of the work be licensed for
merchandising use on coffee mugs, t-shirts, baby bibs, hats, keychains, drink
coolers, furniture, bedsheets, night lights, tote bags, magnets, mouse pads,
greeting cards, posters, watches, bumper stickers, tapestries, bow ties, and
all manner of other products. At any point during the copyright life of the
work, the visual artist who created the Image may also elect to exhibit the

Image in fine art galleries, offer and sell fine art prints of the Image to collectors, and pursue other derivative uses.

An Image that has seldom or never been monetized may be monetized at any time, at the discretion of the visual artist. A visual artist may elect against the licensing or sale of the work for any period of time—determined by the artist—in an effort to protect, maintain, or enhance the value of the work in the derivative marketplace.

A visual artist may focus on a particular derivative market for a period of time, and then shift to another derivative market. The artist may at any time adopt a new or different strategy for monetizing the work in the derivative marketplace, and in so doing, significantly increase (or decrease) the revenue stream generated by the Image. For example, a visual artist may at any time submit the Image to an agent or other representative or party and authorize that party to develop and exploit new or different derivative markets for the Image. Examples include submission of the Image to a stock image agency, gallerist, or licensing agent.

The monetization opportunities for an Image are dynamic, in that the perceived value of the Image may vary with time. For example, licensing revenue generated by an Image of a public figure may temporarily increase exponentially if that person is involved in a scandal or passes away. The value of a visual artist's works on the fine art market may increase significantly as the result of a new project, positive review, effective promotional campaign, high-dollar auction sale, significant exhibition, or other event. Of course, the visual artist may assign or transfer copyright ownership to another party, who may then monetize the photograph in the same or different derivative markets, in the same or different manners.

The visual artist may, at any time during the copyright life of the work, elect to create and monetize variations of the Image, such as new derivative works in the same or different media. The visual artist may colorize a previously black and white Image, or create a black and white version of a

18

color Image. The visual artist may add or remove visual elements to or from the Image using paint, pencil, pen, digital tools, video editing or other techniques. The visual artist may create derivatives at different sizes, different edit sequences, or may recompose the Image or individual scenes by cropping, editing or otherwise manipulating the Image. The visual artist may elect to render the Image or portions of the Image as a charcoal sketch, pencil sketch, painting, woodcut, line drawing, mosaic, embroidered work, sculpture, engraving, screened print, lithograph, or in any other medium. The visual artist, as the copyright owner, has the discretion to create derivative works in any, all, or none of the above manners, and has the discretion to determine the point in time at which derivatives will be made, at any time during the copyright life of the Image.

When the visual artist eventually dies, the visual artist's heirs may, at any point during the remaining 70 years of the copyright life of the work,[2] elect to make derivatives or to monetize the Image in the same or different markets.

For the aforementioned reasons, the history of an Image—its past licenses, sales, derivative markets, and the quantity and character of the variations derived—is an inaccurate, misleading, and otherwise unreliable indicator in determining the future purposes for or methods by which that Image may be exploited throughout its copyright life, in any and all derivative versions, in any and all derivative markets, by the visual artist and the artist's heirs, successors, and assigns.

For the above-described reasons, I disagree with Defendants' experts assertions that the creation of a derivative work in the form of a tattoo does

---

[2] In general, copyright endures for a term consisting of the life of the author plus 70 years after the author's death. For works made for hire and anonymous and pseudonymous works, the duration of copyright is 95 years from first publication or 120 years from creation, whichever is shorter (unless the author's identity is later revealed in Copyright Office records, in which case the term becomes the author's life plus 70 years). 17 U.S.C.§ 302.

not require a license. The creation of unlicensed tattoos usurps the market for visual art licenses for artist reference and art rendering.

## C.    Defendants' Experts Ignore the Practices and Models Employed in the Visual Art Copyright Licensing Industry

As discussed above, and contrary to Defendants experts' opinions, compensation derived by visual artists for the creation of an Image (often expressed as a "Creative Fee," "Photographer's Fee," or "Videographer's Fee") is typically insufficient to operate a sustainable business. Leveraging their exclusive rights under copyright law, visual artists typically require compensation not only for the creation of Images, but also require a "Usage Fee" or "License Fee" in exchange for granting a licensee the right to exploit the artist's copyrights in the Images.[3]

When visual artists accept assignments to create Images, they typically grant their clients limited rights at first with the expectation and intention that those clients will later return to purchase licenses for additional uses and for additional periods of use. These "Rights Managed" ("RM") licenses require a license fee based primarily on the scope of the rights granted. In RM licensing, the greater the scope of usage desired, the greater the licensing fee required of the client. The scope of use permitted under RM licenses spans the full spectrum, from very narrow to very broad.

The license scope is defined generally by the media in which the Images may be reproduced, distributed, and displayed, subject to temporal and geographic limitations. The license is often more specifically defined by

---

[3] While some visual artists may elect to only specify a "Photographer's Fee," or "Videographer's Fee" on their estimates and invoices, such visual artists typically contemplate the client's scope of use of the Images when determining the amount of that single fee, which combines compensation both for the creation and use of the Images. Similarly, some visual artists employ a "Day Rate," as a fee compensating the artist for the artist's time dedicated to creating Images. While a "Day Rate" typically excludes the fee applicable to licensed use of the resulting Images, some artists may incorporate a License Fee into a Day Rate, by adjusting the Day Rate to contemplate the scope of the license granted.

20

limitations on versions, placements, size, quantity, languages, and industries in which the Images may be reproduced, distributed, displayed, and transformed.

Under the visual artists' business model, a visual artist assumes significant risk, as a client may never return to license additional rights. To mitigate that risk, visual artists typically make a special effort to create Images that exceed their client's expectations and deliver maximum value to their client's business. This practice is intended to maximize secondary licensing revenues, allowing visual artists to fully monetize their copyrights. Clients benefit as well, at first paying only for the rights they need, and then later acquiring additional rights on an ad hoc basis, spreading licensing revenues across multiple budget periods, and avoiding the advance purchase of rights they may never need. As a result, the RM licensing model serves visual artists and their clients well.

Visual artists often also engage in licensing Images to parties other than the commissioning client (if any), throughout the copyright life of the Images. A long-standing rights model, RM licensing is the most common form of licensing in the assignment marketplace.

When semi-professionals, enthusiasts, and amateurs license Images, they nearly always do so under the RM model, at the behest of clients accustomed to operating under that model when licensing Images directly from copyright owners.

In the alternative, visual artists and others may agree to assign copyright ownership to their clients. Or, visual artists may agree to create Images under work-made-for-hire terms, whereby copyright ownership vests with the commissioning client upon creation.

21

In addition to commissioning Images under the RM model for assignment work as discussed above, clients may acquire rights to existing Images ("Stock Images").

Visual artists often create Images independently and speculatively, and then later offer these Stock Images for licensed usage by clients. This offering is typically made on licensing websites, either by the visual artist directly, or more commonly by an intermediary "stock agency" acting as an authorized licensor of the visual artists' Images.

Clients seeking ready-made Stock Images typically visit stock Image websites, search for Images meeting their requirements, and then purchase licenses and download the Images for usage. Such purchases are primarily made via an automated process online, and are seldom made by communicating with sales staff at stock agencies or visual artists' studios.

Clients may acquire rights to Stock Images under various licensing models. While some vendors specialize in certain licensing models, many vendors offer Images under several different licensing models. Common stock Image licensing models include:

(1) Rights Managed Stock Licensing: RM remains a common form of stock Image licensing, ubiquitous among visual artists. As described above, usage fees for RM licenses are based not on file size, but on the scope of usage desired by the client. While RM Images are often created by professional visual artists, RM Images are also created by semi-professionals, amateurs, and enthusiasts. Fees associated with RM licenses are typically higher than fees associated with the Royalty Free license model described below. Nearly all license transactions directly between visual artists and clients fall under the RM model.

22

(2) Royalty Free Stock Licensing ("RF"):[4] The RF model allows a client to pay a single, one-time fee, based on the size of the digital file desired by the client. The client receives a license allowing broad usage of the Image; typically in unlimited media, for an unlimited period of time, at any size of reproduction, in any quantities, worldwide, for nearly any purpose, including but not limited to the promotion of products and services. For example, an RF license may allow a client to use an Image on any number of websites in any and all countries, worldwide, forever. There may be any number of detailed restrictions on RF licenses, but in general, RF licenses allow broad usage. As RM licenses may also allow broad usage, but never base pricing on digital file size;[5] the primary differentiator between RM and RF licenses is the consideration of digital file size in the determination of the license fee for RF licenses. The RF licensing marketplace includes Images created by professionals, semi-professionals, amateurs, and enthusiasts. RF Images are typically less unique than Images offered under the RM model. Individual visual artists do not offer RF licensing directly to clients.[6] Visual artists may instead contribute Images to stock photo agencies, who serve as intermediaries to licensees. For this reason, RF and its variants described below are inapplicable to transactions directly between individual visual artists and end-users of Images.[7]

---

[4]  The Royalty Free licensing model should not be conflated/confused with the term "royalty free" as the latter often appears in the terms of agreements. The Royalty Free licensing model refers to a licensing model in which a license fee is based primarily on the size of the digital file requested by a client. In contrast, the term "royalty free" is often employed in agreements to indicate that the licensee need not pay additional royalties in the future. The term "royalty free" may appear in a license agreement whether the relevant license is RM (fee based on scope of use), or RF (fee based on digital file size).

[5]  While RM pricing is not based on digital file size, RM pricing may be based in part on the actual dimensions of reproductions to be made, distributed and displayed under the license.

[6]  Rare exceptions may exist.

[7] As visual artists in most markets do not base license fees on file size, the RF model (any license in which the license fee is based in part on digital file size) is not suitable for use in calculating applicable damages in circumstances under which an infringer accessed an infringed Image from a source other than an RF collection at stock agency.

23

(3) Microstock: A variant of RF licensing, microstock is typically a less expensive alternative. Like RF, microstock licenses provide broad rights for a low price, based on the size of the image file desired by the client. Like RF, microstock licenses include restrictions, but typically permit usage in unlimited media, unlimited quantities, unlimited sizes, and unlimited countries, for an unlimited period of time. Microstock agencies offer Images created by professionals, semi-professionals, amateurs, and enthusiasts.

(4) Subscription: An increasingly popular RF licensing variant, subscription-based licensing allows clients to pay a monthly or annual subscription fee in exchange for a broad license permitting the download of a quantity of Images during each subscription period— per year, per month, or per day. Such licensors typically employ a system of graduated pricing tiers under which clients pay an amount commensurate with a maximum quantity of Images available for downloading during the subscription period. There are many variants on subscription licensing schemes, driven by competitive pressures. Subscription agencies offer Images created by professionals, semi-professionals, amateurs, and enthusiasts.

(5) New Models: Seeking to maximize profitability and sales, stock agencies have been experimenting with new, hybrid models, such as licenses requiring payment based on the quantity of viewers of Images published online, or payment for advertising placement in or on an Image published online. The market continues to evolve.

The above is a limited overview of visual art licensing models, and is not intended to serve as a comprehensive description of all practices related to copyright licensing in the visual art industry. Exceptions exist.

Based upon my review of the documents, materials and testimony available to me in this Matter, and with a reasonable degree of certainty, Plaintiff offers

licenses exclusively under the RM model, under which the license fee is determined in greatest measure by the proposed scope of use of a photograph by a prospective licensee.

My opinions on Image licensing models are based on my personal knowledge and experience as a professional visual artist and trade association leader charged with establishing and developing industry standards and associated visual art licensing terms and agreements.

**D.     Defendants and Their Experts Incorrectly Imply that Copyright Owners Do Not Require Licenses for Use of Their Works as the Basis for Tattoos.**

Defendants and their experts claim that neither Defendants nor any tattooer in history has sought or obtained a license to create a tattoo based on a photograph, tattoo, or other artwork. Defendants and their experts claim that no artist requires a license to make use of a design as a tattoo, and that there is no copyright licensing in the tattoo industry.

Based on my knowledge, training and experience in the visual arts licensing industry, copyright owners and their authorized licensors expect and require that artists (in any and all genres) seek and obtain a license prior to creating derivative works based on a photograph or illustration.

To verify that my existing opinion is accurate, I contacted the copyright owners or authorized licensors of a selection of the photographs used as examples by Defendants' experts, and confirmed that each and every such copyright owner requires that tattoo artists request and obtain authorization prior to creating a tattoo based on one of their photographs.

Example 1

Defendants' Expert Friedman opined that no license was required for the creation of tattoos based on photographer Gered Mankowitz's portrait of

Jimi Hendrix. I contacted Mr. Mankowitz and confirmed that he requires a license for such use. See Exhibit C for copies of my communication with Mr. Mankowitz.

Example 2

Defendants' Expert Friedman opined that no license was required for the creation of tattoos based on photographer Irving Penn's portrait of Miles Davis. I contacted Mr. Penn's Foundation, and confirmed that the Foundation requires that tattoo artists seek permission from the Foundation prior to the creation of derivative works.  See Exhibit C for copies of my communication with Mr. Penn's Foundation.

Example 3

Defendants' Expert Friedman opined that no license was required for the creation of tattoos based on photographer Andrew Bernstein's photograph of Michael Jordan. I contacted Getty Images (authorized licensor for the photograph) and confirmed that Getty Images requires that a license is obtained prior to the creation of derivative works based on the photograph.

 In addition, Defendants produced copies of two Instagram posts from High Voltage Tattoo's Instagram account, depicting tattoos of Johnny Cash. I visited High Voltage Tattoo's Instagram account and made screen captures of those Instagram posts, discussed below.

26

Example 4

Defendants' 2018 Instagram post displays a tattoo made by a tattooer at High Voltage Tattoo, depicting Johnny Cash gesturing with his middle finger.



I recognized this tattoo as a derivative work based on a photograph made by the late photographer Jim Marshall. I contacted Marshall's estate and asked if this tattoo is a licensed derivative. The estate advised that they had not licensed this tattoo, that they require a license for such tattoos, and that they deem this tattoo an infringement.  See Exhibit C for a copy of my communications.

27

Example 5

Defendants' 2018 Instagram post displays a tattoo made by a tattooer at High Voltage Tattoo, depicting Johnny Cash gesturing with his forefinger.



I recognized this tattoo as a derivative work based on a photograph made by the late photographer Leigh Wiener, my mentor. I contacted Wiener's estate and asked if this tattoo is a licensed derivative. The estate advised that they had not licensed this tattoo, and that they require a license for such tattoos. See Exhibit C for a copy of my communications.

Supplementing the above, I contacted four of the major stock image agencies in the the visual arts industry, to determine if each agency normally requires that tattoo artists secure a license prior to creating a tattoo based

on one of the photographs offered for licensing by the agencies.  I contacted Alamy, Masterfile, Superstock and Danita Delmont, and without advising them of this litigation, asked if a license was required in order to create a tattoo of a photograph. Each agency confirmed that a license is required, and each agency provided a license quote.[8] See Exhibit D for copies of my communications with the stock image agencies.

Lastly, Plaintiff's long standing business practice is to require that the rights to create derivative works based on Plaintiff's photographs must be licensed in advance.  See copy of Plaintiff's licensing page, attached as Exhibit E.

For the above-described reasons, the assertions by Defendants and Defendants' experts that no license is required to make use of a Photograph to create a derivative tattoo are incorrect. Defendants' unlicensed creation of the Tattoo, will, if permitted, influence other tattooers to make unlicensed use of photographs, disrupting and usurping an existing market for the licensing of rights for artist reference and art rendering.

## E.  Defendants Experts Ignore the Existing Licensing Practices in Which Designs are Offered for Licensed Use by Tattoo Artists

Defendants' experts ignore common instances of offerings of tattoo designs for licensed use by tattooers.

---

[8] Importantly, in each such instance, I selected a generic image, not comparable to the Photograph. For this reason, and as Plaintiff does not permit stock image agencies to license his works,  the fees quoted by the agencies are inapplicable to the Photograph and do not indicate the value of a license of the Photograph for use as a tattoo.

Example 1: StarGarden



## Example 2: Miaohki



Home / Tattoo Ticket





**Tattoo Ticket**

If you would like to get one of my existing illustrations tattooed:

Tattoo artists require written approval before tattooing another artist's work to avoid copyright issues. This is an easy way to obtain my approval for a tattoo, as well as support my work.

Please write the **number & title** of the illustration you would like to tattoo in the text box (Both can be found on the "Work" page). One PDF Ticket will be sent to your email within 48 hours of purchase. There is no shipping on this item.

Illustrations found on the "Contact" page are not available for tattoos as my clients own all rights to their commissions.

Please note: You are purchasing a non-exclusive Tattoo License for 1 specified illustration for 1 personal tattoo. Any other reproduction or use of the image will be a violation of copyright law.

$49.99

Please write the number & title here!

Quantity

1

Add to Cart

31

Example 3: Tattoo Johnny



**F.     Defendants' Expert Incorrectly Suggests that "Shunning" is an
Appropriate Substitute for Copyright Law.**

Defendant's expert Lane opines that tattooers are not subject to copyright
law, and instead rely on "shunning:"

> ...tattooists do not rely on copyright law to police their industry
> internally. The cultural norms and industry customs of tattooing has
> its own mechanisms for policing and protecting designs...the industry
> has traditionally operated in the absence of state-based solutions –
> such as legal actions for copyright infringement – in favor of resolving
> issues of conflict informally and within the community...When a
> tattooist outright copies another's work, they may be shunned by
> others, other tattooists may refuse to work with them, some
> tattooists may even refuse to tattoo the offender, and others may
> spread rumors and misinformation to disrupt the offender's business."

Lane paints a remarkable picture . Lane suggests that in lieu of rights and
remedies afforded creators under copyright law, unwritten community
"norms" should be enforced by angry ad hoc mobs of practitioners who act
as judge and jury, meting out punishment by destroying the businesses and
livelihoods of  competitors who they perceive have dared to violate those
"norms" by copying designs created by other tattoo artists.

Remarkably, while suggesting that unauthorized copying of tattoo designs is
not tolerated in the tattoo industry, Lane also suggests that tattooers have
the right to freely copy the creations of photographers. Lane and Defendants'
other experts ignore the fact that increasingly, tattoo artists seek to enforce
their legal rights by filing copyright infringement claims against companies
who dare to depict their tattoos in motion pictures and video games.
Defendants' experts proffer an egregious double standard.

33

## VI.  RIGHT TO SUPPLEMENT

My opinions hereinabove are to a reasonable degree of certainty for an image licensing and copyright expert, based on my training, education, knowledge experience, and on my review of the materials listed in *Materials Considered* (Exhibit B). I understand that Defendants may offer additional expert testimony to support Defendants' claims and defenses in the Matter, and I expect that additional information and documents may come to light subsequent to my submission of the Report. If requested by Plaintiff's counsel, I may offer supplemental rebuttal reports to the opinions expressed by Defendants' experts, in accordance with the Court's scheduling order.

Respectfully Submitted,


_____   February 8, 2022
Professor Jeffrey Sedlik

34

Index to Exhibits

A       Professor Jeffrey Sedlik Curriculum Vitae

B       List of Materials Considered

C       Photographer Communications

D       Stock Image Agency Communications

E       Sedlik.com licensing info page

**EXHIBIT A**

# PROFESSOR JEFFREY SEDLIK
## Curriculum Vitae

---

## Contact Information

| | |
|---|---|
| Mailing Address | 145 North Sierra Madre Boulevard, Studio 4, Pasadena, California 91107 USA |
| Telephone | 626.808.0000 (LA)   212.447.1255 (NYC)   213.716.6627 (Cell) |
| Email | expert@sedlik.com |

---

## About Professor Sedlik

President & CEO of the PLUS Coalition, the international standards body for the licensing of visual artworks. Professional photographer, educator, publisher, forensic analyst, graphic designer, product designer, expert witness, fundraiser, negotiator, and consultant. Past National President of the Advertising Photographers of America (APA), a leading trade association in the commercial photography industry. APA Chief Advisor on Licensing and Copyright. 2005 Photography Industry Leadership Award, International Photography Council.  2006 Photography Person of the Year, Photo Media Magazine. 2007 Industry Leadership Award, Advertising Photographers of America.

Advises clients on industry trends, business practices, copyright and contract issues, branding, fair use, copyright registration validity, public domain works, moral rights, work-made-for-hire, merchandising/packaging infringements, Creative Commons,  asset identification systems, asset management systems, asset licensing systems, stock photography industry practices and methodologies, metadata standards, rights languages, valuation of photographs/photography, illustrations, graphic designs, and other visual artworks and related services, licensing, rights of publicity/privacy, social media technologies and terms, web project development, investment and acquisition opportunities, strategic partnerships, art history, historical practices and technologies in photography, digital and traditional photographic and design techniques and workflows, forensic analysis of photographs and videos, graphic design, product design, publishing, photography-related software design, patents of photography-related technologies and procedures, and product manufacture. Provides expert witness and consulting services on these and other matters related to photography, illustration, visual art, advertising, design, and the modeling industry.  Provides expert testimony on actual damages, statutory damages, causal nexus for disgorged profits, and other damages and liability arising from breach of contract, infringement of copyright, trade dress, trademark, removal/alteration/falsification of copyright management information, DMCA violations, rights of publicity/privacy, loss/damage/theft of visual artworks, image manipulation, creative expression, original authorship, substantial similarity, independent economic value, employment status, sale tax and other issues. Provides photogrammetric services and forensic analysis of images and video.  Serves as a Professor at the Art Center College of Design.  An accomplished and experienced educator, conducts advanced seminars and workshops for professionals, and teaches college-level courses on copyright, licensing, advertising, design and related business practices.

---

## Professional Experience

**PLUS Coalition, Inc.**, 2005 – Present.  Serves as President and CEO for the global standards body for the image licensing industries. A non-profit organization, Picture Licensing Universal System ("PLUS") is dedicated to the development and maintenance of international licensing standards and systems in the photography, illustration,

1

publishing, advertising, graphic design, museum, library, and education communities in 120 countries. Directed recruitment of trade organizations and other interested parties worldwide and supervised development and implementation of licensing standards, and development of a global rights registry.

**PLUS Coalition, LTD.**, 2005 – Present.  Serves as President, CEO and Director of the London-based subsidiary of the PLUS Coalition, Inc.

**Sedlik Productions/Sedlik Design,** 1986 – Present. Serves as President of a leading commercial photography, design, and film production company.  Also serves as Producer, Director, Photographer, and Director of Photography, creating photography, film and video productions for advertising agencies, graphic design studios, the entertainment industry, and other clients. Operates SedlikStock, a subsidiary dedicated to licensing existing Sedlik images for advertising, editorial and merchandizing usage via affiliates including stock photography agencies and publishers. Maintains relationships with major photography industry manufacturers, testing and demonstrating analog and digital equipment and software. Provides graphic design, advertising design and product design and manufacturing services.

**Partial Client List- Sedlik Productions/Sedlik Design**

**Clients:** 3m; 20th Century Fox; A&E Television Network; ABR Information Services; Alpo; AmSouth Bank; Andazia, Inc; Arista Records; Association of Tennis Professionals; AT&T; Avery Dennison; Bank of America; Barrington Music Products; BBC;  Blue Cross; BMG/RCA Records; Bristol Myers Squibb; Buena Vista Pictures; Bureau of Census; CareAmerica; Chesebrough-Ponds; CBS/Sony Music; Cedars Sinai; Century 21; Cherokee; Columbia Pictures; Computer Associates; Concord Records; Conroy's Florist; Direct TV; Disney; Doubleday; Dreyfus; Epson; Essilor; Farmers Insurance; Federal Express; Fitzgerald-Hartley Co.; Ford; Gannon/Hartley; Geffen Records; Georgia Pacific; Great Performances; Great Western Bank; GRP Records; GTE; Guinness Museum; Hanna-Barbera; Harcourt Publishers; Hopper Papers; Ikea; Infiniti Automobiles; Island Records; Janssen Pharmaceuticals; JVC Musical Industries; Kraft Food Products; Korg, Inc.; LaFace Records; Laura Ashley; Levi Strauss; Mark Taper Forum; Missouri Historical Society; MCA Records; MCA International; Metro Goldwyn Mayer; Microsoft; Motion Picture & TV Fund; Movieland; MSN; MTM Entertainment; MTV Networks; Navisite; NBC Television; Neenah Paper; Nestle'; New World Pictures; Nike; Pacific Bell; Palm Press; Paramount Pictures; Phillip Morris; Polygram Records; Pomegranate Books; Potlatch; Prentice-Hall; San Diego Zoo; Schering Plough; SBC; Signature Eyewear; Smithsonian Institution; Sony Inc.; Southern Natural Gas; Spanish Tourism Office; Sugar Hill Records; Taco Bell; Telarc International; Toyota; Turner Broadcasting; U. C. Press; United Airlines; United Way; Universal Studios; VH-1; Warner Brothers Records; Web TV; Windham Hill Records; Word Records; World Savings; Yamaha; Zellerbach; Ziff-Davis; Zildjian

**Advertising Agencies & Design Firms:** Alan Sekuler & Associates; Asher Gould; BBDO;  Bozell, Brierley & Partners; Brooks-Gruman Advertising; Campbell, Mithun, Esty; Cline, Davis, & Mann; Cross & Associates Design; Dailey & Associates; Davis, Elen; Daymark; DDB Needham, Worldwide; Deutsch; Douglas Oliver Design; DVC Marketing; DZN; The Design Group; East/West Network; Fitzgerald & Associates; FKQ Advertising; FP Horak Advertising; Foote, Cone, & Belding; GBF Ayer; Goodby Silverstein; Grey Advertising; Hill & Knowlton; Huerta Design; Ikkanda Design; Interbrand; J. Walter Thompson; Kang & Lee; Kaufman/Stewart; Ketchum Advertising; Klemtner Advertising; Kovel Kresser; Kuester Group; Lehman Millet, Inc; Lintas Campbell Ewald; Mangos; Mediatrix; Melia Design Group; Ogilvy & Mather; OZ Advertising; Phillips Ramsey; Poppe-Tyson; Potter Katz & Partners; John Ryan Company; Saatchi & Saatchi; Seineger Advertising; Slaughter Hanson; SmithKlein Beecham; Strike Group; Team One Advertising; Team Creatif; Torre Lazur; Tracy-Locke; Tribe Design; Vrontikis Design; White Rhino Advertising; Young & Rubicam

2

**Editorial:** American Film; Arts & Entertainment; CD Review; Cosmopolitan; Details; Downbeat; Elle; Entertainment Weekly; Glamour; GuestInformant; Imperial Press; In Focus; Interiors & Sources; Jazziz; Jazz Times; Life; Los Angeles Magazine; Los Angeles Times Magazine; Mirabella; Music Connection; Newsweek; Photo District News; People; Premiere; Pulse; Q Magazine; Rolling Stone; Select; Spin; Time-Life

## Other Professional Experience

**Copyright Public Modernization Committee (CPMC) of the Library of Congress.** 2021 – Present. Appointed by Librarian of Congress Carla Hayden to serve as her advisor on the modernization of the Copyright Office.

**Linked Content Coalition, (LCC)** 2013 – Present.  Serves as a Founding Director of the Linked Content Coalition (LCC), a UK-based, not-for-profit global consortium of standards bodies and registries. LCC members are organizations engaged in creating and managing data standards associated with content of one or more types, particularly for identifiers, metadata, and messaging. The purpose of the LCC is to facilitate and expand the legitimate use of content in the digital network through the effective use of interoperable identifiers and metadata.

**American Society of Collective Rights Licensing (ASCRL),** 2014 – Present. Serves as Founding Director of ASCRL, a non-profit collecting society engaged in collecting and distributing  foreign and domestic royalties to authors and copyright owners in visual works in the United States.

**Copyright Alliance (CA),** 2016 – Present. Serves as Board member on the Copyright Alliance Creators Advisory Board and Academic Advisory Board, collaborating with leading organizations and experts in the creative industries on copyright-related issues including education, legislation, advocacy, and other efforts.

**Advertising Photographers of America (APA)**. Served as National President , 2000 – 2002. Directed and supervised all operations of the largest trade organization representing advertising photographers, leading more than seventy volunteer board members located in all areas of the country. Advised federal and state legislators, and senior officials at the Small Business Administration and US Copyright Office. Serve  as Chair of the Model Release Working Group, charged with developing international standards for model releases, communication of usage rights,  and model release workflow. Served on the Board of Directors of the APA Los Angeles Chapter, and on that chapter's Legal and Legislative Committee, Advocacy Committee and Sales Tax Committee. Serve as Chief Advisor on Licensing and Copyright, 2002 – 2012, and 2018 – Present.

**Beijing Intellectual Property Expertise Center of Judicature (JZSC),** 2007 – Present. Advisor to Chinese governmental agency and the People's Court of China on intellectual property issues in China.

**IPTC Photo Metadata Working Group,** 2006 – Present. Active participant in the International Press Telecommunications Council (IPTC) standards body. Member of the IPTC Photo Metadata Working Group, charged with establishing and maintaining standards for embedded metadata in digital photographs. Co-authored the IPTC Photo Metadata White Paper 2007 and the IPTC-PLUS Photo Metadata Toolkit.

**Universal Photographic Digital Imaging Guidelines (UPDIG),** 2004 – Present.  Active participant in working group charged with developing worldwide standards in the commercial application of digital imaging technologies.

**Consultant and Expert Witness,** 2000 – Present. Provide consulting services, forensic analysis and expert testimony on legal, business, and technical matters related to digital and traditional photography, illustration, marketing, and other topics.

Exh A Page 40

**United States Copyright Office**, 2008 – Present. Advises senior staff members on topics including copyright registration, regulatory, re-engineering and professional workflow issues. Alpha test consultant for online electronic copyright registration system.

**Adobe Photographer's Council,** 2004 – 2010. Advised Adobe Systems on matters related to Adobe products and services, including digital photography technologies, stock photography, and industry standards.

**Adobe Pre-release Testing,** 2004 – Present. Provides pre-release testing services to Adobe, both alpha and BETA testing of Adobe products and services.

**Founder, Digital Technology Advisory Council,** 2002. Founded advisory council comprised of high-level representatives from each of the leading photography industry manufacturers.

**Advisory Board Member, WorkbookStock,** 2000 – 2006. Served on the advisory board of WorkbookStock, a leading stock photography agency. Consulted on the development of a vendor contract, copyright registration procedures, and web interface.

**Advisory Board Member, Exactly Vertical**, 1998 – 2000. Served on the advisory board of Exactly Vertical, a company offering interactive business management solutions for photographers. Consulted on issues including web interface, software design, copyright registration, merchandizing, stock licensing, photographers' workflows, and branding.

**Other, 1996 – Present:** Numerous additional consulting  engagements under NDA, including the identification and analysis of investment opportunities, strategic partnerships, acquisition targets, product development and launch strategies, advisory council recruitment, fundraising, negotiations, mediation, and deal brokering.

## Awards & Recognition

**APA Photography Industry Leadership Award,** 2007. Presented by Advertising Photographers of America.

**Photography Person of the Year,** 2006. Presented by Photo Media Magazine.

**ICP Photography Industry Leadership Award,** 2005. Presented by the International Photography Council, a non-governmental organization of the United Nations.

**Mamiya Award of Excellence in Photo Education**, 1999. Recognized as a leading arts educator. Selected from all college-level photography instructors, nationwide.

**The Clio Awards. Silver Clio, Director of Photography, Rich Media Advertising**, 1999.

**Selected Additional Awards and Recognition:** Print's Regional Design Annual. Award of Excellence, 1999; Ozzie Awards. Silver Ozzie for Best Photography, 1999; Art Directors Club. Excellence in Photography, 1999; Art Directors Club. Excellence in Photography, 1999; PDN/Nikon Award of Excellence in Self Promotion, 1998; Advertising Photographers of America. Best in Show, 1998; Communication Arts Award of Excellence in Editorial Photography, 1998; The One Show Award for Excellence in Advertising, 1997; Communication Arts Award of Excellence, Unpublished Work, 1997; Communication Arts Award of Excellence in Self Promotion, 1996; Communication Arts Award of Excellence in Advertising Photography, 1994; Communication Arts Award of

Excellence, Book Series, 1993; Art Direction Magazine Creativity Award, 1992; Communication Arts Award of Excellence in Editorial Photography, 1992; Communication Arts Award of Excellence in Advertising Photography, 1991; Communication Arts Award of Excellence in Editorial Photography, 1990; Art Direction Magazine. Creativity Award, 1990.

## Selected Articles Authored

**ASMP Professional Business Practices in Photography, 2008.** Contributing author.

**United States House Judiciary Committee.** "The Orphan Works Dilemma: Challenges & Recommendations," 2006. Treatise submitted to the House Judiciary Committee by invitation of the General Counsel, in relation to the U.S. Copyright Office "Report on Orphan Works."

**Photo District News.** Contributor to Photo District News, the photography industry's primary trade publication. Authored the "Ask the Expert" column, writing on subjects of business management, licensing, copyright, and creativity.

**In Focus.** Contributor to In Focus Magazine, the magazine of the Advertising Photographers of America, writing on subjects including business management, industry trends, protecting the value of photography, licensing, copyright, creativity.

**Wraparound.** Founder and regular contributor to Wraparound Magazine, writing on legal and business topics.

**APA/LA News Magazine.** Contributor to the news magazine published by the Advertising Photographers of America, Los Angeles Chapter.

**Photo Media.** "Get Down to Business" Fall, 2000

**IPTC Photo Metadata White Paper 2007.** Co-author.

## Professional Societies

**Advertising Photographers of America (APA)**

**American Institute of Graphic Arts (AIGA)**

**American Society for Collective Rights Licensing (ASCRL)**

**American Society of Media Photographers (ASMP)**

**American Society of Picture Professionals (ASPP)**

**Copyright Alliance (CA)**

**Copyright Society of the United States of America (CSUSA)**

**Photography Instructors Education Association (PIEA)**

**PLUS Coalition, Inc. (PLUS)**

**Pro Imaging (PI)**

---

**Selected Speaking Engagements**

---

**American Photographic Artists,** 2020. *"Why Register Copyright?"*

**United States House of Representatives, Committee on the Judiciary,** 2020. Testimony on proposed amendments to the Copyright Act.

**United States Copyright Office**, 2020. Invited speaker on the development and efficacy of Standard Technical Measures and Copyright Management Information under the Digital Millennium Copyright Act.

**United States Senate, Committee on the Judiciary, Subcommittee on Intellectual Property,** 2020. Testimony on proposed amendments to the Copyright Act.

**Copyright Society of the USA,** 2019. "Expert Witnesses in Copyright Matters"

**Copyright Society of the USA - Copyright Technology Conference**, 2019. "Rational Approaches to Online Image Licensing."

**Copyright Society of the USA,** 2018. "Perfect Storm: Embedding, Linking and Copyright Infringement."

**United States Department of Commerce,** 2018. "Developing the Marketplace for Copyright Works: Licensing and Monetization."

**American Society of Media** Photographers, 2018. "Understanding New Copyright Regulations for Group Registration of Photographs"

**United States Copyright Office,** 2017. "Original Expression and Authorship in Photography."

**Photo+ Expo,** 2017. "They Stole My Work. Now What?"

**Copyright Society of the USA,** 2017.  Mid-winter Meeting**. "**TMI About CMI: The Rash of Recent Claims Under Section 1202 Regarding Removal of Copyright Management Information.

**United States Copyright Office,** 2016. "Copyright Licensing in the Visual Arts."

**International Federation of Reproduction Rights Organizations (IFRRO),** 2016**.** Annual General Meeting. "Licensing Reproduction Rights."

**Joint Photographic Experts Group (JPEG),** 2016. JPEG Committee Meeting – JPEG Privacy & Security Workshop: "Embedded Rights Metadata in Photographs."

**Duke University Law School and New York University Law School**, 2016. "Copyright Office for the 21st Century: Registration and Recordation Functions"

Exh A Page 43

**United States Copyright Office,** 2016.  California Roundtable on Section 512: "Applicable Legal Standards," "Scope and Impact of Safe Harbors," "Technological Standards and Solutions."

**Legal Issues in Museum Administration Conference,** 2015. Smithsonian Institution. "Copyright Clearance and Cultural Heritage."

**International Press Telecommunications Council (IPTC) Conference,** 2015. "The Application of Rights Metadata in Photographs."

**Initiative for a Competitive Online Marketplace (ICOMP),** 2015. "How the Digital and Creative Economies Can Prosper Together."

**International Federation of Reproduction Rights Organizations (IFRRO),** 2015**.** Annual General Meeting. "Measuring the Use of Visual Works."

**International United States Patent and Trademark Office,** 2015. **"**Copyright, Culture, Art and Science in the Digital Age: Hot Topics in the Visual Arts. Painting, Photography and Sculpture – Toward a Copyright Hub."

**Stanford University Law School,** 2014-2015. Copyright Practicum: **"**Copyright in Visual Artworks Identification, Metadata, Registration, Licensing."

**United States House of Representatives Judiciary Subcommittee on the Courts, Intellectual Property, and the Internet**, 2014. Testimony at hearing entitled "Preservation and Reuse of Copyrighted Works."

**United States Copyright Office**, 2014. "Orphan Works & Mass Digitization Round Table."

**University of California Los Angeles**, 2014. "US Copyright Office Recordation Reengineering Roundtable."

**International Confederation of Societies of Authors and Composers (CISAC).** 2013. "World Creators' Summit - Orphan Works:  Balancing Access and Creator's Rights."

**International Press Telecommunications Council (IPTC).** IPTC Metadata Conference, 2013. "Metadata Technology. What the Future Might Bring."

**California Visual Resources Association Conference**, 2014. Image Rights: "Leveraging Rights Metadata to Maximize Access and Minimize Liability."

**United States Patent and Trademark Office.** 2013. "Copyright Policy, Creativity, and Innovation in the Digital Economy."

**National Association of Recording Merchandisers (NARM) Conference,** 2013. "Managing Photographic and Video Archival Assets."

**Advertising Photographers of America (APA)**, 2013. "Social Media, the PLUS system, and Strategic Licensing in the Internet Age."

**Copyright and Technology Conference, 2012**. Rights Registries and Copyright Hubs: "The Holy Grail, or the Enemy of the Good?"

**ICON LA Illustration Conference**, 2010.  **"**Illustrators and Copyright."

**Picture Archive Council of America, International Conference**, 2004.  Image Licensing in the 21st Century

**Createasphere EXPLORE Entertainment Technology Exposition**, 2010. Digital Asset Management Workflows

**American Society of Media Photographers**, 2010. Copyright and the New Economy: Issues Facing Visual Artists

**Photo+ Expo**, 2009. "Strategic Copyright Licensing."

**Museum Computer Network**, 2009. "Copyright in the Cultural Heritage Sector."

**Smithsonian Institution**, 2009. "Beyond the Copyright Field: Current Trends in Rights and Licensing Metadata."

**Photo Marketing Association**, 2008. "Breakthroughs in Photo Archiving using Metadata"

**Picture Archive Council of America International Conference**, 2008. "Copyright in the Stock Image Industry."

**Henry Stewart DAM Symposium**, 2008. "Rights, Images and PLUS: Challenges & Solutions"

**IDEAlliance XMP Open Content Metadata Summit**, 2008. "Leveraging XMP to Advance Industry Standards"

**Picture Archive Council of America**, 2007. "Finding  Common Ground: Setting Standards in a Time of Change."

**Library of Congress**, 2007. "Image Preservation with PLUS."

**Japan Photographer's Union**, 2007. "Photography & Copyright: International Issues."

**Digital Library Federation, Fall Forum**, 2007. "Facilitating Fair Licensing of Digital Images,Determining Copyright."

**Museum Computer Network Conference**, 2007. "Museums and Intellectual Property: Challenges and Solutions."

**IDEAlliance XMP Open Content Metadata Summit**, 2007. "Advanced Metadata Workflow Strategies."

**American Society of Picture Professionals, Education Conference**, 2006.  "Strategic Licensing: The Art & Science of Maximizing Your Profits."

**International Press Telecommunications Council (IPTC) Conference**, 2006. "PLUS and IPTC, Collaborating on Rights Metadata Standardization."

**Coordination of European Picture Agencies Press Congress (CEPIC) Conference**, 2006. "Implementing International Standards in Image Licensing."

**Oxford University**, 2006.  "Digital Object Identifiers and Copyright."

**Miscellaneous Events and Engagements,** 1977 – Present. Invited speaker/panelist at the industry's major trade shows, speaking on topics including copyright, licensing, advertising, branding, design, publishing, product development, self-promotion, stock image licensing and technical issues. Lectured on photography at LAUSD

Community Adult School. Speaks before groups of photographers and creatives worldwide. Wrote and produced the APA "Real World" seminar series on topics ranging from estimating, to licensing, to producing. Participated in the development of Digital Imaging for Photographers, a leading seminar series dedicated to cutting- edge digital techniques and equipment.  Speaker at the "PDN on the Road" seminar series, on copyright, licensing, and stock photography.  Speaker at the ASMP Strictly Business Workshops, ASMP Copyright Symposiums, Copyright & Technology Conferences, Digital Asset Management Conferences, World Copyright Summits, Copyright Office Roundtables, and many other events.

## Foundation, Community Service and Charitable Work

**Warren King Foundation**, President, 2000–2002. Created foundation providing endowed photography scholarships to promising photography students. Produced a fundraising event attended by photographers, educators, government officials and media. Lobbied Los Angeles Unified School District to re-launch abandoned arts education programs in local schools. Arranged for an arts teacher to receive a lifetime achievement award at the Kennedy Center.

**Other Community Service and Charitable Work.** Conduct visiting lectures on the art and history of photography for elementary school students in the Los Angeles Unified and Pasadena Unified School Districts. Judge photography exhibitions at the high school, college, and amateur, and professional levels.  Photograph pro-bono or reduced-fee public service campaigns for charitable organizations such as the LA Times "Reading by Nine" program, Jewish Family Services, Motion Picture and Television Fund, United Way, and others. Volunteered time to leadership in the Boy Scouts and public schools. Donated original photographic prints to each of the Focus on Aids annual fundraising auctions 1987-2003, Woodcraft Rangers, Pediatric Aids Foundation, and other vital charitable organizations.

**Boy Scouts of America,** Eagle Scout, 1972-1977.

## Academic

**Continuing Education,** 1986-Present. Attends workshops and seminars on business, legal and technical issues affecting photographers, illustrators, designers, and other visual creators, with an emphasis on intellectual property, business management, stock photography, and digital technology courses. Consults with manufacturers and distributors in testing new equipment and software applications  to stay abreast of the latest developments in digital imaging, design, and manufacturing technologies.

**Brooks Institute,** 2008, MFA, HC.

**Art Center College of Design,** 1986,  BFA.

**University of California at Santa Barbara,** 1980-1983, Liberal Studies major with emphasis in Art, Art History, Economics, Business Management.

**EXHIBIT B**

**Materials Considered**

Defendants' production KVD 000000 through KVD 000133
Plaintiff's Production JSP 000001 through JSP 007928
Exhibits to Jeffrey Sedlik Deposition
Exhibits to Katherine Von Drachenberg Depositon
Exhibits to this Report
Inline Illustrations in this Report

**EXHIBIT C**

| | |
|---|---|
| **From:** | Matthew Krejcarek |
| **To:** | Jeffrey Sedlik |
| **Subject:** | Penn Foundation Permissions Protocol |
| **Date:** | Monday, February 7, 2022 9:23:34 AM |

Dear Jeff,

Following up on our recent conversation, here is a brief statement that outlines the Penn Foundation's basic copyright law expectations and permissions protocol:

In accordance with established copyright law principles and in the spirit of respecting artist's moral rights, The Irving Penn Foundation expects that those who wish to create a reproduction or derivative work based on Mr. Penn's work will contact the Foundation in advance in order to request and obtain permission to do so—to this end, we have a dedicated page on our website set up with detailed information, guidelines, and instructions to facilitate this process: https://irvingpenn.org/permissions.  Following its consideration of a submitted proposal, the Foundation then exercises its discretion under copyright law to either grant or withhold permission.

Sincerely,
Matthew

_____

THE IRVING PENN FOUNDATION

**Matthew Krejcarek**
*Assistant Director, Intellectual Property*
m.krejcarek@irvingpenn.org | (347) 662-2361
irvingpenn.org

_____

## Licensing

As the representative of one of history's most influential and prolific photographers, The Irving Penn Foundation takes very seriously its responsibility to uphold and enhance the legacy of Irving Penn.

To ensure that Penn's work continues to inspire creative minds and inform the art of photography, the Foundation is committed to fostering quality reproductions with publishers and making his work accessible to audiences and scholars around the world.

The Foundation owns all of the copyrights owned by Penn at the time of his death in 2009 and is the sole entity authorized to license those copyrights. For historical reasons, selected Penn copyrights are jointly managed by third parties and may be licensed for reproduction by them. If you are uncertain about the appropriate party to grant a license for the reproduction of a Penn image, the Foundation may be able to provide information to you.

## Reproduction Requests

In order for your request to be processed, kindly fill in the form below as completely as possible so that we may carefully evaluate your proposed use. If you are unable to submit your request online using the form, please email the details of the proposal to Matthew Krejcarek at m.krejcarek@irvingpenn.org.

The Foundation will review submitted information and be in touch with you as quickly as possible—if your request is approved, a written licensing agreement will be issued. Please note that, due to the volume of requests received, this process of review typically takes up to three weeks and advance notice is required to properly facilitate permission.

As part of the protocol, licensees of Penn images are expected to observe the following guidelines: the licensed image must be shown in its entirety without cropping or overlay of type; the Foundation must be given the opportunity to review and approve the final design layout (including facing pages), credit lines, and any accompanying text for accuracy at least one week in advance of publication or public release; and copies of the item(s) in which a Penn image is licensed must be provided to the Foundation for its archival repository upon request. These guidelines are binding legal requirements for images licensed by the Foundation, and in cases where an invoice is issued, no grant of reproduction rights is effective until payment of the required licensing fee is made in full and received by the Foundation. Revenues generated through licensing fees support an increasing number of the Foundation's philanthropic initiatives and educational activities.

Open Form

🔒 https://www.artsy.net/artwork/irving-penn-miles-davis-new-york-july-1



A

Search by artist, gallery, style, theme, tag, etc.   🔍   Buy   Sell   Price Database   Editorial   [ Log In ]   [ Sign Up ]

Artists   Artworks   Auctions   Viewing Rooms   Galleries   Fairs   Shows   Museums   NFTs   Download App

Phillips: Photographs (April 2018) - Phillips   In auction



Irving Penn
American, 1917–2009                                    [ Follow ]

*Miles Davis, New York, July 1*, 1986
Selenium toned gelatin silver print
14 4/5 × 14 4/5 in
37.5 × 37.5 cm

Bidding closed

Want to sell a work by this artist? **Consign with Artsy**.

♡ Save      👁 View in room      ⬆ Share

About the work      Provenance                              Exh A Page 52

| | |
|---|---|
| **From:** | AMELIA DAVIS |
| **To:** | Jeffrey Sedlik |
| **Subject:** | Re: Tattoo use |
| **Date:** | Tuesday, February 8, 2022 2:05:06 PM |
| **Attachments:** | PastedGraphic-6.tiff |

Hello Jeff

I was not aware of this tattoo of Jim Marshall Photography's iconic Johnny Cash flipping the bird at San Quentin Prison 1969.It is not an artistic interpretation.

This tattoo copies Johnny Cash's expression in the original Jim Marshall photograph including lighting, shading at the moment Jim created the photograph with his subject.

This is an infringement on Jim Marshall Photography LLC's copyright. We license Jim Marshall's images for a fee and this tattoo is something we would definitely require a licensing fee to use.

Thank you.

Amelia

AMELIA DAVIS
Jim Marshall Photography LLC
www.jimmarshallphotographyllc.com
ameliadavis1@mac.com

Follow us on Instagram, Facebook Twitter



On Feb 8, 2022, at 1:10 PM, jeffsedlik@gmail.com wrote:

Hello Amelia,

I recently learned of this tattoo made of Jim's photograph. by Kat Von D's shop in LA, High Voltage Tattoo.
https://www.instagram.com/p/BiCmKbUFM5n/?utm_source=ig_web_copy_link

Did you license this use?

Seems they even replicated the platinum print edge effect from your print.

Do you require that tattoo artists and other artists seek permission and license from you before making derivative works of Jim's photographs?

Thanks
Jeff
~~~





_0000-iconic-country-cash-bird-folsom-1968.jpg

| | |
|---|---|
| **From:** | info@mankowitz.com |
| **To:** | Jeffrey Sedlik |
| **Subject:** | RE: confirmation of discussion |
| **Date:** | Monday, January 31, 2022 7:32:54 AM |

Dear Jeff,

I can confirm that your understanding is correct on all five points and the only detail I would clarify is that I am the creator of the images and the copyright is owned by my company Bowstir Ltd.

I hope that this is of some assistance and don't hesitate to contact me again if I can be of any further help.

Kind regards,
Gered.

Gered Mankowitz FRPS

## BOWSTIR Ltd trading as www.mankowitz.com

**From:** Jeffrey Sedlik <Jeff.Sedlik@Artcenter.edu>
**Sent:** 29 January 2022 19:37
**To:** info@mankowitz.com
**Subject:** confirmation of discussion

Hello Gered, thanks for taking my call. It was a pleasure speaking with you.

I understand from our conversation that :

1. You are the creator and copyright owner of the attached Hendrix photograph.
2. You expect and require that any tattoo artist or other artist who wishes to create a new work based on one of your photographs will contact you in advance, and will request and obtain permission and license from you before creating a derivative work.
3. Neither you nor any of your representatives issued a license permitting the creation of either of the attached tattoos, or any other tattoo based on your photograph.
4. If approached by a tattoo artist with a request to use your photograph as reference material for a tattoo or to otherwise create a tattoo based on your photograph, you would exercise your discretion under copyright law to either grant or withhold permission and license.
5. In your view, each of the attached tattoos is an infringement on your copyright in your Hendrix photograph.

Can you confirm that my understanding is correct?

Thanks Again
Jeff

ICONIC**IMAGES**

News | Archive A-Z | Photographers | Shop | Licensing | Contact

Search image archive

Home > Photographers > Gered Mankowitz > Music > Jimi Hendrix



### Jimi Hendrix

American rock guitarist, singer, and songwriter Jimi Hendrix, photographed in London, 1967.

Photographer: **Gered Mankowitz**
Media name: **GM_JH024**

A **fine art print** is available of this image.

Email us or visit our store
for more information

This image is available for **editorial** and **commercial licensing**.

Email us or visit our licensing platform
for more information

image tags

1960s | 1967 | American | b/w | Black and White | Gered Mankowitz | Guitarist | Jimi Hendrix | London | Male | Man | Music | Musician | Rock | Singer | Sixties | Songwriter | Square

Exh A Page 58

getty images

BROWSE    PRICING

BOARDS    CART    SIGN IN

Search the world's best editorial photos

Editorial Images ⌄

## 1993 NBA Finals Game 6: Chicago Bulls vs. Phoenix Suns

PHOENIX - JUNE 20: Michael Jordan #23 of the Chicago Bulls celebrates winning the NBA Championship after Game Six of the 1993 NBA Finals on June 20, 1993 at th America West Arena in Phoenix, Arizona. The Bulls won 99-98. NOTE TO USER: User expressly acknowledges and agrees that, by downloading and/or using this Photograph, user is consenting to the terms and conditions of the Getty Images License Agreement. Mandatory Copyright Notice: Copyright 1993 NBAE (Photo by Andrew D. Bernstein/NBAE via Getty Images)

PURCHASE A LICENSE

Get personalized pricing by telling us about when, where, and how you want to use this video.

**SELECT OPTIONS**

**SAVE TO CART**



 Comp     Save

### DETAILS

| | |
|---|---|
| Restrictions: | USER IS NOT PERMITTED TO DOWNLOAD OR USE IMAGE WITHOUT PRIOR APPROVAL. |
| Credit: | Andrew D. Bernstein / Contributor |
| Editorial #: | 76027850 |
| Collection: | National Basketball Association |
| Date created: | June 20, 1993 |
| License type: | Rights-managed |
| Release info: | Not released. More information |
| Source: | NBAE |
| Object name: | 72825116AB_DNA046675277 |
| Max file size: | 2398 x 3598 px (7.99 x 11.99 in) - 300 dpi - 2 MB |

Exh A Page 59



BENJAMIN LAUKIS

Exh A Page 60

| | |
|---|---|
| **From:** | Devik Wiener |
| **To:** | jeffsedlik@gmail.com |
| **Subject:** | Re: Tattoo use |
| **Date:** | Tuesday, February 8, 2022 1:55:49 PM |

Dear Jeff,

Thank you for your note. I was completely unaware of this use thank you for bringing to my attention.
I did not license this image and I would have required one for a tattoo.

Kind regards,
Devik Wiener


> On Feb 8, 2022, at 12:57 PM, jeffsedlik@gmail.com wrote:
>
>
> Hello Devik,
>
> I recently learned of this tattoo made of your father's photograph by Kat Von D's shop in LA, High Voltage Tattoo.
> https://www.instagram.com/p/BiC5RwgFtuJ/?utm_source=ig_web_copy_link
>
> Did you license this use?
>
> Do you require that tattoo artists and other artists seek permission and license from you before making derivative works of your father's photographs?
>
> Thanks
> Jeff

Exh A Page 62

https://www.morrisonhotelgallery.com/photographers/zAeBHy/Leigh-Wiener



# Johnny Cash, Los Angeles, CA, August 1960

© Leigh Wiener, 1960

Photographed at Leigh Wiener's studio.

💛 STAFF PICK

PAIGE CALIFANO'S STAFF PICKS "Johnny Cash is a true icon of American music. Leigh Wiener captured the complex nature of Johnny Cash in a series of four sessions from 1960-1963. It was a crucial time for Johnny. He had just signed with Columbia records, enabling him to produce gospel albums and tour. This was the beginning of a new chapter for him. In 1962 June Carter joined him on the road. The two married six years later." For more information on purchasing Leigh Wiener's prints, please contact our gallery. Los Angeles Sales +1 310-881-6025 New York City Sales +1 212 941 8770











**EXHIBIT D**

 Gmail

Sandra sedlik <sandrasedlik@gmail.com>

---

## FW: Alamy | Quote for Tattoo Use
1 message

---

**Charlotte Jackson** <charlotte@alamy.com>                              Tue, Feb 8, 2022 at 2:24 PM
To: "sandrasedlik@gmail.com" <sandrasedlik@gmail.com>



w  http   //www alamy com
USA: +1 866 671 7305 (toll free)  |  Canada: +1 866 331 4914 (toll free)
a: Alamy, 49 Flatbush Ave, #130, Brooklyn, NY 11217
Follow us: Facebook, YouTube, Instagram, LinkedIn, Pinterest, Twitter, Blog

--------------- Forwarded Message ---------------
**From:** Evan Sapio [evan@alamy.com]
**Sent:** 2/8/2022 2 19 PM
**To:** Sandrafedlik@gmail.com
**Subject:** Alamy | Quote for Tattoo U  e

Hi Sandra,

Thanks for your call!

Please find your quote below that will cover image C0WGJ2 to be used as an artistic reference for a tattoo:

* Details: To be used as a partial reference for a tattoo design. | Cost: US $ 60.00

If you would like to proceed, use the link HERE to create a free Alamy account and we can place the license into your shopping cart.

Best,

Evan
Cu  tomer Service

Read our latest blogs for insider tips and inspiration here

ref   00D0YaeHz   5004LFdMVt ref

Alamy and it  logo are trademark   of Alamy Ltd  and are regi tered in certain countrie   A di claimer applie  to all email    ent
from Alamy. For the full text please see https://www.alamy.com/terms/general.aspx#Email-disclaimers

alamy

284,880,256 stock photos, 360° images, vectors and videos

💬 Live chat | ⊕ Lightboxes | 🛒 Cart | 👤 Account

All images ⌄ | Search for images | 📷 🔍

A musician with sax and music score



**RM** Image ID: **C0WGJ2**

⬇ Preview | ⊕ Save | ⌁ Share

**IMAGE DETAILS**

| | |
|---|---|
| Contributor: | Pierre BRYE / Alamy Stock Photo |
| File size: | 34.9 MB (1.2 MB Compressed download) ⓘ |
| Releases: | Model - no \| Property - no   Do I need a release? |
| Dimensions: | 2847 x 4288 px \| 24.1 x 36.3 cm \| 9.5 x 14.3 inches \| 300dpi |
| Date taken: | 23 January 2009 |
| Location: | France |

**Save up to 30%** with our image packs
Pre-pay for multiple images and download on demand.

View discounts

**Buy this stock image now…**

Standard licenses | Build a license

○ **Personal use** — $19.99
Personal prints, cards and gifts, or reference for artists. Non-commercial use only, not for resale.

○ **Presentation or newsletters** — $19.99

○ **Website** — $49.99

○ **Magazines and books** — $69.99

○ **Marketing package - Small business** — $59.99

○ **Marketing package - Large business** — $199.99

**Buy now ›**    Exh A Page 67

 Gmail

                                                    **Sandra sedlik <sandrasedlik@gmail.com>**

---

## RE: Artist Reference License

1 message

---

**Danita Delimont** <Danita@danitadelimont.com>              Tue, Feb 8, 2022 at 2:09 PM
To: "sandrasedlik@gmail.com" <sandrasedlik@gmail.com>

Dear Jeff,


Thanks for your inquiry into the licensing of an image to be used as an "artist reference". We often
license our images to artists planning to develop their artform by using the image as creative
reference and inspiration. For a tattoo artist to use an image as an artist reference we would charge
a licensing fee of $100.


If you have any further questions, please don't hesitate to ask.


With best wishes,


Danita



Danita Delimont

CEO/Agent





Delimont, Herbig & Associates

Tel:   425-562-1543

Website | Facebook | Instagram

Exh A Page 68

Exh A Page 69

# DANITA DELIMONT
STOCK PHOTOGRAPHY & FOOTAGE AGENCY

Galleries    Lightboxes    Register    Log In    🛒 0

search by keyword, photographer name or image ID

Return to Results



Rights Managed

   

US19 AJE0037

**Louisiana, New Orleans. Close-up of musicians hands playing saxophone.**

Copyright © Adam Jones / DanitaDelimont.com -- All rights reserved.

Release Information: Not Released

Terms and Conditions

**ITEM SPECS**

51.31 MB    11.5x17.3 in    300 dpi    3458x5186 px

**SIMPLIFIED RM PRICING**

| | |
|---|---|
| ○ Travel Brochure – Inside, N. America ⓘ | $300.00 |
| ○ Travel Brochure – Cover, N. America ⓘ | $700.00 |
| ○ Textbook – N. America ⓘ | $250.00 |
| ○ Textbook - Worldwide ⓘ | $300.00 |
| ○ Magazine, Newletters and Periodicals – N. America ⓘ | $275.00 |
| ○ Web & App - Editorial ⓘ | $150.00 |
| ○ Web & App - Commercial ⓘ | $225.00 |

**\*Note:** Call or email us for bulk pricing.

🛒 ADD TO SHOPPING CART

🧮 MORE PRICING OPTIONS

**RELATED ITEM SEARCH**

To search for related items, choose from the following related keywords. To search multiple keywords, select multiple checkboxes and click Search Selected. To search for a single keyword, click the keyword itself.

● All checked keywords    ○ Any checked keywords

| | |
|---|---|
| ☐ adam jones | ☐ audio |
| ☐ close-up | ☐ finger |
| ☐ gold | ☐ hear |
| ☐ hobby | ☐ jazz music |
| ☐ male | ☐ man |
| ☐ musician | ☐ new orleans |
| ☐ passion | ☐ play |
| ☐ saxophone | |

Search Selected

 Gmail

**Sandra sedlik <sandrasedlik@gmail.com>**

---

## Masterfile Price Quote
1 message

**Lisa Gilpin** <lgilpin@masterfile.com>                                Tue, Feb 8, 2022 at 11:35 AM
To: sandrasedlik@gmail.com

Hi Sandra & Brian,

Thank you for your intere t in Ma terfile  The following i   pricing regarding non e clu ive right  for u e of Ma terfile Right Managed image 700 03644685  Price   are in US fund

Artist reference: tattoo, in perpetuity, USA

-------------------------------------------------------------------

$50



Please feel free to contact me with any questions or if you wish to proceed with licensing.


Thanks,

Lisa




A Division of Design Pics Inc.

## LISA GILPIN

Senior Account Executive | www.masterfile.com
Phone: 1.800.387.9010 Email: lgilpin@masterfile.com


**Design Pics Inc.** (Head Office)
#101, 10464-176 St.
Edmonton, AB Canada  T5S 1L3
w w w.designpics.com
Accounting Inquiries: Worldw ide: 780.447.5433 Toll-Free:1.877.337.5433



## DID YOU KNOW... Design Pics Now Has An Art Decor Site?

THE INFORMATION CONTAINED IN THIS E-MAIL IS INTENDED ONLY FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED RECIPIENT(S) NAMED ABOVE. It is the property Of Design Pics Inc. and shall not be used, disclosed or reproduced w ithout the express w ritten consent of Design Pics Inc. If the reader of this message is not the intended recipient or an agent respons ble for delivering it to the intended recipient, you are hereby notified that you have received this e-mail and any attached documents in error and that any review, dissemination, distr bution or copying of this message is strictly proh bited.  If you have received this communication in error, please notify us immediately by telephone or e-mail and delete the original e-mail. Thank you.



Masterfile Stock Photos: Masterfile: 700-03644685 - Google Chrome

https://www.masterfile.com/enlarged/enlarged.html?img=700-03644685

PREVIEW    FILE SIZES



*Masterfile*

700-03644685
**Premium Rights-Managed**
Artist: Ikonica
Man Playing Saxophone

Model Release: No
Property Release: No

**Reminder:** This enlargement does not show the finer details of this image. Please review the high resolution file.

It may not be copied, downloaded or reproduced in any manner without the express written permission of Masterfile.

© 2021 Masterfile, a Division of Design Pics, Inc.
Terms & Conditions

Exh A Page 74

| | |
|---|---|
| **From:** | Darryl Jacobson |
| **To:** | sandrasedlik@gmail.com |
| **Cc:** | jeffsedlik@gmail.com |
| **Subject:** | Image use price confirmation |
| **Date:** | Tuesday, February 8, 2022 12:16:01 PM |
| **Attachments:** | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |
| | image006.png |

Hi Sandra,

Jeff called regarding a price quote for a stock photo usage. He asked me to send you the quote.

Image: 1052-112
Usage: Artist's reference for a tattoo
Price: $100

Please let me know if you have any questions or if you decide to license the image.

Thank you,

Darryl

 SUPERSTOCK

**Darryl Jacobson**
Sales Manager

**Direct** 904.680.1836
**Mobile** 904.616.2541
**Email** darryl@superstock.com
**Website** superstock.com



 Follow on Instagram

⊖ → C ⌂ 🔒 https://www.superstock.com/stock-photos-images/1052-112 

# ⊚ | SUPERSTOCK

🔍 | Search | IMAGES ⌄ | **CONTEMPORARY**  **FINE ART**  **VINTAGE**  **FOOTAGE**  **BOARDS**  **RESEARCH**



**DETAILS**

**Image Number: 1052-112**
Rights Managed
**Credit:** Dennis Yankus / SuperStock
**Model Release:** Yes
**Property Release:** No
**Details:** 5615 x 4753px | 18.72" x 15.84" | 80.06MB | 300 dpi

**EASY RM LICENSING**

○ $99    Personal Print Use    ⓘ
○ $149    Editorial Web Use    ⓘ
○ $250    Publishing/Educational Use    ⓘ
   ○ $350    *Extend this License*    ⓘ
○ $400    Direct Marketing – Interior Use    ⓘ
○ $600    Cover Use    ⓘ
○ $600    Digital Advertising    ⓘ
   ○ $1600    *Extend this License*    ⓘ

For custom discount pricing plans, no watermark comps, or image packs for individuals or corporations please click
NEED MORE OPTIONS button below.

Looking for subscription stock, try our sister site PURESTOCK.

| ADD TO CART | NEED MORE OPTIONS? |

Superstock offers millions of photos, videos, and stock assets to creatives around the world. This image of by Dennis Yankus / SuperStock is available for licensing today.

**KEYWORDS**

arts  entertainment  hat  horizontal  instrument  jazz  man  mood  music  musical  musical instrument  musician  performance  player  playing  sax  sax player  saxophone  saxophone player  smoke  smoky  sseditor=scp  straightforward

**PLEASE CONTACT**

SuperStock Sales and Research
**Email:** yourfriends@superstock.com
**Phone:** 1-866-236-0087
**UK / EU:** +44(0) 20 7036 1800

**EXHIBIT E**

**Sedlik Studio**

studio@sedlik.com
LA 626 808 0000  NYC  212 447 1255
145 North Sierra Madre Blvd, Studio 4, Pasadena CA 91107
Map

**Portfolio Access**

Clients and potential clients may request an access code

**Assignments, Licensing, and Print Sales**

I rely on licensing revenue and print sales to sustain my business and to support my family. When I create a photograph, I anticipate earning licensing revenue from that work by licensing my copyright for use in all manner of media, for all manner of usages, throughout the copyright life of each image (my life, plus 70 years). In addition I support family by selling fine art prints of my work, both directly and through galleries.

I offer limited licenses for marketing, editorial, merchandising, personal, and artist reference uses of  my photographs.

Examples of marketing/advertising use include but are not limited to reproduction on commercial websites (and on non-commercial websites on which advertising appears on the same page as the photographs), branding, advertising, promotional items, collateral, packaging, annual

reports, corporate social media accounts, social media profile image or cover image, and memes employed to promote products, services, brands or causes.

Examples of editorial use include but are not limited to editorial, unpaid insertions in features in books, magazines, newspapers, news media websites/blogs, and memes not employed to promote products, services, brands or causes.

Examples of personal use include but are not limited to home display, personal social media postings, personal memes, reproduction in personal websites and blogs on which advertising does not appear on the same page as the photograph.

Examples of merchandising use include but are not limited to reproduction on posters, shirts, hats, ties, other articles of clothing and accessories, greeting cards, mugs, calendars.

Examples of artist reference use include but are not limited to any derivative work based in whole or in part on one of my photographs, such as tattoos, paintings, sketches, illustrations, woodcarvings, charcoal renderings, posterizations, CGI, photoshop manipulations, photo compositions, collages, murals and works in photography or in any other medium in which my photograph or a representation of my photograph is rendered.

In addition, for any social media use, it is my intention to generate licensing revenue from the sharing, linking and embedding of my photographs and from derivative works based on my photograph.

The above is not a comprehensive list of the types of usage for which I intend to license my photographs. My intention is to license my photographs for use in any and all media, now existing or yet to be developed. I may withhold certain of my photographs from certain media temporarily. This does not indicate a lack of intent to license photographs for use in that media. Rather, it is an effort to preserve and maximize the value of my photographs in anticipation of future licensing opportunities.

I am the exclusive copyright owner in each of my photographs, and reserve all rights. My photographs may not be reproduced, distributed, displayed, or altered without my advance permission and license.

My photographs on this website may be copied only for the purpose of allowing you to view the photographs. Additional reproduction is prohibited.

Thank you for respecting my work and my rights.

Jeff Sedlik
Contact Sedlik Studio
LA 626 808 0000  NYC 212 447 1255
studio@sedlik.com

**Partial Client List**

Clients: 3m; 20th Century Fox; A&E Television Network; ABR Information

Services; Alpo; AmSouth Bank; Andazia, Inc; Arista Records; Association of Tennis Professionals; AT&T; Avery Dennison; Bank of America; Barrington Music Products; BBC; Blue Cross; BMG/RCA Records; Bristol Myers Squibb; Buena Vista Pictures; Bureau of Census; CareAmerica; Chesebrough-Ponds; CBS/Sony Music; Cedars Sinai; Century 21; Cherokee; Columbia Pictures; Computer Associates; Concord Records; Conroy's Florist; Direct TV; Disney; Doubleday; Dreyfus; Epson; Essilor; Farmer's Insurance; Federal Express; Fitzgerald-Hartley Co.; Ford; Gannon/Hartley; Geffen Records; Georgia Pacific; Great Performances; Great Western Bank; GRP Records; GTE; Guinness Museum; Hanna-Barbera; Harcourt Publishers; Hopper Papers; Ikea; Infiniti Automobiles; Island Records; Janssen Pharmaceuticals; JVC Musical Industries; Kraft Food Products; Korg, Inc.; LaFace Records; Laura Ashley; Levi Strauss; Mark Taper Forum; Missouri Historical Society; MCA Records; MCA International; Metro Goldwyn Mayer; Microsoft; Motion Picture & TV Fund; Movieland; MSN; MTM Entertainment; MTV Networks; Navisite; NBC Television; Neenah Paper; Nestle'; New World Pictures; Nike; Pacific Bell; Palm Press; Paramount Pictures; Phillip Morris; Polygram Records; Pomegranate Books; Potlatch; Prentice-Hall; San Diego Zoo; Schering Plough; SBC; Signature Eyewear; Smithsonian Institution; Sony Inc.; Southern Natural Gas; Spanish Tourism Office; Sugar Hill Records; Taco Bell; Telarc International; Toyota; Turner Broadcasting; U. C. Press; United Airlines; United Way; Universal Studios; VH-1; Warner Brothers Records; Web TV; Windham Hill Records; Word

Records; World Savings; Yamaha;
Zellerbach; Ziff-Davis; Zildjian

Advertising Agencies & Design
Firms: Alan Sekuler & Associates;
Asher Gould; BBDO; Bozell, Brierley
& Partners; Brooks-Gruman
Advertising; Campbell, Mithun, Esty;
Cline, Davis, & Mann; Cross &
Associates Design; Dailey &
Associates; Davis, Elen; Daymark;
DDB Needham, Worldwide; Deutsch;
Douglas Oliver Design; DVC
Marketing; DZN; The Design Group;
East/West Network; Fitzgerald &
Associates; FKQ Advertising; FP
Horak Advertising; Foote, Cone, &
Belding; GBF Ayer; Goodby
Silverstein; Grey Advertising; Hill &
Knowlton; Huerta Design; Ikkanda
Design; Interbrand; J. Walter
Thompson; Kang & Lee;
Kaufman/Stewart; Ketchum
Advertising; Klemtner Advertising;
Kovel Kresser; Kuester Group;
Lehman Millet, Inc; Lintas Campbell
Ewald; Mangos; Mediatrix; Melia
Design Group; Ogilvy & Mather; OZ
Advertising; Phillips Ramsey; Poppe-
Tyson; Potter Katz & Partners; John
Ryan Company; Saatchi & Saatchi;
Seineger Advertising; Slaughter
Hanson; SmithKlein Beecham; Strike
Group; Team One Advertising; Team
Creatif; Torre Lazur; Tracy-Locke;
Tribe Design; Vrontikis Design;
White Rhino Advertising; Young &
Rubicam

Editorial: American Film; Arts &
Entertainment; CD Review;
Cosmopolitan; Details; Downbeat;
Elle; Entertainment Weekly;
Glamour; GuestInformant; Imperial
Press; In Focus; Interiors & Sources;
Jazziz; Jazz Times; Life; Los
Angeles Magazine; Los Angeles
Times Magazine; Mirabella; Music
Connection; Newsweek; Photo
District News; People; Premiere;
Pulse; Q Magazine; Rolling Stone;

Select; Spin; Time-Life

**Selected Awards and Recognition**

Clio Award (Silver); Photo Media
Magazine - Photographer of the
Year; Print's Regional Design Annual
- Award of Excellence (3x); Art
Directors Club - Excellence in
Photography (3x); PDN/Nikon Award
of Excellence in Photography;
Advertising Photographers of
America Awards - Best in Show;
Communication Arts Award of
Excellence in Editorial Photography
(3x); Communication Arts Award -
Excellence in Self Promotion;
Communication Arts Award -
Excellence in Advertising
Photography (4x); Communication
Arts Award - Excellence in a Book
Series; Art Direction Magazine -
Creativity Award (2x); One Show
Award for Excellence in Advertising
Photography (5x); Mamiya Award of
Excellence in Photography
Education; International Photography
Council - Photography Industry
Leadership Award; American
Photographic Artists - Industry
Leadership Award; Ozzie Awards -
Silver Ozzie for Best Photography