**1**

1    UNITED STATES DISTRICT COURT
     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION
2    HONORABLE DALE S. FISCHER, U.S. DISTRICT JUDGE

3

4   JEFFREY B. SEDLIK,

5                    Plaintiff,

6     v.                              Case No.
                                      2:21-cv-01102-DSF-MRW
7   KATHERINE VON DRACHENBERG, et
    al.,
8
                     Defendant.
9   _____

10

11

12

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS
                 FINAL PRETRIAL CONFERENCE

14            Monday, November 14, 2022
                     3:10 P.M.
15
              LOS ANGELES, CALIFORNIA
16

17

18

19

20

21

22

23   _____

24          JUDY K. MOORE, CRR, RMR
        FEDERAL OFFICIAL COURT REPORTER
         350 WEST 1ST STREET, #4455
25       LOS ANGELES, CALIFORNIA 90012
                213.894.3539

1                                    APPEARANCES

2    FOR THE PLAINTIFF:
     MR. JOEL B. ROTHMAN
3    Sriplaw
     8730 Wilshire Boulevard, Suite 350
4    Beverly Hills, California 90211

5    FOR THE DEFENDANT:
     MR. ALLEN B. GRODSKY
6    Grodsky Olecki & Puritsky, L.L.P.
     1111 Santa Monica Boulevard, Suite 1070
7    Los Angeles, California 90025

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**3**

1          (Proceedings commenced at 3:10 p.m.)

2          COURTROOM DEPUTY:  Case Number CV-21-1102, Jeffrey

3    B. Sedlik versus Katherine Von Drachenberg, et al.

4          MR. GRODSKY:  Good afternoon, your Honor.  Allen

5    Grodsky and John Metzidis for the defendants.

6          MR. GROSSBARDT:  Jonah Grossbardt and Joel Rothman

7    for the plaintiff.

8          MR. ROTHMAN:  Your Honor, may Mr. Sedlik, the

9    plaintiff, sit at counsel table, or should he sit in the

10   gallery?

11         THE COURT:  No, he can sit at counsel table.

12         MR. ROTHMAN:  Thank you.

13         THE COURT:  All right.  I'll ask each of you to

14   repeat your name when you speak for our court reporter.

15         Every time I have to pick this up and look at it

16   again, I get a little bit confused.  I know there's two issues.

17   One is the tattoo on the gentleman's body, and the other is

18   what the post of the picture of the tattoo or the posting of --

19   I'm sorry -- the posting of the -- yeah, I guess it's the

20   picture of the tattoo or the posting of the picture of the

21   photograph?

22         MR. ROTHMAN:  May I speak, your Honor?

23         THE COURT:  If you stand.

24         MR. ROTHMAN:  Thank you.

25         THE COURT:  And state your name.

1          MR. ROTHMAN:  Joel Rothman.  So, your Honor, the

2  allegations of copyright infringement pertain to the posting of

3  the photo of the tattoo on Instagram in order to promote the

4  defendant's business.  I believe it may have been earlier in

5  the case before I got involved may have been an issue with

6  respect to the actual tattooing itself, but the plaintiff is

7  not pursuing an infringement claim relating to the actual

8  inking, for lack of a better term, of the tattoo on the

9  gentleman's arm, but there was other associated conduct, such

10 as tracing the outline of the tattoo onto tracing paper and

11 things like that associated with the inking of the tattoo.  But

12 it's mainly an issue related to the photograph of the tattoo as

13 it was put on the gentleman's arm and the distribution of those

14 photos across social media.

15         THE COURT:  So not -- I thought there was -- it

16 doesn't matter, I guess, if you're not suing on this, but I

17 thought on the social media there was the photograph of the

18 tattoo and then the actual photograph of the photograph of

19 Miles Davis to show how similar they were.

20         MR. ROTHMAN:  Yes, there was that copying -- there

21 was that copying as well.

22         THE COURT:  Okay.  So you don't -- you're not suing

23 on the photo of the Miles Davis photo?

24         MR. ROTHMAN:  No.  No.  We are.  I wanted to

25 distinguish -- I'm sorry, your Honor.  I wanted to distinguish

between the tattooing itself, which is what I thought I heard your Honor asking the question about, but whether it's a photo of the tattoo or a photo of the photograph itself, those are copying, and that would be a violation that we are suing on, yes.

THE COURT:  Okay.  Let's start again.  I'm sure it's me.  Kat Von D, if she doesn't mind me referring to her that way, took a photograph -- I shouldn't say it that way.  The gentleman brought her -- I'm forgetting his name.  What is his name, the tattooee?

MR. GRODSKY:  This is Allen Grodsky.  The name was Blake Farmer.

THE COURT:  Mr. Farmer.  Thank you.  All right.  So Mr. Farmer brings in a photograph of the Miles Davis photograph to Kat Von D who then has it -- she's looking at it.  She does a sketch on Mr. Farmer's arm or on something else first and then put it on his arm?

MR. ROTHMAN:  Yes.

THE COURT:  Okay.  Of those things so far, what are you suing on?

MR. ROTHMAN:  The image taken of the photograph, the sketch outline of the photograph.

THE COURT:  Well, the image taken of the photograph was taken by Mr. Farmer, right?  Didn't he bring that in?  He didn't bring in the original Miles Davis photograph?

**6**

1          MR. ROTHMAN:  Right.  He brought a copy in.

2          THE COURT:  Right.  Okay.  So until -- I mean, he

3    can -- it's not unheard that he brought a copy of a photograph

4    in.  So she hasn't done anything wrong yet.

5          MR. ROTHMAN:  Right.

6          THE COURT:  Until she made a sketch of that.

7          MR. ROTHMAN:  Correct.

8          THE COURT:  And so are you saying that she

9    couldn't -- she wasn't allowed to make a sketch of the

10   photograph?  If somebody walked in here with a photograph and I

11   had the ability, which I clearly do not, to make a sketch that

12   would look anything like that photograph, I can't do that?

13         MR. ROTHMAN:  You couldn't, your Honor, if the

14   purpose for doing so was to copy and to distribute it, which is

15   what was the purpose here.

16         THE COURT:  She didn't plan to distribute the

17   sketch, did she?

18         MR. ROTHMAN:  No, but she did plan to distribute

19   photographs of the tattoo.  She did plan to and did distribute

20   video and photographs of the tattoo thereafter.  It was part of

21   the process.

22         THE COURT:  But not of the sketch, so --

23         MR. ROTHMAN:  No, not of the sketch --

24         THE COURT:  -- I'm going to pars out what it was in

25   more detail, because I think I know what you're claiming, but

1  if we tried to take it step by step, then it's either

2  getting -- it's getting way broader than I thought it was.

3          MR. ROTHMAN:  Okay.

4          THE COURT:  So you're going to ask the jury to find

5  that she violated the copyright law when she sketched the

6  photo?

7          MR. ROTHMAN:  Yes, because that is the making of a

8  copy, and, in fact, what she was attempting to do in sketching

9  the photo was to duplicate the photo.

10          THE COURT:  Well, suppose -- I don't know.  Suppose

11 she drew a stick figure intending to copy it.  That wouldn't be

12 copyright violation, would it?  I mean, I'm trying to figure

13 out, is that the evidence you're going to present?  Are you

14 going to show now the Miles Davis photo and her sketch and say,

15 ladies and gentlemen, look at the similarity of the two?  Do

16 we, like, need a verdict question on that?  I thought we were,

17 like, a step or two past that before we got to the violation.

18          MR. ROTHMAN:  I think we are a step or two past

19 that, your Honor.  I think that the evidence that the jury will

20 hear and see are the Instagram posts of the tattoo, the video

21 of the tattoo.  It's those images that copy, not only the

22 tattoo which was a copy, but also the photograph that my client

23 took.  Those are the principal evidence that the jury will see.

24 The sketch part, I think, is -- you know, while it's part of

25 certainly the story, it relates more to Ms. Von

1  Drachenberg's -- her process, if we can put if that way.

2       THE COURT:  Well, that makes more sense.  So you're

3  not claiming the sketch itself is the violation?  In other

4  words, if she had done the sketch and said, nope, don't think

5  I'll do this, don't like it --

6       MR. ROTHMAN:  Oh, I don't think we'd be here in that

7  case, your Honor.  I agree.

8       THE COURT:  Okay.  So that's not what it is.  Now,

9  are you claiming that when she then sketched it on Mr. Farmer's

10  arm, that was a violation?

11       MR. ROTHMAN:  We are no longer going to advance that

12  theory to the jury.  You know, we don't want this to be a

13  situation where, you know, the trier-of-fact needs to consider,

14  you know, whether tattooing something on someone's body, you

15  know, could be a violation or not.

16       THE COURT:  So, now, even the fully finished

17  tattoo -- never mind the sketch of the tattoo that she was

18  working with -- is the fully finished tattoo on his arm part of

19  the case?

20       MR. ROTHMAN:  The fact that it's on his arm is part

21  of the case.  It isn't a copyright violation that we are

22  seeking to recover for.  And, you know, to perhaps say it a

23  different way, your Honor, if the gentleman -- if Mr. Farmer

24  had gone in and said to Ms. Von Drachenberg, I'd like you to

25  tattoo this and she did and that was the end of it and there

1  was never any publicity or any distribution of the image, never

2  any impact on my client and his -- you know, his rights as the

3  photographer, then we wouldn't be here.  So it really has to do

4  with the distribution of the image both on his arm and the

5  photograph in order to promote the tattooing itself that is --

6  that this is about.

7           THE COURT:  So now we've moved on to the photograph

8  of the completed tattoo that was on Instagram or whatever?

9           MR. ROTHMAN:  Yes.

10           THE COURT:  That's the only thing you're claiming as

11  the violation.  The rest is the story?

12           MR. ROTHMAN:  I'm sorry.  What do you mean by "the

13  story"?

14           THE COURT:  Well, the story of how we got to how

15  this got on Instagram.

16           MR. ROTHMAN:  Yes.  Yes.

17           THE COURT:  You litigators are storytellers, right?

18           MR. ROTHMAN:  We are, your Honor.

19           THE COURT:  That's what I meant "the story."  I was

20  not being pejorative.

21           MR. ROTHMAN:  Of course not.  We think in stories,

22  and that is the story.  And the story has the video.  It also

23  has photos, and that's part of the story.  And in the story,

24  Ms. Von Drachenberg, she does trace the image, and that's part

25  of it, but if the tracing of the image and the tattooing had

1  happened and no one ever heard about it, right, if it had never

2  gone on Instagram, if it had never been publicized, then we

3  wouldn't be here.  I hope that helps.

4          THE COURT:  Okay.  It helps.

5          From the defense, was that your understanding all

6  along, or now, at least?

7          MR. GRODSKY:  Well, this is Allen Grodsky.  No.

8  Until this moment, it has always been the plaintiff's position

9  that the making of the tattoo was an infringement.  It's

10 something that was discussed in your summary judgment motion.

11 It's been discussed all the way up until today.  This is the

12 first we've heard that the tattoo itself is not something they

13 are moving on, and I just want to somehow make -- have it made

14 clear today that this is being stipulated to and agreed to, and

15 in preparing for trial we are not going to hear an argument

16 that the tattoo itself is an infringement, because that's a --

17 that was a big part of the case, and if they're abandoning

18 that, they have a right to do it, but we need to make it clear.

19 I don't see how if the tattoo is not an infringement, a photo

20 of the tattoo is an infringement, but that's a different

21 argument that we'll make in front of the jury.

22         THE COURT:  Okay.  So I heard at least what I think

23 I heard and I've repeated it, so that's what I think we're

24 going to trial on.  I don't know what that changes now of all

25 these three or four inches of paper that I have before me, but

1    you can tell me about that.  I suppose, with that, maybe

2    there's a different consideration about whether this case can

3    settle.  I was going to ask -- and you both know a whole lot

4    more about copyright law than I do, so if I ask a question that

5    sounds uneducated, you can politely indicate to me that it's

6    not -- it doesn't make sense if you can't answer it, but I was

7    going to ask what the relevance was, if any, of the *Warhol*

8    *case*, and so I guess the question now is, okay, does *fair*

9    *use* -- how does *fair use* play in here now.  And if it does at

10   all, then is the *Warhol case* relevant?  Should we be waiting

11   for that?

12            MR. GRODSKY:  Well, those are very good questions,

13   your Honor.  As I recall from the summary judgment motion,

14   there were basically -- putting aside damages, there were two

15   outstanding issues.  Outstanding Issue Number 1 was *substantial*

16   *similarity*.  That's not affected by *Warhol*.  But Outstanding

17   Issue Number 2 was the fair use doctrine, and in particular you

18   identified that there were disputes of fact about the

19   transformative factor, the commercial factor, and the fourth

20   factor as it relates to traditional and foreseeable uses.  The

21   *Warhol case* is addressing that standard.  That's what -- I

22   mean, we've -- I'm sure all of us, at least on this side, have

23   heard the argument, and there are arguments on all sides of

24   that issue in the *Warhol case*.  And it is very possible that at

25   least as to fair use, there is going to be decision by the

1   Supreme Court that is going to affect this case.  And whether

2   we should put it off or not put it off, I'll leave that to the

3   other side and we can talk about it, but it is certainly clear

4   that the Supreme Court is going to do something and it's going

5   to -- something to clarify the fair use standard, and that may

6   impact this case.

7            THE COURT:  We can only hope.  I guess we -- yes,

8   you can hope for different results, but we hope that at least

9   they resolve something to help us down here at the lower

10  levels.

11           Counsel, your thoughts on that?

12           MR. ROTHMAN:  Yes.  Thank you, your Honor.  Joel

13  Rothman.  So, your Honor, the case before the Supreme Court is

14  quite different than this case, and I think the facts are

15  really important to understand.  So in that case what we had

16  was we had a photograph of Prince, and then what Mr. Warhol's

17  state, what they did with it, was what I think could be termed

18  interpretations of it, of that photo, varying degrees of

19  difference from the original photograph.

20           And what we have here is Mr. Farmer going in to Ms.

21  Von Drachenberg and saying, I want that on my arm and Ms. Von

22  Drachenberg complying with that and putting that on his arm,

23  which is not the same as, you know, I want an interpretation of

24  that image in some fashion.

25           So I don't think that, regardless of how the Supreme

1  Court determines the transformative use standard or any of the

2  other different elements of *fair use*, I don't think that that's

3  going to provide a jury, which still under the last time the

4  Supreme Court addressed this issue, which is *Oracle v. Google*,

5  the jury is entitled to make the determination of *fair use*.  So

6  it would seem to us that delay would just be delay for no

7  reason because your Honor would be in a position to instruct

8  the jury on existing understanding of *fair use*, and under these

9  facts, it would be their determination.

10       THE COURT:  Well, isn't -- I mean, there are things

11  that I said were not an issue here, which included Mr. Farmer's

12  point of view.

13       MR. ROTHMAN:  Correct.

14       THE COURT:  I think Ms. Von Drachenberg had

15  indicated in some way that she was doing something different

16  with the photograph.  Whether that was what Mr. Farmer wanted

17  or not probably isn't relevant.  So that sounds more like --

18  and I'd have to go back and read the papers again to see

19  exactly what she -- what she said for the purpose of the

20  summary judgment motion or whatever else I was doing, but she

21  was pointing out that -- I think the different -- I don't know

22  what the word would be -- the different feeling someone would

23  get when looking at the Miles Davis tattoo, not just because it

24  was a tattoo instead of a photograph, but because of the

25  different things she had done, whether related to the

1   tattooness or not.  So that's -- it sounds a little bit more

2   like the *Warhol case* than the way you described the *Warhol*

3   *case*.

4         MR. ROTHMAN:  And, your Honor, certainly I think

5   this is a topic where there are many different points of view,

6   but one thing that I think needs to be considered is that,

7   regardless of, as you indicated in your order, Mr. Farmer's

8   subjective knowledge or regardless of Ms. Von Drachenberg's --

9   you know, her own subjectivity about what she was doing,

10  ultimately the jury and any trier-of-fact needs to look at this

11  objectively to make the correct determination.  So those --

12  while those ideas that an artist may have about what they're

13  putting into their work may be relevant, they're not the

14  decision point.  The decision point needs to be the objective

15  determination that a trier-of-fact would make.

16        THE COURT:  Well, isn't it maybe what the Supreme

17  Court is going to indicate how relevant or in what way

18  relevant?  I frankly did not listen to the hearings.  I didn't

19  even know they had actually been heard.  I suppose it will

20  still be months or more before we know.

21        MR. ROTHMAN:  It's true, your Honor.  What I

22  would -- you know, from our position as the plaintiff, I think

23  I've said we'd like the trial to move forward.  And, you

24  know --

25        THE COURT:  But you don't want to try it twice, do

1  you?

2        MR. ROTHMAN:  No, we don't want to try it twice, but

3  then again, what we're talking about, I think -- unless I'm

4  wrong, what we're talking about is in the nature of a sentence

5  in the jury instructions, perhaps.

6        THE COURT:  Okay.  But that's how we get reversed is

7  when our sentences in the jury instruction are not right.

8        MR. ROTHMAN:  That is -- that is a good point.  The

9  other issue that I think is relevant is that there was a

10  license in the *Warhol case* and there is no license here.  So

11  that's going to factor into the Supreme Court's decision, and

12  that has no relevance to our case at all where there was no

13  license.

14        THE COURT:  Well, I don't predict what will factor

15  into the decisions of my esteemed colleagues on the Supreme

16  Court.  They're much smarter than I am, so...

17        Did you want to have a response to --

18        MR. GRODSKY:  Well, I -- no, I -- I know the Supreme

19  Court granted cert only on the issue of transformativeness, so

20  that's the only issue the Supreme Court is addressing.  I would

21  just say this:  If the tattoo is out of the case, if they're

22  not arguing infringement of the tattoo, it's no longer a

23  question of comparing the photograph and the tattoo; it's the

24  question of comparing the photograph with the social media

25  posts.  So there's a social media post that has Ms. Von

1   Drachenberg, and she's working on it and it's sort of a process

2   photo.  There's another photo that's a partial version of the

3   tattoo and the arm, it has other things showing.

4          So it appears it's no longer a case where we're

5   comparing, as you did in the summary judgment motion, the

6   making of the tattoo with the making of the photograph.  If

7   they're dropping the issue that the tattoo is an infringement,

8   then the question is to compare Mr. Sedlik's photograph with

9   these social media posts and videos that he's moving on.  And

10  that's going to be the question as to substantial similarity

11  and that's going to be the question on transformativeness, and

12  whether the Court decides to wait for Warhol or not, I will

13  leave that to the Court.  I do think it's very possible that

14  the Supreme Court is going to make a revised rule on how the

15  fair use doctrine applies, and if that means we've wasted a

16  trial and have to try it again, if the Court -- if the jury

17  gets past substantial similarity, if they don't, won't matter,

18  then that's what will happen, but I could understand going

19  either way on this.

20         THE COURT:  All right.  So I reviewed your proposed

21  pre-trial order, and some of the statements -- I don't know

22  whether it just wasn't careful drafting or I'm not reading it

23  correctly, but you don't seem to make -- I don't want to say

24  they don't make sense.  They don't seem consistent.  For

25  example, for Claim 2 -- and now I don't know what claims we're

1   actually making.  Claim 2, you said Mr. Sedlik had to prove

2   defendants had the right and ability to supervise or control

3   the infringing activity of the defendants.  That doesn't really

4   make any sense.  Do you mean Kat Von D had the right and

5   ability to supervise or control High Voltage Tattoo or it had

6   the ability to control her, or what -- what exactly -- or are

7   you just going to throw it all -- throw it all in and expect

8   the jury to figure out what you're talking about?

9          And then for 3, you said Mr. Sedlik has to prove the

10  defendant, this time lower case D and singular, as opposed to

11  upper case D and plural, knew or had reason to know of the

12  infringing activity of the defendants, again capital D and

13  plural.  So you weren't really explaining to me who you were

14  going to allege did what to whom and controlled whom, so...  I

15  think that needs to be straightened out before -- probably

16  before opening statements and certainly before I give jury

17  instructions.

18          For trial, I think six hours for each side is

19  sufficient.  That would include opening statement, not closing

20  argument.  I'll give you a separate time frame for closing

21  argument before you have to give that.  I was looking at your

22  list of exhibits.  I don't necessarily know exactly what they

23  are -- what many of them are, I should say, so I won't be able

24  to tell what relevance they may have, but you need to provide

25  copies of at least the contested exhibits to me no later than

1  next Monday so I can take a look at them and rule on them if I

2  can at this point without waiting to see what the evidence is.

3  I prefer not to make -- not to have to make a lot of decisions

4  on the fly.  It tends to work better if I can think about them.

5           The Defense Motion Number 1 had to do with Mr.

6  Sedlik acting as an expert.  I had never seen that issue before

7  from one aspect of it, and it was really quite interesting.  I

8  do think Daubert motion probably fit within the definition of

9  motions in limine, so I'm not going to be concerned about the

10 timeliness of this, although maybe I'll change my order to have

11 them filed sooner.  There is a split in authority about whether

12 a party can serve as his or its own expert.  I'm sure you know

13 this, many lawyers don't, a District Court decision is not at

14 all binding on me.  It's always nice when there are some out

15 there so that you can read what many of my esteemed colleagues

16 have to say, but in reality, as I often say, it's really the

17 same thing as if I were to walk across the hall and say to my

18 good friend Judge Walter, hey, Jack, what do you think?  So

19 it's really -- and maybe it's because I served on the State

20 Court for six and a half years first where there are no

21 published trial court decisions, so the most anybody would come

22 in and say, the judge down the hall said I could do this, your

23 Honor, so you should, too.  And so I just am not as convinced

24 as some of my colleagues are that it's not appropriate for a

25 party to be his own expert.  I mean, the bias is so completely

1   obvious that it's not like he's going to put one over on

2   anybody.  I think it's -- it's very different from having an --

3   quote, unquote, independent expert who is not, quote, unquote,

4   independent because he or she is on a contingency basis.

5           So I think I would not be inclined to exclude Mr.

6   Sedlik for that reason, but I don't think I really need to

7   decide that because -- and I guess I can think of this some

8   more after hearing what you're actually suing about, but it

9   seems like his testimony is even less likely to be relevant in

10  this case than it was before.  So first, as the defense pointed

11  out, much of it is not rebuttal at all to the extent that it's

12  percipient testimony.  Of course, he can give that, as I think

13  I had previously indicated, but he's not going to testify about

14  shunning, for example.  He can't testify one way or the other

15  as to whether tattooers need a license.  That's not for him to

16  say.  If it were relevant, then the Court would give the law,

17  not an expert of any kind.  Even a legal expert we would not

18  have here testifying to that because I'm the legal expert.  So

19  I don't think also that his explanation of how visual artists

20  license their works, blah, blah, blah, and monetization

21  opportunities I don't think he can present as expert testimony.

22  I suppose he could testify about his own efforts, but I'd have

23  to wait and see what the testimony is.  So to the extent he's

24  not an expert in the tattoo industry, he can't testify about

25  things relating to that.  No legal opinions.  So I don't really

1  think there's anything in the nature of expert testimony, as I

2  said, that he can give.  Percipient testimony, of course, he

3  can give.

4          Defendants Number 2, evidence of profits.  Let's

5  clarify, what kind of damages is he seeking?  In some places in

6  the papers it seemed to be limited to statutory damages, and

7  then in one or two other places it referred to profits.  I

8  wasn't sure whether that was a timing issue.  What is Mr.

9  Sedlik planning to ask for?

10         MR. ROTHMAN:  Well, your Honor, this is -- as you

11  indicated, this is mainly a statutory damages case; however,

12  there does appear to be some indication and some testimony

13  during discovery that there was a value to the work that Ms.

14  Von Drachenberg did that was exchanged in some way in a barter

15  way with Mr. Farmer.  We just don't know how the testimony is

16  going to come out at trial, and the jury should be entitled to

17  make a determination that there was something of value in the

18  use of my client's image, ultimately by her.  And so --

19         THE COURT:  This has to do with something that she

20  got from Mr. Farmer, not as a result of the post?

21         MR. ROTHMAN:  Well, you know, there was some

22  testimony about some sort of barter relationship.  We don't

23  know that.  There was also --

24         THE COURT:  Well, wait a minute.  You're doing

25  discovery and you hear some testimony.  What does that mean?

1  Why didn't you ask them, what sort of barter are you talking

2  about?

3           MR. ROTHMAN:  My understanding is that ultimately

4  there was -- there was no definition provided to that.  But

5  there's -- if your Honor will allow me, there's also the issue

6  of licensing fees that my client would have been entitled to

7  for the uses of the image across social media and other places,

8  and therefore, you know, any value that came to Ms. Von

9  Drachenberg as a result of the use of the image across social

10 media, that ought to be taken into account by the jury for

11 purposes of determining whether, you know, there was some

12 damage.  Whether it's -- translates into the jury's factoring

13 in of how much to award statutory damages or not, it still

14 should be an issue that should be considered.

15          THE COURT:  Okay, so, you're kind of all over the

16 place here.  It was possibly there was a barter value from

17 Mr. Farmer, he should have gotten a license.  We don't know

18 that he would have granted one.  I guess maybe that was the

19 issue you were doing more discovery on?  I don't know.  And

20 then you're talking about potential profits.  So I think the

21 defense motion goes to profits, which is different from a

22 license or anything Katherine Von Drachenberg got from

23 Mr. Farmer.

24          MR. GRODSKY:  Your Honor, it's Allen Grodsky.  This

25 is exactly the point that I was concerned about.  Counsel said

 1   we're not seeking to prove infringement based on the tattoo,

 2   and now his evidence of profits is profits that Ms. Von

 3   Drachenberg supposedly got for making the tattoo.  If you're

 4   not seeking to show that the tattoo is an infringement, then

 5   even if she did receive anything from Mr. Farmer -- and she

 6   didn't -- that's not relevant to the case anymore.  You've

 7   eliminated that claim.  If you could show that there were

 8   profits from the social media posts, which they can't, that's

 9   profits that we can argue about.  But if you're giving up on

10   the idea that the tattoo is an infringement for purposes of

11   this case, then you don't get to recover profits made from

12   making the tattoo.  So I think that's, again, the problem I

13   have of wanting to understand for sure is the tattoo part of

14   the case or is it no longer part of the case, because it seems

15   like there's some confusion.

16          THE COURT:  I'm confused.  I'm not confused; I just

17   don't know what you're asking for.

18          MR. ROTHMAN:  Your Honor, it's impossible for the

19   tattoo not to be part of the case.  Certainly Mr. Grodsky knows

20   that.  The fact is --

21          THE COURT:  I don't think he really meant that it

22   wasn't part of the case.  You just made a whole presentation to

23   us about you're not claiming the tattoo is the infringement,

24   and now as he points out, you're saying the man bartered

25   something, you think, you don't know.  And you don't know what

1  barter means.  You don't know what she might have gotten

2  because whoever was doing this didn't ask, but for this

3  non-infringing tattoo that you're not pursuing, you're just

4  mentioning to me now you think she got something, so why would

5  that be relevant if it's not infringing?

6        MR. ROTHMAN:  Your Honor, without the tattoo itself,

7  okay, we would not be here, there would not have been social

8  media, there would not --

9        THE COURT:  Forget the social media.  I just want to

10  stick with the barter for the tattoo, and I don't know -- I

11  guess you're saying he might have given a license or have been

12  asked to give a license for her to post a picture of the

13  tattoo, because now we're talking about the picture of the

14  tattoo or the video of the tattoo that you're going after.

15        MR. ROTHMAN:  Let me put it this way, your Honor;

16  it's our belief that Ms. Von Drachenberg would not have done

17  the tattoo had there not been an ability to promote what she

18  had done.

19        THE COURT:  That may be true, but what's that got to

20  do with barter for...

21        MR. ROTHMAN:  Well, if she's not being paid for

22  making the tattoo, then there needs for her to be some other

23  remuneration, some exchange for it, and that was Mr. Farmer's

24  cooperation, whatever else he promised her, and her ability to

25  promote it across social media, in videos, et cetera.  And that

1  was all part of the conduct that we're claiming was the

2  infringement.  What we're not claiming is the actual -- because

3  we do not want the jury to believe that what we're trying to do

4  is to prohibit the making of tattoos or force people to remove

5  them, but there still should be the ability --

6          THE COURT:  That was never going to happen, so --

7          MR. ROTHMAN:  Okay.  Well, it is --

8          THE COURT:  What's this license worth that he might

9  have given her if she'd asked him?

10         MR. ROTHMAN:  My client -- the issue about the

11 additional discovery that you mentioned was that my client had

12 previously issued retroactively a license valued at $5,000 to

13 another tattoo -- tattoo artist who had been found to be

14 infringing.  And so that would provide at least some evidence

15 of the value of the license.

16         THE COURT:  So after Kat Von D does the tattoo and

17 all this comes up, then he finds out that somebody else had

18 similarly tattooed some of --

19         MR. ROTHMAN:  No.  No.  That all -- what I'm

20 describing with the other tattoo artist had all pre-dated the

21 situation with Ms. Von Drachenberg.  So it was before Ms. Von

22 Drachenberg.

23         THE COURT:  Okay.  And he just thought of that after

24 the discovery cutoff?

25         MR. ROTHMAN:  No.  No.  There was testimony about it

1    in deposition, and my client could not locate the writing --

2         THE COURT:  All right.  I remember.

3         MR. ROTHMAN:  And he was able to find it.  It had

4    been misfiled, and we produced it immediately.

5         THE COURT:  All right.  Well, so much for all the

6    expert testimony that licenses are never obtained for tattoos.

7         MR. GRODSKY:  Well, your Honor, that may not be the

8    case.  I mean, we will have testimony about this license that

9    was obtained which was for $5,000, except they forgot to tell

10   you, the license was for zero.  What the evidence is going to

11   show is that Mr. Sedlik found some poor tattoo artist on the

12   East Coast who had tattooed his image and he threatened to sue

13   him and said, unless you sign this document which says I'm

14   giving you a license for $5,000 except for professional

15   courtesy it's free, and the guy said -- the guy said, okay, I

16   could spend this much in attorney's fees or I could agree to

17   let you do this license, which appears he never even signed.

18   So I think this would be a document that would help our side of

19   the case as opposed to hurt it.  I would also just note --

20        THE COURT:  So you want this in, right?

21        MR. GRODSKY:  Well, we're going to take this

22   deposition of the fellow on Monday who we first found out about

23   last week or the week before.  My other point is this:  Your

24   summary judgment motion, we moved for summary judgment on

25   actual damages and profits, and your ruling was it's granted in

1  part and denied in part.  You denied it on profits because you

2  said it's possible there could be profits from the social

3  media, but on actual damages you said Mr. Sedlik produced no

4  evidence of actual damages and therefore that's what the motion

5  was granted on.  So this idea of a lost license fee is not

6  damages that they can recover in this case because we have

7  summary judgment on that issue.

8       THE COURT:  So then why are you going through this

9  deposition process, which will just cost probably at least

10  $5,000 and will not get you anywhere?

11      MR. GRODSKY:  I'm hoping it will not cost that, your

12  Honor, but I think we're going through the deposition process

13  because we believe the testimony will be inconsistent with the

14  testimony of Mr. Sedlik at his deposition.  And so for

15  impeachment -- for purposes of challenging his credibility, we

16  want to take this one-hour deposition.

17      THE COURT:  Okay.  Sounds like fun.

18      So profits now.  What is the evidence -- how are you

19  going to present evidence of profits?

20      MR. ROTHMAN:  Your Honor is asking what is the

21  specific evidence of profits?  It would be through the

22  testimony of Ms. Von Drachenberg.

23      THE COURT:  What's she going to say?

24      MR. ROTHMAN:  My understanding is that she's going

25  to testify as to her business and her business's viability.

1          THE COURT:  What's she going to say?  You're just

2     going to throw a witness up on the stand -- I guess she's going

3     to testify anyway -- and say, how much money did you make based

4     on this photograph?

5          MR. ROTHMAN:  Well, my understanding is that the

6     link is not a direct link.  The link is an indirect link.

7          THE COURT:  Okay.  You're way beyond my link

8     expertise.  I'm not even allowed to right click, so...

9          MR. ROTHMAN:  There clearly is some value, or

10    otherwise there wouldn't have been distribution on social

11    media.

12         THE COURT:  People put stuff up on social media all

13    the time that has, if you ask me, negative value, but -- so I

14    don't think that follows.  But go ahead.

15         MR. ROTHMAN:  No, I -- I think I've made my

16    arguments, your Honor.  I don't --

17         THE COURT:  But you haven't given me any reason to

18    think that we should spend any time on this because I don't

19    think you know -- I don't think you have a clue as to what

20    you're going to get answers to whatever questions you plan on

21    asking, right?

22         MR. ROTHMAN:  The information they --

23         THE COURT:  This lawsuit clearly, I guess, is to

24    make some kind of -- I shouldn't say "clearly" and "I guess."

25    It's to make a point, because there doesn't seem to be a lot of

1  money here.  That's obviously up to your client, but what -- I

2  forget, do you get to choose between actual and statutory

3  damages?  Does the jury rule on both and you get to pick one

4  you want, or do you get to go after both?

5        MR. ROTHMAN:  You do.  And the jury is entitled to

6  decide both.  And prior to judgment, the plaintiff can choose

7  which one the plaintiff wants.

8        THE COURT:  Prior to judgment?

9        MR. ROTHMAN:  Prior to judgment.  That's what the

10  statute says.

11        THE COURT:  So you're going to have to decide before

12  the jury tells you what it thinks of whatever testimony you eke

13  out of Kat Von D what the profits are?

14        MR. ROTHMAN:  No.  Prior to judgment, but not prior

15  to the verdict.

16        THE COURT:  Okay.

17        MR. ROTHMAN:  So the jury's verdict -- typically in

18  copyright infringement cases, there'll be an amount for actual

19  plus profits and an amount for statutory, and then the

20  plaintiff gets to choose.

21        THE COURT:  Got it.  Okay.  So I still haven't heard

22  what even are the questions that you're going to ask her that

23  you think you're going to get an actual answer to other than, I

24  don't know, I can't calculate that.  I can't tell you.

25        MR. ROTHMAN:  Your Honor, I've done my best here.

1  This is --

2           THE COURT:  I'm sure you're trying, but we're pretty

3  close to trial.  I know you probably haven't gotten your

4  specific questions yet, but here you are trying to respond to a

5  motion in limine, so I'm asking what you have thought of that

6  you're going to ask about actual damages from Ms. Von

7  Drachenberg when she takes the stand that's going to give you

8  something to argue about.

9           MR. ROTHMAN:  What I'm going to ask as it relates to

10  profits that "Isn't the value of your business" -- "Didn't your

11  business improve?  Didn't you get more clients?  Didn't you

12  increase the interest in your business?  Wasn't there an

13  increase in the good will?  Wasn't there an increase in the --

14  you know, in the value of your personality," which is part of

15  her business.  She was -- she had a show, a popular show, on

16  television.  "Wasn't this part of the persona and the value

17  that the entertainment industry saw in you and the work that

18  you did?"  And all of that, I think --

19           THE COURT:  And the work that you did on this

20  tattoo?  Not even on this tattoo but on posting the photo of

21  this tattoo?

22           MR. ROTHMAN:  This is one of many, certainly, but

23  it's a famous -- it's the most famous picture of Miles Davis.

24  For those who are devotees of him, it has a great value and

25  significance to it, and there's no reason why, you know, the

1  portrayal on the tattoo distributed through social media

2  wouldn't have advanced her business and led to profits.

3           But more than that, your Honor, I'm not --

4           THE COURT:  But how is she going to -- I don't know.

5  Maybe she knows.  Maybe she keeps track of -- even if she knew

6  how much her business had improved, assuming it had improved,

7  how would that -- how's that going to tie to this particular

8  photo of a tattoo?

9           MR. ROTHMAN:  I recognize, as I said before --

10           THE COURT:  Because it can't be speculative, right?

11           MR. ROTHMAN:  Right.

12           THE COURT:  I can't have evidence that's totally

13  speculative.  I guess I could wait and hear what the evidence

14  is and then say I'm not giving it to the jury because it would

15  be totally speculative, trying to spend a bunch of time, but --

16           MR. ROTHMAN:  And that was an argument that we made

17  on the issue, but certainly there was -- this testimony that

18  I'm talking about now is the same testimony that's going to be

19  part of the case anyway.  Because it's wound up in the

20  Instagram posts themselves that distributed my client's image.

21  So it's not like --

22           THE COURT:  What has wound up in the Instagram?

23           MR. ROTHMAN:  The fact that the images were widely

24  distributed on social media.  And that is part of the same

25  testimony that yourself is talking about, how was the -- what

1  was the profit and what was the linking to it?  So, I do

2  believe, and we have argued, that it should certainly at the

3  very least be left for determination at trial.

4          THE COURT:  From the defense?

5          MR. GRODSKY:  I don't have a lot to add.  I think

6  there is no evidence that there is a connection between any

7  income Ms. Von Drachenberg earned, if any, and these social

8  media posts, these five out of the thousand social media posts

9  that have been posted by her over the last few years.

10         THE COURT:  And when you say -- sorry for

11 interrupting you, but when you say there is no evidence, do you

12 mean that in this case so far no evidence has been presented or

13 that there's no evidence that could be elicited because it

14 doesn't exist anywhere, never mind whether it was produced in

15 discovery?

16         MR. GRODSKY:  Both.

17         THE COURT:  Okay.

18         MR. GRODSKY:  The testimony from Ms. Von Drachenberg

19 is that -- well, if these are the questions he wants to ask Ms.

20 Von Drachenberg, there are not going to be a lot of answers, as

21 I think you can imagine.  She's not somebody who keeps close

22 contract (sic).  But what she did testify about was her tattoo

23 business, which closed down, because a lot of these posts were

24 for her tattoo business.  She doesn't charge for her tattoos,

25 and the money that was made by the other tattoo artists went to

1   the tattoo artists, except what was necessary for rent.  So

2   there was no income that was made in connection with those

3   posts.  And Kat Von D, Inc., is out of the case, so income that

4   Kat Von D, Inc., made, which wouldn't have been affected by

5   these posts anyway, that's irrelevant, so I don't think there

6   is any evidence to be elicited.

7           But it certainly is true there has been no evidence

8   so far, and it seems like that's the type of evidence you would

9   have wanted to obtain in discovery and not spend time at trial

10  asking questions that we don't know the answer to from a

11  witness who's not going to know the details of her finances

12  other than big picture, which is going to be negative.

13          THE COURT:  Well, generally you're right.

14  Generally, I see discovery that had been done, but there's

15  certainly nothing that requires it, that I know of, other than

16  if you ask a question and they decline to answer or they say,

17  you know, no; or where they were the first, you would have said

18  no.  So the fact that they hadn't done any discovery really

19  isn't relevant.

20          MR. GRODSKY:  I understand, your Honor.  I really

21  have nothing to add other than that.  You know, you've limited

22  the amount of time that people have to ask questions, and if

23  that's what they want to do with their time, I guess that's

24  their decision.

25          THE COURT:  Okay.  I think that makes sense.  The

1   Defendant's 3 and Plaintiff's 4 about Farmer's testimony, I

2   think I've said it before, it's even less relevant now, so I

3   don't care.  It's not relevant to the case what meaning he

4   describes to the tattoo.

5         I'm not sure whether Plaintiff's 1 about the use of

6   the word "freehand" is still relevant, but it's denied.  You

7   can deal with whatever terminology she chooses to use in

8   cross-examination.

9         Plaintiff's Number 2, excluding affirmative defenses

10  from the proposed pre-trial conference order.  I don't know why

11  you couldn't have met and conferred on this.  It appears that

12  the defendant s intend to pursue the second, which is the

13  statute of limitations; the third, which is *fair use;* and the

14  fifth, which is *innocent infringement*, so the only dispute

15  based on plaintiff's motion in limine is the statute of

16  limitations.  There's no -- I don't even know where you got

17  this.  There's no obligation to file a motion for summary

18  judgment on your affirmative defense?  So I don't understand

19  the abandonment argument.  Maybe it's me, but I didn't get it.

20  So no, denied.

21        Any other sort of unusual evidentiary issues that

22  you think may come up that you should brief for me?

23        MR. ROTHMAN:  Not that -- Joel Rothman for the

24  plaintiff.  Not that I can think of, your Honor.

25        MR. GRODSKY:  Allen Grodsky for the defendants.  Not

1  that I can think of.

2            THE COURT:  Okay.  Well, if something does come up,

3  talk to each other about it, make sure that you don't have a

4  dispute, and if you do, let me know.

5            I looked at the jury instructions.  There are far

6  too many disputed instructions, and it really wasn't -- I mean,

7  I know before computers we didn't just keep cutting and pasting

8  and saying the same thing over and over.  It wasn't helpful to

9  just keep repeating that the plaintiff's version was

10  even-handed, straightforward, unbiased, and follows the law.

11  But it's clear from the 9th Circuit instructions that for quite

12  a number of these the 9th Circuit didn't get to them or the 9th

13  Circuit thought that it really depends, as, of course, it does,

14  on the nature of the case and it didn't get to absolutely

15  everything.  Maybe they'll come up with some more based on

16  cases that come down.  But you need to work together and get a

17  lot closer.

18            So just some general thoughts on a couple of them

19  because I'm not going to go through all of them.  You need to

20  do it.  I thought the Defense Number 1 was fine.

21            As for the dispute between Plaintiff's 2 and

22  Defendant's 2, 3, and 4, I think three instructions are fine.

23  It doesn't matter whether I have a two-page instruction or

24  whether I have three.  One-paragraph instructions, that's just

25  really not an issue.  In fact, I sort of like the separate

1    instruction concept better.  I think it's probably easier for

2    juries to parse through.  But I've never been on a jury, so I

3    don't know.  As I said, you need to meet and confer.

4            I don't really approve of the description in

5    defendant's proposed explanation of extrinsic test, but

6    plaintiff's isn't really adequate either.  And as I was looking

7    at those, I was going to ask, didn't you need to distinguish

8    better between the photo and the tattoo?  But now I think you

9    need to look at many of them, in light of what the narrowing, I

10   think, of the claim is.  And don't use the word "monopoly" in a

11   jury instruction.  The first note I'm going to get is what's a

12   monopoly?  Or somebody on the jury is going to claim to know

13   what a monopoly is, and you'll have no idea whether that person

14   is correct.  So I wouldn't use words like that.

15           The fair use instruction, looking at the Defendant's

16   Paragraph Number 2, it might be appropriate to specify the

17   basis for the fair use defense, but again, I think -- I didn't

18   go back and look at it, obviously, but I think that you were

19   doing that for the tattoo itself but then -- but then maybe not

20   for the photograph.  But some of that maybe is better explained

21   in closing argument than in a jury instruction.  I didn't think

22   the third and fourth paragraphs in that instruction were

23   appropriate.  I do appreciate the work my colleague up north

24   did on *fair use*, but as I said, it's like asking Judge Walter

25   what he thinks.  Doesn't mean that all of his instructions

1  should be given here.  In fact, I do think there were -- I

2  don't want to say too many because he did a fine job.  Maybe my

3  style is just a little different.  And my wording of things

4  would be different if they don't come directly from a 9th

5  Circuit instruction, so...  I think maybe I'm a little bit more

6  formal, I'm not sure how to describe it, but that's really not

7  how I would say some of those things.  As I said, some of those

8  things just belong in closing arguments.

9         So, for example, I'm never going to say in a jury

10  instruction "our Courts have uniformly held."  That's not how I

11  would do a jury instruction.  So...  If it's the law where I've

12  determined that's what the instruction is, I just tell them the

13  instruction.  I don't tell them what the Courts have uniformly

14  held.  There's usually an outlier somewhere anyway.  And some

15  of these just kind of go on and on.  Just because there's

16  language in a case -- cases are talking to lawyers unless

17  they're specifically evaluating an instruction, so just because

18  it's in a case doesn't mean it belongs -- doesn't mean that

19  language belongs in an instruction.

20         And to the extent that you want me to look at Judge

21  Alsop's instructions, you need to give them to me.  I'm not

22  going to spend time trying to figure out how to get onto his

23  docket.  I know I have law clerks back there, but they have

24  many, many, many -- too many other things to do.  So if you

25  come back relying on any of them, you need to provide them...

1         The fact that an instruction is not part of or a

2    model instruction is not in itself a reason not to give it.

3    Sometimes there are no instructions.  Sometimes the 9th Circuit

4    itself decides it doesn't like one of the 9th Circuit

5    instructions.  But I do think it's hard even for judges

6    sometimes to figure out which way a factor would cut.  I'm not

7    sure that relates directly to the fair use factors, but not all

8    of them really need to be explained.  Some of them are

9    self-explanatory, one would think.

10        I'm not sure that Defendant's 14 is proper, but the

11   plaintiff's objection is not at all helpful.  I'm not giving

12   15.  Defendant's 16, I would be inclined to give the second and

13   third paragraph but not the first.  And, again, 17 relates to

14   damages to some degree.  I forget what it was.  I just had my

15   notes here.  But you need to clarify the burden of proof, and I

16   don't like the phrasing of the first two paragraphs.

17        So now after saying I wasn't going to go over them,

18   I guess I got ambitious yesterday and decided to look at them

19   all.  So you should meet and confer and resubmit those by

20   November 22nd.  I will look at them.  If they're close enough,

21   then I suppose it's possible we could go to trial on the 13th,

22   but if they're not close -- I'm not going to start that short

23   of trial without having a great deal of confidence in the jury

24   instructions.  Obviously, they can change based on what the

25   evidence is, but I'm not going to be staying up until midnight

1   e-mailing back and forth with you to get a set while the jury's
2   coming in early the next morning or whatever, so they need to
3   be really close.

4          Put them all in a single set, disputed and
5   undisputed, in the order in which they would be given.  And for
6   the ones still disputed, put one side's version in first with
7   the argument, as you did, and then right after that the other
8   side's version and the other side's argument so it's all in one
9   package.  With the clean set, make that again without
10  authorities, without titles.  And then for the ones that are
11  still disputed, just put on the bottom "Disputed plaintiff's
12  version," "Disputed defendant's version" and just have them
13  both in there.  It's just so much easier to delete something
14  than to add it, so -- so I'll need a word version of that.

15         I think defendant's version of the verdict form is
16  closer.  Why does the defense object to Plaintiff's Question
17  Number 1?

18         MR. GRODSKY:  Your Honor, Allen Grodsky.  I think
19  the answer to that is, the issue is whether it's substantially
20  similar.  If it's substantially similar, it's a derivative work
21  and it's an infringement; if it's not substantially similar,
22  it's not a derivative work.  So to me, the real question to ask
23  is the *substantially similar* question.  If the jury says yes,
24  they're substantially similar, then it's an infringement.  If
25  the jury says no, then it's not an infringement.  That's the

 1  9th Circuit standard for what you have to prove to show

 2  infringement.  There are a number of things that we've agreed

 3  upon and then *substantial similarity*, so to me, that's the

 4  question that we need to get an answer to.

 5          THE COURT:  All right.  Well, take a look at the

 6  verdict form and see if anything needs to be changed based on

 7  the narrowing of the case now.

 8          We need a minimum of six jurors, as you know, so I

 9  usually choose eight.  As you probably know, there are no

10  alternates in Federal Court on civil cases.  Our magistrate

11  judges review for hardship, but we shouldn't have too much

12  problem with that with our time estimate.

13          Sometimes I will tell the jury that they are allowed

14  to ask questions.  In my court, they would always be allowed

15  to, but I don't always announce to them their ability to do

16  that.  It may depend whether we have an engineer on our jury or

17  not.

18          A pass does not count as peremptory in my court

19  unless both sides pass with the same panel.  I know at least

20  one of you submitted voir dire.  I can't remember whether it

21  was the plaintiff who submitted voir dire, too?

22          MR. GRODSKY:  I think we both did, although they

23  were pretty similar, to tell you the truth.

24          THE COURT:  Good.  Makes it easier for me.  If you

25  are able to settle this case, which I don't know if you just

1  decided to go to battle on this regardless of the common sense

2  of that, then fine.  Otherwise, let me know if you settle it,

3  especially if it's close to the jury date.  Otherwise, there

4  would be a requirement of paying the jury fees if we need to

5  spend any of our time dealing with that.

6           Make sure you don't have anything on your computer

7  screen that the jury can see.

8           I don't know what's going to be going on by

9  December.  We may still be wearing masks and we may be

10  distanced with the jury out in the gallery.  That's where those

11  little black cushions are.  We may be picking the jury in

12  Courtroom 1 or here, depending on what else is going on.  If

13  there is a criminal case going on, they have many more jurors

14  they need to call, so they would be using Courtroom 1.

15           Trial schedule, the first day will go through -- go

16  to 4:30 or 5:00 with a lunch break.  After that, probably 8:30

17  to 2:30 with three 15-minute breaks.  I'll have to check my

18  calendar, though, and make sure I don't have any committee

19  meetings I need to attend or anything else that would cause us

20  to change the schedule.

21           I think our criminal trial continued for the 13th, I

22  think, so that would just leave one lower numbered civil trial

23  set to go a week before yours if that doesn't settle.  I'm

24  sorry.  Yeah, that was a week before.  So if it doesn't take

25  more than four days, we could start -- or five days, we could

1  start yours by the 13th, but I also have -- I haven't checked

2  today to see who's asked for continuance, but I also have three

3  criminal trials set to start on the 13th.  Criminal trials

4  always take precedence over civil trials, so I can't really

5  predict the likelihood of the case going on that date, but we

6  may be able to just have you trail from day-to-day until I open

7  back up.

8          Questions?

9          MR. GRODSKY:  Yes.  It's Allen Grodsky.  I'm just

10  curious, if we're at a point where we are wearing masks, are

11  the witnesses going to be wearing masks or --

12          THE COURT:  You need to get clear masks for them.

13          MR. GRODSKY:  All right.

14          THE COURT:  And generally I've been telling the

15  jurors during voir dire, if they're willing to lower their

16  mask, to go ahead and do that when they're being questioned.

17  And most of them do, some of them are still -- like me, I'm

18  still masking.  Every time I think I'm not going to, I find out

19  somebody who's become horribly ill from Covid, so I don't

20  really care to be forcing jurors and others to be here and

21  exposing them to that concern.

22          So that's -- any other questions, Mr. Rothman?

23          MR. ROTHMAN:  Joel Rothman, your Honor.  So I

24  haven't been in this courthouse for a trial before.  Would the

25  plaintiff be sitting there and the defense be behind them, or

 1   would we be here at this table and the defense at that table?

 2           THE COURT:  Well, that's where the Marshals sit when

 3   I have criminals sitting there, so no.

 4           MR. ROTHMAN:  Oh, okay.  Okay.  Right.

 5           THE COURT:  So no.  You're sitting --

 6           MR. ROTHMAN:  We're sitting here?

 7           THE COURT:  I mean, the party with the burden of

 8   proof would always be on the side of the jury.  The jury will

 9   probably be out there, but yes, that would be the table where

10   you would be sitting.

11           MR. ROTHMAN:  Okay.  All right.

12           THE COURT:  Otherwise, I would get horribly

13   confused.

14           MR. ROTHMAN:  Okay.  And so my client has asked me

15   to clarify something on the record.  I thought I was clear

16   about this, but he believes maybe I wasn't.  So with respect to

17   the issue of the claim concerning the tattoo, which we talked

18   about for a while, okay, it is the plaintiff's position that we

19   are not seeking damages for anything related to the tattooing.

20   All right?  I wanted to make sure that that was understood.

21           THE COURT:  That is my understanding.

22           MR. ROTHMAN:  Right.  Okay.  Super.

23           THE COURT:  Yes.  Okay.  Anything else?

24           MR. GRODSKY:  May I just ask about the Elmo?  When

25   we use the Elmo, is this the screen that it goes to for the

1  jury?

2          THE COURT:  It goes to -- well, if they're not

3  sitting in the jury box where they also have screens, it also

4  goes there.  We've only been using one, right, Renee?

5          COURTROOM DEPUTY:  Uh-huh.

6          THE COURT:  Yes.  Then it goes on your screens and

7  my screen here.

8          MR. GRODSKY:  Okay.  Thank you.

9          THE COURT:  All right.  Then I will expect to see

10 both a word version and whatever docketed versions of your

11 revised jury instructions in the chambers email next Tuesday, I

12 said.

13         Anything else?  Going once, going twice --

14         MR. ROTHMAN:  Joel Rothman again, your Honor.  Just

15 to clarify, I think I understood your Honor to say the week of

16 the 13th that you have three criminal trials still docketed to

17 begin on the 13th, those will take precedent, and you're not

18 sure what the status is of those at this time?

19         THE COURT:  Correct.

20         MR. ROTHMAN:  Okay.  All right.  Would you estimate,

21 in terms of checking back with your Honor, when you would know,

22 or would we just find out on the 13th?

23         THE COURT:  No.  I would hope I would know before

24 the 13th.  Well, I would check back...  I don't know when the

25 pre-trial conferences are.  You can check back on December 5.

**44**

1          MR. ROTHMAN:  Okay.  Thank you.  That's very

2    helpful.

3          THE COURT:  Going once, going twice?  All right.

4    Have a good evening.

5          MR. GRODSKY:  Thank you, your Honor.

6          MR. ROTHMAN:  Thank you, your Honor.

7          (Proceedings concluded at 4:22 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**0**

CERTIFICATE OF OFFICIAL REPORTER

COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )


        I, JUDY K. MOORE, FEDERAL OFFICIAL REALTIME COURT

REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.




        DATED THIS 20TH DAY OF NOVEMBER, 2022.



                /s/Judy K. Moore
        _____
            JUDY K. MOORE, CRR, RMR
        FEDERAL OFFICIAL COURT REPORTER