# EXHIBIT 2

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                   WESTERN DIVISION

 4                     ---oOo---

 5   JEFFREY B. SEDLIK,

 6          Plaintiff,

 7   vs.                           No. 2:21-cv-01102-
                                        DSF-MRWx
 8   KATHERINE VON DRACHENBERG (a.k.a.

     "KAT VON D"), an individual;

 9   KAT VON D., INC., a California

     corporation; HIGH VOLTAGE TATTOO,

10   INC., a California corporation;

     and DOES 1 through 10, inclusive,

11

          Defendants.

12   _____/

13

14

15            VIDEOTAPED VIDEOCONFERENCE

16          DEPOSITION OF BRYAN VANEGAS

17

18

19

20      Stenographically taken before SUSAN L. GARSIDE

21               CSR No. 13712

22               July 31, 2023

23

24

25

                                          Page 1
```

```
 1                    DEPOSITION OF BRYAN VANEGAS

 2

 3          BE IT REMEMBERED, that pursuant to Notice, and on

 4     the 31st day of July 2023, commencing at the hour of

 5     10:07 a.m., before me, SUSAN L. GARSIDE, a Certified

 6     Shorthand Stenographic Reporter, State of California,

 7     personally appeared BRYAN VANEGAS, via videoconference,

 8     produced as a witness in said action, and being by me

 9     first duly sworn, was thereupon examined as a witness in

10     said cause.

11                         ---oOo---

12     VIDEOCONFERENCE APPEARANCES

13     For the Plaintiff:

14             ROBERT E. ALLEN
               Glaser Weil Fink Howard Avchen & Shapiro LLP

15             10250 Constellation Boulevard, 19th Floor
               Los Angeles, CA 90067

16             310.282.6280
               rallen@glaserweil.com

17

       For the Defendants:

18
               ALLEN B. GRODSKY

19             Grodsky, Olecki & Puritsky LLP
               11111 Santa Monica Boulevard, Suie 1070

20             Los Angeles, CA 90025
               310.315.3009

21             allen@thegolawfirm.com

22     Also Present:

23             JEFFREY B. SEDLIK, Plaintiff

24             DANIEL BRUUN, Videographer

25             KRYSTAL ISHIBASHI, Veritext Technician


                                                    Page  3
```

1    second here.

2              (Exhibit 321 marked for identification.)

3    BY MR. GRODSKY:

4         Q.  This is a document that was Bates-stamped

5    Nos.  8196 and 8197.  All right.  I think, if you        10:17

6    click "refresh," it should come up.

7         A.  Yeah, Exhibit 321; right?

8         Q.  Yeah.  Do you recognize that document?

9         A.  Just waiting for it to load up.

10        Q.  I'm sorry, you said it looks familiar?        10:18

11        A.  It's still loading.

12        Q.  Oh, it's still loading.  Sorry.

13        A.  Yes, yes.  I do recognize this.  Yeah,

14   this was the -- this was what he sent me after we

15   had gone back and forth through e-mails.  You know,   10:18

16   I told him, you know, I'm not really sure what he's

17   looking for.  I -- I kind of -- in the e-mail, I

18   told him flat out; I was like, "I don't have that

19   money.  So I don't know" -- "I don't know what" --

20   "what" -- "what you're looking for me from (as        10:18

21   said)."  Again, like I said, that was in the

22   beginning of my career.  So I don't even think I

23   was tattooing quite as often.

24              We had sort of, like, talked very briefly

25   -- or there was an e-mail exchange where he was       10:18

                                        Page 12

```
 1      like, you know, "We're going to" -- "the way that
 2      we're going to do this is, we're going to," I
 3      guess, pretend or act like I had asked for
 4      permission.  "And this is what it's going to" --
 5      you know, this is the license that he had sent me,     10:19
 6      pretty much saying that I -- you know, I was able
 7      to use his photo with his permission.  I do
 8      remember that kind of being a little bit of --
 9      again, forgive me for thinking this way, but it was
10      elementary, just -- it seemed like all he wanted      10:19
11      was for me to just ask him, which would have been
12      fine.  But like I said, when someone brings in an
13      image or a reference or something from, you know --
14      either they printed it out or they had a book or
15      whatever, that's -- what do you call it?  We don't    10:19
16      typically go out looking for, you know, who was the
17      original author, artist, photographer, whatever --
18      especially when it's somebody's face.
19           I wasn't aware that you could copyright
20      like a -- like a portrait of somebody.  So he had    10:19
21      sent me this.  And this is kind of where, you know,
22      I guess he had given me the permission to use it.
23      But to be honest, I took that photo down after
24      that, you know.  I never even reposted it ever
25      again, just out of fear that this could potentially  10:20
```

Page 13

```
 1    to do with it?  Or does it go back to the original
 2    artist?  But like I said, as we kind of got deeper
 3    into these conversations.  I kind of gave in and I
 4    just decided to be safe, maybe be smart about it,
 5    and just take it down.  Just because I didn't want        10:41
 6    to -- I didn't want to deal with this any- --
 7    anymore.
 8         Q.  I understand.  Let me ask you, you're
 9    still a tattoo artist; correct?
10         A.  Yes.                                             10:41
11         Q.  And you've worked in various tattoo shops?
12         A.  Yes.
13         Q.  Are you familiar with tattoo flash books?
14         A.  Yeah.
15         Q.  What are tattoo flash books?                    10:42
16         A.  Tattoo flash books are designs from
17    multiple artists, some in the career, some not.
18    But they're typically sold as references for us to
19    use, for clients to look at for inspiration.  Art
20    books, if you will, just with more tattoo-related       10:42
21    artwork in them.
22         Q.  All right.  I want to show you an exhibit.
23    It's the right one... Okay.  No, that's the right
24    one here.  Sorry.  Here we are.  Okay.  I'm going
25    to show you --                                          10:43
```

Page 31

1          MR. ALLEN:  I guess this will be Exhibit

2     -- and forgive me, Allen.  Your last exhibit, was

3     that 321?  So I guess we'll make this 322?

4          MR. GRODSKY:  Yeah, but I was -- I was

5     using -- that was marked as a trial exhibit.  So I          10:43

6     was just using the original trial exhibit number.

7     There's already exhibits that are marked as "322"

8     and "323," et cetera, et cetera.

9          MR. ALLEN:  Oh, there are?  Oh.

10         MR. GRODSKY:  Yeah.                                     10:43

11         MR. ALLEN:  Do you know what the last

12    exhibit is?

13         MR. GRODSKY:  Yeah, hold on.  I have 326

14    as the last exhibit.  So I can think you go 327.

15         MR. ALLEN:  All right.  Let's do 327.                   10:43

16         (Exhibit 327 marked for identification.)

17    BY MR. ALLEN:

18         Q.  All right.  If you refresh, you should be

19    able to see Exhibit 327.

20         A.  Yes.                                                10:44

21         Q.  All right.  This is a first page of a book

22    called Droppin a Deuce, A Book of Art By Tony

23    Ciavarro.  Have you ever heard of him?

24         A.  I might have.  I'm sorry, it's still --

25    still loading on my -- my screen.  Sorry, guys.            10:44

1      It's saying:   "Generating file.   Preview may take a

2      while."

3          Q.   Oh, sorry.

4          A.   Hoping it's not -- hoping it's not my

5      Internet.                                              10:44

6          Q.   Well, while it's loading, let me ask you a

7      few questions.   Have you ever -- you've worked in

8      shops that have flash books; correct?

9          A.   Yes.

10         Q.   And -- and are you aware that the tattoo      10:45

11     shop purchases those books?

12         A.   It kind of varies.   Sometimes it's us,

13     personally, or sometimes it might be the owner, or

14     whatever, just having these books out there.

15         Q.   So sometimes the tattoo artist will           10:45

16     purchase one of the books.   Is that what you're

17     saying?

18         A.   Yes.

19         Q.   And sometimes the shop will purchase the

20     book (as said)?                                        10:45

21         A.   Yeah.

22         Q.   Okay.   Have you ever purchased any of

23     these books?

24         A.   Yeah, I have a -- I've got a pretty wide

25     library of it and --                                   10:45

                                                      Page  33

1      Q.   Oh, could you -- do you have one handy,

2    right near you?

3      A.   I might.   This just loaded up for me.   Am

4    I -- did you want me to see anything in here or --

5      Q.   Sure, sure.   Let's -- let's -- we can look      10:45

6    at this first.

7      A.   Okay.

8      Q.   So you have it now?   Can you see Droppin a

9    Deuce, A Book of Art By Tony Ciavarro?

10     A.   Yes.   And I do -- I do now recognize this.      10:46

11     Q.   You do or do not?

12     A.   I do, I do.

13     Q.   You do?   Okay.   And so what is this?   This

14   is a book of flash art?

15     A.   Yep.   It's a bunch of artists that just        10:46

16   kind of put their stuff out there.   This guy,

17   he's -- I don't want to say "old school," but he

18   was one of those artists that first started this

19   style of tattooing.   Yeah, there's a bunch on here.

20     Q.   Okay.   So if you look to page two...           10:46

21     A.   Right.

22     Q.   It has some text at the top.   Can you read

23   the first couple of sentences?

24     A.   Hold on one second.   Page two.   All right:

25   "This book is for tattoo reference.   None of the     10:46

Page 34

1    images in this book can be used for anything

2    besides tattoo reference without written permission

3    from the artist.  All images and layout by Tony

4    Ciavarro.  I did everything but print it."

5        Q.  And then it says -- there's a C with a          10:46

6    little symbol, which means "copyright"; "Tony

7    Ciavarro 2009."  See that?

8        A.  Yeah, yeah.

9        Q.  Okay.  So if you look to the -- well, you

10   understand, then, that by purchasing the book, you      10:47

11   may use the images in the book for reference?

12       A.  Yes.

13       Q.  All right.  And that you can't use it for

14   anything else; correct?

15       A.  Yeah.                                            10:47

16       Q.  So by buying the book, is it your

17   understanding that you're getting a license to use

18   those images for reference?

19       A.  I mean, "license" sounds pretty official.

20   But I would say the book is there to help other         10:47

21   artists, to use it for reference, yeah.  You don't

22   typically see the -- that:  "None of the images in

23   this book can be used for anything besides tattoo

24   reference."  That's -- that's interesting.

25       Q.  But when it says:  "This book is for            10:47

Page 35

1    tattoo reference," you understand that by buying

2    the book, you can use those images for reference

3    purposes?

4         A.  Yes.

5         Q.  Okay.  And if you didn't buy the book,          10:48

6    then would you understand that you did not have the

7    right to use it or that you would have the right to

8    use the images in the book, if you didn't buy it?

9         A.  I mean, yeah.  I think that becomes,

10   like -- sort of like a commonsense thing.  We          10:48

11   wouldn't go to, say, like a tattoo convention, see

12   this book there, and take photos of it.  That's

13   considered a dick move, you know what I mean?

14        Q.  Right.  Got it.

15        A.  There's also things where -- you know, at      10:48

16   least me, personally -- I know some artists aren't

17   the same.  But me, personally, I love having these

18   art books.  But it's just that, reference.  It's

19   not, "I'm going to take this image from this book

20   and I'm going to tattoo it and say it's mine."  If     10:48

21   I see a picture of -- I think there was one in

22   there that's like an owl.  "Oh, this is really

23   nice.  I like this.  I could show it to a client."

24   The client will like it, and I will say, "Hey, this

25   is" -- "this is good.  Now I have an idea of what      10:48

Page 36

1          MR. ALLEN:  This will be 328.

2          (Exhibit 328 marked for identification.)

3     BY MR. ALLEN:

4          Q.  And this one's not as -- hopefully this

5     will load more quickly.                          10:57

6          A.  Let's see.  This is... It hasn't loaded

7     for me yet.  Oh, there it is.

8          Q.  All right.  So the first page is Tattoo

9     Johnny.  Have you ever heard of Tattoo Johnny?

10         A.  Yes, I do -- I do recognize this, yeah.   10:57

11         Q.  And who is Tattoo Johnny?

12         A.  Well, he's a guy that -- if I'm not

13    mistaken, his whole thing was always -- he's got a

14    lot of flash books.  I didn't know he was an actual

15    tattoo artist, but he sells a lot of these kind of   10:58

16    more cartoony, if you will, flash designs.  That's

17    about as much as I know from him.  Although, seeing

18    this website, I think I did maybe hear that he --

19    he might have been one of those early, early tattoo

20    artists maybe that were trying to sell designs to    10:58

21    make some extra money.

22         Q.  Okay.  So based upon this page, it looks

23    like you can choose a design from -- from Tattoo

24    Johnny and then download it, so that way -- and you

25    pay some money to do that, and then you are able to   10:58

Page 43

```
1          Q.  And if somebody came in, you could -- you

2      could agree to just charge them nothing if you

3      wanted; right?

4          A.  Yes.

5          Q.  Do you ever draw tattoos freehand?          11:01

6          A.  A lot, yeah.

7          Q.  What does it mean to draw something

8      freehand?

9          A.  Typically, if you're talking about on

10     paper, it's just drawing from your head, you know.    11:01

11     Sometimes -- you know, those flash books that you

12     saw before, that could just be someone just drawing

13     whatever comes off the top of their head.  And if

14     they're a good enough artist, then they can

15     probably get away with doing a lot.                   11:01

16             When you're talking about freehand

17     tattooing, that is -- maybe somebody just, with

18     marker, draws real quick a rough sketch of whatever

19     they want to tattoo.  Or, in some instances -- I

20     haven't tried it yet -- people just -- before        11:01

21     there's a design, before there's a tattoo, there's

22     a brief conversation about what they're looking to

23     get, and somebody could just tattoo right on the

24     skin.

25         Q.  Right.  So if -- is it true that freehand    11:02
```

Page 46

1    tattooing does not involve a stencil?

2        A.  Like I said, if it's freehand -- like --

3    like I just said, on the -- on the actual skin

4    itself, no, not typically.

5        Q.  What is your understanding of the claims          11:02

6    involved in the lawsuit between Kat Von D and Mr.

7    Sedlik?

8        A.  Legally, I don't -- I don't know a lot.

9    But my impression is that Kat Von D, I guess she --

10   she did the same portrait and she had posted it to     11:03

11   social media.  And I guess Mr. Sedlik saw it and

12   kind of did the same thing that he did with me.

13   But the biggest difference is that -- again, at the

14   time -- probably today, I'm not worth much.  Kat

15   Von D, she built herself a little bit of an empire.    11:03

16   So I kind of -- my interpretation is that he found

17   a -- he found somebody that he could potentially

18   make some decent money off of with the copyright.

19         Again, Kat Von D is a portrait tattoo

20   artist.  That's kind of her -- her bread and           11:04

21   butter, if you will.  So do I -- I guess, if you're

22   asking my opinion, do I think that it's a credible

23   one?  Not really because, again, it's kind of

24   something that somebody wanted on their skin.

25   Somebody loved Miles Davis and his work enough to      11:04

                                              Page 47

```
 1    started.  I -- yeah, that's -- that's when I saw

 2    that he was involved in some sort of copyright -- I

 3    want to say it was like a group of artists,

 4    lawyers, all, you know -- again, my impersonation

 5    (as said) is, he had a team of people looking          11:05

 6    online to see if anyone was using his stuff.

 7        Q.  So back when Mr. Sedlik first contacted

 8    you, you went to his website and checked it out?

 9        A.  Yeah, didn't quite understand exactly what

10    it was about.  But that was my impersonation (as       11:06

11    said).

12        Q.  All right.  I'm going to show you another

13    -- another exhibit.  So it's 329.

14            (Exhibit 329 marked for identification.)

15            THE WITNESS:  Yeah, I got it.  Just a          11:06

16    second.

17    BY MR. ALLEN:

18        Q.  Let me know when it pops up.

19        A.  Yep.  Got it right here.

20        Q.  All right.  So this is a page from Mr.         11:06

21    Sedlik's website that, I'm going to represent to

22    you, has been on for many years.  And I want you to

23    go to page -- I think it's page two.

24        A.  Okay.  Yeah.

25        Q.  And do you see where it starts at the          11:07
```

Page 49

```
 1    bottom, it says:  "Examples of artist reference

 2    use"?  Do you see that?

 3        A.  Yes.

 4        Q.  And you see that that includes tattoos?

 5    You want to read that sentence?                    11:07

 6        A.  Yeah:  "Examples of artist reference use"

 7    -- "reference use include but are not limited to

 8    any derivative work based in whole or in part on

 9    one of my photographs, such as tattoos, paintings,

10    sketchings (as said), illustrations, woodcarvings,  11:08

11    charcoal renderings, posterizations, CGI, photoshop

12    manipulation, photocompositions, collages, murals,

13    and works in photography, or in any other medium in

14    which my" -- "my photograph or a representation of

15    my photograph is rendered."  That's a lot.         11:08

16        Q.  This was on the website when you went to

17    go look at the website.  Did you read about Mr.

18    Sedlik and the works that he does and how he

19    licenses things?

20        A.  Briefly.  I don't exactly remember.  I     11:08

21    will say this:  That that whole passage is -- with

22    all due respect, it's -- it is kind of crazy.  If

23    you have an artist that -- that is even doing this

24    just to practice, let's say just on paper,

25    sketching it.  For him to go as far as to say you   11:08
```

Page 50

```
 1              Tattooing is a very personal experience.
 2     People don't usually take tattoos, especially
 3     portraits, very lightly.  So I guess, if it was a
 4     thing for me to talk to Mr. Sedlik personally, I
 5     would have said, "This was never anything to" --      11:12
 6     "to use against you or to" -- "to sort of use as a"
 7     -- "as a means for us to monetize on it."  It was
 8     mainly used as somebody just really appreciated the
 9     photograph and really loved the -- the man himself.
10          Q.  If you -- on that exhibit, can you go to      11:13
11     page one for a second?
12          A.  The one that you had just sent us; right?
13          Q.  Correct.
14          A.  Yeah, "Sedlik Studio"?
15          Q.  Right.  And it says -- there's a --           11:13
16     there's a first section that's entitled
17     "Assignments, Licensing, and Print Sales."
18          A.  Yeah.
19          Q.  Could you read that first paragraph?
20          A.  "I rely on licensing revenue and print        11:13
21     sales to sustain my business and to support my
22     family."
23          Q.  Oh, I'm sorry.  If you could read the
24     whole paragraph.
25          A.  "When I create a photograph, I anticipate      11:13
```

Page 54

1    earning licensing revenue from that work by

2    licensing my copyright for use in all manner of

3    media, for all manner of usages, throughout the

4    copyright life of each image, my life, plus 70

5    years.   In addition, I support family (as said) by      11:14

6    selling fine art prints of my work, both directly

7    and through galleries.   I offer limited licenses

8    for marketing, editorial, merchandizing, personal,

9    and artist reference uses of my photographs."

10        Q.   That's fine.  So do you understand -- and      11:14

11    you can tell me if you remember looking at this at

12    the time of the -- that Mr. Sedlik contacted you.

13    Did you understand that Mr. Sedlik was trying to

14    ensure that he maintains his living through the

15    licensing of his photograph (as said)?                  11:14

16        A.   I believe -- I believe maybe in one of the

17    e-mails that we had exchanged, he may have said

18    something along what I just read.  But again, to be

19    totally honest, it was the exorbitant amount of

20    money that he was threatening to sue me with that       11:14

21    kind of took over all that.  I didn't get the

22    impression that he was doing this to support a

23    family.  I got the impression that this guy wanted

24    my money, and he found a way to get it.  And I

25    remember thinking, like I said before or earlier, I     11:15

Page 55

1                     SIGNATURE OF DEPONENT

2

3            I, the undersigned, BRYAN VANEGAS, do hereby

4     certify that I have read the foregoing deposition and

5     find it to be a true and accurate transcription of my

6     testimony, with the following corrections, if any:

7

8     PAGE      LINE                  CHANGE

9     ____      ____  _____

10    ____      ____  _____

11    ____      ____  _____

12    ____      ____  _____

13    ____      ____  _____

14    ____      ____  _____

15    ____      ____  _____

16    ____      ____  _____

17    ____      ____  _____

18    ____      ____  _____

19    ____      ____  _____

20    ____      ____  _____

21    ____      ____  _____

22    ____      ____  _____

23

24                    _____

                      BRYAN VANEGAS, Date

25

                                              Page 69

```
 1                    REPORTER'S CERTIFICATE

 2

 3

 4          I, SUSAN L. GARSIDE, a Shorthand Stenographic

 5     Reporter, State of California, do hereby certify:

 6          That BRYAN VANEGAS, in the foregoing deposition

 7     named, was present and by me sworn as a witness in the

 8     above-entitled action at the time and place therein

 9     specified;

10          That said deposition was taken before me at said

11     time and place, and was taken down in shorthand by me, a

12     Certified Shorthand Stenographic Reporter of the State of

13     California, and was thereafter transcribed into

14     typewriting, and that the foregoing transcript

15     constitutes a full, true and correct report of said

16     deposition and of the proceedings that took place;

17        IN WITNESS WHEREOF, I have hereunder subscribed my

18     hand this 6th day of August 2023.

19

20

           SUSAN L. GARSIDE CSR NO. 13712

21         State of California

22

23

24

25

                                              Page 70
```

```
1    BRYAN VANEGAS

2    vega16tattoos@gmail.com

3                                          August 6, 2023

4    RE: JEFFREY B. SEDLIK VS. KATHERINE VON DRACHENBERG

5    JULY 31, 2023, BRYAN VANEGAS, JOB NO. 6019441

6    The above-referenced transcript has been

7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10      to schedule a time to review the original transcript at

11      a Veritext office.

12   __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13      Transcript - The witness should review the transcript and

14      make any necessary corrections on the errata pages included

15      below, notating the page and line number of the corrections.

16      The witness should then sign and date the errata and penalty

17      of perjury pages and return the completed pages to all

18      appearing counsel within the period of time determined at

19      the deposition or provided by the Code of Civil Procedure.

20   __ Waiving the CA Code of Civil Procedure per Stipulation of

21      Counsel - Original transcript to be released for signature

22      as determined at the deposition.

23   __ Signature Waived - Reading & Signature was waived at the

24      time of the deposition.

25
```

Page 71

1    _X_Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF

2        Transcript - The witness should review the transcript and

3        make any necessary corrections on the errata pages included

4        below, notating the page and line number of the corrections.

5        The witness should then sign and date the errata and penalty

6        of perjury pages and return the completed pages to all

7        appearing counsel within the period of time determined at

8        the deposition or provided by the Federal Rules.

9    __ Federal R&S Not Requested - Reading & Signature was not

10       requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 72

```
 1   RE: JEFFREY B. SEDLIK VS. KATHERINE VON DRACHENBERG

 2   BRYAN VANEGAS, JOB NO. 6019441

 3                  E R R A T A   S H E E T

 4   PAGE_____ LINE_____ CHANGE_____

 5   _____

 6   REASON_____

 7   PAGE_____ LINE_____ CHANGE_____

 8   _____

 9   REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____      _____

24   WITNESS                                 Date

25
```

Page 73