# EXHIBIT A

```
 1                 UNITED STATES DISTRICT COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
 3                       WESTERN DIVISION
 4                          ---oOo---
 5    JEFFREY B. SEDLIK,
 6           Plaintiff,
 7    vs.                                    No. 2:21-cv-01102-
                                                    DSF-MRWx
 8    KATHERINE VON DRACHENBERG (a.k.a.
      "KAT VON D"), an individual;
 9    KAT VON D., INC., a California
      corporation; HIGH VOLTAGE TATTOO,
10    INC., a California corporation;
      and DOES 1 through 10, inclusive,
11
             Defendants.
12    _____/
13
14
15              VIDEOTAPED VIDEOCONFERENCE
16              DEPOSITION OF BRYAN VANEGAS
17
18
19
20      Stenographically taken before SUSAN L. GARSIDE
21                      CSR No. 13712
22                     July 31, 2023
23
24
25

                                                   Page 1
```

| | |
|---|---|
| 1 | that you had posted a photograph of? |
| 2 | A. Yes. |
| 3 | Q. And what was that tattoo of? |
| 4 | A. It was a -- it was my -- I remember that, |
| 5 | actually, because it was my first portrait I've     10:12 |
| 6 | ever done. It was of Miles Davis. |
| 7 | Q. It was of Miles Davis. And had you used a |
| 8 | photograph as a reference in creating that tattoo? |
| 9 | A. Yeah, the way that it had worked was, when |
| 10 | I was originally doing this tattoo, this client     10:12 |
| 11 | that I had had, that was willing to let me practice |
| 12 | -- you know, I had asked him if there was any |
| 13 | portraits that he had wanted to do or, you know -- |
| 14 | just to think about, you know -- just because I |
| 15 | wanted to start practicing doing more realistic     10:12 |
| 16 | tattoos. He came in with this picture that he just |
| 17 | printed off of -- I don't know if it was Yahoo |
| 18 | Images. It was one of those older ones. I don't |
| 19 | even think it was Google at the time. And it was a |
| 20 | picture of Miles Davis. So that's -- that's what   10:13 |
| 21 | we did. |
| 22 | Q. And did you charge this client for the |
| 23 | tattoo? |
| 24 | A. Again, like I said, that was at the |
| 25 | beginning of my career. And since I was practicing  10:13 |

Page 8

| | |
|---|---|
| 1 | realistic stuff -- typically, in the tattoo |
| 2 | industry, you don't really charge for -- when |
| 3 | you're first starting something, with the intention |
| 4 | of the client knowing, "Hey, there's a chance it |
| 5 | might not work," and that's why we're just doing it   10:13 |
| 6 | for free. |
| 7 |     Q.  Did you ask -- well, actually, you had had |
| 8 | no communications with Mr. Sedlik before you inked |
| 9 | this tattoo on the client; correct? |
| 10 |     A.  Yes, yeah.  I didn't know anything   10:13 |
| 11 | about... |
| 12 |     Q.  And so you didn't ask for a license from |
| 13 | Mr. Sedlik before you inked that tattoo? |
| 14 |     A.  No, no, no, no. |
| 15 |     Q.  All right.  So you described receiving a   10:13 |
| 16 | number of communications from Mr. Sedlik.  Were all |
| 17 | your communications with him in writing or was |
| 18 | there -- there ever any communications on the phone |
| 19 | or -- I don't know if they had Zoom back then or |
| 20 | any other -- FaceTime or anything like that?   10:14 |
| 21 |     A.  No, no.  I -- I -- actually, to this day, |
| 22 | I'm not even 100 percent sure what he looks like. |
| 23 | I only remember the name because he, you know, |
| 24 | instilled the fear in me at the time that I was, |
| 25 | you know -- it was a bummer.  It was a big bummer.   10:14 |

Page 9

| | | |
|---|---|---|
| 1 | It was all through, like I said, originally | |
| 2 | messages.  And then at some point, it turned into | |
| 3 | e-mails.  And that's when I realized it was kind of | |
| 4 | starting to get serious.  I believe I had briefly | |
| 5 | talked with a copyright lawyer about it.  And | 10:14 |
| 6 | that's when he had kind of told me, like, "Hey," | |
| 7 | you know -- he didn't want to charge me just for | |
| 8 | asking a question.  He just kind of told me that, | |
| 9 | you know, "Respond back and just see" -- "see | |
| 10 | exactly what it is he wants." | 10:14 |
| 11 |     Q.  And did you ask Mr. Sedlik what he wanted? | |
| 12 |     A.  Yeah, I -- I sent him an e-mail back, just | |
| 13 | kind of like, "Hey," you know, "I'm not sure | |
| 14 | exactly what's going on.  I don't know," you know, | |
| 15 | "if this" -- "if there's a photo in specific that | 10:15 |
| 16 | you're talking about.  But," you know, "the way | |
| 17 | that it works is somebody brings something in.  And | |
| 18 | normally, that's just" -- you know, "it's artist | |
| 19 | interpretation" -- "tattoo artist" -- I'm sorry -- | |
| 20 | "interpretation of how they go about it."  But the | 10:15 |
| 21 | message was pretty much just asking, like, you | |
| 22 | know, "What is it that you're looking for?" | |
| 23 | Because he had, in a previous e-mail, I think, | |
| 24 | threatened to sue me for maybe ten thousand, maybe | |
| 25 | more.  Something along those lines.  I'm not 100 | 10:15 |

| | | |
|---|---|---|
| 1 | percent sure what the number was.  But I just | |
| 2 | remember it was enough that, at the time, being a | |
| 3 | young guy and still starting off in tattooing, it | |
| 4 | definitely kind of freaked me out a little bit. | |
| 5 |     Q.  And so what did he tell you that he | 10:15 |
| 6 | wanted? | |
| 7 |     A.  There was -- I remember -- I remember this | |
| 8 | part because I kind of remember thinking it was a | |
| 9 | little bit, like, kind of -- forgive me for saying | |
| 10 | it, but kind of elementary.  He had responded with | 10:15 |
| 11 | something along the lines of -- and I'm not -- I | |
| 12 | can't quote exactly because I don't remember.  But | |
| 13 | I do remember it was along the lines of something | |
| 14 | like, "Those are" -- "I see that you have likes and | |
| 15 | comments on this photo.  Those are my likes; those | 10:16 |
| 16 | are my comments.  You don't deserve them."  And it | |
| 17 | was after that that I remember I -- you know, just | |
| 18 | kind of thinking about it in my head.  He had also | |
| 19 | made a mention of something along the lines of | |
| 20 | like, "This is" -- kind of giving me the whole | 10:16 |
| 21 | idea, like, "This is (as said) the copyright | |
| 22 | images"; "This is," you know, "not yours to use," | |
| 23 | and, you know, et cetera, et cetera. | |
| 24 |     MR. GRODSKY:  So I'm going to mark as | |
| 25 | Exhibit 321 a document in Exhibit Share.  Give me a | 10:16 |

Page 11

```
 1      second here.
 2              (Exhibit 321 marked for identification.)
 3      BY MR. GRODSKY:
 4         Q.   This is a document that was Bates-stamped
 5      Nos. 8196 and 8197.  All right.  I think, if you        10:17
 6      click "refresh," it should come up.
 7         A.   Yeah, Exhibit 321; right?
 8         Q.   Yeah.  Do you recognize that document?
 9         A.   Just waiting for it to load up.
10         Q.   I'm sorry, you said it looks familiar?          10:18
11         A.   It's still loading.
12         Q.   Oh, it's still loading.  Sorry.
13         A.   Yes, yes.  I do recognize this.  Yeah,
14      this was the -- this was what he sent me after we
15      had gone back and forth through e-mails.  You know,    10:18
16      I told him, you know, I'm not really sure what he's
17      looking for.  I -- I kind of -- in the e-mail, I
18      told him flat out; I was like, "I don't have that
19      money.  So I don't know" -- "I don't know what" --
20      "what" -- "what you're looking for me from (as         10:18
21      said)."  Again, like I said, that was in the
22      beginning of my career.  So I don't even think I
23      was tattooing quite as often.
24              We had sort of, like, talked very briefly
25      -- or there was an e-mail exchange where he was        10:18
```

Page 12

```
 1     like, you know, "We're going to" -- "the way that
 2     we're going to do this is, we're going to," I
 3     guess, pretend or act like I had asked for
 4     permission.  "And this is what it's going to" --
 5     you know, this is the license that he had sent me,    10:19
 6     pretty much saying that I -- you know, I was able
 7     to use his photo with his permission.  I do
 8     remember that kind of being a little bit of --
 9     again, forgive me for thinking this way, but it was
10     elementary, just -- it seemed like all he wanted     10:19
11     was for me to just ask him, which would have been
12     fine.  But like I said, when someone brings in an
13     image or a reference or something from, you know --
14     either they printed it out or they had a book or
15     whatever, that's -- what do you call it?  We don't   10:19
16     typically go out looking for, you know, who was the
17     original author, artist, photographer, whatever --
18     especially when it's somebody's face.
19             I wasn't aware that you could copyright
20     like a -- like a portrait of somebody.  So he had    10:19
21     sent me this.  And this is kind of where, you know,
22     I guess he had given me the permission to use it.
23     But to be honest, I took that photo down after
24     that, you know.  I never even reposted it ever
25     again, just out of fear that this could potentially  10:20
```

Page 13

1      "Jeff Sedlik Photography: License"?

2              MR. ALLEN:  Objection.  Document speaks

3      for itself.  And that is not an accurate depiction

4      of what the license fees says.

5      BY MR. GRODSKY:                                         10:21

6         Q.  Did you ever pay him anything in

7      connection with this document?

8         A.  No, nothing.

9         Q.  And did -- did Mr. Sedlik discuss with you

10     ahead of time that there was a $5,000 license fee      10:21

11     that he was waiving as a professional courtesy?

12        A.  Not that I recall.  The only -- the only

13     thing that I remember -- number was being thrown

14     out there was when he originally sent the -- the

15     first couple of messages and e-mails threatening to    10:21

16     -- to -- to sue me for, like I said, if I'm not

17     mistaken, around or over ten thousand.

18        Q.  All right.  And you'll see at the top

19     right-hand corner of this document, it says:

20     "April 15, 2014."  Does that seem, to the best of      10:22

21     your recollection, around the time that you

22     received this license?

23        A.  Yep.  That's -- I started tattooing in

24     2012.  Unfortunately, that was during the last

25     depression we had.  So 2013, 2014, somewhere in        10:22

Page 15

```
 1    it's -- that the date was set for today to finally
 2    do the deposition.
 3         Q.  Prior to today, have you spoken to anyone
 4    about what you would be testifying to today?
 5         A.  Yeah.  In those phone calls, they were          10:25
 6    just asking -- I think they briefly asked just what
 7    was the -- what was the situation and why I was
 8    involved.  I told them.  And then the only thing
 9    they said was that, you know, "We're going to be
10    deposing" me.  And they just want to know what the      10:25
11    full story is, but we have to do it in a courtroom.
12    That's all.
13         Q.  Okay.  And to be clear, when you say
14    "them," who -- who are the people that contacted
15    you?                                                    10:25
16         A.  Hold on one second.  I might have his
17    name.  It was a John Metzidis.  I hope I'm saying
18    that right.
19         Q.  Do you have a spelling of the man's name?
20             MR. GRODSKY:  I can -- it's John Metzidis,     10:26
21    M-E-T-Z-I-D-I-S.  He was the lawyer who -- he was
22    (as said) a lawyer who formerly worked at my firm.
23    BY MR. ALLEN:
24         Q.  And did -- I'm just going to call him
25    "John" because his last name is difficult.  Did         10:26
```

Page 18

```
 1    John ask you -- you know, what questions did John
 2    ask you specifically about your interaction with
 3    Mr. Sedlik?
 4         A.   The first thing he asked was if I had
 5    recognized the -- the -- the exhibit that you just      10:26
 6    showed me, the license.  I said, "Yes."  And then
 7    he just asked me to briefly tell him what -- how me
 8    and Mr. Sedlik knew each other.  I had asked him --
 9    or I mean, I told him that, you know, I had gotten
10    the messages, same as I said here.  I didn't really    10:27
11    take it seriously.  After that, I got the e-mail
12    threatening to sue.  And that's when I contacted a
13    lawyer.  I talked to Sedlik after the lawyer gave
14    me a little bit of advice on just how to proceed.
15    And that -- again, the same thing; he asked me to      10:27
16    ask for his permission, and that was that.  And
17    then he sent me this form.  The only other thing
18    that we talked about was just trying to figure out
19    a time and place that we were going to do
20    everything, especially since I'm on the East Coast     10:27
21    and I believe this was all happening on the West
22    Coast.
23         Q.   Do you remember -- now, your
24    correspondence with Mr. Sedlik, was that under your
25    name or someone else's name?                           10:27
```

Page 19

```
 1          A.   My name.
 2          Q.   Okay.  And I understand that some of the
 3     e-mails may have used the name "Dan."  Was there a
 4     "Dan"?  Did you know a "Dan"?
 5          A.   The former manager at the shop that I was      10:27
 6     at, which -- Rise of the Machine (as said).  There
 7     was --
 8               (Reporter requests shop-name
 9               clarification.)
10               THE WITNESS:  Rise of the Machine.  That       10:28
11     was the shop that I was working at when Sedlik
12     first contacted me.  There is or was -- I'm sorry,
13     I'm -- he passed away.  The old manager there was
14     Dan Laurier (phonetic), I think his name was.  But
15     he -- he wasn't a tattoo artist.  He was just a           10:28
16     manager.
17     BY MR. ALLEN:
18          Q.   Did you communicate with Mr. Sedlik
19     through the e-mail from the shop, Rise of the
20     Machines (as said)?                                       10:28
21          A.   I don't remember.  I'm 80 percent sure
22     that he sent this to me on my personal e-mail.
23          Q.   Does Rise of the Machines still exist?
24          A.   No.
25          Q.   And you mentioned a few times that you --      10:28
```

Page 20

```
 1    you thought that Mr. Sedlik was threatening to sue
 2    you.  Do you remember the exact words that were in
 3    the e-mail that gave you that impression?
 4         A.  After I had kind of -- or didn't respond
 5    to those messages through the social media, when I      10:29
 6    got that e-mail, that's when I kind of started
 7    taking it more seriously.  If I'm not mistaken, it
 8    was kind of in the vein of what I said before.  I
 9    might be mixing these messages together just
10    because it's been ten years, so I'm trying my best      10:29
11    to remember it.  But it was a whole, "That's not
12    your photo, that's my photo"; "Those are my likes,
13    not your likes"; "Those are my comments, not your
14    comments."  "If you don't respond or if" --
15    something along the lines of, like -- I think he        10:29
16    just wanted me to communicate back with him.  It
17    was something in (as said) the lines of, like, you
18    know, "I will sue you."
19              And I think he provided it as an example
20    at first, words like, you know, "Things like this       10:30
21    can go," you know, "for upwards" whatever amount.
22    But I remember -- if I'm not mistaken, I do
23    remember him saying, you know, "You will be getting
24    sued for ten thousand" or -- I'm sorry.  "You will
25    be getting sued for" what I -- what I -- around the     10:30
```

```
 1    ten thousand mark.  It might have been eight; it
 2    might have been seven.  But I do remember ten
 3    thousand being a scary number.
 4         Q.   And these were things that were said prior
 5    to you responding?                                        10:30
 6         A.   Yes.
 7         Q.   All right.  So once you did respond, what
 8    was the tenor of the communication with Mr. Sedlik?
 9         A.   It was, I guess -- I'm trying to remember
10    exactly how it was said.  I remember reading it and      10:30
11    then thinking that he was just kind of like -- just
12    complaining to me, like, you know, "This is
13    somebody's work, and you can't be stealing it."  In
14    the e-mail that I had sent him, I think I remember
15    saying, like, you know -- again, "I" -- "If someone     10:30
16    brings in a picture, we don't go out of our way to"
17    -- "to look who the original photographer is of
18    every picture."  He had kind of responded -- might
19    have annoyed him, me responding that way.  He said,
20    you know, "You should do your homework"; "You           10:31
21    should do this"; and "You should make sure that" --
22    you know, "Even if it's on a (as said) Google or
23    Yahoo, whatever, it's still subject to copyright."
24              At the end of the -- I'm trying to
25    remember because we had a couple of e-mails.  But       10:31
```

Page 22

| | | |
|---|---|---|
| 1 | that first e-mail definitely, from -- from what I | |
| 2 | remember, was, "Okay.  I have to kind of play ball | |
| 3 | with this guy because it seems like" -- and again, | |
| 4 | sorry for me saying it this way, but it seemed very | |
| 5 | bullying, that some guy on the West Coast was | 10:31 |
| 6 | coming after a young, not even known tattoo artist | |
| 7 | at the time, and threatening to sue for, like I | |
| 8 | said, around $10,000. | |
| 9 |       Q.   Right.  But once you started -- once you | |
| 10 | actually started engaging in a conversation, was | 10:31 |
| 11 | the tenor of the conversation more respectful and | |
| 12 | there was no more threats at that point? | |
| 13 |       A.   Yeah, after that original e-mail, I had | |
| 14 | sent back my e-mail, and then he got back to me | |
| 15 | kind of like -- like a little bit scolding, if I | 10:32 |
| 16 | remember correctly.  But after that, I had asked | |
| 17 | him -- or I told him, like, "I don't" -- "I don't | |
| 18 | have any money."  I'm barely in this two years at | |
| 19 | the time.  You know, "What exactly can I do to make | |
| 20 | the situation better?"  He responded with, you | 10:32 |
| 21 | know, something along the lines of, "Okay.  I" -- | |
| 22 | you know, "It seems like you didn't mean to do this | |
| 23 | out of spite."  I do remember him saying something | |
| 24 | along the lines of, like, asking if I had | |
| 25 | re-created it for posters or T-shirts or art prints | 10:32 |

```
 1      you started engaging with Mr. Sedlik regarding
 2      Exhibit 321?
 3           A.   After.
 4           Q.   And did you receive this license before or
 5      after you took down the photos?  Which came first?    10:39
 6           A.   I got the license.  But I took down the
 7      photos just out of fear for anything else coming up
 8      with it.
 9           Q.   But the license gave you permission to
10      continue using the photos, didn't it?                 10:39
11           A.   You know, it does.  But I had actually
12      spoken with a couple of co-workers at the time.
13      And like I said, the sort of -- again, sorry for
14      making it sound so elementary.  But the sort of
15      vibe, if you will, that I got from the e-mail         10:39
16      exchanges -- and especially those earlier messages
17      from Mr. Sedlik -- was I almost felt like he was
18      bullying me at the time.  And I hope that doesn't
19      sound so weak, if you will, or elementary.  But
20      it's just I didn't want to take any chances.  When    10:40
21      I found out that he was not only the original
22      photographer, but I guess at the time -- or he
23      still does run some sort of big copyright group or
24      -- or something like that.  I just didn't even want
25      to take a chance at that point.  So I just took       10:40
```

Page 29

```
 1    everything down, just out of fear, like I said.
 2    Those e-mails, it got a little bit more respectful
 3    at the end of our conversation.  But, you know,
 4    it's one of those things where I'd rather be on the
 5    cautious side.                                          10:40
 6         Q.   Did you remove anything -- when I say
 7    "remove anything," remove anything from social
 8    media or the website or anything prior to you first
 9    responding to Mr. Sedlik?
10         A.   Regarding the tattoo of Miles Davis?          10:40
11         Q.   Yes.
12         A.   Nope.  I don't think so.
13         Q.   Is it possible that you did?
14         A.   Maybe.  Maybe during -- maybe -- maybe
15    after we had originally first started talking.         10:41
16    Maybe then.  But I -- again, being a younger guy
17    back then, I was also kind of a little bit on the
18    (as said) rebellious streak and thinking to myself,
19    "I'm not taking this down."  I don't -- me,
20    personally, I didn't feel like I broke any rules.     10:41
21    There was talk of, "Does that kind of work once
22    something's transferred onto human skin?" human
23    skin being kind of an entirely different canvas.
24    Who takes the real ownership?  The client, who's --
25    it's now on their body, and that's what they decide   10:41
```

Page 30

REPORTER'S CERTIFICATE

I, SUSAN L. GARSIDE, a Shorthand Stenographic Reporter, State of California, do hereby certify:

That BRYAN VANEGAS, in the foregoing deposition named, was present and by me sworn as a witness in the above-entitled action at the time and place therein specified;

That said deposition was taken before me at said time and place, and was taken down in shorthand by me, a Certified Shorthand Stenographic Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings that took place;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 6th day of August 2023.

SUSAN L. GARSIDE CSR NO. 13712
State of California