ROBERT E. ALLEN (SBN 166589)
rallen@glaserweil.com
LARA A. PETERSEN (SBN 318475)
lpetersen@glaserweil.com
JASON C. LINGER (SBN 323031)
jlinger@glaserweil.com
GLASER WEIL FINK HOWARD
 JORDAN & SHAPIRO LLP
10250 Constellation Boulevard
19th Floor
Los Angeles, California 90067
Telephone: (310) 553-3000
Facsimile: (310) 556-2920

Attorneys for Plaintiff
JEFFREY B. SEDLIK

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY B. SEDLIK,<br><br>             Plaintiff,<br><br>v.<br><br>KATHERINE VON DRACHENBERG (a.k.a. "KAT VON D""), an individual; KAT VON D., INC., a California corporation; HIGH VOLTAGE TATTOO, INC., a California corporation; and DOES 1 through 10, inclusive,<br><br>             Defendants. | Case No.: 2:21-cv-01102-DSF (MRWx)<br><br>Before the Hon. Dale S. Fischer, U.S. District Court Judge<br><br>**PLAINTIFF JEFFREY B. SEDLIK'S OPPOSITION TO DEFENDANTS' MOTION FOR RECONSIDERATION**<br><br>Hearing Date: September 18, 2023<br>Time:          1:30 p.m.<br>Place:         Courtroom 7D<br>               First Street Courthouse<br>               350 West 1st Street<br>               Los Angeles, CA 90012<br><br>Action filed:   February 7, 2021<br>Trial Date:     November 28, 2023 |

# **<u>TABLE OF CONTENTS</u>**

**Page**

I.   INTRODUCTION ................................................................................. 1

II.  DEFENDANTS DID NOT MAKE FAIR USE OF THE
     PHOTOGRAPH. ................................................................................. 3

     A.   The Tattoo ................................................................................. 3

          1.   Unauthorized Use of Davis Photograph as a Reference ............ 4

          2.   Unauthorized Making of a Derivative Tattoo. ......................... 5

          3.   There Was No Justification for The Use. ................................. 9

          4.   Defendants Made and Used the Tattoo for Commercial
               Purposes. ............................................................................ 10

     B.   The Social Media Posts ............................................................ 14

          1.   Unauthorized Public Display of the Tattoo and the Davis
               Photograph Without Justification ........................................ 14

          2.   Defendants' Public Display of the Tattoo and Davis
               Photograph Was Not Transformative. .................................. 14

          3.   Defendants' Social Media Posts Were Commercial. ............. 16

     C.   Summary and Balancing of the Factors .................................... 16

III. CONCLUSION .................................................................................. 19

SEDLIK'S OPPOSITION TO DEFENDANTS' MOTION FOR RECONSIDERATION

# TABLE OF AUTHORITIES

**Page**

**CASES**

*A&M Recs., Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ...................................................... 1, 11, 16

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
143 S. Ct. 1258 (2023) ................................................................. passim

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015) ................................................................. 9

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) ................................................................................ 2

*De Fontbrune v. Wofsy*,
39 F.4th 1214 (9th Cir. 2022) ............................................................ 18

*Dr. Seuss Enterprises, L.P. v. ComicMix LLC*,
983 F.3d 443 (9th Cir. 2020) ........................................................ 7, 18

*Elvis Presley Enterprises, Inc. v. Passport Video*,
349 F.3d 622 (9th Cir. 2003) ................................................................ 7

*Entmn't Research Grp., Inc. v. Genesis Creative Grp., Inc.*,
122 F.3d 1211 (9th Cir. 1997) .............................................................. 7

*Gracen v. Bradford Exch.*,
698 F.2d 300 (7th Cir. 1982) ................................................................ 8

*Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985) ............................................................................. 11

*Leadsinger, Inc. v. BMG Music Pub.*,
512 F.3d 522 (9th Cir. 2008) ................................................. 13, 14, 17

*McGucken v. Pub. Ocean Ltd.*,
42 F.4th 1149 (9th Cir. 2022) ..................................................... passim

*Monge v. Maya Magazines, Inc.*,
688 F.3d 1164 (9th Cir. 2012) ............................................................ 18

*Northland Fam. Plan. Clinic, Inc. v. Ctr. for Bio-Ethical Reform*,
868 F. Supp. 2d 962 (C.D. Cal. 2012) ............................................... 16

*Rogers v. Koons*,
960 F.2d 301 (2d Cir. 1992) ......................................................... 1, 5, 7

*Society of Holy Transfiguration Monastery, Inc. v. Gregory*,
689 F.3d 29 (1st Cir. 2012) ................................................................ 11

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) ............................................................................ 11

*Wall Data Inc. v. L.A. Cnty. Sheriff's Dep't*,
  447 F.3d 769 (9th Cir. 2006) .................................................. 11

*Weissmann v. Freeman*,
  868 F.2d 1313 (2d Cir. 1989) ................................................. 11

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
  227 F.3d 1110 (9th Cir. 2000) ............................... 2, 11, 12, 16

**STATUTES**

17 U.S.C. § 101 ......................................................................... 5, 6

17 U.S.C. § 107 ........................................................................... 13

**Glaser Weil**

SEDLIK'S OPPOSITION TO DEFENDANTS' MOTION FOR RECONSIDERATION

2320273.1

# I.      __INTRODUCTION__

Both parties agree that the Supreme Court's decision in *Warhol*, which solely addressed the first fair use factor, constitutes a change of law warranting reconsideration of the Court's summary judgment order. Astonishingly, despite clear guidance from the Supreme Court, Defendants' Motion for Reconsideration (ECF 141, the "Motion") contends that the Tattoo was a fair use of the Davis Photograph. First, Defendants' arguments rest upon numerous, critical misinterpretations of both *Warhol* and Ninth Circuit law. For example:

- Defendants assert that providing a new "aesthetic" is transformative. Motion, 11. Wrong. As *Warhol* explained, "[t]he first fair use factor would ***not*** weigh in favor of" fair use "just because the [new work] added new expression or had a different *aesthetic*."[1]

- Defendants claim that a use is fair if the new work appears in a "distinct and different" environment. Motion, 10-11. *Warhol*, however, found that a copyright owner has the exclusive right to create and use derivative works that recast, transform, or adapt the original into a different media (e.g., a book to a movie). While Defendants assert that they made a new adaptation and interpretation of the Davis Photograph, "that does not in itself dispense with the need for licensing"[2] from Sedlik the right to make and exploit a derivative work, whether as a tattoo or in any other medium.

- Defendants contend that not charging the customer a monetary fee for the Tattoo renders it "noncommercial." Motion, 8-9. Not so. "[R]epeated and exploitative copying of copyrighted works, *even if the copies are not offered for sale*, may constitute a commercial use."[3] The dichotomy is between

---

[1] *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258, 1282 (2023). *Warhol* further explained that in *Campbell*, there was transformation of the song because it was a parody, not because it "had a different message or aesthetic."

[2] *Id.*; *Rogers v. Koons*, 960 F.2d 301, 312 (2d Cir. 1992) (discussed below).

[3] *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1015 (9th Cir. 2001) (holding that free downloading of pirated music was still commercial) (all emphasis herein added,

commercial use and *nonprofit educational* use.

Second, Defendants ignore several key holdings of *Warhol*:

- The Supreme Cour held that the focus is on the purpose and character of the **use** of the work (e.g., parody or criticism), not the artistic purpose or expression within the work or whether there is new expression. *Warhol*, 143 S. Ct. at 1273.

- A use that has a further purpose or different character than the original is said to be "transformative," but the degree of transformation required "must go beyond that required to qualify as a derivative [work]." *Id.* That is because a copyright "owner has a right to derivative transformations of her work." *Id.*

- There must be a "compelling" justification for the use of a copyrighted work. *Id.* at 1276. "[A] use may be justified because copying is *reasonably necessary* to achieve the user's new purpose. Parody, for example, 'needs to mimic an original to make its point.'" *Id.* Other new purposes like commentary or criticism "that target[] an original work" may (but not always) have a compelling reason to "conjure up" the original by borrowing from it. *See id.* (citing *Campbell*, 510 U.S. at 588).

- This justification relates to the use of *the copyrighted work itself*, not what is depicted in that work. As the Court held, because Warhol's new work "ha[d] no critical bearing on *Goldsmith's photograph*, the commentary's claim to fairness in borrowing from her work diminishes accordingly (if it does not vanish)." *Id.* at 1285 (internal citation omitted, emphasis added).

In light of *Warhol*, especially since it is Defendants' burden to prove fair use, this Court should find as a matter of law that neither the Tattoo, nor the social media posts, nor any of Defendants' other uses, reproductions, or displays of the Tattoo or Davis Photograph, were fair use.

---

unless otherwise noted); *Worldwide Church of God v. Philadelphia Church of God*, 227 F.3d 1110, 1118 (9th Cir.2000) (church engaged in commercial use because it gained increased recognition and membership).

## II.   **DEFENDANTS DID NOT MAKE FAIR USE OF THE PHOTOGRAPH.**

Defendants argue that the Court should "analyze each challenged use separately" (i.e., Defendants' social media posts displaying the Tattoo must be analyzed separately from Defendants' inking of the Tattoo). Motion, 8. In *Warhol*, Defendants correctly note (at 6) that the Court found that "[t]he same copying may be fair when used for one purpose but another." *Warhol*, 143 S. Ct. at 1277.

But such analysis does not help Defendants. Each of the uses Defendants made of the Davis Photograph is no different from the way Sedlik uses the Davis Photograph. The Davis Photograph is Sedlik's original and creative expression of a portrait of Miles Davis, which Sedlik offers, licenses, and sells for, among other uses, reproduction, distribution, and display, by all manner of clients, in all manner of media, including use by other artists as a visual reference in creating visual works (including tattoos). PSUF ¶¶ 7, 49, 40. Importantly, none of Defendants' uses of the Photograph "reflect the sorts of copying that courts and Congress most commonly ha(ve) found to be fair uses"—criticism, comment, news reporting, teaching, scholarship, or research. *Warhol*, 143 S. Ct. at 1274. Instead, as Defendants readily admit, they used the Davis Photograph to display a portrait of Miles Davis, and in so doing, Defendants traced the Davis Photograph as a visual reference, made a derivative work of the Davis Photograph in the Tattoo, reproduced this derivative work in a new medium, and then publicly displayed both the Davis Photograph and the Tattoo on the Internet via social media. DSUF ¶¶ 24, 94, 95. As discussed below, none of Defendants' uses of the Davis Photograph was transformative, nor have Defendants argued or provided evidence that their uses were nonprofit educational.

### A.   **The Tattoo**

Defendants contend that the Tattoo was transformative because it had a "sufficiently different purpose or character" than the Photograph. Motion, 5. But both the Tattoo and the Davis Photograph had substantially the same use—to display a portrait of Miles Davis. Defendants admit to copying the Davis Photograph, and both

SEDLIK'S OPPOSITION TO DEFENDANTS' MOTION FOR RECONSIDERATION

it and the Tattoo depict a portrait of Miles Davis in essentially the same pose, angle, and lighting. DSUF ¶ 24 ("Farmer had ideas of *getting a portrait* tattoo of Miles Davis ever since he was in college."); PSUF ¶ 5 ("Mr. Sedlik independently conceived and *created the iconic photographic portrait* depicting world-famous jazz musician Miles Davis"); Order, 23 ("[T]he Tattoo copied numerous elements from the Portrait."). Where an infringer uses a photograph "simply to illustrate what that work already depicts, the infringer adds no 'further purpose or different character.'" *McGucken v. Pub. Ocean Ltd.*, 42 F.4th 1149, 1158 (9th Cir. 2022) (not fair use where defendant embedded plaintiff's photo into an online article and added a discussion of various natural phenomena, because both uses "depict[ed] the lake").

Defendants admitted to copying the Davis Photograph in creating the Tattoo by: (1) using the Davis Photograph as a reference (DSUF ¶ 54); (2) tracing (reproducing) the Davis Photograph into a line drawing (DSUF ¶ 45); (3) creating a stencil of the line drawing (another reproduction) (DSUF ¶ 46); (4) transferring the line drawing onto thermal fax paper (another reproduction) (DSUF ¶ 47); (5) transferring the thermal-fax paper to Blake Farmer's skin (another reproduction) (DSUF ¶ 48); (6) drawing the tattoo with a skin pen onto Mr. Farmer's skin, "using her own artistic judgment" (another reproduction and creation of derivative work) (DSUF ¶¶ 53, 55, 56, 58); and (7) shading the tattoo, where Kat Von D applied "her own interpretation" of the Davis Photograph (DSUF ¶¶ 64, 67). In the end, Kat Von D achieved a result nearly identical to the Davis Photograph.

### 1. Unauthorized Use of Davis Photograph as a Reference.

Defendants admit that Kat Von D used the Davis Photograph as an artistic reference for the Tattoo (ECF 41, 28:19-20; DSUF ¶ 54). Sedlik not only testified that he has and continues to offer and license the Davis Photograph as an artistic reference for use by other artists to prepare derivative works, but has done so specifically for tattoos (PSUF ¶¶ 7, 39). Indeed, Sedlik produced two reference licenses for the Davis Photograph, including one for a tattoo (PSUF ¶ 40). *Warhol* confirmed that one of the

SEDLIK'S OPPOSITION TO DEFENDANTS' MOTION FOR RECONSIDERATION

ways photographers make a living is by licensing their photographs to be used as a reference for other artists. *Warhol*, 143 S. Ct. at 1278. Accordingly, the purpose of Defendants' use of the Davis Photograph is *identical* to one of the purposes for which Sedlik licenses the Davis Photograph—as an artistic reference. *See, e.g.*, *Rogers v. Koons*, 960 F.2d 301, 312 (2d Cir. 1992) (not fair use to use a photograph as a reference to make a derivative sculpture).  As the Court in *Warhol* recognized: "Warhol himself paid to license photographs for some of his artistic renditions. Such licenses, for photographs *or derivatives of them*, are how photographers like Goldsmith make a living."  *Warhol*, 143 S. Ct. 1278 (emphasis added). Defendants' uses robbed Sedlik of a license to which he was entitled.

### 2.      Unauthorized Making of a Derivative Tattoo.

*Warhol* clarified that "the owner has a right to derivative transformations of her work," and thus, creating a derivative work does not constitute fair use. *Warhol*, 143 S. Ct. at 1275, 1282. Derivative works "recast, *transform or adapt* the original, *add new expression, meaning or message*, or otherwise provide new information, *new aesthetics*, new insights and understandings." *Id*. at 1282 (citing § 101) (cleaned up). While *Warhol* involved two magazine covers, the Court made clear that derivative works can extend to other forms of media, "including musical arrangements, film and stage adaptions, sequels, [and] spinoffs." *Id.* "Such transformations may be substantial, like the adaptation of a book into a movie." *Id.* at 1275. To preserve a copyright owner's right to prepare derivative works, "the degree of transformation required to make 'transformative' use of an original must go beyond that required to qualify as a derivative." *Id*.

Thus, the first factor does not weigh in favor of fair use because a new work "added new expression or had a different aesthetic." *Id.* An adaptation might win awards for its "significant creative contribution," alter the meaning of the original work, and add "important new expression," but "that does not in itself dispense with the need for licensing." *Id.* Instead, *Warhol* requires "a distinct purpose" in the new

SEDLIK'S OPPOSITION TO DEFENDANTS' MOTION FOR RECONSIDERATION

work, exemplified by the Court's finding in *Campbell* that "2 Live Crew's transformation of Orbison's song rose to the level of parody, a distinct purpose of commenting on the original or criticizing it." *Id.* In addition to parody, the Court noted that the types of copying that courts typically consider to be fair use involve criticism, comment, news reporting, teaching, scholarship, or research. *Id.* at 1274. Defendants do not argue that the creation of the derivative Tattoo falls into any of categories.

Instead, Defendants admit that Kat Von D made the Tattoo by adapting the Davis Photograph, while allegedly adding new expression and aesthetics (DSUF ¶¶ 53-55, 58, 67, 70, 78-81; PSUF ¶ 38). That is the very definition of a derivative work. *Warhol*, 143 S. Ct. at 1282; 17 U.S.C. § 101. And the Davis Photograph and the Tattoo have the exact same purpose—to display a portrait of Miles Davis. Indeed, Mr. Farmer wanted a portrait tattoo of Miles Davis, found the Davis Photograph online, gave it to Kat Von D (DSUF ¶¶ 23, 24, 33, 34), who prepared a portrait of Miles Davis solely based on the Davis Photograph (DSUF ¶¶ 45-81; PSUF ¶ 38).

Defendants argue that their use is not the same as Sedlik's because a "hand-inked" tattoo "on the arm of Kat Von D's friend [] is nothing like the copyrighted use, a photograph licensed to be used in a magazine article about Miles Davis." Motion, 10. Such argument is meritless and ignores the facts.

First, Defendants attempt a sleight-of-hand by arguing the *initial* use of the Davis Photograph is the only use. *Id.* ("The Portrait was originally taken in connection with a photoshoot for Jazziz Magazine . . . and not for use in the market for tattoos."). As discussed above, since the initial taking of the Photograph, Sedlik has offered and sold non-exclusive copyright licenses authorizing limited reproduction, distribution, display, and creation of derivative works of the Davis Photograph, including as a reference for a tattoo. PSUF ¶¶ 7, 39. Indeed, in *Warhol*, Goldsmith took the Prince photograph at issue in 1981 at her studio, and three years later, licensed it to Vanity Fair to serve as an artist reference for an illustration.

*Warhol*, 143 S. Ct. at 1267. The Court's focus was not only on Goldsmith's intended first use of the photograph, *but how she actually used and could potentially use it*, including both as an artist reference and as a portrait of Prince. *Id.* at 1278.

Second, Defendants implicitly argue without authority that a change in medium from photographic paper to skin is somehow not subject to the Copyright Act's protection from unauthorized derivative works. The Ninth Circuit has held that there is no fair use simply by copying photographs in a new medium. *Elvis Presley Enterprises, Inc. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003) (use of still photographs and music in a sixteen-hour film documentary "serve[d] the same intrinsic entertainment value" and not fair use). Similarly, the Second Circuit held in a case, with quite similar facts to those here, that it is "irrelevan[t]" if the copying is carried out "in a different medium" because it still hurts the "effect on the potential sale of adaptation rights" (e.g., books to movies). *Rogers*, 960 F.2d at 312. In *Rogers*, the Court held that a three-dimensional sculpture did not make fair use of a black-and-white photograph, where the artist was instructed to make the sculpture "just like [the] photo" and the sculpture captured "the essence of the photograph." *Id.* The fact that the original was a photograph and the derivative was a sculpture was "irrelevan[t]." *Id.* Here, Farmer instructed Kat Von D to use the Davis Photograph, she kept the Davis Photograph by her side while she made the Tattoo, and the Tattoo captures the essence of the Photograph. DSUF ¶¶ 33, 34, 95; PSUF ¶ 31.

Defendants offer no authority that they have the right to prepare a derivative work without authorization, where the new work is in a different medium. *See, e.g., Warhol*, 143 S. Ct. at 1275 ("[T]he owner has a right to derivative transformations of her work. Such transformations may be substantial, like the adaptation of a book into a movie."); *Dr. Seuss Enterprises, L.P. v. ComicMix LLC*, 983 F.3d 443, 459 (9th Cir. 2020) (finding harm to potential market for derivative works of Dr. Seuss' book, including movies and toys); *Entmn't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1218 (9th Cir. 1997) (three dimensional inflatable costumes

based upon the defendant's two dimensional cartoon characters were derivative works of those characters and not separately copyrightable); *Gracen v. Bradford Exch.*, 698 F.2d 300, 302 (7th Cir. 1982) (painting of Judy Garland based upon still photographs was a derivative work). Defendants offer no evidence that their use of the Davis Photograph in creating the Tattoo went beyond that required to qualify as a derivative work.

Defendants further present no reason why tattoo artists, unlike all other artists, should not have to follow copyright law. As this Court noted in its summary judgment decision, Defendant's caselaw "does not establish that the Tattoo inherently created a different meaning by virtue of its location on the human body" and "[t]he Court is not convinced that tattooists, unlike other visual artists, should as a matter of law be immune from licensing requirements[.]" ECF 69, 20, 24 n.4.

Third, Defendants contend that this Court already found that the Tattoo "provided otherwise unavailable information about the original." Motion, 11. That is false. Under the pre-*Warhol* standard, this Court found that Kat Von D had created a new "aesthetic": "The Court finds Defendants have met their burden of showing the Tattoo has a purpose or meaning … by virtue of the way Kat Von D changed its appearance to create what she characterizes as adding movement and a more melancholy *aesthetic*." ECF 69, 21 (emphasis added).

Importantly, Defendants' equating the Tattoo's "new aesthetic" with "otherwise unavailable information about the original" is a complete misreading of *Warhol*. *Warhol* was clear that a new "aesthetic" is not a transformative purpose.

Without a doubt, 2 Live Crew transformed Orbison's song by ***adding new lyrics and musical elements***, such that "Pretty Woman" had ***a new message and different aesthetic*** than "Oh, Pretty Woman." Indeed, the whole genre of music changed from rock ballad to rap. ***That was not enough for the first factor to weigh in favor of fair use***, however. The Court found it necessary to determine whether 2 Live Crew's

transformation of Orbison's song rose to the level of parody, a distinct purpose of commenting on the original or criticizing it. *Warhol*, 143 S. Ct. at 1275.

Nor have Defendants identified any information in the use of the Tattoo "about the original," as *Warhol* requires. *Id.* at 1285 ("Because [the new work] 'has no critical bearing on' Goldsmith's photograph, the commentary's 'claim to fairness in borrowing from' her work 'diminishes accordingly (if it does not vanish).'"). Here, that means that the Tattoo must provide information about the Davis Photograph itself. The Tattoo provided **no** information about the Davis Photograph. Indeed, Kat Von D admitted that she adapted the Davis Photograph to make her own interpretation of Miles Davis, not the Davis Photograph. *See, e.g.*, DSUF ¶ 90 ("Kat's goal was to create a sentiment on Mr. Farmer's body that both evoked melancholy and had movement in it."); PSUF ¶ 37 (Kat Von D admitted that could have used "another image" to make the Tattoo).

The citation immediately following *Warhol*'s reference to "otherwise unavailable information" confirms that Defendants did not provide any information about the Davis Photograph. The Court cited to the Second Circuit's decision in *Authors Guild*, which lists various cases where courts found a new use provided otherwise unavailable information: digital copying to find particular words; digital copying to find plagiarism; digital copying of thumbnails to provide Internet pathway; copying from autobiography to show person who murdered his father was an unfit custodian; and copying a photo of beauty pageant winner to explain why the winner's title was withdrawn. *Authors Guild v. Google, Inc.*, 804 F.3d 202, 215-16 n.17 (2d Cir. 2015). None of these uses applies here.

### 3.      There Was No Justification for The Use.

Defendants admit that Kat Von D *only* used the Davis Photograph because it was a portrait of Miles Davis that Mr. Farmer sent to her to copy. PSUF ¶¶ 37, 38; DSUF ¶¶ 23-24, 33-35. Defendants have never argued or provided any evidence that

the Tattoo comments on or criticizes the Davis Photograph. Even if it had, Defendants needed a *compelling* reason to copy the Davis Photograph. *Warhol*, 143 S. Ct. at 1276 ("[O]ther commentary or criticism that targets an original work may have a compelling reason to 'conjure up' the original by borrowing from it."). Since the Tattoo had no critical bearing on the substance or style of the Davis Photograph, "the commentary's claim to fairness in borrowing from [Sedlik's] work diminishes accordingly (if it does not vanish)." *Id.* at 1285.

As in *Warhol*, the Defendants needed an independent and compelling reason for copying the Davis Photograph—"like satire that does not target an original work, [Warhol]'s asserted commentary 'can stand on its own two feet and so requires justification for the very act of borrowing." *Id.* at 1285 (internal citation omitted). And as in *Warhol*, Defendants "offer[] no independent justification, let alone a compelling one, for copying the photograph, other than to convey a new meaning or message. . . . that alone is not enough for the first factor to favor fair use." *Id.* at 1285-86. Not only do Defendants not have a compelling reason for copying the Davis Photograph in creating the Tattoo, they admit that they had *no reason* to do so—Kat Von D acknowledged that the Davis Photograph was interchangeable—she would have "just used another image" of Miles Davis to make the Tattoo if the Davis Photograph did not exist. PSUF ¶ 37. This is fatal to Defendants' claim of fair use, at least with respect to the first factor.

**4.    Defendants Made and Used the Tattoo for Commercial Purposes.**

Defendants focus their attention on the inking of the Tattoo, contending that, standing alone, the Tattoo is non-commercial because Kat Von D allegedly did not charge Mr. Farmer a fee for the Tattoo. Motion, 8-9. Defendants describe the Tattoo as a "gift" to a "friend." *Id.*[4]

---

[4] Blake Farmer was not Kat Von D's "friend"—he did lighting for a film shoot for her make-up line (ECF 35-2 ¶¶ 10-12).

Glaser Weil

1    Defendants do not cite any authority in support of their "gift" theory of
2    commerciality. Both Supreme Court and Ninth Circuit precedent establish that
3    Defendants' use of the Davis Photograph to prepare and make the Tattoo was still
4    commercial. "The crux of the profit/nonprofit distinction is not whether the sole
5    motive of the use is monetary gain but whether the user stands to profit from
6    exploitation of the copyrighted material without paying the customary price." *Harper*
7    *& Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985); *see also Sony*
8    *Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 450 (1984) ("Even
9    copying for noncommercial purposes may impair the copyright holder's ability to
10   obtain the rewards that Congress intended him to have.").

11   The Ninth Circuit has held that the "profit" referenced by *Harper* is not limited
12   to dollars and cents, but can come in the form of any "advantage" or "benefit" to the
13   infringer, such as enhanced recognition or publicity, even when the infringer
14   distributes the new works *for free*. *Worldwide Church of God v. Philadelphia Church*
15   *of God, Inc.*, 227 F.3d 1110, 1118 (9th Cir. 2000) (distribution of religious text by
16   non-profit religious organization "at no cost" was commercial because it allowed it to
17   attract new members and fostered the organization's growth); *Wall Data Inc. v. L.A.*
18   *Cnty. Sheriff's Dep't*, 447 F.3d 769, 779 (9th Cir. 2006) (finding use of software by
19   law enforcement agency was commercial because the use of the software was "made
20   to save the expense of purchasing authorized copies"); *Napster*, 239 F.3d at 1015
21   (holding that *free* downloading of pirated music was commercial).

22   As aptly stated in *Napster*, "[d]irect economic benefit is not required to
23   demonstrate a commercial use." *Id.*; *accord Society of Holy Transfiguration*
24   *Monastery, Inc. v. Gregory,* 689 F.3d 29, 61 (1st Cir. 2012) (finding commercial gain
25   where defendant benefitted by providing, free of cost, the core text of the works to his
26   members and gained recognition within his community); *Weissmann v. Freeman*, 868
27   F.2d 1313, 1324 (2d Cir. 1989) (finding commercial gain where defendant gained
28   recognition among his peers in the profession and authorship credit).

Glaser Weil

Here, it is *undisputed* that Sedlik offered and sold non-exclusive copyright
licenses authorizing limited reproduction, distribution, display, and creation of
derivative works of the Davis Photograph. PSUF ¶ 7; *see* ECF 42, 5 (Defendants'
Response: "Undisputed"). Sedlik presented evidence of two exemplary licenses for
the Davis Photograph, including one to a tattoo artist named Bryan Vanegas. PSUF ¶
40; ECF 144-2 (copies of the two licenses). It undisputed that Defendants did not seek
or obtain Sedlik's permission or license to use the Davis Photograph. PSUF ¶ 40.
Thus, Defendants exploited the Davis Photograph without authorization and achieved
a significant advantage or benefit, including promotion of their various business
interests and tremendous publicity, all without obtaining a customary license to do so.
As discussed below, the benefits and recognition that Defendants received as a result
of their exploitation of the Davis Photograph was substantial.

While each *use* of the Davis Photograph should be analyzed separately, that
does not mean the Court should be blind to how Defendants profited from the creation
of the derivative Tattoo. Here, Defendants profited from creating the derivative
Tattoo in several ways. First, Defendants admit that the purpose of the tattoo shop
where the Tattoo was made was to generate opportunities to feed Kat Von D's
passion in inking tattoos and generate opportunities for other tattoo artists working at
the shop. DSUF ¶¶ 9-11; ECF 35-11, 33:18-23. Thus, Kat Von D and her fellow
artists profited from making the Tattoo for Mr. Farmer. *See, e.g.*, *Worldwide Church*,
227 F.3d at 1118 (distribution of religious text by non-profit religious organization "at
no cost" was still commercial because it allowed it to attract new members and
fostered the organization's growth).

Second, Defendants profited from the creation of the Tattoo by using it to
advertise and promote Kat Von D, High Voltage Tattoo, and her other business
interests, including her shoe line. ECF 35-11, 172:23-25. Defendants made extensive
use of the Tattoo on social media, posting it at least a dozen times to their millions of
followers on Twitter, Instagram, and Facebook. DSUF ¶¶ 94-100. In total, Defendants

received at least 150,000 likes and reactions to these posts from her fans, who praised Kat Von D's "amazing" and "beautiful" work. *See* ECF 35-19 through 35-30. One of the posts' description encourages followers to get their own tattoos of musicians. ECF 35-27 ("What musician would you get?"). Based on seeing the Tattoo, multiple fans expressed an interest to get their own tattoos from Kat Von D. ECF 35-21 ("How long is the wait to get a tattoo done by you?"); 35-29 ("Need a tat by Kat!!!").

Kat Von D's inking of the Tattoo was entirely commercial in nature (and certainly not for nonprofit educational uses). Defendants do not argue, let alone produce any evidence, that their uses of the Davis Photograph and the Tattoo were for nonprofit educational purposes, as required. *Warhol*, 143 S. Ct. at 1274 ("whether such use is of a commercial nature or is for nonprofit educational purposes." (quoting § 107(1)). Kat Von D is a professional tattoo artist with "expertise in inking 'black and gray' style portrait tattoos." DSUF ¶¶ 2-3. Indeed, Kat Von D tattooed Mr. Farmer over two sessions, and began advertising and promoting her services, image, and brand before it was even finished. PSUF ¶¶ 16-23; DSUF ¶¶ 94-97; ECF 35-11, 149:2-150:21. The advertising and promotion on social media that Defendants engaged in confirm that Defendants' creation of the Tattoo was for commercial purposes. How the Tattoo was actually exploited via its public display on social media is relevant to the commerciality of the Tattoo itself, just as a feature film's box office sales and trailer advertisements are relevant to showing the intended commerciality of the film itself.

The Ninth Circuit rejected a similar attempt to misdirect the Court with the invention of a different, non-commercial purpose from a clearly commercial one. In *Leadsinger, Inc. v. BMG Music Pub.*, the infringer, a manufacturer of karaoke devices, argued that its use of copyrighted song lyrics was non-commercial because the devices had the "potential to teach singing," "help[ed] consumers to understand the song lyrics," and "facilitate[d] parental control over objectionable song words." 512 F.3d 522, 530 (9th Cir. 2008). The Ninth Circuit was unpersuaded, holding that

the infringer's "basic purpose remain[ed] a commercial one—to sell its karaoke devices for profit" and that the end-user's specific "utilization" was "irrelevant." *Id.*

### B. **The Social Media Posts**

#### 1. **Unauthorized Public Display of the Tattoo and the Davis Photograph Without Justification**

Defendants admitted to publicly displaying photographs and videos of both the Tattoo and the Davis Photograph on Defendants' commercial Twitter, Instagram, and Facebook pages. DSUF ¶¶ 94-100 (admitting to at least 12 postings to these pages); ECF 35-19 through 35-30 (the 12 posts). Defendants did so without authorization from Sedlik. PSUF ¶ 21. There was no justification for the use. Defendants have never alleged such display was done for purposes of criticism, comment, or parody of the Davis Photograph. Instead, Defendants admitted that the posting of the Tattoo and Photograph on the social media accounts was done to display the Tattoo, a derivative of the Davis Photograph. DSUF ¶ 94.

#### 2. **Defendants' Public Display of the Tattoo and Davis Photograph Was Not Transformative.**

As discussed above, *Warhol* requires "a distinct purpose" in the new work. In addition to parody, the types of copying typically considered to be fair use involve criticism, comment, news reporting, teaching, scholarship, or research. *Warhol*, 143 S. Ct. at 1274. Defendants do not argue that the public display on social media of both the Tattoo or the Davis Photograph falls into any of these categories. Indeed, Defendants' public display social media of both the Tattoo and the Davis Photograph had the same purpose as Sedlik—to display a portrait of Miles Davis. DSUF ¶ 24; PSUF ¶ 5. Further, Defendants displayed the works to promote their brands; Sedlik offers licenses so that others may do the same. PSUF ¶ 7.

Nor do Defendants argue or provide evidence that the social media posts comment on or criticize the Davis Photograph, as *Warhol* requires. *Warhol*, 143 S. Ct. at 1285 and n.20 ("Because [the new work] 'has no critical bearing on' *Goldsmith's*

1  *photograph*, the commentary's 'claim to fairness in borrowing from' her work

2  'diminishes accordingly (if it does not vanish).'").

3      Defendants previously argued in their summary judgment motion that all of

4  their social media posts were transformative because they show the Tattoo "in

5  progress" and that the Davis Photograph represents "at most 10%" of the overall

6  image on social media. ECF 32, 24. "[T]he proper comparison is between the amount

7  used and the *copyrighted* work[.]" *McGucken*, 42 F.4th at 1162 (emphasis original).

8  Defendants copied the *entire* copyrighted work—the Davis Photograph.  The entire

9  Davis Photograph or the Tattoo (a derivative of the Davis Photograph) appear

10 prominently in the social media posts, the posts' description is of the Tattoo, and the

11 reactions from fans, followers, and customers praise the Tattoo, calling the portrait

12 "amazing" and "beautiful." *See* ECF 35-19 through 35-30. In fact, most of the social

13 media posts depict the Tattoo in only "final" form and occupy the entire image. *See*

14 ECF 35-23, 35-24, 35-25, 35-28, 35-29, 35-30. One of the posts that does show

15 "progress" states "[m]essy progress shot," but provides no further discussion of Kat

16 Von D's "progress" and provides no comment on the Davis Photograph. ECF 35-21.

17 Kat Von D certainly did not post these dozen photographs and videos for the purpose

18 of educating anyone about the Davis Photograph (nor have Defendants ever argued

19 that their use was educational in nature).

20     Nor do Defendants argue that any transformation in the social media posts went

21 beyond that required to qualify as derivative works (i.e., works that "recast, *transform*

22 *or adapt* the original, *add new expression, meaning or message*, or otherwise provide

23 new information, *new aesthetics*, new insights and understandings."), which Sedlik

24 has the exclusive right to prepare.  *Warhol*, 143 S. Ct. at 1275, 1282 ("the degree of

25 transformation required to make 'transformative' use of an original must go beyond

26 that required to qualify as a derivative.").  As discussed above, the first factor does

27 not weigh in favor of fair use because a new work "added new expression or had a

28 different aesthetic." *Id.* at 1275.

Defendants present no compelling justification for the repeated use of the Tattoo and the Davis Photograph on their social media accounts. As in *Warhol*, Defendants "offer[] no independent justification, let alone a compelling one, for copying the photograph, other than to convey a new meaning or message. . . . that alone is not enough for the first factor to favor fair use." *Id.* at 1285-86.

### 3. Defendants' Social Media Posts Were Commercial.

Defendants do not argue or provide any evidence that the social media posts were for non-commercial educational purposes (focusing only the inking of the Tattoo). Motion, 8. Therefore, each and every social media post was for a commercial purpose as a matter of law. Moreover, through these posts, Kat Von D gained publicity and recognition, gained exposure for herself and her brands, and promoted High Voltage Tattoo and the other artists working there. *See* ECF 35-19 through 35-30 (over 150,000 likes and reactions from Kat Von D's followers, fans, and customers); ECF 35-11, 33:18-23, 172:23-25. That is a commercial use. *Northland Fam. Plan. Clinic, Inc. v. Ctr. for Bio-Ethical Reform*, 868 F. Supp. 2d 962, 979 (C.D. Cal. 2012) ("Generating traffic to one's website or conveying one's message effectively using copyrighted material is within the type of 'profit' contemplated by *Worldwide Church*."); *Worldwide Church*, 227 F.3d at 1118 (distribution of religious text by non-profit religious organization "at no cost" was still commercial because it allowed it to attract new members and fostered the organization's growth); *Napster*, 239 F.3d at 1015 (holding that *free* downloading of pirated music was still commercial).

### C.  Summary and Balancing of the Factors

Defendants bear the burden of demonstrating that their use was fair. *McGucken*, 42 F.4th at 1163. Defendants fail to meet their burden on any factor.

**Factor 1:** Defendants argue that the Tattoo was transformative because it appeared in a different medium (ink on skin) and allegedly provided a different "aesthetic." Motion, 10-11. But Defendants' position cannot be reconciled with

*Warhol*, which held that the *use* of a work is what matters for the fair use analysis, that owners have the right to make derivatives in other media, and that providing a different aesthetic does not transform a work. All of Defendants' *uses* were done to depict a portrait of Miles Davis. Defendants have never alleged that their use was for criticism, comment, parody, or teaching of the Davis Photograph.

Moreover, Defendants fail to establish that their use was non-commercial. Motion, 8-9. Defendants exploited the Photograph without purchasing or obtaining a license from Sedlik. Defendants received various benefits from the Tattoo, including advertising and promotion on social media to their millions of followers, generating 150,000 social media reactions, boosting the image of Kat Von D, her fellow tattoo artists, and High Voltage Tattoo, and feeding Kat Von D's professional pursuits. "And commercial use of copyrighted material is 'presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright.'" *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 530 (9th Cir. 2008).

**Factor 2:** Defendant argues that the second factor weights in favor of fair use "given that the [Davis Photograph] was widely published." Motion, 13. Defendants' position is contrary to *McGucken*, which found that the second factor weighs *against* fair use where the published photographs at issue "were the product of many technical and artistic decisions." *McGucken*, 42 F.4th at 1162-63; PSUF ¶ 34. The Ninth Circuit found that although the photographs were *published*, just as they were here, "that does **not** weigh in favor of fair use." *Id.* That makes perfect sense: if an owner decides to publish his works, that should not allow others to use the work for free with impunity. Accordingly, this Court should revise its previous decision and find that factor two weighs against fair use.

**Factor 3:** This Court previously found that the third factor (amount and substantiality of the portion used) weighs against fair use. ECF 69, 23. Defendants acknowledge that decision, and do not challenge it in their motion for reconsideration. Motion, 13. Thus, the Court should find that factor three weighs against fair use.

Glaser Weil

**Factor 4:**  Defendants contend that this factor weighs in favor of fair use because "Sedlik's showing … was quite weak." Motion, 14. But Defendants, who bear the burden of proof, ignore Sedlik's actual deposition testimony and the two exemplary licenses for the Davis Photograph. *Id.* Sedlik submitted evidence of two licenses for the Davis Photograph, including one to a tattoo artist named Bryan Vanegas. PSUF ¶ 40; ECF 144-2. Sedlik testified that he offered other licenses of the Davis Photograph to a city in France for a statute, in addition to University of California, Disney, and "various record companies and publishers." ECF 35-12, 106:6-11. Unlike these entities, Defendants did not seek or obtain Sedlik's permission or license to use the Davis Photograph. PSUF ¶ 40.

To prove that the fourth factor weighs in favor of fair use, Defendants "must bring forward favorable evidence about relevant markets." *McGucken*, 42 F.4th at 1163. By not addressing these licenses, Defendants fail to meet *their* burden on the fourth factor.  Indeed, Defendants offers *no* evidence about the effect on the market for the licensing of the Davis Photograph.  The result of this failure is that Defendants *cannot meet their burden* and the fourth factor weighs against fair use as a matter of law. *Id.* (citing *De Fontbrune v. Wofsy*, 39 F.4th 1214, 1226 (9th Cir. 2022)).

Additionally, this factor considers both the market harm caused by the infringer *and* whether similar conduct by others would result in an adverse impact on the potential market for both the original and the market for derivative works. *McGucken*, 42 F.4th at 1163. To negate fair use, Sedlik "need only show that if the challenged use should become widespread, it would adversely affect the *potential* market for the copyrighted work." *Id.* (quoting *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1182 (9th Cir. 2012)). Here, Sedlik has presented evidence not of a *potential* market, but an actual one, and if Defendants' uses of the Davis Photograph should become widespread, it would destroy Sedlik's business of licensing the Davis Photograph to prepare derivative works (including tattoos) and/or as an artistic reference.  PSUF ¶ 7; *Dr. Seuss*, 983 F.3d at 459 (finding that unauthorized use of Dr. Seuss' book would

hurt the market for derivative works in other mediums where Seuss had authorized other derivatives, such as toys and motion pictures).

As *McGucken* emphasized:

> The harm to the market for licensing McGucken's photos would be immense. There is no dispute that a market exists to republish McGucken's photos. *See VHT[, Inc. v. Zillow Group, Inc.]*, 918 F.3d [723,] 744 [9th Cir. 2019] (**licensing "a handful of photos" showed "that [a] market was more than 'hypothetical'"**). **If carried out in a widespread and unrestricted fashion, Pub Ocean's conduct would destroy McGucken's licensing market. Pub Ocean made the same use of McGucken's photos as the publications that obtained licenses—copying them in an online article about the ephemeral lake.** As we have recognized, an infringing use would destroy a derivative market when the infringing work is of the same type as existing works by licensed users.

42 F.4th at 1163 (emphasis added). Consequently, the fourth factor weighs against fair use as a matter of law.

Considering that Defendants have not met their burden with respect to any of the four factors, Defendants are not entitled to a fair use defense as a matter of law.

## III. <u>CONCLUSION</u>

If Kat Von D, a world-famous tattoo artist with millions of followers on social media, can use the Davis Photograph and other photographs like it without permission from the owner, surely others will follow her lead. That would destroy the means by which many photographers make a living. Because the relevant facts are undisputed and all of the factors weigh against a finding of fair use, the Court should find that neither the Tattoo, nor any of Defendants' other uses, reproductions, displays, or derivatives of the Davis Photograph, were fair use of the Davis Photograph.

DATED: August 21, 2023

GLASER WEIL FINK HOWARD
 JORDAN & SHAPIRO LLP

By: */s/ Robert E. Allen*

ROBERT E. ALLEN
LARA A. PETERSEN
JASON C. LINGER

*Attorneys for Plaintiffs*

Glaser Weil

SEDLIK'S OPPOSITION TO DEFENDANTS' MOTION FOR RECONSIDERATION

2320273.1