# EXHIBIT 3

```
 1                  UNITED STATES DISTRICT COURT
                   CENTRAL DISTRICT OF CALIFORNIA
 2                       WESTERN DIVISION
 3
 4    JEFFREY B. SEDLIK,              )        Case No.
                                      )    2:21-cv-01102-DSF-MRWx
 5                 Plaintiff,         )
                                      )
 6    -vs-                            )
                                      )
 7    KATHERINE VON DRACHENBERG       )
      (a.k.a. "KAT VON D"), an        )
 8    individual; KAT VON D, INC.,    )
      a California corporation;       )
 9    HIGH VOLTAGE TATTOO, INC.,      )
      a California corporation;       )
10    and DOES 1 through 10,          )
      inclusive,                      )
11                                    )
                   Defendants.        )
12
13
14                       DEPOSITION OF
15                     JEFFREY B. SEDLIK
16           TAKEN ON BEHALF OF THE DEFENDANTS
17                   VIA VIDEOCONFERENCE
18                   ON JANUARY 11, 2022
19
20
21
22
23
24
25           REPORTED BY:  TRENA K. BLOYE, CSR
```

Page 1

```
 1                   A P P E A R A N C E S
 2
 3
 4      (All parties appeared via videoconference.)
 5
 6    For the Plaintiff:
 7             GARY SEDLIK
               SEDLIK GROUP, P.C.
 8             P.O. BOX 3238
               Manhattan Beach, California 90266
 9             310-439-9986
               gary@sedlikgroup.com
10
11
12    For the Defendant:
13             JOHN J. METZIDIS
               GRODSKY, OLECKI & PURITSKY, LLP
14             11111 Santa Monica Boulevard
               Suite 1070
15             Los Angeles, California 90025
               310-315-3009
16             john@thegolawfirm.com
17
18
19
20
21
22
23
24
25

                                               Page 2
```

1   Q   Who is Shane Wallin?
2   A   He's a tattoo artist in San Diego.
3   Q   How did you know him?
4   A   We're in the same motorcycle club.
5   Q   And what prompted you to send this email to
6   him?
7   A   He's the only tattoo artist that I know well
8   enough to contact on that topic.
9   Q   And what prompted you to reach out to him?
10  A   Three days earlier I had discovered the
11  infringement and I thought I would reach out to him to
12  confirm my existing understanding at the time.
13  Q   So you had a phone conversation with him?
14  A   Yes.
15  Q   Tell me everything you discussed with him.
16  A   I told him that I had discovered an
17  infringement of my photograph by Kat von D, asked him if
18  he was familiar with Kat von D, he said yes.  And I told
19  him that she had not requested permission from me before
20  making the tattoo based on my photograph.  And that I
21  asked him to confirm my understanding that in the tattoo
22  industry it's commonplace for tattoo artists to require
23  that their clients approaching them with photographs to
24  confirm that their clients have the right to commission
25  a tattoo based on a photograph.

Page 136

1         And he confirmed that that is the practice in
2    his industry.  He's quite a well-known tattoo artist.
3    And so I said something to the effect of, So this was
4    improper?  He said yes.  I said, Are there forms and
5    things like that?  Which I had some familiarity with
6    through my non-profit, which sets standards for the
7    licensing of images and which has a term applicable to
8    the licensing of tattoos in our glossary of usages I
9    believe.
10        I asked him if there were industry standard
11   forms.  And I forget his answer specifically, but, in
12   essence, he said, yes, there is a release of some sort
13   having to do with if there is some kind of physical
14   issue that occurs as a result of getting a tattoo.  I
15   don't know what that might be, infection or otherwise,
16   and that the client indemnifies and holds harmless the
17   tattoo artist from liability and asserts that they have
18   the right to commission this tattoo based on some work
19   by some third-party.  That was the extent of the
20   conversation.
21      Q   Have you told me everything that you discussed
22   with Mr. Wallin?
23      A   That's all that I can recollect sitting here at
24   this moment.  I didn't take notes or anything like that.
25   I had the existing understanding from my work in the

Page 137

```
 1    immediately after you discovered the social media posts
 2    of the tattoo.  Did you have just one conversation with
 3    Shane Wallin or did you have multiple conversations with
 4    him about issues relevant to this case?
 5         A    To the best of my knowledge, directly answering
 6    the question here, I called him that one time.  I just
 7    wanted to confirm that my understanding was correct
 8    because of my prior experience and my standards
 9    organization setting standards for tattoo licensing
10    terminology, that I understood that tattoo artists do
11    license from photographers, as they should, under
12    copyright law.
13              And he confirmed yes and confirmed there is
14    typically a form that customers sign that is in the form
15    of a release of some kind.  And he may or may not have
16    given me a referral to a trade organization that
17    represents the interests of tattoo artists.
18         Q    Since February of '18 have you had any other
19    conversations with Mr. Wallin about this case?
20         A    Yes.  I had a communication with him yesterday.
21         Q    What did you discuss?
22         A    I wanted to ask him about -- to confirm my
23    understanding that the way -- just mechanically, the way
24    that a tracing is transferred to a tattoo artist skin.
25    I wanted to confirm my understanding that was done using
```

Page 142

```
 1    That's what he's confirming there.
 2        Q   Do you see where, on page JSP 8695, sort of in
 3    the middle of the page where you write to Mr. Bergeron,
 4    "I have licensed tattoo use in the past, for a fee."
 5        A   Yes.
 6        Q   Does that refresh your recollection as to
 7    whether you received a fee for the time that you
 8    licensed the silence photograph to that tattoo artist on
 9    the east coast?
10        A   I don't know if I was referring to that
11    photograph or another photograph.  And I don't have
12    specific recollection sitting here at this moment.  But
13    it is apparent that I was asking him if he could share
14    any information with me because he had posted about a
15    tattoo license.  And it had been a number of years since
16    I had seen a public post about a tattoo license, back to
17    my standard organization, on the subject of tattoo
18    license of photographs.
19        Q   Did you have any oral discussions with
20    Mr. Bergeron about any of the issues in this case, or
21    were communications with Mr. Bergeron solely over email?
22        A   I don't recall a phone conversation with him.
23        Q   Other than phone conversations, any other oral
24    conversations you had with him about the issues in this
25    case?
```

Page 147

```
1                  J U R A T   P A G E

2

3

4        I, JEFFREY B. SEDLIK, do hereby state under oath

5   that I have read the above and foregoing deposition in

6   its entirety and that the same is a full, true and

7   correct transcript of my testimony so given at said time

8   and place, except for the corrections noted.

9

10

11

12                       _____

13                            JEFFREY B. SEDLIK

14

15

16

17

18        SUBSCRIBED AND SWORN TO before me, the

19   undersigned Notary Public in and for the State of

20   _____, by said witness, this _____ day

21   of _____, 2022.

22

23

24                       _____

                              Notary Public

25                            My Commission Expires:_____
```

Page 186

```
 1                    C E R T I F I C A T E

 2

 3    STATE OF OKLAHOMA    )

 4                         ) SS:

 5    COUNTY OF OKLAHOMA   )

 6            I, Trena K. Bloye, Certified Shorthand Reporter

 7    within and for the State of Oklahoma, certify that

 8    JEFFREY B. SEDLIK was by me first duly sworn to testify

 9    the truth, the whole truth, and nothing but the truth,

10    in the case aforesaid; that the witness chooses to read

11    and sign the deposition; that the above and foregoing

12    deposition was taken by me in shorthand and thereafter

13    transcribed; that the same was taken on January 11,

14    2021, at 10:11 a.m. PT, via video conference; that I am

15    not an attorney for, nor a relative of any of said

16    parties or otherwise interested in the event of said

17    action.

18            IN WITNESS WHEREOF, I have hereunto set my hand

19    and official seal this 19th day of January, 2022.

20

21

22

23              <%8249,Signature%>

24              Trena K. Bloye, CSR

25              State of Oklahoma CSR No. 1522
```

Page 188