# EXHIBIT 1
# to Linger Declaration

# Trial Transcript

1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                  WESTERN DIVISION

4      THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

5

6    JEFFREY B. SEDLIK,              )
                                     )
7                   Plaintiff,       )
                                     )
8                                    )
           v.                        )   No. CV 21-1102-DSF-MRW
9                                    )
     KATHERINE VON DRACHENBERG aka KAT )
10   VON D;  KAT VON D, INC.; and HIGH )
     VOLTAGE TATTOO, INC.,           )
11                                   )
                    Defendants.      )
12   _____)

13

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16

17                Los Angeles, California

18          Tuesday, January 23, 2024, 8:30 A.M.

19      Day 1 of Jury Trial, Page 1 through 246, Inclusive

20

21                         PAT CUNEO CSR 1600, CRR-CM
                           Official Reporter
22                         First Street Courthouse
                           Room 4311
23                         350 West 1st Street
                           Los Angeles, California 90012
24                         213-894-1782
                           patcuneo1600@gmail.com
25                         www.patcuneo.com

2

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFF:     GLASER, WEIL, FINK, JACOBS & SHAPIRO, LLP
                            BY:   ROBERT E. ALLEN, ATTORNEY AT LAW
 3                          AND  JASON C. LINGER, ATTORNEY AT LAW
                            10250 Constellation Boulevard
 4                          Nineteenth Floor
                            Los Angeles, California  90087
 5                          310-553-3000
                            rallen@glaserweil.com
 6                          jlinger@glaserweil.com

 7
     FOR THE DEFENDANTS:    GRODSKY OLECKI & PURITSKY LLP
 8                          BY:   ALLEN B. GRODSKY, ATTORNEY AT LAW
                            AND  TIM HENDERSON, ATTORNEY AT LAW
 9                          11111 Santa Monica Boulevard
                            Suite 1070
10                          Los Angeles, California  90025
                            310-315-3009
11                          allen@thegolawfirm.com
                            tim@thegolawfirm.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Day 1 of Jury Trial, January 23, 2024*

156

| | |
|---|---|
| 1 | wife and I decided to move forward with having a family and, |
| 2 | you know, looking in a way to supplement our income so that |
| 3 | we could save up gradually to put our kids through school if |
| 4 | we could. |
| 5 | And thinking of those, thinking of that, I founded |
| 6 | this company named after -- initially it was just called |
| 7 | Jazz & Blues Masters and them we got pregnant.  So then it |
| 8 | turned into Mason Editions and I made him the president |
| 9 | unofficially when he was born. |
| 10 | And I started out with one poster which is of this |
| 11 | Miles Davis photograph, and then I did a BB King poster of |
| 12 | one of my BB King photographs and a Dizzy Gillespie poster |
| 13 | of one of those.  And then I got a lot of requests for a |
| 14 | John Coltrane poster but he died when I was one. |
| 15 | And so I went to another photographer, licensed |
| 16 | the rights to make a poster of his image, and then made a |
| 17 | John Coltrane poster. |
| 18 | Q.   Well, let's look at Exhibit 251. |
| 19 | (The exhibit was displayed on the screen.) |
| 20 | Q.   Mr. Sedlik, could you share with the jury what this is? |
| 21 | A.   Well, my primary focus -- first of all, this is a |
| 22 | website for the Jazz & Blues Masters which is what I called |
| 23 | my series of portraits which is an extensive series, and I |
| 24 | primarily sell to distributors and stores, not directly to |
| 25 | the public, although in the past I sold directly to the |

1   public.

2           This was a website that was made way back when and

3   it's still live but I don't really use it and it is the four

4   posters that we offer and we only have four posters.

5   Q.   So it's a little bit hard to see.  We think that we

6   have some blowups of these actual posters so we can see them

7   a little more clearly.

8   A.   They're in my car and so --

9   Q.   They didn't quite make it here.

10  A.   I'll bring them in here after the break.

11  Q.   All right.  Well, let's take a look at them again.

12  Maybe zoom in and you can show us.  The first one is the

13  Miles Davis portrait photo; is that right?

14  A.   Right.

15  Q.   And is this the same photo that's at issue in this

16  case?

17  A.   It is.

18  Q.   All right.  And the second one is -- I guess the second

19  one is Dizzy Gillespie?

20  A.   Yes, yes.  I photographed Dizzy a couple of times and

21  came up with this idea which he liked very much and --

22  because he was very famous for how his cheeks blew out when

23  he was playing the trumpet.  And I approached with a sketch

24  of this.  He loved it and so we got together and we did

25  this.

1    photographs?

2    A.    I mean, I offer fine art prints of many of my portraits

3    and other work and people do buy that and it's in

4    collections and I can't that I don't make money from that.

5    I make some money.  But primarily I'm engaged in licensing

6    my work rather than selling copies of my works.

7    Q.    Can you give me some examples of the type of uses that

8    you license to other people to use your photographs?

9    A.    So a magazine might approach me and want to use one of

10   my photographs in the magazine or on the cover.  A book

11   company -- a book publisher might want to use a picture on

12   the cover, on the inside textbooks, fiction books,

13   nonfiction books.

14        Newspapers license my work for inside newspapers.

15   Entertainment companies like move studios license my work

16   for use on one sheets which are movie posters.  Automotive

17   companies license my work for use in advertising as do

18   credit card companies and, you know, all types of companies.

19        And then I also license my work to appear -- to be

20   reproduced on products which is called merchandising.

21   That's like mugs and shirts and what have you.  I mean, in a

22   way that I'm pleased with, with reproduction quality that

23   I'm pleased with but I will allow licenses after the chance

24   to review.

25   Q.    Well, under the business-to-business photography model,

1    or pretending he could fly.

2    Q.   How much did you charge as a license fee for this; and

3    if we need to go back to the first page, we can.

4    A.   $7,000 with the understanding that there would be no

5    use of the photograph itself.  And this was after I had been

6    paid by the other client to create and to use the photo; and

7    if somebody approaches me today, I would grant another

8    license.

9    Q.   And this was done in what year?  This license?

10   A.   I can't see that on the screen.  Well, I can see that I

11   signed it in 2005.

12   Q.   Was that around the time of the license?

13   A.   That would be when I issued the license.

14   Q.   Did either that it was not an exact copy or that

15   additional elements were added affect your decision to enter

16   into this artistic reference license?

17   A.    No.  It's commonplace for people to contact me and

18   about artist reference licenses of one kind or another in

19   one medium or another.  It could be a sculpture or -- that's

20   going to go -- there's one in France, a sculpture in France

21   based on a photo.

22          Changing the mediums is one way of using a photo

23   as artistic reference but it didn't come to mind in terms

24   of, well, if you change it x percent, you don't need this

25   license.

1          It was the longstanding practice here of

2   requesting and receiving artist reference license to execute

3   a copy or derivative work in another medium.

4   Q.   Let's go to Exhibit 322.

5          *(The exhibit was displayed on the screen.)*

6   Q.   Mr. Sedlik, could you he tell us what we're looking at

7   in Exhibit 322?

8   A.   A painter, a very good -- a really excellent artist,

9   Jay Johansen, approached me to request the right to make use

10  of my Miles Davis photo in, I think, a series of prints; and

11  I don't recall the specific circumstance.  This was only

12  three years ago but I've been pretty busy so I don't recall

13  every detail.

14         But I know that I had a discussion with him about

15  usage and we came to an agreement that he could create a

16  painting and part of -- well, I'll stop there.  It is a

17  license for artist reference to make a painting completely

18  different medium on canvas of my photograph and with all

19  kinds of color and other, changing quite a bit of the

20  photograph.

21  Q.   Is this license applied to the same image that's at

22  issue here?

23  A.   It does.

24  Q.   Let's go to Exhibit 34.

25         *(The exhibit was displayed on the screen.)*

*Day 1 of Jury Trial, January 23, 2024*

1  Q.   What was the total revenue that you received for this

2  artist reference license?

3  A.   This is in progress right now so I have received the

4  advance and then he's made the painting.  I just need to

5  pick it up and then he'll proceed with the -- I think he's

6  going to get the approval of the Miles Davis Estate to do

7  the editions of these other prints that he's going to sell.

8          And so we're waiting on that.  But all told, it

9  would add up to about $85,000 or so, if everything sells,

10 that I would receive from this agreement.  85- to a hundred

11 thousand dollars.

12 Q.   Let's go back to 323.

13          *(The exhibit was displayed on the screen.)*

14 Q.   Is this painting an exact copy of your photograph?

15 A.   No.

16 Q.   How is it different?

17 A.   I think he used the photograph underneath and then he

18 applied different paints and different colors all around the

19 edges of the face and he painted over parts of the painting

20 and of course added his signature there.

21 Q.   Let's go to Exhibit 321.

22          THE COURT:  Let's take a 15-minute break.

23          Ladies and gentlemen, don't talk about the case or

24 form or express any opinions about the case until it's

25 finally submitted to you.  We'll see you in 15 minutes.

```
 1   by somebody -- I'm not quite sure of the circumstances
 2   sitting here today -- but I saw that he had posted it either
 3   on his webpage or on social media.
 4           I saw he had a total of three followers; right?
 5   And so I reached out to him again with my typical -- in my
 6   typical manner, artist to artist, meaning no ill will.  I've
 7   registered my copyright.  Can we please discuss this?
 8           And he responded -- and by the time he responded,
 9   he removed -- he had removed the work.  He said:  I'm so
10   sorry.  I've removed the work.  I respect your rights and
11   that was one of those circumstances.
12           Three followers, one posting of the image, deeply
13   respectful and appreciative and apologetic, that I decided
14   to grant him a retroactive license and use that as an
15   educational opportunity.
16   Q.   Do you recall looking to see how many followers he had
17   on his social media accounts?
18   A.   I did.  He had three followers.
19   Q.   Did you consider his respectful response and
20   cooperation when determining the zero-dollar retroactive
21   fee?
22   A.   Deeply.
23   Q.   Did you require any other compensation from Mr. Vanegas
24   in the license?
25   A.   I did.
```

1   Q.   What did you require?

2   A.   I required that he provide attribution on any copies

3   that he published going forward so that my work -- it could

4   be identified as my work.  Artists makes use of another

5   artist's work, they recognize the other artist's original

6   work.

7   Q.   And that attribution had value to you?

8   A.   Attribution doesn't take the place of a fee for using

9   the work but it is a consideration.  It does have value and

10  it definitely factors into the fee that you might apply or

11  not apply to a license.

12  Q.   In addition to the Vanegas license, have you similarly

13  issued zero-dollar retroactive licenses?

14  A.   Yes.

15  Q.   Let's go to Exhibit 258.

16          THE WITNESS:  Your Honor, may I have some water?

17          THE COURT:  Sure.

18          *(The exhibit was displayed on the screen.)*

19          THE WITNESS:  Thank you so much.

20  BY MR. ALLEN:

21  Q.   Mr. Sedlik, do you recognize Exhibit 258?

22  A.   Yes.

23  Q.   Could you tell us about what this is?

24  A.   There's a pretty well-known show called *Yellowstone* and

25  my wife was a costume designer working on the show.  She's a

1   professional costume designer.  And one of her -- one of the

2   people working on the shows found a T-shirt with my

3   Miles Davis photograph on it in a store, a used T-shirt

4   unrelated to my wife being on the show, and said:  Why don't

5   we have one of our characters, you know, wear this?

6            And my wife said:  That's my husband's photograph

7   and connected the production of *Yellowstone* with me.  They

8   asked her a favor.  My wife was on the show.  I granted them

9   the right to make use -- to have that T-shirt, not my

10  original photograph but the T-shirt with my photograph

11  appear in the television show and it did and, of course, my

12  wife was working on it.  I made it -- I put a $1500 fee.  I

13  credited the fee.

14  Q.   Let's go to the second page.

15           *(The exhibit was displayed on the screen.)*

16  Q.   The third page.

17           *(The exhibit was displayed on the screen.).*

18  Q.   Is this the picture of the T-shirt on the boy in

19  *Yellowstone*?

20  A.   Yeah.  He played a young thug and attacked a woman in

21  the show and wearing my shirt.

22  Q.   And what was the reason why you waived your license

23  fee?  Well, hold on for that.  Let's go to Exhibit 260.

24           *(The exhibit was displayed on the screen.)*

25  Q.   Do you recognize Exhibit 260?

```
 1              It has to be a magazine cover so it can't, you
 2    know, be a really pulled back wide shot.  It had to be in
 3    tight on him and say something about the person.  And I came
 4    up with that and a few other ideas that we have an exhibit
 5    on, I believe.
 6    Q.   Are there any subtle symbolic references in the work.
 7    I think you were just describing the fingers but --
 8    A.   Well, it would help me to refresh my memory, not that I
 9    don't know my work but if you can let me look at my work
10    while we're talking.
11    Q.   Absolutely.
12              (The exhibit was displayed on the screen.)
13    A.   I'll start answering.  So part of this was the aspect
14    of, you know, of course this shush gesture that he was
15    making.  I actually went in and placed his fingers exactly
16    in that arc.  I walked up to him, asked him if I could.  We
17    had a little bit of a relationship going on.  And I placed
18    his fingers in an arc to represent a musical notation.
19              I carefully had him position his finger and so I
20    was building subliminal things in like that arc of the
21    fingers.  Nobody will ever know, except the people in this
22    room, that I arranged Miles' fingers and I don't think
23    anybody ever did that to him before or ever did it afterward
24    but he really liked this idea.  He let me do that.  There's
25    that.
```

1   why I put those white cards behind the camera so the sun

2   would hit the white cards and then reflect off them, come

3   through and reflect into his eyes.

4           And so, you know, if you look really close up at

5   his eyes, you can see -- you can actually see me in his eyes

6   or reflection of me with my tripod.  But it added these

7   little white dots in his eyes that gives it a little spark.

8           And then I began working with him.  I adjusted a

9   few curls of hair so I could expose one of his ears because

10   it was just black on that side.  I had to turn his head

11   slightly so I wasn't looking at two ears.

12           And then for each exposure, I had him tense up so

13   I could get like that furrow of the brow, those little lines

14   right over his nose.  Only comes out when he kind of like

15   gets -- when he tenses up.

16           So I had him hold his hand down, you know, and

17   bring it up and then we let his finger just right.  I mean,

18   I had to have the fingernail in the right place for me like

19   based on my sketch.  I'm pretty particular.

20           And then I would have him tense up and his veins

21   would pop and his furrowed brow would happen and his eyes

22   would be kind of intense.  Like a lot of people would be

23   intimidated.  And then make the photo and then move to the

24   next photo.

25   Q.   So after you finished your photo session with

230

```
 1   Kat Von D will see this or at least it will be a post that
 2   they might be alerted to.
 3   Q.   All right.  Let's go to Exhibit 208.
 4             (The exhibit was displayed on the screen.)
 5   Q.   So can you tell us what Exhibit 208 is?
 6   A.   So I think what this might be is that Ms. Von D first
 7   posted and it's May 16th, 2017, and then High Voltage Tattoo
 8   shared it and that's why I think that previous one might
 9   High Voltage Tattoo and this is Facebook on Ms. Von D's
10   account.
11   Q.   And this has a similar tag as the one we were just
12   looking at?
13   A.   Right.
14   Q.   And this is dated May 16th, 2017?
15   A.   Yes.
16   Q.   Okay.  Let's go to Exhibit 209.
17             (The exhibit was displayed on the screen.)
18   Q.   Oh, I forgot to ask you.  That photo in 208, let's go
19   back to --
20             (The exhibit was displayed on the screen.)
21   BY MR. ALLEN:
22   Q.   Do you recognize this photo?
23   A.   Yeah, I mean, I put that furrow in that brow with what
24   I -- during my words talking to Miles and the glance is him
25   looking at me and I recognize it immediately.
```

239

1    photo by tracing it?

2    A.   No.

3    Q.   Did you license or authorize Ms. Von D to copy your

4    photo to make a tattoo?

5    A.   No.

6    Q.   Did you license or authorize Ms. Von D to use your

7    photo in social media posts?

8    A.   No.

9    Q.   Did you license or authorize Ms. Von D to use the

10   tattoo copy in social media posts?

11   A.   No.

12   Q.   Could you have discovered these infringements earlier

13   than you did?

14          MR. GRODSKY:  Objection.  Calls for speculation.

15          THE COURT:  Why don't you rephrase your question?

16   BY MR. ALLEN:

17   Q.   Did you know about any of these infringements by

18   Ms. Von D before you discovered them on February 10, 2018,

19   while doing your Internet searches?

20   A.   No.

21   Q.   Had anyone prior to that date contacted you to let you

22   know that Ms. Von D was making a tattoo from one of your

23   photographs?

24   A.   No.

25   Q.   After you discovered the infringement, did you contact

1  Ms. Von D or her representatives about the infringement?

2  A.    I did.

3  Q.    How did you do that?

4  A.    I sent an email to her I think business manager

5  Mr. Brad Lyon.

6  Q.    And when did you contact her?

7  A.    It was December 20th of 2020.

8  Q.    What happened between the discovery on 2-10-18 and the

9  day you reached out to Kat?

10  A.    I did a lot of research to collect and save a lot of

11  the infringing copies.  As you've seen, there are a lot of

12  things going on there.  I downloaded videos and downloaded

13  photographs, made screenshots, looked for other -- looked

14  for others, document whatever I could.

15          Then I also did further research on Ms. Von D and

16  her shop so that I could get an idea of what that -- of what

17  she was engaged in, what kind of business she was engaged

18  in, whether there was also commercial activity on the same

19  accounts that might -- copies of my photograph and

20  derivatives of my photograph were posted to.

21          I reached out to a couple of tattoo friends.  I

22  reached out to a tattoo association.  I -- just to inquire.

23  I contacted again my brother and some other attorneys to

24  consult with them.

25          And of course it takes time, you know, to reach

1  Q.   What did you do?

2  A.   I took the sketch and my photograph and put them side

3  by side to determine whether the sketch exactly matched the

4  outlines of the face, the nose, the eyes, the finger, all in

5  the same place.

6           And side by side it was incredibly close.  So what

7  I wanted to do was see just how close it was.  So I did an

8  overlay of the sketch over my photograph and made the sketch

9  transparent without doing anything to the sketch other than

10  making it transparent.

11           And I overlaid it over my photograph in the same

12  way that that sketch paper or tracing paper was overlaid on

13  the lightbox in the video to see how closely the tracing on

14  the tracing paper of my photograph matched the photograph.

15  Q.   All right.  So let's go to Exhibit 228.

16           *(The exhibit was displayed on the screen.)*

17  Q.   Is this the document that you put together?

18  A.   Yes.

19  Q.   And so your photo is on the left?

20  A.   That's correct.

21  Q.   And the tracing paper is on the right?

22  A.   Yes.

23  Q.   And you put them together in your overlay as you just

24  described in the middle?

25  A.   Yes.  The only change to the sketch being to make it

1    believe it's marked.

2           MR. ALLEN:  We can move on.  It's not important.

3    Let's go back to what we were just looking at.  218 or 228.

4    Yes, correct.

5                    (Pause in the proceedings.)

6           MR. ALLEN:  While we're getting that back up

7    for -- to keep things moving -- oh, okay.

8                    (Pause in the proceedings.)

9           THE COURT:  Can we take those posters down?  I

10   think they're blocking the exit there.  We don't want to do

11   that.

12                   (Pause in the proceedings.)

13   BY MR. ALLEN:

14   Q.    So when you looked at and put the line drawing over

15   your photo, did you come to any conclusions about the

16   similarity between the two?

17   A.    I didn't see any line drawing, Counselor.

18   Q.    I meant this sketch, this traced sketch.

19   A.    I didn't see any sketch.  I'm not playing games.  It's

20   a tracing.  It's on tracing paper laid over a tracing so.

21   Q.    I apologize.  Let me rephrase.

22           When you looked at the tracing paper on the right

23   and you compared that to your photograph, did you come to

24   any conclusions as to whether the two were similar?

25   A.    Yes.

1  Q.   And what was that conclusion?

2  A.   The outlines of the hair matched, the nose matched, the

3  eyes matched, the finger matched, the lips matched, the

4  location of the shoulder matched, the little tiny bit of the

5  ear that was there matched, the cascading fingers that I put

6  into place on my shoot day matched.

7         The little bit of the jaw matched, the highlight

8  on the forehead matched.  And after seeing that, the

9  creative heart of my photograph is basically captured here

10 in the sketch without the shading, I concluded that it is a

11 tracing in the same way that anybody would trace a

12 photograph on tracing paper laying it over a photograph and

13 using a pencil.

14 Q.   Are the proportions between all of the elements in the

15 photo the same in the photograph and in the traced image?

16 A.   When I overlaid it, I confirmed with that center

17 overlay to my satisfaction, even the shadow under the nose,

18 the shape of the shadow because of the way that I arranged

19 the light above, is exactly the same as the photograph.

20 Q.   I was referring more to the relationship between -- the

21 proportional relationship and space between the fingers.

22 Was that the same?

23 A.   Yes.  I can see in the center overlay that the tips of

24 the fingers, the lines around the tips of the fingers are

25 traced in place looking at my photograph through the tracing

1   paper and just drawing over my photograph.

2          Even the fingernails on his pinkie finger are

3   exactly over where I placed his pinkie myself with my own

4   hands.

5   Q.   Once you notify -- what has been your experience when

6   you notify someone that their work is infringing yours?

7   A.   *(No response.)*

8   Q.   Let me rephrase that.  What is your experience -- once

9   you notify someone that they are infringing your work, do

10  they take any actions?

11  A.   I pause because I want to make sure I give a complete

12  answer and I also have to leave time for objections so I

13  know the answer but it's not because I'm uncertain.

14          I don't notify people at the outset that they're

15  infringing.  I approach people in the manner that I

16  testified about yesterday, contacting them in a respectful

17  manner and mentioning -- pointing out that I created the

18  work, that I rely on the work to earn my living, that

19  they're using the work and that I don't have any record of a

20  license to them.

21          And most often, in almost every instance but not

22  all instances, I ask if they have a license because maybe

23  they bought a license from someone that I don't know about

24  and they believe they have a license.

25          I ask those questions without making accusations

1  Q.   And what was that conclusion?

2  A.   The outlines of the hair matched, the nose matched, the

3  eyes matched, the finger matched, the lips matched, the

4  location of the shoulder matched, the little tiny bit of the

5  ear that was there matched, the cascading fingers that I put

6  into place on my shoot day matched.

7       The little bit of the jaw matched, the highlight

8  on the forehead matched.  And after seeing that, the

9  creative heart of my photograph is basically captured here

10 in the sketch without the shading, I concluded that it is a

11 tracing in the same way that anybody would trace a

12 photograph on tracing paper laying it over a photograph and

13 using a pencil.

14 Q.   Are the proportions between all of the elements in the

15 photo the same in the photograph and in the traced image?

16 A.   When I overlaid it, I confirmed with that center

17 overlay to my satisfaction, even the shadow under the nose,

18 the shape of the shadow because of the way that I arranged

19 the light above, is exactly the same as the photograph.

20 Q.   I was referring more to the relationship between -- the

21 proportional relationship and space between the fingers.

22 Was that the same?

23 A.   Yes.  I can see in the center overlay that the tips of

24 the fingers, the lines around the tips of the fingers are

25 traced in place looking at my photograph through the tracing

1    A.    Yes.

2    Q.    And is that a copy of the tattoo on the right?

3    A.    Yes.

4    Q.    Did your choice of camera settings such as the aperture

5    and shutter speed affect Miles Davis' appearance in the

6    portrait photo?

7    A.    Very much so.

8    Q.    And is that same perspective captured and expressed in

9    the tattoo on the right?

10   A.    Yes.

11   Q.    Did Ms. Von D's rendering of your depiction of the

12   visual amount of his face on the right side of the portrait

13   similar so where his cheek is shaded?

14   A.    Yes.

15   Q.    And is that similar to what appears in the tattoo?

16   A.    Yes.  The right -- are you talking about our right or

17   Mr. Davis' right?

18   Q.    Well, let's start with Mr. Davis' right.

19   A.    Mr. Davis' right, which is our left, the cheekbone is

20   in the same place, the highlight wraps around the eye

21   underneath the eye where I placed it; the relative

22   difference between the highlight and shadow -- although the

23   reproduction is not a great reproduction of the tattoo -- is

24   the same.

25   Q.    Is Ms. Von D's rendering of your depiction of the hair

1    similar?

2    A.    Yes.

3    Q.    What about the hairline?

4    A.    The hairline against his forehead including the

5    highlight on the right side along the edge of his forehead

6    where there's a bright area, that's very unique to this

7    photograph because of the way that I shaped the light coming

8    in there, is duplicated.

9    Q.    Is Ms. Von D's rendering of your depiction of the

10   eyebrows similar?

11   A.    I'm just taking a moment.  *(Pause.)*  Yes.

12   Q.    Is Ms. Von D's rendering of your depiction of the

13   center of his brow similar?

14   A.    Yes.  That's the -- the vertical line is the furrows

15   that I was after that I think I saw in my research.  He was

16   in an episode of *Miami Vice* and furrowed his brow.  He was

17   playing a gangster.  I saw that.

18          And so when I talked to him, I had him tensing up

19   to try and get that furrow going.

20   Q.    Let's go to Exhibit 315.

21          *(The exhibit was displayed on the screen.)*

22   Q.    What is Exhibit 315?

23   A.    Those are Miles Davis' eyes from my photograph.  I made

24   a screenshot or I blew up the photograph from the tattoo --

25   the photograph of the tattoo from Instagram or Facebook --

```
 1    and then I blew up the -- or magnified the eyes from my

 2    portrait.

 3              And as I mentioned yesterday, in the eyes, if you

 4    look closely, you can see me in Mr. Davis' eyes and my

 5    tripod and my assistant standing next to me and the white

 6    cards that I mentioned yesterday behind me to break up the

 7    highlight so that there was like little white dots in his

 8    eyes which photographers strive for to kind of add a sparkle

 9    to the eyes.

10              It's a little difficult to do when you're outside,

11    but my approach was to use these white cards behind me and

12    to stand in front of them so that we had these little white

13    dots in his eyes instead of a large white area or just

14    having very dark eyes.

15    Q.   And are those white dots from the photograph similar to

16    the white dots in the tattoo?

17    A.   From the -- in the left eye, we have the reflection of

18    the white foamcore card in the tattoo on the left side and a

19    reflection on the right side and then my silhouette in the

20    middle although I can't say that Ms. Von D recognized that

21    it was me in the eyes when she placed that.

22    Q.   Is Ms. Von D's rendering of your depiction of the eye

23    direction or gaze similar?

24    A.   Yes.  The eyes are in the same position.  The pupils

25    and the irises are directed in the same position.
```

1  Q.   Is Ms. Von D's rendering of your depiction of the

2  eyelids similar?

3  A.   Yes.

4  Q.   Is Ms. Von D's rendering of your depiction of the lower

5  eyelids similar?

6  A.   Yes.

7  Q.   All right.  Let's go back to the exhibit we were just

8  looking at.

9              (The exhibit was displayed on the screen.)

10  Q.   Is Ms. Von D's rendering of your depiction of

11  Miles Davis' nose similar?

12  A.   Yes.  I placed that highlight down the center of his

13  nose with the little square of light that I -- the opening

14  that I made in the black fabric above it in order to get a

15  stripe or a highlight down the center of his nose and it's

16  replicated in the tattoo.  If I had not done that, there

17  would be no highlight there.  The nose would appear to be a

18  different shape.  These noses are the same shape.

19  Q.   And what about the shadows on the side of the nose?

20  A.   It's really a shadow beneath the nose because of where

21  I placed the opening in the tent that I made essentially and

22  so it casts a very particularly shaped shadow below the nose

23  and that shadow was duplicated in the tracing and then when

24  the tracing was transferred to Mr. Farmer's skin, it's

25  duplicated on the skin.

1    Q.   Is Ms. Von D's rendering of your depiction of

2    Mr. Davis' smile lines similar?

3    A.   Are you referring to the labial folds at the side of

4    his face?

5    Q.   You know, I had to look that word up but yes.

6    A.   Yes.  Those are the lines that come off the corner of

7    the crease of his nose and down diagonally toward the

8    outside of the corner of his mouth are duplicated.

9    Q.   Is Ms. Von D's rendering of your depiction of the ear

10   on the left side of the portrait similar?

11   A.   Yes.  The ear was covered with hair when I began making

12   the photographs.  I walked in and up to Mr. Davis, requested

13   his permission to move his hair away from his ear so that I

14   could have some visual interest there, and it's duplicated

15   in the tattoo.

16   Q.   Is Ms. Von D's omission of the ear on the other side of

17   the portrait similar?

18   A.   Yes.  I turned his face to one side.  I didn't want to

19   have two ears in my photograph and felt that this was the

20   best presentation.

21   Q.   Is Ms. Von D's rendering of your depiction of the lips

22   similar?

23   A.   Yes.  The lips are in a certain shape that occurs when

24   you tense your face and purse your lips and I had him do

25   that at the moment that I captured the photograph.

1    Q.   Is Ms. Von D's rendering of your depiction of

2    Mr. Davis' forefinger similar?

3    A.   Yes.  I had him raise and lower his forefinger until

4    the side of his nail matched the crease between his lips.  I

5    was going for this musical note subliminal message that I

6    don't know if it really came across consciously but that was

7    my goal and that is duplicated in the tattoo.

8    Q.   Is Ms. Von D's rendering of your depiction of the

9    position at which the forefinger crosses the lips similar?

10   A.   Yes.

11   Q.   Is Ms. Von D's rendering of your depiction of the

12   middle finger similar?

13   A.   Yes.  Mr. Davis' fingers do not naturally take that

14   position.  I found when he makes a shush pose, I suppose you

15   could say, his fingers were all balled up so I requested his

16   permission to come in and position his fingers for the

17   photograph.

18          And I raised -- I separated his fingers out of a

19   ball, essentially a fist, and raised the middle finger up so

20   that it bisected the angle between his forefinger and the

21   ring finger so that there was a cascade of fingers.

22   Q.   What about the knuckles?

23   A.   The knuckles are duplicated in the tattoo.

24   Q.   What about the rendering of the pinkie finger?

25   A.   Counselor, this copy is pretty blurry on my screen and

1   I had provided a high-resolution copy.  I can't really see

2   the similarity in this particular copy but the fingernail

3   is -- the fingernail on the pinkie finger is in the same

4   position exactly and -- of the same profile exactly as it is

5   in my photograph.  The bend of the pinkie finger is the same

6   as is the ring finger.

7   Q.   What about the side of the hand?

8   A.   Yes.  The highlight on the side of the hand which is

9   being caused by the -- or being created by the pieces of

10  white foamcore 4X8 feet that are behind me and reflecting

11  the noonday sun back into the front of the photograph create

12  a highlight on the side of the hand that's replicated in the

13  tattoo.

14  Q.   All right.  Are there more similarities?  I won't go

15  through every single --

16  A.   Yes.

17  Q.   Just, in general, are there more?

18  A.   Yeah.  Including the collar on the jacket that I chose

19  for him.  You can't really see it very well in this copy of

20  the photograph; but the collar in the photograph -- the

21  collar is there in the photograph and it's replicated in the

22  tattoo.

23  Q.   Did you make choices when you made this photograph?

24  A.   Thousands and thousands of choices.

25  Q.   And are those choices that you made when you created

1   your photograph depicted in the tattoo?

2   A.   Every choice of selecting and coordinating and

3   arranging the elements in this photograph results in the

4   original expression that comes out of all those subjective

5   creative choices.

6   Q.   Does your portrait evoke a sense of drama, moodiness,

7   or melancholy?

8   A.   Drama, yes.  Moodiness, yes.  Melancholy, yes.  But

9   melancholy is going to be in the eye of the beholder.  You

10  know, when you look at the Mona Lisa, some people think that

11  she's smiling and some people think that she's frowning.

12  And it depends on their mood and who they are and what their

13  life experience is.

14        But there is -- there's a sense of intensity and

15  melancholy.  That somebody might look at this and say it's a

16  beautiful, graceful portrait.  Other people might think it's

17  an intense, stern portrait.  It's really where are they

18  coming from?

19        And I -- I, you know, I created this depiction of

20  him and shaped it and, you know, like a sculptor and then

21  people can perceive that sculpture however they might.

22  Q.   Does that tattoo evoke the same sense of drama and

23  moodiness?

24  A.   Yes.

25  Q.   Does your portrait contemplate movement?

1    A.   I tried to get it to appear as if he just raised his

2    hand and made that gesture so that -- you know, it's a still

3    photograph; right?  It's one frame.  It's a two-dimensional

4    image, not a moving picture.

5         But you can create the feeling of a captured

6    moment and capture that decisive movement as if he just

7    moved into that position, which I had him do.

8    Q.   Now let's go to Exhibit 305.

9         *(The exhibit was displayed on the screen.)*

10   Q.   You had talked about different versions of the

11   photograph.  What is Exhibit 305?

12   A.   Exhibit 305 is the same photograph printed lighter

13   print and the middle one is my typical presentation of the

14   photograph and the darker one is another presentation of the

15   photograph.

16        And for some usages like for a newspaper use, I

17   might give them the one on the left because newspapers, when

18   they print, the ink sinks into the newsprint and shadows go

19   really dark and it could get too dark if I gave them the one

20   in the center or the one on the right.

21        And the point is that the photograph doesn't have

22   any one presentation.  Making something darker or lighter

23   doesn't change it.  The photograph has a spectrum at which

24   you can present it.

25   Q.   Do other photographs of Miles Davis exist?

1   similar?

2   A.   Yes.

3   Q.   What about the hairline?

4   A.   The hairline against his forehead including the

5   highlight on the right side along the edge of his forehead

6   where there's a bright area, that's very unique to this

7   photograph because of the way that I shaped the light coming

8   in there, is duplicated.

9   Q.   Is Ms. Von D's rendering of your depiction of the

10  eyebrows similar?

11  A.   I'm just taking a moment.  *(Pause.)*  Yes.

12  Q.   Is Ms. Von D's rendering of your depiction of the

13  center of his brow similar?

14  A.   Yes.  That's the -- the vertical line is the furrows

15  that I was after that I think I saw in my research.  He was

16  in an episode of *Miami Vice* and furrowed his brow.  He was

17  playing a gangster.  I saw that.

18          And so when I talked to him, I had him tensing up

19  to try and get that furrow going.

20  Q.   Let's go to Exhibit 315.

21          *(The exhibit was displayed on the screen.)*

22  Q.   What is Exhibit 315?

23  A.   Those are Miles Davis' eyes from my photograph.  I made

24  a screenshot or I blew up the photograph from the tattoo --

25  the photograph of the tattoo from Instagram or Facebook --

1  and then I blew up the -- or magnified the eyes from my

2  portrait.

3          And as I mentioned yesterday, in the eyes, if you

4  look closely, you can see me in Mr. Davis' eyes and my

5  tripod and my assistant standing next to me and the white

6  cards that I mentioned yesterday behind me to break up the

7  highlight so that there was like little white dots in his

8  eyes which photographers strive for to kind of add a sparkle

9  to the eyes.

10         It's a little difficult to do when you're outside,

11 but my approach was to use these white cards behind me and

12 to stand in front of them so that we had these little white

13 dots in his eyes instead of a large white area or just

14 having very dark eyes.

15 Q.   And are those white dots from the photograph similar to

16 the white dots in the tattoo?

17 A.   From the -- in the left eye, we have the reflection of

18 the white foamcore card in the tattoo on the left side and a

19 reflection on the right side and then my silhouette in the

20 middle although I can't say that Ms. Von D recognized that

21 it was me in the eyes when she placed that.

22 Q.   Is Ms. Von D's rendering of your depiction of the eye

23 direction or gaze similar?

24 A.   Yes.  The eyes are in the same position.  The pupils

25 and the irises are directed in the same position.

1  Q.   Is Ms. Von D's rendering of your depiction of the

2  eyelids similar?

3  A.   Yes.

4  Q.   Is Ms. Von D's rendering of your depiction of the lower

5  eyelids similar?

6  A.   Yes.

7  Q.   All right.  Let's go back to the exhibit we were just

8  looking at.

9            *(The exhibit was displayed on the screen.)*

10  Q.   Is Ms. Von D's rendering of your depiction of

11  Miles Davis' nose similar?

12  A.   Yes.  I placed that highlight down the center of his

13  nose with the little square of light that I -- the opening

14  that I made in the black fabric above it in order to get a

15  stripe or a highlight down the center of his nose and it's

16  replicated in the tattoo.  If I had not done that, there

17  would be no highlight there.  The nose would appear to be a

18  different shape.  These noses are the same shape.

19  Q.   And what about the shadows on the side of the nose?

20  A.   It's really a shadow beneath the nose because of where

21  I placed the opening in the tent that I made essentially and

22  so it casts a very particularly shaped shadow below the nose

23  and that shadow was duplicated in the tracing and then when

24  the tracing was transferred to Mr. Farmer's skin, it's

25  duplicated on the skin.

1  Q.   Is Ms. Von D's rendering of your depiction of
2  Mr. Davis' smile lines similar?
3  A.   Are you referring to the labial folds at the side of
4  his face?
5  Q.   You know, I had to look that word up but yes.
6  A.   Yes.  Those are the lines that come off the corner of
7  the crease of his nose and down diagonally toward the
8  outside of the corner of his mouth are duplicated.
9  Q.   Is Ms. Von D's rendering of your depiction of the ear
10  on the left side of the portrait similar?
11  A.   Yes.  The ear was covered with hair when I began making
12  the photographs.  I walked in and up to Mr. Davis, requested
13  his permission to move his hair away from his ear so that I
14  could have some visual interest there, and it's duplicated
15  in the tattoo.
16  Q.   Is Ms. Von D's omission of the ear on the other side of
17  the portrait similar?
18  A.   Yes.  I turned his face to one side.  I didn't want to
19  have two ears in my photograph and felt that this was the
20  best presentation.
21  Q.   Is Ms. Von D's rendering of your depiction of the lips
22  similar?
23  A.   Yes.  The lips are in a certain shape that occurs when
24  you tense your face and purse your lips and I had him do
25  that at the moment that I captured the photograph.

1    your photograph depicted in the tattoo?

2    A.   Every choice of selecting and coordinating and

3    arranging the elements in this photograph results in the

4    original expression that comes out of all those subjective

5    creative choices.

6    Q.   Does your portrait evoke a sense of drama, moodiness,

7    or melancholy?

8    A.   Drama, yes.  Moodiness, yes.  Melancholy, yes.  But

9    melancholy is going to be in the eye of the beholder.  You

10   know, when you look at the Mona Lisa, some people think that

11   she's smiling and some people think that she's frowning.

12   And it depends on their mood and who they are and what their

13   life experience is.

14        But there is -- there's a sense of intensity and

15   melancholy.  That somebody might look at this and say it's a

16   beautiful, graceful portrait.  Other people might think it's

17   an intense, stern portrait.  It's really where are they

18   coming from?

19        And I -- I, you know, I created this depiction of

20   him and shaped it and, you know, like a sculptor and then

21   people can perceive that sculpture however they might.

22   Q.   Does that tattoo evoke the same sense of drama and

23   moodiness?

24   A.   Yes.

25   Q.   Does your portrait contemplate movement?

1    Q.   Is the use of your photograph as a reference for a

2    tattoo like this one something that you license to others?

3              MR. GRODSKY:   Objection.   This is asked and

4    answered.

5              THE COURT:   We've heard this before.

6                    *(Pause in the proceedings.)*

7    BY MR. ALLEN:

8    Q.   All right.   Mr. Sedlik, I'd like to talk to you a

9    little bit about all the different ways that you have

10   licensed and sold the photograph.

11             We've already talked about a few of them.   We've

12   talked about how you've licensed the photograph for an

13   artist reference?

14   A.   Yes.

15   Q.   And we've shown the posters that you've sold of the

16   photograph?

17   A.   Yes.   Those are not a license to someone else but you

18   said licensed and sold, and my company sells copies licensed

19   by the Miles Davis Estate of my photograph.

20   Q.   And you've sold prints as fine art?   Let's go to

21   Exhibit 250.

22             *(The exhibit was displayed on the screen.)*

23   Q.   Is Exhibit 250 an example of one of your fine art sales

24   or a place where you sell the Miles Davis photo?

25   A.   Yes.   It's an offering of original photographic prints

1    on a site that's basically an online gallery.  And there are

2    multiple galleries like that and, of course, physical

3    galleries around the world.

4    Q.   And we saw earlier the T-shirts.  You've licensed the

5    photograph to be printed on T-shirts?

6    A.   T-shirts and neckties and hoodies, other types of

7    garments.

8    Q.   And you've licensed the photograph for use in

9    magazines?

10   A.   Many magazines, yes.

11   Q.   And you've licensed the photograph for use in press

12   kits for news media?

13   A.   Yes.

14   Q.   And you've licensed the photograph in TV shows?

15   A.   Yes.

16   Q.   You've licensed the photograph in movies?

17   A.   Yes, many movies.

18   Q.   And when you license it for a movie, is that in the

19   background in a scene in a movie?

20   A.   It could be in the foreground or the background and

21   that does affect the price.  But film companies come to me

22   before they produce a film; and if they're going to use my

23   poster or a print of my photograph, they want to make a

24   print to have in a character's home, for example.

25        They come and they have to do what's called rights

 1   clearance and so they will ask me for permission to use the

 2   photograph or the poster in the film, on the wall usually,

 3   or to have somebody wear it on a T-shirt as we saw yesterday

 4   in a film.

 5              They've bought the poster, they've bought the

 6   T-shirt, but they don't have the right to include it in this

 7   other medium without asking and purchasing a license or

 8   acquiring a license.

 9              So they ask and I ask about what the scene is

10   going to be.  If it would be derogatory to, for example,

11   Mr. Davis, anything like that because I have to be careful

12   because I have a relationship with the family and if it's

13   acceptable use, then I license the right for it to appear in

14   the film.

15   Q.   What about street furniture?

16   A.   Yes.  Street furniture -- well, you can ask me what

17   that means.

18   Q.   What exactly is -- I was going to ask you.  What

19   exactly is street furniture?

20   A.   It's a term that's used in the photography licensing

21   industry to refer to things that go on the street on which

22   photographs can appear like a bus bench or a bus stop and

23   directional signs.

24              And in a town in France in which Mr. Davis played

25   a famous concert -- I don't know how to say it so I won't

| | |
|---|---|
| 1 | embarrass myself trying to pronounce the French name of the |
| 2 | town -- but they wanted to put up a sculpture as street |
| 3 | furniture in the center of the square of the town of my |
| 4 | photograph, and they came to me to license those rights. |
| 5 | Q.   What about music videos? |
| 6 | A.   Yes, my photograph has appeared in music videos. |
| 7 | Q.   What about on the covers of -- for record albums? |
| 8 | A.   It's appeared on the covers of two or three albums and |
| 9 | also on the inside in booklets that used to come with CDs. |
| 10 | Q.   What about museums? |
| 11 | A.   Yes.  The Missouri Museum of History came to me because |
| 12 | they wanted to include the photograph in the museum for a |
| 13 | retrospective on Miles Davis' life and they wanted to make |
| 14 | an 8 foot high by 4 foot print, which is rather large, and |
| 15 | they licensed the right to display it in the museum even |
| 16 | though the museum was operated for nonprofit purposes. |
| 17 | Q.   If your business relies on revenue from people and |
| 18 | companies who use your work, does unlicensed use of your |
| 19 | work damage your business? |
| 20 |         MR. GRODSKY:  Objection; relevance. |
| 21 |         MR. ALLEN:  Fourth factor. |
| 22 |         THE COURT:  Overruled. |
| 23 |         THE WITNESS:  Yes.  Because of my exclusive right |
| 24 | to reproduce -- |
| 25 |         THE COURT:  Well, I think you need to -- |

1    for the use of your photograph in a painting?

2    A.   Yes.  And unlike that previous license which was in

3    2005 dollars, I think.  I think that was a 2005 license.

4    And I'm not positive this is a 2021 license.

5    Q.   And talk -- up, up, up.  Sorry.

6              *(The exhibit was displayed on the screen.)*

7    Q.   One more.  One more.

8              *(The exhibit was displayed on the screen.)*

9    Q.   There it goes.  Base license fee.  And the base license

10   fee for that license to use your photograph as an artistic

11   reference is 20,000?

12   A.   Right.

13   Q.   And then we also looked at the Vanegas license which

14   was 321?

15             *(The exhibit was displayed on the screen.)*

16   Q.   And if we scroll down, the license fee was initially

17   5,000 and you reduced it to zero?

18   A.   The 5,000 was my standard fee for artist reference and

19   it can fluctuate up and down depending on the circumstances

20   and the use; and I, for the reasons described yesterday,

21   provided a credit to Mr. Vanegas against that.

22   Q.   And that was in 2014?

23   A.   That was 2014.

24   Q.   And I think that you testified yesterday that when you

25   license the Miles Davis photograph for social media, it

1    depends on various factors?

2    A.   It would depend, yes.

3    Q.   And so one of the factors being how many followers are

4    on that particular person's social media account?

5    A.   That's correct.  That's commonplace in the industry.

6    Less than a million followers, more than a million

7    followers, more than ten million followers, and the fee

8    changes based on the number of followers.

9                    *(Counsel conferred.)*

10   BY MR. ALLEN:

11   Q.   All right.  Mr. Sedlik, when someone posts your work on

12   Instagram and they have fewer than a million followers, how

13   much do you charge for a license?

14              MR. GRODSKY:  Your Honor, objection.  Rule FRE

15   1004.  If they have the license agreements, they should

16   bring those.

17              MR. ALLEN:  I just asked him what he charges.

18              THE COURT:  I don't even know if that's a standard

19   answer.  Why don't you lay some background?

20   BY MR. ALLEN:

21   Q.   So you just described that you base your license fee

22   based upon the number of followers that the person has?

23   A.   In part and also other factors like whether or not I'm

24   receiving attribution.

25   Q.   And what if the -- your work is used multiple times in

1    attribution?

2              THE COURT:  You said by use by a follower?

3              MR. ALLEN:  Let me rephrase.

4    Q.   When you issue a license for social media you use for

5    one of your photographs with attributions to a social media

6    user that has greater than a million followers, is there a

7    range of the amount that you charge?

8              MR. GRODSKY:  Objection; relevance.

9              THE COURT:  Overruled.

10             THE WITNESS:  Yes.  And it really depends on the

11   circumstances as you've seen.

12             THE COURT:  All right.  Move on.

13   BY MR. ALLEN:

14   Q.   Is there a number?

15             THE COURT:  Move on.

16   BY MR. ALLEN:

17   Q.   Did you have an opportunity to determine Ms. Von D's --

18   the number of followers Ms. Von D had on her Facebook

19   account?

20   A.   Yes.

21   Q.   And was it greater than ten million?

22   A.   Yes.

23   Q.   And when you typically charge licenses for social media

24   use to a user that has over ten million followers, what do

25   you typically charge for a license to use one of your

1   Q.   Ms. Gittins, do you recognize this screenshot?

2   A.   Umm, yeah.  It looks like a text.

3   Q.   Is this a text message chain that you were a part of?

4   A.   Yeah.  It looks like a text message from me but I can't

5   be sure.

6   Q.   Do you know the person at the top, JD Stain Glass, Raul

7   Aleman?

8   A.   Umm, I don't really remember them but, umm, yeah.

9   Q.   Do you see the first message says:  Kat no longer

10  charges for tattoos?

11  A.   Yes, that's correct.

12  Q.   And it continues:  But does ask for you to bring a tip

13  for the shop helper Alex between $100 and $150?

14  A.   Uh-huh, yes.

15  Q.   Do you recall sending a message like this?

16  A.   Umm, I'm not -- yeah.  I think I sent this one.  I'm

17  not sure.  I think I did.  I'd have to check my phone

18  because I don't really remember the Raul Aleman, but yeah.

19  Q.   But you would have been the one to coordinate between

20  Ms. Von D's clients coming into the shop for a tattoo and

21  Ms. Von D?

22  A.   Yes.

23  Q.   And you would have provided instructions to the clients

24  on how to get ready for the session and when to arrive,

25  et cetera?

1   A.   Yes.

2   Q.   Can we scroll down a little bit?

3        *(The exhibit was displayed on the screen.)*

4   Q.   There are a few other messages in this chain.  It says:

5   Kat is super-stoked to be tattooing you.  It's going to be

6   amazing.  Do you see that?

7   A.   Yep.

8   Q.   And then it says:  Were you planning on bringing your

9   son or coming solo?

10  A.   Yes.

11  Q.   And then:  Okay.  Sounds good.  Please text me with any

12  questions at all.  I am here for you and it's going to be

13  awesome.

14       Do you recall sending these messages?

15  A.   I don't recall sending these exact ones because I don't

16  really remember that person but that sounds like something I

17  would say, yeah.

18  Q.   Can we go back up to the top?

19       *(The exhibit was displayed on the screen.)*

20  Q.   The tip amount, $100 to $150.

21  A.   Uh-huh.

22  Q.   Is that something that you were instructed to do by

23  Ms. Von D?

24  A.   No.  That would be like -- I'm trying to give guidance

25  to people about the voluntary tip, you know.  If someone

353

1   A.    Uh-huh.

2   Q.   Is that something --

3          THE COURT:  Would you please answer "yes" or "no"?

4          THE WITNESS:  Oh, sorry.  Yes.

5   BY MR. LINGER:

6   Q.   Is that something you would have told Kyle before

7   coming into the tattoo shop?

8   A.    Yes.  I would have told anyone that.

9   Q.   And then do you see in the second blue message it says:

10  If it's okay with you, we do ask you bring a tip for shop

11  manager of $100 to $150 in cash.  Let me know if that works

12  for you.

13          Do you see that?

14  A.    Yes.

15  Q.   So this is another example of you asking for a tip?

16  A.    Yes.  But it was voluntary so that's why I said:  If

17  it's okay with you and let me know if that works.

18  Q.   And this person agreed to bring in the tip?

19  A.    Yeah.

20  Q.   Can you scroll down?

21          (The exhibit was displayed on the screen.)

22  Q.   You see the message that's hearted starting with so?

23  A.    Yes.

24  Q.   And then the one below it?

25  A.    Yes.

1  A.   I do.  I just looked at it outside on my phone as well.

2  Q.   Okay.  And if you scroll down, you'll see on your phone

3  there also appear this drawing which -- I don't know -- it

4  appears to be maybe an album cover?

5  A.   This is the album *Miles Davis Bitches Brew*.

6  Q.   Okay.  And then if you go to the next page, please,

7  you'll also see there's a photographs there.

8  A.   Correct.

9  Q.   Did you send these to Ms. Gittins?

10  A.   I did.

11  Q.   And why did you do that?

12  A.   Because we were -- I was asked to provide the artwork

13  so I did.

14  Q.   Okay.  And why did you provide both of these?

15  A.   At some point we had talked about a larger scheme of

16  tattoos that involved the album artwork but the main -- the

17  first element was the portrait.

18  Q.   And the photo here, is this something that you selected

19  or that Ms. Von D selected?

20  A.   I selected it.

21  Q.   All right.  Did you pay Ms. Von Drachenberg anything

22  for this tattoo?

23  A.   I did not pay her for the tattoo.  I gave the shop

24  manager, or whomever it was that set up her station, a tip

25  as requested.

1   history.  It made sense for me.

2   Q.   Do you recall where you found those two artwork pieces

3   that you sent to Ms. Gittins?

4   A.   No, not really.  I mean, it was a Google search.  The

5   Google image search that yielded -- the album artwork, of

6   course, is on the album but the photo is, to this day,

7   available on a Google image search.

8   Q.   Was there anything in particular about Mr. Sedlik's

9   photograph that you liked?

10  A.   I liked that it was simple.  Most other ones had him

11  playing the trumpet which wouldn't be suitable for an

12  arm-piece, I didn't think.

13  Q.   So you didn't want a tattoo with a trumpet on it?

14  A.   No.

15  Q.   Did you like the position of Davis' hand?

16  A.   Yeah, sure.

17  Q.   Did you like his facial expression?

18  A.   Yeah.

19  Q.   And you wanted those elements in your tattoo?

20  A.   Yes.

21  Q.   You mentioned you were thinking about creating a larger

22  scheme of Davis tribute tattoos.  Did you ever conduct

23  further work on that scheme?

24  A.   No, we didn't.

25  Q.   So it was just the tattoo that you showed to the jury?

1   video on Instagram; is that right?

2   A.   Yeah.  I don't run the High Voltage or I don't have a

3   shop anymore.  But when we did have our tattoo shop, I never

4   ran the social media.  So that was either posted by another

5   artist, a shop helper, somebody at the shop.

6           MR. ALLEN:  Move to strike, Your Honor, as

7   nonresponsive.

8           THE WITNESS:  Oh, sorry.

9           THE COURT:  Overruled.

10  BY MR. ALLEN:

11  Q.   And when did you start tattooing?

12  A.   When did I start tattooing in general?

13  Q.   Yes.

14  A.   I started tattooing at the age 14.  That was my first

15  tattoo.

16  Q.   And you've inked thousands of tattoos over your career;

17  correct?

18  A.   Correct.

19  Q.   And you've worked at various tattoo shops; correct?

20  A.   I have.

21  Q.   You consider yourself a professional tattoo artist;

22  right?

23  A.   Yes.

24  Q.   And you opened your tattoo shop on April 1st, 2007;

25  is that right?

1    A.    Yes.

2    Q.    And when you opened your shop, you started a company

3    called High Voltage Tattoo, Inc.; is that right?

4    A.    It was called High Voltage Tattoo.

5    Q.    But the company --

6    A.    Uh-huh.

7    Q.    -- was called High Voltage Tattoo, Inc.; is that right?

8    A.    Incorporated, yeah.

9    Q.    And you filed documents or you had filed documents with

10   the Secretary of State of California designating Brad Lyon

11   as your agent of service of process; isn't that right?

12   A.    Yeah.  I don't really understand those titles but

13   Brad Lyon is my accountant and he helps me do payroll and

14   run my tattoo -- well, he helped me run my tattoo shop when

15   I had it.

16   Q.    Do you understand that by having your company designate

17   him as a designated agent, that means he is empowered to

18   receive legal documents on behalf of the company?

19   A.    Okay, yeah.  Yeah, sorry.  I didn't know that that was

20   the term but, yeah, he can sign for me on certain things and

21   he -- yeah.

22   Q.    And High Voltage Tattoo, Inc, was your company;

23   correct?

24   A.    Yes.

25   Q.    And you owned it a hundred percent?

1    A.    Yes.

2    Q.    And you were also an employee of that company; correct?

3    A.    Yes.  Or I don't know what that means.  Like I worked

4    there.  I did tattoos at my shop, yes.

5    Q.    But you have testified previously that you were an

6    employee of High Voltage Tattoo; is that right?

7    A.    Yes.

8    Q.    And you have a brand through High Voltage Tattoo; isn't

9    that right?

10   A.    What does that mean?

11   Q.    Do you consider that you have a brand relating to your

12   tattoo work through High Voltage Tattoo?

13   A.    Sure.

14   Q.    And you also had a show on TLC called *L.A. Ink*; right?

15   A.    Yes.  I didn't own that, though.  That's Discovery

16   Channel.

17   Q.    And it premiered on August 7th, 2007?

18   A.    I have no idea.  I don't remember when it premiered.

19   Q.    And you became very popular and well-known through that

20   show; isn't that right?

21   A.    And other venues as well, yes.

22   Q.    And it followed the events of High Voltage Tattoo

23   studio in L.A.?

24   A.    Yes.

25   Q.    Was filmed there?

1  A.    Yes.

2  Q.    And you were also an employee of that company; correct?

3  A.    Yes.  Or I don't know what that means.  Like I worked

4  there.  I did tattoos at my shop, yes.

5  Q.    But you have testified previously that you were an

6  employee of High Voltage Tattoo; is that right?

7  A.    Yes.

8  Q.    And you have a brand through High Voltage Tattoo; isn't

9  that right?

10  A.    What does that mean?

11  Q.    Do you consider that you have a brand relating to your

12  tattoo work through High Voltage Tattoo?

13  A.    Sure.

14  Q.    And you also had a show on TLC called *L.A. Ink*; right?

15  A.    Yes.  I didn't own that, though.  That's Discovery

16  Channel.

17  Q.    And it premiered on August 7th, 2007?

18  A.    I have no idea.  I don't remember when it premiered.

19  Q.    And you became very popular and well-known through that

20  show; isn't that right?

21  A.    And other venues as well, yes.

22  Q.    And it followed the events of High Voltage Tattoo

23  studio in L.A.?

24  A.    Yes.

25  Q.    Was filmed there?

387

1    possible; isn't that right?

2    A.    I try to capture the sentiment of the people that I'm

3    tattooing.

4    Q.    I'm not asking about the sentiment.  I'm asking you

5    about if you're trying to make the portrait look as accurate

6    to the person as possible in the photo?

7    A.    Sure, yes.

8    Q.    And good photographs make great tattoos, don't they?

9    A.    They do.  Bad ones do as well, though.  Some of them.

10   I've done blurry photos that have come out beautiful.

11   Q.    And you've worked in tattoo shops that had flash books,

12   haven't you?

13   A.    In my younger years.

14   Q.    And a flash book is a collection of tattoos, designs,

15   by an artist that the artist makes available for others to

16   use as a reference?

17   A.    So I'm just going to correct myself because I have

18   worked in shops that have had flash; and I think, like the

19   example that you brought up the other day as a flash book,

20   that's not very common in tattoo shops.

21        So like if you do go to a tattoo shop that's

22   considered a street shop, you'll see walls with these --

23   they're kind of like panels of sheets and they have like

24   tattoo designs that people can select images from or get

25   inspiration from or whatever.  Those are typically -- oh,

1  Q.   And flash books give permission for the author's design

2  to be used as a reference as a tattoos, don't they?

3  A.   Sure.  I don't know what you mean by "permission."

4  Q.   Okay.  Well, let's go to Exhibit 308.

5          MR. GRODSKY:  Excuse me.  That's not been

6  admitted.

7          MR. ALLEN:  I thought that we had.  I thought that

8  it needed to be authenticated.

9          MR. GRODSKY:  You're right as long as the page --

10          MR. ALLEN:  Yes, yeah.  All right.

11          Can you scroll up a little bit?  I mean, zoom out

12  a little bit?

13          *(The exhibit was displayed on the screen.)*

14  Q.   Are you familiar with Tony Ciavarro?

15  A.   Never heard of him.

16  Q.   Okay.  So I'm going to -- this was a flash book that

17  was found in a tattoo shop that Mr. Sedlik found; and if you

18  go to page 2.

19          MR. GRODSKY:  Excuse me.  The second page was what

20  was not agreed to, the language on this page.

21                  *(Counsel conferred.)*

22  Q.   Just show the top part.

23          *(The exhibit was displayed on the screen.)*

24  Q.   Okay.  And do you see that the second --

25                  Okay.  Stop there.  So do you see that this book

1    right?

2    A.    I stopped charging because I wanted to give my tattoos

3    away as a gift.   That's why.

4    Q.    But you could now afford to do that that because of the

5    success in your other businesses; isn't that right?

6    A.    Well, that's a part of it but that's not the reason

7    why.

8    Q.    Okay.   But -- and the answer that was -- was that

9    answer that you gave in your deposition not accurate?

10   A.    It is accurate.   I stopped charging because I wanted to

11   give a gift to whoever I was tattooing.

12   Q.    Because you could no longer -- because you could afford

13   not to anymore; isn't that right?

14   A.    That's -- sure, yes.

15   Q.    And when you were charging, you were charging between

16   1- to $3,000 to get a tattoo done; is that right?

17   A.    I had a $1,000 minimum.

18   Q.    And for -- and to tattoo the Miles Davis portrait on

19   Mr. Farmer, had you been charging, you would have charged

20   about $3,000; isn't that right?

21   A.    Maybe more.   I don't know.

22   Q.    All right.   As you testified, High Voltage Tattoo is

23   your shop; right?

24   A.    It is.

25   Q.    And you owned it?

1   A.   It was, yes.

2   Q.   And it cost money to keep it running; isn't that right?

3   A.   Yes.

4   Q.   And you had to pay employees, maintain equipment, and

5   pay rent; right?

6   A.   Yes.

7   Q.   And you had other artists at High Voltage Tattoo who

8   were charging, weren't they?

9   A.   Yep.

10  Q.   They had clients?

11  A.   Yes.

12  Q.   And they paid a portion of the money they earned from

13  tattooing at High Voltage Tattoo to the High Voltage Tattoo?

14  A.   Yes.

15  Q.   Even though you weren't charging a fee for tattoos, you

16  still required people to bring in a tip between $100 and

17  $150; isn't that right?

18  A.   It was a voluntary tip and not everybody tipped and

19  that was just for the shop manager, the shop helper.  It

20  wasn't for me.  I wasn't taking money for tattoos.

21  Q.   Mr. Farmer, you met him on a set of one of your

22  productions?

23  A.   At an interview, yes.

24  Q.   And he's not a friend of yours, is he?

25  A.   I consider him a friend.

399

1   Q.    -- prior to the deposition other than reaching out to

2   him to get his email address for your lawyer; is that right?

3   A.    Yes.

4   Q.    So you had no communication with Mr. Farmer but you

5   consider him your friend.  Is that your testimony?

6   A.    Yes, yeah.  I have tons of friends I don't talk to all

7   the time.

8   Q.    Well, Ms. Von Drachenberg, it's not that you haven't

9   talked to him in a long -- it's not that you haven't talked

10  to him frequently, you hadn't talked to him in five to seven

11  years?

12  A.    Okay.  Yes.  Okay.

13  Q.    Mr. Farmer didn't ask you to make any changes to the

14  photo, did he?

15  A.    Umm, no.  The -- no, no.  I mean, he gave me creative

16  freedom is what -- you know, he just said:  Here.  Go with

17  it.

18  Q.    And Mr. Farmer texted the digital file of the photo to

19  your assistant Rhian; correct?

20  A.    Rhian, yes.

21  Q.    And that was sent on March 1st, 2017?

22  A.    I don't have the text in front of me but I'm sure it's

23  the screenshots we were looking at earlier.

24  Q.    And you didn't reach out to Mr. Farmer directly?  You

25  had your assistant do it; correct?

1   Q.   Okay.  Well, let's go to -- what is it?  249?

2            *(The exhibit was displayed on the screen.)*

3   Q.   And I want you to go to the -- and you never provided

4   Mr. Sedlik a copy of the digital text chain, did you?

5   A.   I'm not sure.  You could ask my lawyers, I guess.

6   Q.   So here is the thumbnail and it's very small and you

7   can't really see if there would be a watermark there because

8   it's so small.  But are -- Mr. Davis' shoulders are in this

9   image, aren't they?

10  A.   It appears so.

11  Q.   Okay.  So let go back to comparison.

12           *(The exhibit was displayed on the screen.)*

13  Q.   So this image attached to your lamp can't be the

14  original photo, can it?

15  A.   It doesn't look like it but I'm not the one who printed

16  it so we'd have to figure out who that person was.

17  Q.   So you agree with me that it has been cropped on the

18  right and the left; is that right?

19  A.   It looks like it.

20  Q.   And you also agree with me that it has been cropped on

21  the bottom?

22  A.   It appears so.

23  Q.   And so if you or your shop manager cropped the photo,

24  it would have cut out the watermark, wouldn't it?

25  A.   I guess so.  I mean, I don't know.

1   A.   What do you mean?

2   Q.   What you just described as what his intent was, was it?

3   A.   No, we knew that was the intent.  It just looks like I

4   wasn't in town.

5           MR. ALLEN:  Move to strike, Your Honor --

6           THE WITNESS:  Oh, sorry.

7           MR. ALLEN:  -- as speculative and nonresponsive.

8           THE COURT:  No.

9   BY MR. ALLEN:

10  Q.   After Mr. Farmer gave you or sent you a copy of the

11  photo, you used it as a reference; right?

12  A.   Pardon?  Sorry.  Sorry.

13  Q.   After you received a copy of Mr. Sedlik's Miles Davis

14  photo, you used it as an artist reference, didn't you?

15  A.   Yes.

16  Q.   And you created a depiction of Miles Davis based on

17  that photograph; is that right?

18  A.   Yes.

19  Q.   You didn't try to figure out who the photographer was,

20  did you?

21  A.   No, it's never been common in the tattoo world.

22  Q.   You didn't ask Mr. Farmer about the artist who created

23  the photo, did you?

24  A.   No.  Neither of us knew who it was.

25  Q.   You didn't ask him if he had permission from the artist

414

```
 1   Q.   Well, let's show Video 4.  It's not -- it's a --
 2                  (Pause in the proceedings.)
 3   Q.   All right.  We'll come back to that.
 4            You didn't ask Mr. Farmer where he got the photo,
 5   did you?
 6   A.   No, but he did mention he Googled it.
 7   Q.   And you didn't search on the Internet to see who the
 8   artist was?
 9   A.   No.
10   Q.   And you didn't ask anyone at High Voltage Tattoo to
11   conduct any searches?
12   A.   Not at all.
13   Q.   You didn't obtain a license from Mr. Sedlik to use the
14   photo an artist reference, did you?
15   A.   No.
16   Q.   You didn't obtain a license from Mr. Sedlik to create a
17   copy of his photo, did you?
18   A.   No.
19   Q.   And we've established that you printed the photo;
20   right?
21   A.   I don't know if it was physically me but somebody at my
22   shop or myself may have, yes.  We printed it off the image
23   that Blake sent.
24   Q.   And from that photo, you created line drawing with it;
25   is that right?
```

1    A.    I did.

2    Q.    You traced it.  You traced the photo?

3    A.    I wouldn't call it tracing a photo because it's kind of

4    hard to trace a photo.  It's not a sticker.  I was mapping

5    it out.

6    Q.    Okay.  When -- you've been in the courtroom when we

7    showed the video of you with the lightbox tracing the photo;

8    correct?

9    A.    Yes.  I'm pinpointing spaces that I'm going to follow,

10   yes.

11   Q.    Oh, okay.  The video is ready.  Let's to back to Nikko.

12                  *(The videotape was played.)*

13   Q.    That was from your show; correct?

14   A.    Yeah.  From *L.A. Ink*.  I don't own *L.A. Ink*.

15   Q.    I understand.  But that was taken at your shop; right?

16   A.    Yes, yes.

17   Q.    That was at your shop?

18   A.    Yes, yes, uh-huh.

19   Q.    Does that refresh your recollection of Nikko creating

20   that tattoo?

21   A.    None at all because when we film tattoos, as you

22   notice, there's nobody else in the room except the artist

23   and the person getting a tattoo.  So I wasn't there when

24   that tattoo happened and I didn't watch my own show.

25   Q.    Let's go to 228.

```
 1              (The exhibit was displayed on the screen.)

 2   Q.   So the tracing that you made is on the right; is that

 3   right?

 4   A.   Correct.

 5   Q.   And that's on tracing paper; correct?

 6   A.   Yeah.  We call it parchment, yes.

 7   Q.   But didn't you also having referred to it as tracing

 8   paper?

 9   A.   I don't know if I've ever called it that but, yeah, in

10   the tattoo industry we call it parchment but I'm sure it

11   means the same thing.

12   Q.   And Mr. Sedlik's photo is on the left; right?

13   A.   Yes.

14   Q.   When you put the -- when Mr. Sedlik put the two on top

15   of each other, they match up exactly, don't they?

16   A.   Uh-huh.

17   Q.   Is that a "yes"?

18   A.   I mean, yeah, I think there's similarities, yeah.

19   Q.   When you sketch as opposed to trace, you don't have a

20   reference photo right under it, do you?

21   A.   Sometimes I do.  When I sketch?  Yeah, sure.  We use

22   lightboxes all the time.

23   Q.   So after you created this tracing of Mr. Sedlik's

24   photo --

25   A.   Yeah.  We refer to it as a line drawing, yeah, in the
```

1     tattoo world.

2     Q.    Okay.  But it's still a tracing of the photo; correct?

3     A.    Sure.

4     Q.    After you've created the tracing of Mr. Sedlik's photo,

5     you convert that onto thermal paper; is that right?

6     A.    Yes.

7     Q.    And then you produce that thermal paper onto

8     Mr. Farmer's arm; right?

9     A.    Yes.

10    Q.    And sort of like a temporary tattoo?

11    A.    It's called a stencil, yes.

12    Q.    All right.  Let's go back to 213.

13              *(The exhibit was displayed on the screen.)*

14    Q.    So this is a shot of you.  I think you call it the

15    progress shot; is that right?

16    A.    I don't know what they've labeled it.

17    Q.    So you're in the middle of a tattooing in this photo;

18    is that right?

19    A.    Yes.

20    Q.    And if you look down by Mr. Miles Davis' hand --

21    A.    Uh-huh.

22    Q.    -- that is the stencil part that has yet to be inked

23    in; is that right?

24    A.    No, that's actually called the blood line.  And so at

25    this point the stencil is already gone.  So if you were to

1    Q.    So the question was --

2    A.    Oh.

3    Q.    Your interpretation doesn't start until after the

4    stencil is applied to Mr. Farmer; and you said "yes."

5    A.    Yeah, that's what I said in my deposition; correct?

6    Q.    Yes.

7    A.    Yeah.  Okay.  Sorry.  I think I misunderstood.

8    Q.    And while you were doing your shading, again as this

9    photo indicates, the photograph of Mr. Sedlik is right next

10   to you; correct?

11   A.    Yes.

12   Q.    And you didn't add any new composition to the tattoo

13   that wasn't in the photo already, did you?

14   A.    Oh, no, I did.  There's definitely my composition that

15   you can see on Blake's tattoo like I did a bunch of texture

16   and movement around it that is not included in the original

17   photo.

18           And that was -- that's like the setup for the rest

19   of the sleeve and what it was going to be like; and I was

20   actually trying to bring in from the album artwork, if you

21   looked at it, to bring some of that movement in that wasn't

22   in the tattoo so yeah.

23   Q.    Both were of Miles Davis; right?

24   A.    Pardon?

25   Q.    Both the photo and the tattoo are of Miles Davis;

1    A.    Yes.

2    Q.    Doing your shading, you claim to have created shadows

3    and highlights; correct?

4    A.    Yeah, I did my own interpretation of the lighting.

5    It's not -- It's not -- I'm not a copy machine.  I can't --

6    physically can't make something exactly the same as a photo.

7    Q.    And the tattoo shadows and highlights match the shadows

8    and highlights of the photo, don't they?

9    A.    A lot of them, yeah.  I wouldn't say all of them,

10   though.

11              *(Plaintiff's counsel conferred.)*

12   Q.    307.  Sorry.  307.  Lot of numbers to keep track of.

13              *(The exhibit was displayed on the screen.)*

14   Q.    Okay.  So shadows exist when an object blocks the

15   pathway of light; isn't that right?

16   A.    Can you repeat that?

17   Q.    Shadows exist --

18   A.    Uh-huh.

19   Q.    -- when an object blocks the pathway of light?

20   A.    Okay, yeah.

21   Q.    You agree with that?

22   A.    Sure.

23   Q.    And I want you to look at the nose of Miles Davis in

24   the photo and the tattoo.

25   A.    Uh-huh.

1          It was -- that's where a lot of motion that you

2     see around the fingers and see how the -- instead of

3     recreating the hair as it was in the photo, I did my own

4     version where it looked like -- almost like smoke and

5     negative space that was going to lead into the album

6     artwork.  So, yeah, I did do my own like additional

7     interpretations.

8     Q.    But you didn't look at any other photos of Miles Davis

9     in putting together the tattoo?

10    A.    Oh, no, no, no.

11    Q.    And you didn't know what Miles Davis even looked like

12    well enough to tattoo without the photo; isn't that right?

13    A.    Right.

14    Q.    And so you just copied the photo to make the tattoo?

15    A.    I did my interpretation of the photo and did my

16    adjustments to it.

17    Q.    And you're a skilled tattooist, aren't you?

18    A.    I feel weird saying that I am but I think I'm pretty

19    good.

20    Q.    And you're able to take a piece of art and copy it into

21    another medium; is that right?

22    A.    I'm not a copy machine so I don't think I -- I mean, I

23    can point out all the things I feel I could have done better

24    actually but, you know, I try my best.

25    Q.    And -- well, copy machines don't copy photos onto skin,

1  Q.   Let's go to page 2.

2         *(The exhibit was displayed on the screen.)*

3  Q.   Can you read the circle?  That's a post by High Voltage

4  Tattoo; correct?

5  A.   Yeah.  And it's in response to somebody named Lennie

6  Vox so it looks like maybe the question has been deleted

7  from Lennie Vox unless it's somewhere else.

8  Q.   No.  It's been deleted but can you read that post?

9  A.   So they wrote:  Nope, it's a hundred percent exactly

10  the same as the reference.  Portraits are traced directly

11  from actual photos.

12  Q.   So that's what your company said; right?

13  A.   Probably one of my shop helpers said that or whoever

14  was running the account that day.

15  Q.   So your company said that the tattoo is a hundred

16  percent exactly the same as the reference photo, doesn't it?

17  A.   Yeah.  I mean, I would say that was bad wording but --

18  because I don't agree with that.  I didn't write it.

19  Q.   But your company did; correct?

20  A.   It's probably one of my shop helpers.  I'm assuming.

21  That's who runs our social media most of the time or a

22  tattooer.

23  Q.   And your company said that you traced directly from the

24  photo; isn't that right?

25  A.   Right.  You have a video of me mapping it out.

451

1    A.    Yeah.

2    Q.    So it's in a different medium; right?

3    A.    Uh-huh.

4    Q.    It's a different design because the letter is reversed;

5    right?

6    A.    Okay.

7    Q.    And it's three-dimensional?

8    A.    Right.

9    Q.    Right?  But you were still upset and felt that Jeffree

10   had stolen from Mr. Betts his artwork; isn't that right?

11   A.    He did.  And then Jeffree paid him back because he knew

12   it was wrong and so -- and he publicly apologized.

13   Q.    HVT has it's own Instagram and Facebook accounts;

14   correct?

15   A.    Yes.

16   Q.    How many followers does High Voltage Tattoo have on

17   Instagram?

18   A.    I don't know.  I've abandoned all of the social media

19   for High Voltage and the website and I've just been waiting

20   for this lawsuit to be over so I can delete all of it.

21   Q.    If I told you there's still 859,000 followers today,

22   would that sound -- would you be surprised by that?

23   A.    It would sound to me that we've lost followers.

24   Q.    How many followers did you have at your peak?

25   A.    I don't know that off the top of my head.

```
 1   Q.    And you closed the shop in 2021; right?

 2   A.    Yes.

 3   Q.    And you still have a lot of followers after being

 4   closed for over two years; right?

 5   A.    I haven't -- I abandoned it so I haven't signed on.

 6   Q.    Do you remember how many followers High Voltage Tattoo

 7   had at the time of your deposition?

 8   A.    Umm, I don't think so but I'm not sure.  I know it was

 9   less than a million.

10   Q.    It was about 914,000?

11   A.    Close to a million, then.

12   Q.    And that was on January 18, 2022?

13   A.    Okay.

14   Q.    And you promoted the tattoo artists at the stop on

15   those social media accounts, didn't you?

16   A.    Yeah.  The shop does.  I don't run the social media for

17   High Voltage so it's whoever is working that shift.  They

18   promote whatever is happening during that time.  It's --

19   it's not Kat Von D's Instagram.  It's High Voltage so and,

20   yes, they promote themselves, yes.

21   Q.    Well, let's talk about the Miles Davis tattoo on social

22   media.

23   A.    Sure.

24   Q.    Your fans said a lot of positive things about it,

25   didn't they?
```

1    A.    I assume so.   I don't spend a lot of time reading too

2    much comments because it can be bad for your health.

3    Q.    Let's go to Exhibit 215.

4              *(The exhibit was displayed on the screen.)*

5    Q.    So the first post here by someone by the name of Mary

6    Miller says, "Holy Moly.  Kat is the queen of portraits.

7    Need a cap by" -- I'm sorry -- "need a tat by Kat."

8              Do you see that?

9    A.    I do.

10   Q.    And further down it says "spectacular."  Another

11   comment is "gorgeous."  Another comment is "amazing."

12   A.    Yeah.

13   Q.    Let's go to 209.

14             *(The exhibit was displayed on the screen.)*

15   Q.    Actually, let's go to 207.

16             *(The exhibit was displayed on the screen.)*

17   Q.    Someone here on 207 says, "How long is the wait to get

18   a tattoo done by you?"  Do you see that?

19   A.    I do.

20   Q.    And go to 213.

21             *(The exhibit was displayed on the screen.)*

22   Q.    And here someone says -- actually, the post itself

23   says, "What musician you would get?"

24   A.    Uh-huh.

25   Q.    Is that a "yes"?

```
 1   A.   Yes.  Sorry.  Yes.
 2   Q.   So it's enticing someone to come get a tattoo of a
 3   musician at High Voltage Tattoo, isn't it?
 4   A.   Not at all.  What we like to do is we like to engage
 5   with our fans and followers.  So we'll usually -- like, I
 6   mean, I know for me personally I like to like sometimes ask
 7   questions like:  Hey, what's your favorite horror movie?
 8   Mine's this.
 9        And it's not that I'm going to make you go see a
10   horror movie.  It's just -- that's called -- it's not
11   antisocial media.  It's like you socialize.  So that's just
12   being cute.
13        Especially considering that I -- I don't take
14   appointments.  I don't do walk-ins.  There's no place that
15   you can go online to book an appointment with me.  There's
16   no -- I can't sell you an appointment.  I just don't do
17   that.
18        So if you notice like:  Hey, how long is the wait
19   for a tattoo by you, there's no response because the truth
20   is that there is no way.  You can't get tattooed by me
21   unless you're my friend.
22   Q.   All right.  But you advertise and promote yourself and
23   your businesses a lot on your social media, don't you?
24   A.   I post for anything that I'm doing.  I like to share
25   with my fans and followers my life.
```

```
1   Q.   But you do more than that, don't you?  You advertise,

2   promote your products, and do what's called --

3   A.   I don't do advertisement on any of my social medias.

4   As far -- there's paid advertisement, I have never done

5   that.  I don't boost my accounts.  I -- none of that.  As

6   far as like I've created projects that I've sold, yeah, you

7   know.

8           I've had a makeup line that people have known

9   about for years.  I no longer have it.  I sold it a long

10  time ago.  And, you know, I have a shoe line.  I had a kid's

11  book that I wrote recently.

12          So like for the kid's book, for example, like

13  people watch me for three months create this kid's book from

14  nothing, from sketches to illustrated finals; and I did a

15  little tattoo page and at the end you got to see my kid

16  reading the book.

17          I share my life with everybody, all aspects,

18  including the projects I create.

19  Q.   I'm going to show you some of the posts from your

20  social media accounts.

21  A.   Sure.

22  Q.   First page is dated September 20th, 2017.

23          (The exhibit was displayed on the screen.)

24  Q.   Do you see that?

25  A.   Is this still on?  This -- oh, oh, this is not on there
```

1   because I was like, when I sold my makeup line, we're not

2   supposed to have anything live anymore so this is probably

3   no longer up; right?

4   Q.   No, it's still up.

5   A.   Oh, it is?  Oh, I should take note of that.  Okay.

6   Q.   It says, "The Saint and Sinner pallet is finally here.

7   This limited edition beauty is available now at

8   katvonbeauty.com."

9   A.   Yeah.

10  Q.   Do you see that?

11  A.   Yes, I do.

12  Q.   And that's an advertisement, isn't it?

13  A.   I don't see it that way.  This is just me announcing

14  like my new creation that I'm releasing.

15  Q.   Someone can go to katvondbeauty, at least in 2017 --

16  A.   Yeah.  That doesn't exist anymore.

17  Q.   -- and click on it and then go purchase it, can't they?

18  A.   Yes, yes.

19  Q.   Let's go to the next page.

20          *(The exhibit was displayed on the screen.)*

21  Q.   And this is a post by you on -- very recently, March 7,

22  2023.

23  A.   Yeah, I auctioned off about a 130 pairs of my shoes to

24  my fans.

25  Q.   And it says, "Click the link in by bio to sign on the

1    Whatnot" --

2    A.    It's the Whatnot app.

3    Q.    Right.  -- "for free if you want to be able to bid on

4    the day of the auction."

5    A.    Yeah.  Like it's -- I don't get paid by Whatnot.  It's

6    -- Whatnot is like a new -- like a social media version of

7    eBay and, basically, it's for people who like to thrift shop

8    and you go up there and you're like:  Here's a shoe for zero

9    dollars and then you guys get to bid on it and then we all

10   talk about it and I'm like live-streaming it.  So that --

11   Q.    Like Poshmark?

12   A.    I've never done Poshmark.  This was my first time ever

13   auctioning stuff.  So I did this with my shoes and then with

14   my sunglasses later.

15        And I would tell stories about the shoes:  Like

16   hey, I kissed my now husband for the first time wearing

17   these; and then, you know, people like to hear the stories

18   of that.  And so Whatnot did not pay me to do it.  I just

19   used them because my friend Candy had done it.  She does

20   like weekly -- like where she purges her closet; and I just

21   thought it would be funny and fun and she came over and we

22   did it together.

23   Q.    But someone who is on your social media account can

24   read this --

25   A.    Uh-huh.

1   Q.   -- go into the bio section --

2   A.   Uh-huh.

3   Q.   -- find the link and go there to go auction or place a

4   bid on a pair of shoes; is that right?

5   A.   Well, not anymore but at the time, yeah, they could.

6   Q.   All right.

7           Okay.  Let's go to the next page.

8           *(The exhibit was displayed on the screen.)*

9   Q.   This is something -- this is a post you made on your

10  Instagram.

11  A.   Yeah, uh-huh.

12  Q.   I'm sorry.  Is it your Instagram --

13  A.   Well, I think, yeah.

14  Q.   -- or Facebook?

15  A.   It's my Instagram.  They're all linked so it's going to

16  be on all of them.

17  Q.   And this is dated September 15th, 2022?

18  A.   Yes.

19  Q.   And you write, "Today is the day.  Get your copy of my

20  first ever kid's book."

21  A.   *Leafar.*

22  Q.   *Leafar and the Magical Treasure Chest.*  Link in bio.

23  A.   Yes.

24  Q.   So if one went into the bio section, there's a link

25  there --

1    A.    Uh-huh.

2    Q.    -- is that right?

3    A.    Yes.

4    Q.    And the link will take you to the website to purchase

5    the book; is that right?

6    A.    Correct.

7    Q.    So you're advertising for the book on your social media

8    account, aren't you?

9    A.    I don't see it as advertisement.  I just -- I'm

10   releasing a book and this is where you can get it.  But I'm

11   not -- it's like for me as somebody who has owned a big

12   corporate company, an advertisement is like an actual

13   campaign that you are purchasing views.  You're purchasing

14   like a commercial ad on Instagram.

15         I've never done that with my own stuff.  Kat Von D

16   Beauty did that on their own during the time that, you know,

17   and I don't know if they still do it because, again, I don't

18   have anything to do with them.

19         But I don't see this as an advertisement.  This is

20   me sharing you the final progress of me creating my first

21   ever kid's book.

22   Q.    You watch TV or have watched TV, Ms. Von D?

23   A.    I don't really watch TV.  I like movies.

24   Q.    Have you ever watched TV?

25   A.    Of course.

1   BY MR. ALLEN:

2   Q.    In this post you're promoting the sale of your book,

3   aren't you?

4   A.    Yes.

5   Q.    And on the ones that we've seen before with the makeup,

6   you were promoting the sale of your pallet in that other

7   one; correct?

8   A.    Yes.

9   Q.    And for the shoes, were you promoting the auction of

10  your shoes; is that correct?

11  A.    Yes.

12  Q.    Okay.  Let's go to the next page.

13         *(The exhibit was displayed on the screen.)*

14  Q.    This is a post on High Voltage Tattoo dated April 9,

15  2009.

16  A.    No, this is a post on Kat Von D.  It's -- see?  It's

17  @thekatvond.

18  Q.    Oh.

19  A.    I know before you guys were trying to figure it out.  I

20  can explain it to you because I'm a bigger nerd.

21         THE COURT:  Let him ask another question.

22         THE WITNESS:  Oh, if you want -- okay.

23  BY MR. ALLEN:

24  Q.    I appreciate the correction.

25         So this is on your personal Instagram page?

462

1   A.   Yes.

2   Q.   And it says, "Just finished signing a batch of all

3   three of my books here at High Voltage Tat.  Get them while

4   they last."  And then there are a couple of tags to it.

5   A.   Uh-huh.

6   Q.   And so you were promoting the sale of your books which

7   you were signing at High Voltage Tattoo; correct?

8   A.   Yes.

9   Q.   And you posted this on your Instagram site to promote

10  the sale of those books?

11  A.   Yes.

12  Q.   Let's go to the next page.

13          *(The exhibit was displayed on the screen.)*

14  Q.   Here is a post on your personal Instagram account dated

15  July 23rd, '21, and you write, "Go to katvond.com or click

16  the link in my bio to get your tickets now."

17          So you were promoting tickets to your musical

18  show?

19  A.   Yes.

20  Q.   Is that right?  On your social media account?

21  A.   Yes.

22  Q.   And so a user or a follower could go to -- on this

23  page, just click a link to go buy the ticket; is that

24  correct?

25  A.   A couple links, yes.

1    Q.    Okay.  Go to the next page.

2              *(The exhibit was displayed on the screen.)*

3    Q.    This is a post you made on October 1st, 2019, on your

4    Facebook page; is that right?

5    A.    Yes.

6    Q.    And you write, "After two years of building this shoe

7    line from scratch, I'm so excited to finally launch Von D

8    Shoes into the world, launching on November 1st on World

9    Vegan Day."

10             And where it says "Von D Shoes," it's blue.  Does

11   that mean -- that means it's a link; correct?

12   A.    It's not a link.  It just -- I mean, it links you to

13   the Von D Shoes Facebook account.  So you if you clicked on

14   that, like you could tag your friend and then whoever is

15   following you can see who your friends are.  It's not -- if

16   you click on that, it won't take you to vondshoes.com.

17   Q.    Okay.  But you're promoting your shoe line in your post

18   on your Instagram -- I'm sorry -- on your Facebook page;

19   isn't that right?

20   A.    Yeah.  Yes.

21   Q.    Go to the next page.

22             *(The exhibit was displayed on the screen.)*

23   Q.    And this is from your Facebook page dated

24   September 4th, 2020.

25   A.    Uh-huh, yes.

1  A.   No.   I was working with a skateboard company to make

2  some sweatshirts.

3  Q.   And you provided in this post, basically, an

4  advertisement to go to katvond.com and get 30 percent off

5  this week; is that right?

6  A.   I wouldn't call it an advertising.   But, yeah, I was

7  leading people to know that I was having 30 percent off of

8  old merch.

9  Q.   How many followers do you have on your personal

10  Instagram account?

11  A.   I believe I'm at 9.7 million.

12         MR. ALLEN:  Thank you, Ms. Von D.

13         I have no further questions.

14         THE WITNESS:  You're welcome.

15         MR. GRODSKY:  Your Honor, I'd like to reserve

16  questioning until my side of the case.

17         THE COURT:  That's fine.

18         You can step down, Ms. Von D.

19         Do you have another witness, Mr. Allen?

20         MR. ALLEN:  We don't, Your Honor.

21         THE COURT:  Plaintiff rest?

22         MR. ALLEN:  Plaintiff rests.

23         MR. GRODSKY:  Then I will have Ms. Von D turn

24  around and --

25         THE COURT:  Come on back.

474

1   about when it closed.  Tell me what the purpose of High

2   Voltage was?

3   A.   High Voltage was this like creative space that I wanted

4   to make for artists because I've worked at many shops and a

5   lot of the times the owners don't ever take care of artists.

6           And I basically -- I wasn't making a, you know,

7   like this wasn't how I made money, you know, because,

8   basically, I just charged the boys like a very small

9   percentage enough just to pay for, you know, my overhead

10  which, you know, it was quite expensive.

11          But I think, you know, having guest artists and

12  things like that, it ended up paying for itself.  A majority

13  of the time I was paying for it to stay alive.

14          And then I had a space where I could tattoo in

15  private too.  So I tattoo a lot of, you know, different

16  people but because I -- I have like an emotionally charged

17  setup that most tattooers don't have, I really needed like

18  my own space in the background where I could have intimate

19  one-on-one time with the people I tattoo.

20  Q.   So we talked -- this has been talked about briefly but

21  let me just go over it.  Do you charge for tattoos?

22  A.   I don't.  I stopped charging for tattoos over a decade

23  ago.

24  Q.   And who were the people that you tattoo?

25  A.   Who did I tattoo?  In the beginning or now?

1   referred to as mapping out?

2   A.   All of it.  I mean, when you're tattooing a portrait, I

3   tattooed none of these lines.  I think there's actually no

4   lines in the portrait.  At least for me.  Some tattooers do

5   it differently.

6          So these are sketches of like you can see the nose

7   and the eyes like, you know, if you zoom in on the eye,

8   there's -- you don't see Mr. Sedlik in the reflection.  I

9   did my own interpretation of what a highlight might be, you

10  know.

11         And to be honest, I didn't have a high res image

12  of this.  I just got the printout from Google so I didn't

13  know there was fabric or any of that in his shirt.  Like I

14  just -- even if you look at that stroke -- sorry.

15         If you scroll down a little bit like where his

16  shoulder is.  That's from the -- even his jawline.  That's

17  not accurate to his jawline.  I'm just, you know, putting it

18  intuitively where I think it would go.  Like that's not his

19  actual shoulder.

20  Q.   All right.  So will you explain the process once you've

21  created the line drawing, what's the technical process of

22  what you do with it?

23  A.   So with this, you know, I usually tend to draw really

24  large because I want to be able to kind of get the scope of

25  where detail placement will be.

| | |
|---|---|
| 1 | preparation for the rest of the tattoo.  We were going to -- |
| 2 | it was more inspired by the album artwork of *Bitches Brew* |
| 3 | more than this actual photo. |
| 4 | Q.   Did you add any shading or highlight to the fingers? |
| 5 | A.   No.  I probably just did less of it.  I think, you |
| 6 | know, as a tattooer I'm not trying to be a camera.  I want |
| 7 | you to see the human fingerprint.  This should feel like I |
| 8 | tattooed it versus just a sticker. |
| 9 | So as you can see like in the forehead and stuff, |
| 10 | I didn't get microscopic with the details.  I didn't do the |
| 11 | veins in his temple.  You know, the -- even the furrowed |
| 12 | brow, you know, I really didn't get as involved as the |
| 13 | photo.  I simplified a lot of that.  The eyes as well.  Like |
| 14 | on the highlights, they're definitely not the same.  I |
| 15 | think -- yeah. |
| 16 | Q.   Did you include the clothing in the -- the clothing |
| 17 | that Mr. Davis wore? |
| 18 | A.   No.  Like I said I was -- I even was guesstimating on |
| 19 | his jawline.  This is a much higher res image so you can |
| 20 | clearly see the jawline on it whereas mine doesn't even |
| 21 | include a jawline. |
| 22 | And then I think the other thing that sets like |
| 23 | portrait artists apart from each other is that like anybody |
| 24 | can learn how to tattoo, you know.  It doesn't take like a |
| 25 | genius or anything.  It's just a matter of practice. |

1    Q.   Okay.  So we're going to show you what is Exhibit 217.

2    It should appear on your screen.

3                    *(The videotape was played.)*

4    BY MR. GRODSKY:

5    Q.   All right.  Ms. Von Drachenberg, you reviewed this

6    video last night as well, didn't you?

7    A.   I did.

8    Q.   Okay.  And in looking at this video, are you able to

9    point out any other differences or distinctions between your

10   tattoo and Mr. Sedlik's photograph?

11   A.   Sure.  I think this video, unlike the still, it shows

12   you the entire radius of the tattoo so you can see a lot of

13   the detail in the back especially; and I'm not sure if

14   you're able to like rewind and pause it.

15           But there's obviously big differences in what we

16   were referring to as composition yesterday.  So a lot of

17   that -- or all of that would be free-hand which is coming

18   from my own interpretation and that would include a lot of

19   the waves that you see in the hair and creating my own

20   highlights and actually creating a lot of my own hair that

21   you can see just a lot closer on the back side of it.

22   Q.   And were there any distinctions with respect to the

23   jawline?

24   A.   Yes.  My jawline is a definite interpretation and does

25   not match the photograph itself as well as the shoulder.

630

1   no doubt that the two works -- the photo and the tattoo --

2   are substantially similar.

3           Let's move to fair use.

4           It's defendant's burden to prove each factor.  So

5   Instruction No. 22 are the four factors.  Important, I'd

6   like to point out, is Factor 1, the purpose and character of

7   the use.

8           And you'll see in Instruction 21, it including

9   whether the use is of a commercial nature or is for a

10  nonprofit educational purposes.

11          Going to the first factor, the purpose and

12  character of the use -- that's Instruction No. 23 -- again,

13  burden on defendants to prove.

14          Let's talk about transformative use.  The Court's

15  already determined the tattoo is not transformative.

16          MR. GRODSKY:  Your Honor, I object to the slide.

17  It says something about Factor 3 that is not in the

18  instructions.

19          THE COURT:  All right.  Take that down.

20              *(Pause in the proceedings.)*

21          MR. ALLEN:  A work that has a different purpose is

22  called transformative.  The different purposes include

23  criticism, comment, news reporting, teaching, scholarship,

24  and research about the original work which would be the

25  photo.

1          THE COURT:  Thank you.

2              *(At 4:44 p.m., the trial was adjourned.)*

3

4                          -oOo-

5

6                      **CERTIFICATE**

7

8          **I, PAT CUNEO, CSR 1600, hereby certify that**

9  **pursuant to Section 753, Title 28, United States Code, the**

10  **foregoing is a true and correct transcript of the**

11  **stenographically reported proceedings held in the**

12  **above-entitled matter and that the transcript page format is**

13  **in conformance with the regulations of the Judicial**

14  **Conference of the United States.**

15
    Date:  February 9, 2024
16

17

18

19

20                          **/s/**_____

21                          **PAT CUNEO, OFFICIAL REPORTER**
                            **CSR NO. 1600**
22

23

24

25