# EXHIBIT A

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                    WESTERN DIVISION

4       THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

5

6   JEFFREY B. SEDLIK,              )
                                    )
7                  Plaintiff,       )
                                    )
8                                   )
             v.                     )   No. CV 21-1102-DSF-MRW
9                                   )
    KATHERINE VON DRACHENBERG aka KAT )
10  VON D;  KAT VON D, INC.; and HIGH )
    VOLTAGE TATTOO, INC.,           )
11                                  )
                   Defendants.      )
12  _____)

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16

17               Los Angeles, California

18          Tuesday, January 23, 2024, 8:30 A.M.

19      Day 1 of Jury Trial, Page 1 through 246, Inclusive

20

21                          PAT CUNEO CSR 1600, CRR-CM
                            Official Reporter
22                          First Street Courthouse
                            Room 4311
23                          350 West 1st Street
                            Los Angeles, California 90012
24                          213-894-1782
                            patcuneo1600@gmail.com
25                          www.patcuneo.com

```
 1              It has to be a magazine cover so it can't, you
 2    know, be a really pulled back wide shot.  It had to be in
 3    tight on him and say something about the person.  And I came
 4    up with that and a few other ideas that we have an exhibit
 5    on, I believe.
 6    Q.   Are there any subtle symbolic references in the work.
 7    I think you were just describing the fingers but --
 8    A.   Well, it would help me to refresh my memory, not that I
 9    don't know my work but if you can let me look at my work
10    while we're talking.
11    Q.   Absolutely.
12              (The exhibit was displayed on the screen.)
13    A.   I'll start answering.  So part of this was the aspect
14    of, you know, of course this shush gesture that he was
15    making.  I actually went in and placed his fingers exactly
16    in that arc.  I walked up to him, asked him if I could.  We
17    had a little bit of a relationship going on.  And I placed
18    his fingers in an arc to represent a musical notation.
19              I carefully had him position his finger and so I
20    was building subliminal things in like that arc of the
21    fingers.  Nobody will ever know, except the people in this
22    room, that I arranged Miles' fingers and I don't think
23    anybody ever did that to him before or ever did it afterward
24    but he really liked this idea.  He let me do that.  There's
25    that.
```

1          You do get an iconic feeling from the work and a

2   sense of moodiness and melancholy.  It's kind of a dark

3   portrait with shadows on him.  I, you know, I picked out the

4   wardrobe to keep it very dark in the image and, you know, it

5   says a lot of those things that I just mentioned, you know.

6   It just feels like his music to me.  It feels like him.

7          He was a very gracious person.  A lot of people

8   were intimidated by him but he was a really wonderful,

9   gracious person.

10  Q.   Did you intend to create a sculptural quality in the

11  image?

12  A.   I did.  My lighting method is to sculp people out of

13  darkness.  Sometimes that involves a very bright image in

14  the end and something I sculp them out of the background and

15  there's a lot of creative expression that goes into

16  achieving that.

17  Q.   Were there other intended purposes in creating this

18  photograph other than what you've just described?

19  A.   Well, I knew that I was going to license it and, of

20  course, that's the way I make my living; and so every time I

21  create an image, of course making the art is at the top

22  of -- like expressing myself is at the top of my list.

23          But then again, I can't afford to go do something

24  for, you know, in this case for no fee just on a barter

25  basis and to pay a portion of the expenses myself, or all

1    mark out with tape on the ground where we were going to put

2    this thing and build it and have Miles step in.

3    Q.   What happened on the morning of the shoot day?

4    A.   I met my crew, which was four or five, maybe six

5    assistants, I'm not sure, because we had to work fast at my

6    studio.

7            And the day before the shoot, we had gone and

8    picked up rental equipment and packed that rental studio

9    into the back of a big truck, like a 21 foot what they call

10   a high-cube truck along with a generator and backup

11   generator, all kinds of lighting equipment and stands and

12   camera equipment in case -- I mean, what if the clouds came

13   over and I didn't haven't sun to come into my little studio

14   that I was building.  Just contingency things.

15           So we packed the truck full of all that the night

16   before.  So that we met in the morning, got some coffee, got

17   in the truck, and my assistants got in their cars and makeup

18   artists and everybody and we caravaned from downtown L.A.

19   over to Miles' house in Malibu.

20   Q.   Did you meet with Miles before the shoot?

21   A.   I did.  He let me in and we sat on his couch and talked

22   about music and photography and boxing and what the plans

23   were for the day and went over the sketches, decided what

24   order we were going to shoot them in.  And then I asked him

25   if we could go up to his closet so I could go through and

1    pick the wardrobe that he would wear for the various

2    photographs because this was not the only setup that we were

3    going to do that day.  So I picked out this wardrobe and

4    some jewelry for him.

5    Q.   What about makeup and hairstyling?

6    A.   Once I had the wardrobe picked out, then I brought him

7    over to the -- I guess you would call it a groomer or makeup

8    and hairstylist.

9         And then I had a discussion with that person about

10   how to do the makeup so that it would work for photography.

11   I wanted to use the reflectance on darker skin.  You can

12   apply oil I found.  Looks like almost a baby oil but it's a

13   particular brand and you get a wonderful reflectance in the

14   skin.

15        It's different than lighting lighter shades of

16   skin.  And so I talked to her about doing that.  I had asked

17   her to bring the product and I told her about:  Don't overdo

18   it, don't underdo it, don't put it here, don't put it there.

19        Like I didn't want it on his hand because I wanted

20   every to die off after his face in terms of the lighting.

21   So I had her rub this oil into his skin and so once I had

22   her going with the makeup and hair -- he was very particular

23   about his hair -- then I went outside and my crew had

24   already built out the studio following my drawing for how

25   the studio would be erected in order to get the light just

```
 1   right for me.

 2   Q.   How big was the structure?

 3   A.   20X20 feet.

 4   Q.   And did it have -- what did it have as a roof?

 5   A.   So we had what's called speed rail which is kind of an

 6   aluminum piping, and we made a frame, a 20X20 square out of

 7   this aluminum piping, and that was the top of this studio.

 8            And then we stretched a white fabric similar to a

 9   sail cloth that lets the light through it across the whole

10   top of that structure.  And we draped a 20X20 black fabric

11   called duvetyne off the sides and off the back of it so the

12   light wasn't coming in from the sides or the back.

13            And then where the camera would go on the open

14   side, because I covered three sides in black and the top, I

15   put white 4X8 sheets of what's called foamcore.  It's this

16   white cardboard-like material behind where the camera would

17   go to reflect the light in from the front but the main light

18   was coming in from the top and it's the lighting I had

19   worked out in the test.

20            I took a 20X20 sheet of that sail cloth and tied

21   it to those rails, and then I took a 20X20 black fabric and

22   placed it over the white fabric so now there's no light

23   coming in, and then I had cut a hole during the test, a

24   small like a 2X2 hole in that black fabric so that as the

25   sun came down at noonday, it would turn into the most
```

1   beautiful light you've ever seen and come down in like a

2   shaft of light.  It's kind of a hard light and a soft light

3   at the same time drawing out the texture of his skin,

4   et cetera, and really bringing the portrait to life directly

5   overhead.

6           And the lighting was very different if you had

7   this ceiling like one foot away from his head or eight feet

8   away from his head.  But we had worked that out including an

9   angle of that thing to really get his face to light up.

10          I think we placed -- we did -- we placed this

11  square at a diagonal to him, and so then I had an assistant

12  stand in by sitting in a stool and we made sure the lighting

13  was good on that assistant.

14          And I fine-tuned the light.  I put black panels on

15  the left and right, big black panels.  They're like --

16  they're called flags and it's not like the United States

17  flag.  It's just black fabric on frames on either side of

18  him to soak up the light at the sides and reflect black into

19  that oil that's in his skin on the sides.

20          And then Miles came out.

21  Q.   And what happened once he arrived?

22  A.   Well, all of my assistants were in awe; right?  And

23  then -- first time getting to meet Miles Davis.  He was very

24  gracious and he handed out his new CDs of his new release at

25  the time and then sat on the stool that we had there for him

1  inside this outdoor studio.

2       And I went in and had him turn just so and then

3  turn his waist just so, then turn his shoulders to get

4  torsion and then I modeled the -- his jacket.  I placed his

5  collar where his collar is there, and then I made some

6  ridges in that jacket so that they would catch some of the

7  light so it wouldn't just go absolutely black and had his --

8  tilt his head just so.

9       And then in order to get this kind of intensity in

10 the portrait, the first thing I did was measure the distance

11 between the ground and his pupils with a tape measure and

12 then go over to where my camera was and measured the

13 distance between the ground and the center of my lens so

14 that they would both be on the exact time height at his eye

15 height and he's looking right at me, not up, not down, but

16 right at me and it's extremely direct.

17      And then I, you know, I chose a lens that would

18 flatten his shape.  You know, if you use a wide-angle lens,

19 you get a big nose and small ears and all kinds of things

20 like that.

21      But if you use a longer lens, it flattens the

22 shape of it which I didn't want to flatten him completely

23 but I wanted to compress his shape which does come through

24 in this portrait.

25      I also wanted highlights in his eyes.  So that's

1  why I put those white cards behind the camera so the sun

2  would hit the white cards and then reflect off them, come

3  through and reflect into his eyes.

4          And so, you know, if you look really close up at

5  his eyes, you can see -- you can actually see me in his eyes

6  or reflection of me with my tripod.  But it added these

7  little white dots in his eyes that gives it a little spark.

8          And then I began working with him.  I adjusted a

9  few curls of hair so I could expose one of his ears because

10  it was just black on that side.  I had to turn his head

11  slightly so I wasn't looking at two ears.

12          And then for each exposure, I had him tense up so

13  I could get like that furrow of the brow, those little lines

14  right over his nose.  Only comes out when he kind of like

15  gets -- when he tenses up.

16          So I had him hold his hand down, you know, and

17  bring it up and then we let his finger just right.  I mean,

18  I had to have the fingernail in the right place for me like

19  based on my sketch.  I'm pretty particular.

20          And then I would have him tense up and his veins

21  would pop and his furrowed brow would happen and his eyes

22  would be kind of intense.  Like a lot of people would be

23  intimidated.  And then make the photo and then move to the

24  next photo.

25  Q.   So after you finished your photo session with

1        THE COURT:  Thank you.

2             *(At 4:44 p.m., the trial was adjourned.)*

3

4                         -oOo-

5

6                     **CERTIFICATE**

7

8        **I, PAT CUNEO, CSR 1600, hereby certify that**

9   **pursuant to Section 753, Title 28, United States Code, the**

10  **foregoing is a true and correct transcript of the**

11  **stenographically reported proceedings held in the**

12  **above-entitled matter and that the transcript page format is**

13  **in conformance with the regulations of the Judicial**

14  **Conference of the United States.**

15
    Date:  February 9, 2024
16

17

18

19

20                         **/s/**_____

21                         **PAT CUNEO, OFFICIAL REPORTER**
                            **CSR NO. 1600**
22

23

24

25

# EXHIBIT B

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               WESTERN DIVISION

4     THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

5

6   JEFFREY B. SEDLIK,                )
                                      )
7                    Plaintiff,       )
                                      )
8              v.                     )   No. CV 21-1102-DSF-MRW
                                      )
9                                     )
    KATHERINE VON DRACHENBERG aka KAT )
10  VON D; KAT VON D, INC.; and HIGH  )
    VOLTAGE TATTOO, INC.,             )
11                                    )
                     Defendants.      )
12  _____  )

13

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16

17             Los Angeles, California

18      Wednesday, January 24, 2024, 7:46 A.M.

19    Day 2 of Jury Trial, Page 247 through 502, Inclusive

20

21                         PAT CUNEO CSR 1600, CRR-CM
                           Official Reporter
22                         First Street Courthouse
                           Room 4311
23                         350 West 1st Street
                           Los Angeles, California 90012
24                         213-894-1782
                           patcuneo1600@gmail.com
25                         www.patcuneo.com

1    Q.   Is Ms. Von D's rendering of your depiction of
2    Mr. Davis' smile lines similar?
3    A.   Are you referring to the labial folds at the side of
4    his face?
5    Q.   You know, I had to look that word up but yes.
6    A.   Yes.  Those are the lines that come off the corner of
7    the crease of his nose and down diagonally toward the
8    outside of the corner of his mouth are duplicated.
9    Q.   Is Ms. Von D's rendering of your depiction of the ear
10   on the left side of the portrait similar?
11   A.   Yes.  The ear was covered with hair when I began making
12   the photographs.  I walked in and up to Mr. Davis, requested
13   his permission to move his hair away from his ear so that I
14   could have some visual interest there, and it's duplicated
15   in the tattoo.
16   Q.   Is Ms. Von D's omission of the ear on the other side of
17   the portrait similar?
18   A.   Yes.  I turned his face to one side.  I didn't want to
19   have two ears in my photograph and felt that this was the
20   best presentation.
21   Q.   Is Ms. Von D's rendering of your depiction of the lips
22   similar?
23   A.   Yes.  The lips are in a certain shape that occurs when
24   you tense your face and purse your lips and I had him do
25   that at the moment that I captured the photograph.

1  BY MR. ALLEN:

2  Q.   So you had mentioned some of the ways that the

3  Miles Davis photograph and your licensing of that is damaged

4  by unlicensed use.  What specific elements of loss is there

5  when -- because Ms. Von D used your work without a license?

6          MR. GRODSKY:  Objection; relevance.

7          THE COURT:  Well, I don't understand exactly what

8  you mean so why don't you try to reframe it?

9  BY MR. ALLEN:

10  Q.   What did you lose as a result of Ms. Von D using your

11  work without a license?

12          MR. GRODSKY:  Relevance.

13          MR. ALLEN:  It goes to damages.  It goes to --

14          THE COURT:  Well, you need to narrow it, then.

15  BY MR. ALLEN:

16  Q.   Mr. Sedlik, did you lose license fees as a result of

17  Ms. Von D using your work without a license?

18  A.   Yes.  I first lost license fees by not having the

19  opportunity to receive a license fee from Ms. Von D at the

20  time or before she made the adaptation.

21          Then I lost license fees when she used a copy of

22  my work, the original photograph, in social media posts

23  distributed to many millions of followers.

24          Then I lost license fees when she distributed

25  depictions of the tattoo which would normally -- those types

```
1    Q.   Okay.  Well, the only other question I have,
2    Mr. Farmer, is I'd like you to show the tattoo to the jury.
3    Which arm is it?
4    A.   The right arm.
5    Q.   The right arm.  So I don't know how you'll have to turn
6    to do this but if you could -- would you mind, Your Honor,
7    if he stands up?
8            THE COURT:  I don't know.  Yeah.  Why don't you
9    stand up.  And I don't know how well any of them will be
10   able to see it unless he gets down and walks.
11           MR. GRODSKY:  Is that all right if we do that?
12           THE COURT:  Yes.
13           Why don't you just walk down in front of the jury
14   box?
15                    (Witness complies.)
16           THE COURT:  Anybody want a closer look, you can
17   step down and look.
18           Looks like they're good.  Okay.  Thank you.
19           MR. GRODSKY:  That is all the questions I have.
20           THE COURT:  Cross-examination?
21                    CROSS-EXAMINATION
22   BY MR. LINGER:
23   Q.   Good morning, Mr. Farmer.
24   A.   Good morning.
25   Q.   You were not sued by Mr. Sedlik; correct?
```

1   A.    Correct.

2   Q.    Would you bring up Exhibit 249.

3            *(The exhibit was displayed on the screen.)*

4            THE COURT:  How much more do you have, Mr. Linger?

5   Just because it's about time for a break.

6            MR. LINGER:  Probably five minutes.

7            THE COURT:  All right.  Why don't we just go ahead

8   and take our break.

9            Ladies and gentlemen, don't talk about the case or

10  form or express any opinions about the case until it's

11  finally submitted to you.  We'll take a 15-minute break.

12            THE CLERK:  All rise.

13            *(The jurors exited the courtroom.)*

14      *(The following was held outside the jury's presence:)*

15            THE COURT:  You can step down, sir.

16            May I see the tattoo?

17                     *(Witness complies.)*

18            THE COURT:  Anything we need to discuss?

19            MR. GRODSKY:  Yes, actually.

20            THE COURT:  *(To the Law Clerk:)*  Take a look at

21  the tattoo.

22            MR. GRODSKY:  The only thing I wanted to mention

23  is that --

24            THE COURT:  Go ahead, Mr. Farmer.  And I'm going

25  to ask my law clerk to take a look at the tattoo as well.

1    *know.  I guess that would be one of the only ones that I*

2    *would have done without an image."*

3                    *(End of reading deposition.)*

4    Q.   Do you recall saying that?

5    A.   Umm, not really.

6    Q.   Do you remember being deposed on January 18, 2022?

7    A.   I do.

8    Q.   And do you remember taking an oath that you were going

9    to tell the truth?

10   A.   I do.

11   Q.   And --

12   A.   I also think I worded it a little bit like -- I don't

13   know.  I don't think I was trying to say exactly that.

14   Sorry if I was being a little bit too painterly with my

15   words.  But to answer your question, yes, I've always used a

16   reference for portrait tattoos.

17   Q.   And in terms of portraits, your goal -- let me back up.

18           When you receive a photograph as a reference, you

19   don't like making changes to the photograph when you make

20   the tattoo, do you?

21   A.   That's not accurate at all.  I actually always make

22   adjustments and changes on every tattoo I've done as far as

23   portraits go.

24   Q.   And in terms of portraits, your goal is to make the

25   portrait to look as accurate to the person in the photo as

1   possible; isn't that right?

2   A.   I try to capture the sentiment of the people that I'm

3   tattooing.

4   Q.   I'm not asking about the sentiment.  I'm asking you

5   about if you're trying to make the portrait look as accurate

6   to the person as possible in the photo?

7   A.   Sure, yes.

8   Q.   And good photographs make great tattoos, don't they?

9   A.   They do.  Bad ones do as well, though.  Some of them.

10  I've done blurry photos that have come out beautiful.

11  Q.   And you've worked in tattoo shops that had flash books,

12  haven't you?

13  A.   In my younger years.

14  Q.   And a flash book is a collection of tattoos, designs,

15  by an artist that the artist makes available for others to

16  use as a reference?

17  A.   So I'm just going to correct myself because I have

18  worked in shops that have had flash; and I think, like the

19  example that you brought up the other day as a flash book,

20  that's not very common in tattoo shops.

21       So like if you do go to a tattoo shop that's

22  considered a street shop, you'll see walls with these --

23  they're kind of like panels of sheets and they have like

24  tattoo designs that people can select images from or get

25  inspiration from or whatever.  Those are typically -- oh,

```
1   Q.   Okay.  Well, let's go to -- what is it?  249?

2            (The exhibit was displayed on the screen.)

3   Q.   And I want you to go to the -- and you never provided

4   Mr. Sedlik a copy of the digital text chain, did you?

5   A.   I'm not sure.  You could ask my lawyers, I guess.

6   Q.   So here is the thumbnail and it's very small and you

7   can't really see if there would be a watermark there because

8   it's so small.  But are -- Mr. Davis' shoulders are in this

9   image, aren't they?

10  A.   It appears so.

11  Q.   Okay.  So let go back to comparison.

12           (The exhibit was displayed on the screen.)

13  Q.   So this image attached to your lamp can't be the

14  original photo, can it?

15  A.   It doesn't look like it but I'm not the one who printed

16  it so we'd have to figure out who that person was.

17  Q.   So you agree with me that it has been cropped on the

18  right and the left; is that right?

19  A.   It looks like it.

20  Q.   And you also agree with me that it has been cropped on

21  the bottom?

22  A.   It appears so.

23  Q.   And so if you or your shop manager cropped the photo,

24  it would have cut out the watermark, wouldn't it?

25  A.   I guess so.  I mean, I don't know.
```

1    Q.   So the question was --

2    A.   Oh.

3    Q.   Your interpretation doesn't start until after the

4    stencil is applied to Mr. Farmer; and you said "yes."

5    A.   Yeah, that's what I said in my deposition; correct?

6    Q.   Yes.

7    A.   Yeah.  Okay.  Sorry.  I think I misunderstood.

8    Q.   And while you were doing your shading, again as this

9    photo indicates, the photograph of Mr. Sedlik is right next

10   to you; correct?

11   A.   Yes.

12   Q.   And you didn't add any new composition to the tattoo

13   that wasn't in the photo already, did you?

14   A.   Oh, no, I did.  There's definitely my composition that

15   you can see on Blake's tattoo like I did a bunch of texture

16   and movement around it that is not included in the original

17   photo.

18           And that was -- that's like the setup for the rest

19   of the sleeve and what it was going to be like; and I was

20   actually trying to bring in from the album artwork, if you

21   looked at it, to bring some of that movement in that wasn't

22   in the tattoo so yeah.

23   Q.   Both were of Miles Davis; right?

24   A.   Pardon?

25   Q.   Both the photo and the tattoo are of Miles Davis;

422

1  A.   Yes.

2  Q.   Doing your shading, you claim to have created shadows

3  and highlights; correct?

4  A.   Yeah, I did my own interpretation of the lighting.

5  It's not -- It's not -- I'm not a copy machine.  I can't --

6  physically can't make something exactly the same as a photo.

7  Q.   And the tattoo shadows and highlights match the shadows

8  and highlights of the photo, don't they?

9  A.   A lot of them, yeah.  I wouldn't say all of them,

10  though.

11          (Plaintiff's counsel conferred.)

12  Q.   307.  Sorry.  307.  Lot of numbers to keep track of.

13          (The exhibit was displayed on the screen.)

14  Q.   Okay.  So shadows exist when an object blocks the

15  pathway of light; isn't that right?

16  A.   Can you repeat that?

17  Q.   Shadows exist --

18  A.   Uh-huh.

19  Q.   -- when an object blocks the pathway of light?

20  A.   Okay, yeah.

21  Q.   You agree with that?

22  A.   Sure.

23  Q.   And I want you to look at the nose of Miles Davis in

24  the photo and the tattoo.

25  A.   Uh-huh.

1    A.    People cover my songs all the time.

2              THE COURT:  Let's just stop.

3              MR. GRODSKY:  Objection; relevance.

4              THE COURT:  Sustained.

5    BY MR. ALLEN:

6    Q.    Mr. Farmer came to you and told you that he wanted to

7    eventually get a whole sleeve of Miles Davis inspired

8    tattoos, didn't he?

9    A.    That's right.

10   Q.    And isn't that the reason why the hairline is a little

11   bit different so that way you could incorporate other

12   tattoos later on?

13   A.    The hairline is different because it's my

14   interpretation of telling the story of this artist that

15   meant so much to him and using the artwork that he was

16   inspired by.  So, you know, tattooing is storytelling, too,

17   just like photography is.

18   Q.    Right.  But some of the reasons why it's a little bit

19   different around the edges is so that way you could add to

20   it later with other tattoos; isn't that right?

21   A.    Sure.  Parts of it, yeah.  Some of it is just also my

22   composition.  That's just how I -- I never do like a

23   floating head.  I always create a composition around a

24   portrait.

25   Q.    And because of that, you added what you referred to as

427

1  texture around the hair; isn't that right?

2  A.   Yes.

3  Q.   So -- and you just copied Miles Davis' hair as depicted

4  in the photo, didn't you?

5  A.   What?   Can you repeat that?   I'm sorry.

6  Q.   You just copied Miles Davis' hair as depicted in the

7  photo?

8  A.   Not at all.   I think that's one of the big parts that

9  is pretty -- not very similar at all.   I think, even when

10  you look at the tracing on the line drawing, I was mapping

11  out the motion of hair highlights and creating my own.

12  They're really not accurate to the photo.

13  Q.   Bottom line is that the tattoo is a hundred percent

14  exactly the same as Mr. Sedlik's tattoo; isn't that right?

15  A.   Oh, no.   I would highly disagree; that it's not exactly

16  the same.

17          THE COURT:   You referred to Mr. Sedlik's tattoo.

18          MR. ALLEN:   I'm sorry?

19          THE COURT:   You referred to Mr. Sedlik's tattoo.

20          MR. ALLEN:   Sorry.   Let me rephrase.

21  Q.   The bottom line is that the tattoo is a hundred percent

22  exactly the same as the reference photo of Mr. Sedlik; isn't

23  that right?

24  A.   I would disagree.   I don't think it's exactly the same.

25  Q.   And your portraits are traced directly from the actual

1    Q.   And you've testified that your tattoo is free-hand;

2    right?

3    A.   The tattooing part is free-hand.  That's a tattoo term.

4    Free-hand is to like, you know -- you know, when like

5    someone is painting like a landscape and you put your easel

6    up and then you look at the tree and then you're doing that.

7    That's considered free-hand.

8    Q.   But the only thing that's free-hand that you did was

9    the shading; isn't that right?

10   A.   Which is 99 percent of the tattoo.

11   Q.   Ms. Von Drachenberg, yes or no?

12   A.   Oh, yes.

13   Q.   The only thing free-hand that you did in the tattoo is

14   the shading; is that right?

15   A.   Yes.  All right.  Most of it, yeah.  I think I did some

16   of the free-hand -- some of the lines are also free-hand

17   even though there's not really a lot of lines in portraits.

18   But like the wrinkles, there's no way that you can map out

19   all the wrinkles on Miles Davis' face.

20            So a lot of that was me just giving you the

21   sentiment of wrinkles under his eyes.  It was like, you

22   know, the -- the reflection that Mr. Sedlik referred to

23   earlier.  Like I didn't see that because it was just a

24   medium-res image from online.

25            So they were my interpretations of highlights.  So

*Day 2 of Jury Trial, January 24, 2024*

1    some of that is free-hand.  It's not just the shading.

2    Q.   You understand that magazines, before they use a

3    photograph, have to do their due diligence.  They can't just

4    use a photo without permission of the photographer; right?

5    A.   Yeah.

6    Q.   But you don't think the same rules apply to you when it

7    comes to artist reference photos?

8    A.    No.  I think there's a difference between selling a

9    product like a mass-produced magazine that -- like, you

10   know, whatever name the big magazine that's selling.  You're

11   selling thousands of units based off of somebody's artwork.

12         I'm literally tattooing my friend with his

13   favorite trumpet player because it means a lot to him and I

14   make zero money off of it.  So I think there's -- I'm not

15   mass-producing anything or gaining any monetary value so I

16   think there's a big difference.

17   Q.   Well, you wouldn't copy --

18   A.   It's fan art.

19   Q.   Sorry to interrupt.

20   A.   Sorry.  I consider this fan art and so I do see it as

21   different than, you know, a corporation like taking

22   advantage of an artist.  It's not what I'm doing.

23   Q.   You wouldn't copy another tattoo design, would you?

24   A.   Sure.  People do all the time.

25   Q.   You do?

1          MR. ALLEN:  Your Honor, before the defendants

2     present their case --

3          THE COURT:  Do you want to approach?

4          MR. ALLEN:  Sure.

5          *(The following was held at the bench:)*

6                    **MOTION FOR DIRECTED VERDICT**

7          MR. ALLEN:  I'd like to move for directed verdict

8     on substantial similarity.  Kat Von D admitted the

9     similarity on all of those elements.  There's no evidence to

10    the contrary.  I mean, she's admitted it.

11          So on the issue of substantial similarity, I think

12    it would facilitate things moving forward if we could move

13    for a directed verdict on that.

14          MR. GRODSKY:  Well, she's not -- first of all, I

15    have the opportunity to ask her questions.  She has not

16    admitted on anything.  Remember, there's an extrinsic and an

17    intrinsic test.

18          Extrinsic test requires his client to identify the

19    objective factors that -- the objective creative factors

20    that make up his tattoo and then we have to determine

21    whether the group of them are similar; and that hasn't

22    happened.  That testimony is disputed at this point in time.

23          THE COURT:  I'll take it under submission.

24          MR. ALLEN:  Thank you, Your Honor.

25          *(The following was in open court in the jury's presence:)*

1    to be, I'm just mapping it out so that it's kind of like a

2    code for the artist to know.

3           And then when I stencil it on, I always warn the

4    client:  Hey, remember, it's going to look crazy.  Like it's

5    going to look like a monster but this is not what it's going

6    to look at the end after I do all the free-hand shading.

7           And so it's more for you to know size and the

8    placement.

9    Q.   Let me see Exhibit 202.

10   A.   And then in many cases, you know, the client will say:

11   That's way too big.  Oh, my gosh.  Or, hey, that's -- I

12   wanted it bigger.  Or can we explore putting it on another

13   arm?

14          So, for example, if I would have -- if he would

15   have gotten it on his other arm, I would have flipped the

16   image just because it's considered correct to face forward

17   on -- depending on what side of your body.

18   Q.   So take a look at Exhibit 202.

19          *(The exhibit was displayed on the screen.)*

20   Q.   Do you recognize this?

21   A.   Yes.

22   Q.   What is this?

23   A.   This is the line drawing that I created based off of

24   Mr. Sedlik's photo.

25   Q.   Can you tell me what on this drawing is what you

```
1    referred to as mapping out?
2    A.   All of it.  I mean, when you're tattooing a portrait, I
3    tattooed none of these lines.  I think there's actually no
4    lines in the portrait.  At least for me.  Some tattooers do
5    it differently.
6            So these are sketches of like you can see the nose
7    and the eyes like, you know, if you zoom in on the eye,
8    there's -- you don't see Mr. Sedlik in the reflection.  I
9    did my own interpretation of what a highlight might be, you
10   know.
11           And to be honest, I didn't have a high res image
12   of this.  I just got the printout from Google so I didn't
13   know there was fabric or any of that in his shirt.  Like I
14   just -- even if you look at that stroke -- sorry.
15           If you scroll down a little bit like where his
16   shoulder is.  That's from the -- even his jawline.  That's
17   not accurate to his jawline.  I'm just, you know, putting it
18   intuitively where I think it would go.  Like that's not his
19   actual shoulder.
20   Q.   All right.  So will you explain the process once you've
21   created the line drawing, what's the technical process of
22   what you do with it?
23   A.   So with this, you know, I usually tend to draw really
24   large because I want to be able to kind of get the scope of
25   where detail placement will be.
```

```
 1              Like I did his pupils with the liner and other
 2      than that, we jumped into the shading pretty quickly and
 3      that's where all the free-hand shading starts.
 4                      (Pause in the proceedings.)
 5      Q.   Let's put that up.
 6              (The exhibit was displayed on the screen.)
 7      Q.   All right.  Ms. Von D, I have put up Exhibit 307 and
 8      I'm wondering if you could explain some of the differences
 9      between your interpretation and Mr. Sedlik's photograph.
10      A.   Sure.  This is obviously showing more of the front view
11      since it's on Blake's arm.  As you guys saw earlier today,
12      it kind of wraps around.
13              And so you see like the center part is, you know,
14      my rendition of Mr. Sedlik's photograph; and then I did my
15      own interpretation of trying to create a composition.
16              So like I said before, I don't want it to look
17      like it's a totem pole.  Like people bring in photos all the
18      time, and then if I were to do it exactly like the photo, it
19      would just look like a block with like a head cut off
20      floating on your arm.
21              So I always suggest to the client that, you know,
22      to add some type of composition and that's where I started
23      putting like the negative space and you see like that
24      texture that kind of is a little bit smoky.
25              Like I mentioned before, a lot of that was in
```

492

1    preparation for the rest of the tattoo.  We were going to --
2    it was more inspired by the album artwork of *Bitches Brew*
3    more than this actual photo.
4    Q.    Did you add any shading or highlight to the fingers?
5    A.    No.  I probably just did less of it.  I think, you
6    know, as a tattooer I'm not trying to be a camera.  I want
7    you to see the human fingerprint.  This should feel like I
8    tattooed it versus just a sticker.
9          So as you can see like in the forehead and stuff,
10   I didn't get microscopic with the details.  I didn't do the
11   veins in his temple.  You know, the -- even the furrowed
12   brow, you know, I really didn't get as involved as the
13   photo.  I simplified a lot of that.  The eyes as well.  Like
14   on the highlights, they're definitely not the same.  I
15   think -- yeah.
16   Q.    Did you include the clothing in the -- the clothing
17   that Mr. Davis wore?
18   A.    No.  Like I said I was -- I even was guesstimating on
19   his jawline.  This is a much higher res image so you can
20   clearly see the jawline on it whereas mine doesn't even
21   include a jawline.
22          And then I think the other thing that sets like
23   portrait artists apart from each other is that like anybody
24   can learn how to tattoo, you know.  It doesn't take like a
25   genius or anything.  It's just a matter of practice.

1    But like what makes you stand out is just when you

2    stylize things; and like when you look at like the way that

3    the wrist is, instead of like fully polishing and rendering

4    it, I just wanted to make it more abstract and give you

5    almost like a watercolor feeling.

6    And that way, like when you compare this to other

7    Miles Davis' tattoos, which there are many of, it's going to

8    be different.  I mean, it's my rendition.

9    Q.   All right.  We know that you made the tattoo and we're

10   going to talk about the social media posts.  But just to be

11   clear, did you ever attempt to sell any prints or images of

12   this tattoo?

13   A.   No, none at all.  And I never -- and I never phrased it

14   to take credit for this photo.  I was born in 1982 so

15   there's no way I could have taken this photo.  I would have

16   been like four or something.

17   Q.   And then did you ever sell or manufacture any

18   merchandise using the tattoo?

19   A.   No.

20   Q.   Did you make any money at all in connection with the

21   tattoo?

22   A.   Not at all.

23        MR. GRODSKY:  Your Honor, I can move on to another

24   area if you would like.  I know we're close to the time.

25        THE COURT:  All right.  We can go ahead and stop.

```
 1                           CERTIFICATE

 2

 3           I, PAT CUNEO, CSR 1600, hereby certify that

 4   pursuant to Section 753, Title 28, United States Code, the

 5   foregoing is a true and correct transcript of the

 6   stenographically reported proceedings held in the

 7   above-entitled matter and that the transcript page format is

 8   in conformance with the regulations of the Judicial

 9   Conference of the United States.

10

11   Date:  February 9, 2024

12

13

14

15                          /s/_____

16                          PAT CUNEO, OFFICIAL REPORTER
                            CSR NO. 1600
17

18

19

20

21

22

23

24

25
```

# EXHIBIT C

503

```
 1                 UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3                       WESTERN DIVISION

 4         THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

 5

 6   JEFFREY B. SEDLIK,

 7                                  )
                         Plaintiff, )
 8                                  )
                                    )
 9            v.                    )   No. CV 21-1102-DSF-MRW
                                    )
10   KATHERINE VON DRACHENBERG aka KAT )
     VON D;  KAT VON D, INC.; and HIGH )
11   VOLTAGE TATTOO, INC.,          )
                                    )
12                      Defendants. )
     _____)
13

14

15

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS

17

18                 Los Angeles, California

19           Thursday, January 25, 2024, 7:50 A.M.

20      Day 3 of Jury Trial, Page 503 through 593, Inclusive

21                              PAT CUNEO CSR 1600, CRR-CM
22                              Official Reporter
                                First Street Courthouse
23                              Room 4311
                                350 West 1st Street
24                              Los Angeles, California 90012
                                213-894-1782
25                              patcuneo1600@gmail.com
                                www.patcuneo.com
```

1    Q.    Okay.  So we're going to show you what is Exhibit 217.

2    It should appear on your screen.

3                    *(The videotape was played.)*

4    BY MR. GRODSKY:

5    Q.    All right.  Ms. Von Drachenberg, you reviewed this

6    video last night as well, didn't you?

7    A.    I did.

8    Q.    Okay.  And in looking at this video, are you able to

9    point out any other differences or distinctions between your

10   tattoo and Mr. Sedlik's photograph?

11   A.    Sure.  I think this video, unlike the still, it shows

12   you the entire radius of the tattoo so you can see a lot of

13   the detail in the back especially; and I'm not sure if

14   you're able to like rewind and pause it.

15              But there's obviously big differences in what we

16   were referring to as composition yesterday.  So a lot of

17   that -- or all of that would be free-hand which is coming

18   from my own interpretation and that would include a lot of

19   the waves that you see in the hair and creating my own

20   highlights and actually creating a lot of my own hair that

21   you can see just a lot closer on the back side of it.

22   Q.    And were there any distinctions with respect to the

23   jawline?

24   A.    Yes.  My jawline is a definite interpretation and does

25   not match the photograph itself as well as the shoulder.

```
 1   A.    They were linked as well.
 2   Q.    All right.  And, again, who made the posts on the High
 3   Voltage accounts?
 4   A.    High Voltage Tattoo was run by whoever the shop helper
 5   was at the time or, you know, the tattooers that worked at
 6   that shop were welcomed to use it whenever they wanted to as
 7   well.
 8   Q.    All right.
 9              I'd like to take a look at Exhibit 203.
10              (The exhibit was displayed on the screen.)
11   Q.    All right.  I've put up Exhibit 203.  This is one of
12   your social media posts and this post is dated March 18,
13   2017.  Do you see that?
14   A.    Yes.
15   Q.    Okay.  This post, you understand, was reposted at other
16   times and on other account; correct?
17   A.    Yes.
18   Q.    Okay.  But the picture is the same in all of those
19   posts; correct?
20   A.    Yes.
21   Q.    Okay.  So I want to talk about, talk about this post.
22   Why did you make this post?
23   A.    Umm, it's just a picture of me doing what I do, my
24   tattoos, and so I -- like I said, I like to share process of
25   my daily life with my friends and followers.
```

1   Q.   Okay.  Now, Mr. Allen showed you yesterday other
2   Instagram posts and some of them had websites or links where
3   you could go somewhere where you could buy a product.
4           Did this social media post have any link to
5   somewhere where you could buy a product?
6   A.   No.
7   Q.   Were you promoting any kind of product with this link?
8   A.   Not at all.
9   Q.   So I see there's a #Miles Davis.  Do you see that?
10  A.   Yes.
11  Q.   What is hashtag just if could you explain for the jury
12  and the Court what a hashtag means.
13  A.   When you hashtag a word, it makes it a hyperlink so you
14  can click on it and it will take you to any other images on
15  Instagram that share that same hashtag.
16          So this -- I tagged Miles Davis so that, you know,
17  if you don't know who he is, it would take you to pictures
18  of Miles Davis.
19  Q.   So you weren't trying to promote or sell Miles Davis
20  album or T-shirts or anything?
21  A.   Not at all.
22  Q.   All right.  Okay.  Let me -- just a minute.  Let me put
23  up Exhibit 207.
24          (The exhibit was displayed on the screen.)
25  Q.   All right.  This is another Instagram post.  This

```
1              THE COURT:  Redirect?

2              MR. GRODSKY:  No questions.

3              THE COURT:  Thank you very much.

4              THE WITNESS:  Thank you.

5              THE COURT:  You may step down.

6              Does the defense have another witness?

7              MR. GRODSKY:  We have a -- well, we have some

8    dispositions to deal with.

9              THE COURT:  Okay.

10             MR. GRODSKY:  I have spoken to Mr. Allen already

11   about reading a very short portion of Mr. Sedlik's

12   deposition which I'm going to do right now.

13             THE COURT:  Okay.

14             MR. GRODSKY:  So this is from Mr. Sedlik's

15   deposition on January 11th, 2022.  It's page 117, line 7,

16   to 117, line 14; and Mr. Allen and I discussed and agreed

17   that during this deposition the photograph at issue was

18   being referred to as the "Silence" photograph so that's

19   what's refused to.

20             "QUESTION:  Has anyone ever told you that they

21   would not buy a copy of your "Silence" photograph as a

22   result of having seen Kat Von D's tattoo?

23             "ANSWER:  No.

24             "QUESTION:  Has anyone ever told you that they

25   would not buy a copy of your "Silence" photograph as a
```

1    *result of the social media posts about the tattoo?*

2           *"ANSWER:  No."*

3                   *(End of reading deposition.)*

4           MR. GRODSKY:  And the next witness we have is a

5    witness by deposition, Bryan Vanegas, and we have a

6    videotape that includes everybody's portions which we're

7    ready to play.

8           THE COURT:  All right.

9           MR. ALLEN:  One second, Your Honor.

10                  *(Counsel conferred.)*

11          MR. GRODSKY:  All right.  So we're -- if it's all

12   right with the Court, we'll play Mr. Vanegas' deposition.

13          THE COURT:  That's fine.

14                  *(The videotape was played.)*

15          MR. GRODSKY:  Your Honor, we have no more

16   witnesses.  The defense rests.

17          THE COURT:  All right.

18          Any rebuttal?

19          MR. ALLEN:  Yes.  Yes, Your Honor.  Plaintiffs

20   call Mr. Sedlik.

21          THE COURT:  All right.  Approach.

22                  *(The following was held at the bench:)*

23          THE COURT:  Okay.  What's the rebuttal about?

24          MR. ALLEN:  I would like him to respond to --

25   first of all, when Mr. Grodsky said he was going to read

```
 1              MR. ALLEN:  We have worked on it and so we have

 2    something that we're going to send to you.

 3              MR. GRODSKY:  But I'm just saying that doesn't

 4    have to be done before.  I would think that we could get the

 5    jury instructions done in an hour or, I don't know, an hour

 6    and a half and you could read them and that would expedite

 7    things but I'm also fine if it's --

 8              THE COURT:  What's going to take an hour and a

 9    half?

10              MR. GRODSKY:  Maybe not.  Maybe it's less than

11    that.  Maybe it's far less.  I'm just saying it seems like

12    we could read jury instructions.  I would ask that we start

13    closing tomorrow.

14              MR. ALLEN:  Right, I agree.

15              THE COURT:  Well, what kind of arguments do you

16    have to make?  I thought we were all done with them except

17    for making those changes we discussed.

18              MR. GRODSKY:  There's one or two arguments I want

19    to make about -- well, it's really one.  About one of the

20    changes that you made.  I don't know what his --

21              MR. ALLEN:  I have a bunch.

22              THE COURT:  All right.  Well, I guess I'll let

23    them go home then.  I don't want to keep them around here

24    for an hour just to read 40 minutes of jury instructions.

25              MR. ALLEN:  And then, additionally, in light of
```

1    the closing of the defense case, we renew our directed

2    verdict on substantial similarity.

3         We also move for a directed verdict on the

4    three-year bar.  There's been absolutely --

5         THE COURT:  Okay.  Well, you can let them go and

6    then you can . . . .

7         MR. ALLEN:  Okay.

8    *(The following was in open court in the jury's presence:)*

9         THE COURT:  Well, I don't know whether there's

10   good news and bad news or good news and good news so I'll

11   let you decide.  You don't have to tell me which it is.

12        So the first good news is that we finished much

13   more quickly than I had predicted and so both sides are

14   finished presenting the evidence.

15        The semi-bad news is I have to work on the jury

16   instructions to give you and I could keep you around here

17   waiting but I really don't know how long that's going to

18   take and I don't want to have you sitting around for an hour

19   just to come back and hear some jury instructions when we

20   can do that tomorrow.

21        So I think the best thing for us to do and the

22   best use of your time is for me to let you go.  I'm sorry

23   you had to come down here for just an hour but look at it as

24   having the whole next week that you thought you were going

25   to have to spend here instead.

```
1              THE COURT:  We'll see you tomorrow at 7:45.  If
2    something comes up, email the chambers email.
3              All right.  Thank you.
4              MR. GRODSKY:  Thank you, Your Honor.
5              MR. ALLEN:  Thank you.
6              THE CLERK:  All rise.
7              Court is adjourned.
8              (At 12:42 p.m., the trial was adjourned.)
9
10                           -oOo-
11
12                         CERTIFICATE
13
14              I, PAT CUNEO, CSR 1600, hereby certify that
15    pursuant to Section 753, Title 28, United States Code, the
16    foregoing is a true and correct transcript of the
17    stenographically reported proceedings held in the
18    above-entitled matter and that the transcript page format is
19    in conformance with the regulations of the Judicial
20    Conference of the United States.
21
      Date:  February 9, 2024
22
23
24                      /s/_____
25                      PAT CUNEO, OFFICIAL REPORTER
                        CSR NO. 1600
```

# EXHIBIT D

```
 1                  UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3                         WESTERN DIVISION

 4        THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

 5

 6   JEFFREY B. SEDLIK,               )
                                      )
 7                    Plaintiff,      )
                                      )
 8                                    )
            v.                        )   No. CV 21-1102-DSF-MRW
 9                                    )
     KATHERINE VON DRACHENBERG aka KAT)
10   VON D;  KAT VON D, INC.; and HIGH)
     VOLTAGE TATTOO, INC.,            )
11                                    )
                      Defendants.     )
12   _____)

13

14

15             REPORTER'S TRANSCRIPT OF PROCEEDINGS

16

17                    Los Angeles, California

18             Friday, January 26, 2024, 7:47 A.M.

19      Day 4 of Jury Trial, Page 594 through 718, Inclusive

20

21                             PAT CUNEO CSR 1600, CRR-CM
                               Official Reporter
22                             First Street Courthouse
                               Room 4311
23                             350 West 1st Street
                               Los Angeles, California 90012
24                             213-894-1782
                               patcuneo1600@gmail.com
25                             www.patcuneo.com
```

1    think about the word "fair," when you decide whether

2    something is fair, it's not like you can take a book and the

3    book will tell you:  Well, this is fair and this is not

4    fair.

5              Fair is something that involves judgment and

6    weighing of different factors when you decide whether

7    something is fair, and that's what you're going to have to

8    do.

9              You're going to have to weigh a number of

10   different factors back and forth, up and down, all together,

11   to figure out as a whole if you decide that the uses that

12   are at issue here are fair.

13             So I want to start by saying these factors are

14   analyzed differently, and the reason I say that is that

15   there's two factors that are the same for everything and

16   there's two factors that you have to think about differently

17   for each kind of social media post so -- and tattoo.

18             So what I want to do is I want to start with the

19   factors that are sort of the same for everything; and I'll

20   start with the easiest one, Factor No. 2, whether the

21   Miles Davis photo was creative.

22             Well, the answer to that is "yes."  The

23   Miles Davis photo was creative.  There's no question about

24   that.  It's a fantastic photo.

25             And the instructions will tell you that that means

1   that this factor can be weighed against fair use.  So that's

2   a factor that doesn't help me but is a factor that you have

3   to consider.

4           The next factor I want to talk about, though, is

5   Factor 4; and Factor 4 relates to the effect of -- well, the

6   effect of the accused infringer's use on the potential

7   market for and value of the copyrighted work.

8           And potential market, you'll see in the jury

9   instructions, is defined to mean a traditional, reasonable,

10  or likely-to-be-developed market.

11          And read the jury instruction because it tells you

12  this is the single-most important factor and you can

13  understand why that is.

14          That if somebody is making a use that's going to

15  hurt a copyright user, that's probably something that's less

16  fair than somebody who's doing somebody that isn't going to

17  hurt or maybe is going to help that person.

18          So let's talk about this factor.  And the primary

19  witness who testified about the effect of the alleged

20  infringements on the value and the market of the Miles Davis

21  tattoo was Mr. Sedlik himself.

22          So before we go over what the evidence showed,

23  let's talk about Mr. Sedlik's credibility.  You saw

24  Mr. Sedlik testify.  You saw a lot of it.  It was about four

25  and a half hours of it.

1    for the shop assistant who set up the table and cleaned up.

2            So Sedlik says:  Okay.  Kat wasn't paid and High

3    Voltage wasn't paid but the fact your assistant got a tip,

4    which is customary in the industry, that turns this into

5    something commercial.

6            I mean, talk about no good deed goes unpunished.

7            The suggestion because Kat didn't want her shop

8    assistants to lose out on tips that are customary in the

9    industry, that this makes this a commercial deal is

10   ridiculous.

11           So what does that mean?

12           If you remember, the fair use Factor 1 is an

13   analysis where you look at whether it's transformative and

14   you look at whether it's commercial.  That's what the

15   instruction will tell you.

16           We agree that it's already been decided that the

17   tattoo is not transformative.  But in this case, more than

18   anything else in this case, the tattoo itself was not a

19   commercial transaction.  It was not commercial in any way

20   and so that factor weighs in favor of fair use.

21           Factor 2, we already told you weighs against fair

22   use.

23           Factor 3 is the amount of the tattoo -- sorry --

24   the amount of the photo that was used.

25           There's a lot of the photo that was.  There's a

1    lot of the photo that you will see here.  There's lot that

2    was not.  I'm just going to say it's neutral.

3            And then Factor 4 we just discussed.  It weighs

4    heavily in favor and it is the single-most important factor.

5            So for the tattoo, evidence showed the tattoo is a

6    fair use.

7            Now let's talk about the line drawing.  Okay.  The

8    line drawing, commerciality again, there was no product sold

9    with the line drawing.  She didn't get any payment for it.

10   And this one does have a completely different purpose.

11           Miles Davis' photo is a photo that Mr. Sedlik

12   uses.  It celebrates Miles Davis.  It's used as something

13   that he sells his prints.  He sells his posters.

14           The line drawing is a tool.  It's a tool that's

15   used to size and place tattoos.  It is a completely

16   different purpose.  So that weighs -- Factor 1,

17   transformative, yes.  Noncommercial, yes.  Weighs heavily in

18   favor.

19           Factor 2 weighs against.

20           How much of the photograph was used?  That's

21   Factor 3.  Well, the reality is very little of the

22   photograph was used in this.  That factor weighs in favor.

23           And Factor 4, as we said, weighs heavily in favor.

24   The line drawing is a fair use.

25           Then we have the four-and-a-half-minute Instagram

```
 1   story.  There's no evidence that it promoted anything.
 2   There's no evidence there was advertising received.  There
 3   was no link in this post to the sale of products and it has
 4   a completely different purpose.  It was a compilation of
 5   stories of Kat making videos.  This was a tiny part of a
 6   much larger thing.
 7          So Factor 1, not commercial, transformative,
 8   weighs heavily in favor.
 9          Factor 2, weighs against.
10          Factor 3, because it shows the tattoo, we'll say
11   it's neutral.
12          And Factor 4, we've already discussed, weighs
13   heavily in favor.
14          Then there's the Kat at the lightbox photo.
15   Again, not commercial, not promoted, no advertising received
16   in links to sales.
17          And by the way, the evidence that's best to show
18   what's commercial and not commercial is the post that they
19   keep on showing you, other social media posts.
20          Kat certainly has other social media posts where
21   she promotes things.  Those are social media posts that are
22   commercial.  And then there are social media posts that
23   promote nothing.  Those are not.
24          This also has a completely different purpose.
25   It's showing the process of making tattoos.
```

```
 1              Factor 1 weighs heavily in favor.
 2              Factor 2 weighs against.
 3              Factor 3 is neutral.
 4              Factor 4 weighs heavily in favor.
 5              It's a fair use.
 6              Then there's the post of Kat working on the
 7    tattoo.  For the same reasons it's not commercial and,
 8    again, the purpose of this is not to show Miles Davis but to
 9    show Kat's process of making tattoos.
10              Weighs heavily in favor.
11              Factor 2 against.
12              Factor 3 weighs against because they used the
13    photograph in the back.
14              But Factor 4 weighs heavily in favor.
15              It is a fair use.
16              Lastly, messy progress shot.  Not commercial for
17    the same reasons.  Completely different purpose.  Shows her
18    process and what a tattoo can look like before it's
19    finished.
20              Factor 1, heavily in favor.
21              Factor 2, against.
22              Factor 3, how much of the photograph was used?
23    Very little.  Weighs heavily in favor.
24              Factor 4, heavily in favor.
25              This is a fair use.
```

```
 1                        CERTIFICATE

 2

 3          I, PAT CUNEO, CSR 1600, hereby certify that

 4  pursuant to Section 753, Title 28, United States Code, the

 5  foregoing is a true and correct transcript of the

 6  stenographically reported proceedings held in the

 7  above-entitled matter and that the transcript page format is

 8  in conformance with the regulations of the Judicial

 9  Conference of the United States.

10
    Date:  February 9, 2024
11

12

13

14

15                          /s/_____

16                          PAT CUNEO, OFFICIAL REPORTER
                            CSR NO. 1600
17

18

19

20

21

22

23

24

25
```

# EXHIBIT E













# EXHIBIT F

**Tim Henderson**

---

| | |
|---|---|
| **From:** | Patricia Kim <Patricia_Kim@cacd.uscourts.gov> |
| **Sent:** | Tuesday, January 23, 2024 1:06 PM |
| **To:** | rallen@glaserweil.com; Jason Linger; Allen Grodsky; Tim Henderson |
| **Subject:** | Sedlik 21-1102 |
| **Attachments:** | Sedlik dsf draft Instructions 1.23.24_.docx |

Counsel,

Please see attached.

Best,



**PATRICIA KIM**
RELIEF COURTROOM DEPUTY
**UNITED STATES DISTRICT COURT**
**CALIFORNIA CENTRAL DISTRICT COURT**
350 W 1st Street
Los Angeles, CA 90012-3332
Office: (213) 894-0583
Email: Patricia_Kim@cacd.uscourts.gov

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JEFFREY B. SEDLIK,

               Plaintiff,

v.

KATHERINE VON DRACHENBERG
aka KAT VON D, et al.,

               Defendants.

2:21-cv-01102-DSF-MRW

**JURY INSTRUCTIONS**

# INSTRUCTION NO.

The intrinsic test is a holistic comparison that focuses on whether the works are substantially similar in the total concept and feel of the works.

## Ruling

The Court finds that three instructions are clearer.  Defendants' instructions are adopted with revisions to correspond to Rentmeester v. Nike, Inc., 883 F.3d 1111, 1118–19 (9th Cir. 2018), overruled on other grounds by Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin, 952 F.3d 1051 (9th Cir. 2020).

Plaintiff's objection that "Defendants' instruction fails to consider the Ninth Circuit's decisions in Norse and Range Road, which held that a substantial similarity analysis is irrelevant and unnecessary in a case such as this one involving direct copying of the copyrighted work[,]" continues to be wrong as a matter of law.  The Ninth Circuit has been clear–the second prong of the infringement analysis contains two separate components: "copying" and "unlawful appropriation."  Skidmore, 952 F.3d at 1064 (citing Rentmeester, 883 F.3d at 1117).  Even "after proving that the defendant's work is the product of copying rather than independent creation, the plaintiff must still show copying of protected expression that amounts to unlawful appropriation."  Rentmeester, 883 F.3d at 1124.  "Proof of unlawful appropriation— that is, illicit copying—is necessary because copyright law does not forbid all copying."  Id. at 1117.

"Unfortunately, . . . [the Ninth Circuit has] used the same term—'substantial similarity'—to describe both the degree of similarity relevant to proof of copying and the degree of similarity necessary to establish unlawful appropriation."  Id.  Plaintiff continues to confuse these two concepts.  While no substantial similarity analysis is needed to prove copying when it is admitted, it is still necessary to prove unlawful

appropriation.

In both <u>Norse</u> and <u>Range Road</u> it was indisputable that copyrightable original expression was used.   <u>Norse</u> concerned idiosyncratic phrases from unpublished letters, and <u>Range Road</u> concerned the public performance of copyrighted songs. Here, for several of the challenged uses (including the tattoo), Defendants argue that the elements copied from the Portrait (such as Miles Davis's face) are not copyrightable.  Therefore, the admitted copying does not foreclose the substantial similarity issue, because it may not be forbidden copying.

# EXHIBIT G

## Tim Henderson

| | |
|---|---|
| **From:** | Robert Allen <rallen@glaserweil.com> |
| **Sent:** | Thursday, January 25, 2024 11:27 AM |
| **To:** | Patricia Kim; Jason Linger; Allen Grodsky; Tim Henderson |
| **Subject:** | Re: Sedlik Draft Jury Instructions |
| **Attachments:** | Sedlik nes draft Instructions 1.25.24 v2 MARKED UP.docx |

We have agreed to the redline changes, except for what is highlighted in Nos. 24, 26 and 34.

**From:** Patricia Kim <Patricia_Kim@cacd.uscourts.gov>
**Date:** Thursday, January 25, 2024 at 10:00 AM
**To:** Jason Linger <jlinger@glaserweil.com>, Robert Allen <rallen@glaserweil.com>, allen@thegolawfirm.com <allen@thegolawfirm.com>, tim@thegolawfirm.com <tim@thegolawfirm.com>
**Subject:** FW: Sedlik

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JEFFREY B. SEDLIK,

             Plaintiff,

v.

KATHERINE VON DRACHENBERG
aka KAT VON D, et al.,

             Defendants.

2:21-cv-01102-DSF-MRW

**JURY INSTRUCTIONS**

1

**INSTRUCTION NO. 24**

The first fair use factor concerns the purpose and character of the accused use. It considers whether the use of a copyrighted work has a further purpose or different character, which is a matter of degree, and the degree of difference must be balanced against ~~the commercial nature of the use.~~ other considerations like commercialism.

If an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use.

The fair use analysis, and the first factor in particular, requires an analysis of each specific use of a copyrighted work that is alleged to be an infringement. The same copying may be fair when used for one purpose but not another.

A work that has a different purpose is said to be "transformative." But to be transformative, the secondary work must have a purpose that goes beyond that required to qualify as a derivative work and that has a justification for conjuring up the original work to shed light on the work itself, not just the subject of the work. For example, criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, and research are all different purposes. The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to gain a benefit or advantage from exploitation of the copyrighted material without paying the customary price.

The court has already determined that the tattoo is not transformative, meaning that it does not imbue the copyrighted work with a new purpose beyond recasting the copyrighted work in a new visual medium, like turning a painting into a sculpture. You must decide whether the tattoo is of a commercial nature. If you find that it is, the first factor should weigh against fair use.

36

1    For each social media post, you must determine whether the post has a further
2  purpose or different character than the copyrighted work.  You must then determine
3  whether each social media post is of a commercial nature.  Then you must balance the
4  degree of difference against the commercial nature, if any, of the post.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INSTRUCTION NO. 25**

The second fair use factor is the nature of the copyrighted work. Copyrighted works that are creative in nature are more protected.  It is agreed that the Miles Davis Photo is creative in nature, and therefore Thus, if you find that the original work was creative in nature, this factor is less more likely to favor weigh against fair use.

38

**INSTRUCTION NO. 26**

The third fair use factor is the amount and substantiality of the portion used in relationship to the copyrighted work as a whole. This factor looks to the amount of the original work used and the importance of the portion copied.

When an accused work copies little of the original work, this factor weighs in favor of fair use. When an accused work copies most of the original work, then this factor more likely weighs against fair use. If the secondary user copies only as much as is necessary for his or her intended use, then this factor will not weigh against fair use. This factor weighs against fair use if the infringer publishes "the heart" of an "individual copyright picture" without justification.

The court has already determined that the third factor weighs against fair use with respect to each of the claimed infringements. It is up to you to weigh how much the third factor weighs against fair use, both as an individual factor and when weighing all of the factors together.

**INSTRUCTION NO. 34**

The plaintiff is barred from recovering damages for infringing acts that occurred more than three years before he filed his lawsuit. I will refer to this limitation as the "three-year bar." An infringing act occurs each time a work is reproduced, publicly displayed, used to prepare a derivative work or distributed.

There is an exception to the three-year bar. The exception is this: if, prior to the critical date of three years before filing the lawsuit, the plaintiff was unaware of the infringement, and his lack of knowledge was reasonable under the circumstances, then the three-year bar does not apply.

Plaintiff filed this lawsuit on February 7, 2021. Three years before he filed the lawsuit is February 7, 2018.

It is the defendants' burden to prove by a preponderance of the evidence that the plaintiff knew or reasonably should have known about an infringement before February 7, 2018.

If you find that the plaintiff discovered or should have discovered any of the alleged infringements before February 7, 2018, then the three-year bar applies as to that infringement. You may award damages only as to those alleged infringements that you determine the plaintiff discovered on or after February 7, 2018.

**Formatted:** Highlight

# EXHIBIT H

1

1    UNITED STATES DISTRICT COURT
     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION
2    HONORABLE DALE S. FISCHER, U.S. DISTRICT JUDGE

3

4    JEFFREY B. SEDLIK,

5                    Plaintiff,

6      v.                              Case No.
                                       2:21-cv-01102-DSF-MRW
7    KATHERINE VON DRACHENBERG, et
     al.,

8
                     Defendant.
9    ─────────────────────────────────

10

11

12
                  REPORTER'S TRANSCRIPT OF PROCEEDINGS
13                   FINAL PRETRIAL CONFERENCE

14                  Monday, November 14, 2022
                           3:10 P.M.
15
                    LOS ANGELES, CALIFORNIA
16

17

18

19

20

21

22

23   ─────────────────────────────────────────────────

24              JUDY K. MOORE, CRR, RMR
           FEDERAL OFFICIAL COURT REPORTER
             350 WEST 1ST STREET, #4455
25          LOS ANGELES, CALIFORNIA 90012
                   213.894.3539

**2**

1                          APPEARANCES

2    FOR THE PLAINTIFF:
     MR. JOEL B. ROTHMAN
3    Sriplaw
     8730 Wilshire Boulevard, Suite 350
4    Beverly Hills, California 90211

5    FOR THE DEFENDANT:
     MR. ALLEN B. GRODSKY
6    Grodsky Olecki & Puritsky, L.L.P.
     1111 Santa Monica Boulevard, Suite 1070
7    Los Angeles, California 90025

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**12**

1   Supreme Court that is going to affect this case.  And whether

2   we should put it off or not put it off, I'll leave that to the

3   other side and we can talk about it, but it is certainly clear

4   that the Supreme Court is going to do something and it's going

5   to -- something to clarify the fair use standard, and that may

6   impact this case.

7           THE COURT:  We can only hope.  I guess we -- yes,

8   you can hope for different results, but we hope that at least

9   they resolve something to help us down here at the lower

10  levels.

11          Counsel, your thoughts on that?

12          MR. ROTHMAN:  Yes.  Thank you, your Honor.  Joel

13  Rothman.  So, your Honor, the case before the Supreme Court is

14  quite different than this case, and I think the facts are

15  really important to understand.  So in that case what we had

16  was we had a photograph of Prince, and then what Mr. Warhol's

17  state, what they did with it, was what I think could be termed

18  interpretations of it, of that photo, varying degrees of

19  difference from the original photograph.

20          And what we have here is Mr. Farmer going in to Ms.

21  Von Drachenberg and saying, I want that on my arm and Ms. Von

22  Drachenberg complying with that and putting that on his arm,

23  which is not the same as, you know, I want an interpretation of

24  that image in some fashion.

25          So I don't think that, regardless of how the Supreme

1  Court determines the transformative use standard or any of the

2  other different elements of *fair use*, I don't think that that's

3  going to provide a jury, which still under the last time the

4  Supreme Court addressed this issue, which is *Oracle v. Google*,

5  the jury is entitled to make the determination of *fair use*.  So

6  it would seem to us that delay would just be delay for no

7  reason because your Honor would be in a position to instruct

8  the jury on existing understanding of *fair use*, and under these

9  facts, it would be their determination.

10         THE COURT:  Well, isn't -- I mean, there are things

11  that I said were not an issue here, which included Mr. Farmer's

12  point of view.

13         MR. ROTHMAN:  Correct.

14         THE COURT:  I think Ms. Von Drachenberg had

15  indicated in some way that she was doing something different

16  with the photograph.  Whether that was what Mr. Farmer wanted

17  or not probably isn't relevant.  So that sounds more like --

18  and I'd have to go back and read the papers again to see

19  exactly what she -- what she said for the purpose of the

20  summary judgment motion or whatever else I was doing, but she

21  was pointing out that -- I think the different -- I don't know

22  what the word would be -- the different feeling someone would

23  get when looking at the Miles Davis tattoo, not just because it

24  was a tattoo instead of a photograph, but because of the

25  different things she had done, whether related to the

**0**

1                        CERTIFICATE OF OFFICIAL REPORTER

2

3   COUNTY OF LOS ANGELES     )
                              )
4   STATE OF CALIFORNIA       )

5

6             I, JUDY K. MOORE, FEDERAL OFFICIAL REALTIME COURT

7   REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8   CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9   TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10  IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11  REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12  THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13  REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17                      DATED THIS 20TH DAY OF NOVEMBER, 2022.

18

19
                              /s/Judy K. Moore
20                     _____
                            JUDY K. MOORE, CRR, RMR
21                     FEDERAL OFFICIAL COURT REPORTER

22

23

24

25