# EXHIBIT A

1

```
 1                 UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3                        WESTERN DIVISION

 4        THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

 5

 6   JEFFREY B. SEDLIK,              )
                                     )
 7                     Plaintiff,    )
                                     )
 8                                   )
            v.                       )   No. CV 21-1102-DSF-MRW
 9                                   )
     KATHERINE VON DRACHENBERG aka KAT )
10   VON D;  KAT VON D, INC.; and HIGH )
     VOLTAGE TATTOO, INC.,           )
11                                   )
                       Defendants.   )
12   _____)

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16

17                   Los Angeles, California

18            Tuesday, January 23, 2024, 8:30 A.M.

19        Day 1 of Jury Trial, Page 1 through 246, Inclusive

20

21                             PAT CUNEO CSR 1600, CRR-CM
                               Official Reporter
22                             First Street Courthouse
                               Room 4311
23                             350 West 1st Street
                               Los Angeles, California 90012
24                             213-894-1782
                               patcuneo1600@gmail.com
25                             www.patcuneo.com
```

2

```
 1    APPEARANCES OF COUNSEL:

 2    FOR THE PLAINTIFF:     GLASER, WEIL, FINK, JACOBS & SHAPIRO, LLP
                             BY:  ROBERT E. ALLEN, ATTORNEY AT LAW
 3                           AND  JASON C. LINGER, ATTORNEY AT LAW
                             10250 Constellation Boulevard
 4                           Nineteenth Floor
                             Los Angeles, California  90087
 5                           310-553-3000
                             rallen@glaserweil.com
 6                           jlinger@glaserweil.com

 7

 8    FOR THE DEFENDANTS:    GRODSKY OLECKI & PURITSKY LLP
                             BY:  ALLEN B. GRODSKY, ATTORNEY AT LAW
 9                           AND  TIM HENDERSON, ATTORNEY AT LAW
                             11111 Santa Monica Boulevard
10                           Suite 1070
                             Los Angeles, California  90025
11                           310-315-3009
                             allen@thegolawfirm.com
12                           tim@thegolawfirm.com

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Day 1 of Jury Trial, January 23, 2024*

5

```
 1              THE COURT:  Probably will be taking charge of the
 2   whole case so . . . .
 3              MR. ALLEN:  How did you know?
 4              THE COURT:  Been there.
 5              MR. GRODSKY:  And, Your Honor, this is Tallal
 6   Dahar who is our trial tech who'll also be taking control of
 7   the case and our client is in the courtroom as well.
 8              THE COURT:  Good morning.  And is it -- What? --
 9   she doesn't want to sit up here?
10              MR. GRODSKY:  She will.
11              THE COURT:  Okay.  Is it Von Drachenberg?
12              THE DEFENDANT:  Yes.
13              THE COURT:  All right.  I don't know.  We started
14   out last week with five trials starting today so I don't
15   know if some of them have resolved but otherwise we'll be
16   waiting awhile for jurors to get oriented and gathered for
17   particular cases.
18              So let's talk about some initial things.  How are
19   you -- there's a list of stipulated facts in the pretrial
20   conference order.  How do you intend to present those to the
21   jury?
22              MR. ALLEN:  Your Honor, defense counsel and we
23   have not actually conferred on that.  Perhaps we could do
24   that and get back to you.
25              THE COURT:  That's fine.
```

```
 1              MR. GRODSKY:  He is down on --
 2              THE COURT:  Stop.  You answered my question.  It
 3    was just --
 4              MR. GRODSKY:  Yes, correct.
 5              THE COURT:  I'm a kind of bottom line kind of
 6    judge.  Just answer my question.  Then if you have something
 7    else to say. . . .
 8              So you can have him testify tomorrow but he needs
 9    to be available so we can do it at a convenient time when
10    it's not going to have too much of an impact.
11              I've done hundreds of trials.  It doesn't really
12    matter.  It will be fine.
13              Gittins and Davidson, what's the problem there?
14    The defendant objects; right?  Are you objecting to Gittins
15    and Davidson testifying?
16              MR. GRODSKY:  I don't believe we have.
17              THE COURT:  I must have dreamed it.
18              MR. GRODSKY:  I mean, we did not --
19              THE COURT:  Is it okay with both sides for Gittins
20    and Davidson to testify?
21              MR. GRODSKY:  Gittins, obviously we have no
22    problem.  I will say this about Davidson.  Davidson is a
23    former employee of High Voltage who did not work at the
24    company during the time that the tattoo was created but
25    during the time that most of the -- that virtually all of
```

1   my order was not as clear as it should have been.  But I

2   will allow evidence, if there is any, of hypothetical

3   license damages for the actual use that was made.

4           So I think that narrows it down from what the

5   plaintiff is talking about.  So we always had the tattoo.

6   Then we ended up with the various social media posts.

7           You guys are going to have to get together and

8   come up with a succinct list of actual alleged infringements

9   that we're talking about and it can't be 19.  It needs to be

10  a small list *(laughing)*.

11          MR. ALLEN:  Your Honor, I think that for damages,

12  I don't think the defense would disagree that we're talking

13  about one -- one set of damages for the tattoo and the

14  creation of the tattoo and then one set of damages for the

15  use on social media.

16          And there are, I think, 15 separate posts so those

17  are the two -- there's only like two categories and one is

18  there's just a number of different posts which are in

19  evidence and I -- does that answer your question or satisfy

20  your question?

21          THE COURT:  No.  So I don't know what a set means.

22  There's the tattoo.

23          MR. ALLEN:  Right.  So what I'm saying is for the

24  first grouping of the tattoo, typically a license would

25  cover the tattoo and the making of the tattoo.

29

| | |
|---|---|
| 1 | All right.  So I'm going to ask you with regard to the |
| 2 | parties, Mr. Sedlik and Ms. Von Drachenberg, if you just |
| 3 | have heard their names or you just know them from just brief |
| 4 | references, then I'll talk to you now. |
| 5 | If you have more detailed experience with them for |
| 6 | some reason, then I'll wait for you to be seated up here and |
| 7 | we'll ask you that question again.  So still have the same |
| 8 | hands? |
| 9 | All right.  So let's start in the front and if you |
| 10 | stand, I think Ms. Kim can get you a microphone.  And tell |
| 11 | us your first name and the first initial of your last name. |
| 12 | THE PROSPECTIVE JUROR:  Hi.  I'm Vivian P. |
| 13 | THE COURT:  And how do you know one of these |
| 14 | people? |
| 15 | THE PROSPECTIVE JUROR:  I know Kat Von D just from |
| 16 | social media and all the tattoos that she's famous for. |
| 17 | THE COURT:  Okay.  And do you follow her on social |
| 18 | media? |
| 19 | THE PROSPECTIVE JUROR:  Yes. |
| 20 | THE COURT:  Okay.  We'll ask you more about that |
| 21 | if you're seated as a juror here. |
| 22 | Next person? |
| 23 | Let's get the microphone over.  Great. |
| 24 | THE PROSPECTIVE JUROR:  I'm John Breinholt.  I'm |
| 25 | familiar with Kat Von D from television and news. |

```
 1            THE COURT:  Same way?  Okay.

 2            THE PROSPECTIVE JUROR:  Same way.

 3            THE COURT:  We may talk to you more about that.

 4       Anybody else?

 5            THE PROSPECTIVE JUROR:  I'm Heidi.  I'm familiar

 6  with Kat Von D from makeup.

 7            THE COURT:  Makeup.  Okay.  Thank you.

 8            Anybody else?

 9            THE PROSPECTIVE JUROR:  Hi.  My name is Mariana

10  Lopez and I'm familiar with Kat Von D.  I just watched her

11  not too long ago on a podcast and I see her throughout all

12  social media and I've been following her since she's been on

13  television.

14            THE COURT:  Okay.  Thank you.

15            And I see another hand.

16            THE PROSPECTIVE JUROR:  Hi.  I'm Jacquelin F. and

17  I also know her through her like work and makeup and stuff

18  like that like everyone.

19            THE COURT:  All right.  Thank you.

20            THE PROSPECTIVE JUROR:  I'm Taylor C.  Also

21  familiar with Kat Von D's work with her tattoos and her

22  television shows as well.

23            THE COURT:  All right.  Thank you.

24            Anybody else?

25            THE PROSPECTIVE JUROR:  Hi.  I'm Brian Stratford.
```

1    I know Kat Von D from TV and social media.

2              THE COURT:  Great.  Anybody else?

3              THE PROSPECTIVE JUROR:  Hello.  I'm Charles

4    Chapell and I'm familiar with Kat Von D from television.

5              THE COURT:  All right.

6              THE PROSPECTIVE JUROR:  Hi.  Paige Bonnano.  I'm

7    also familiar with Kat Von D from her work.  I used to live

8    two blocks from High Voltage Tattoo as well.

9              THE COURT:  Did you go into that shop?

10             THE PROSPECTIVE JUROR:  I have, yes.

11             THE COURT:  Okay.  Thanks.

12             Anybody else?

13             THE PROSPECTIVE JUROR:  My name is Andrew Kuo.  K.

14   I'm familiar with Kat Von D tattoo artist on TV.

15             THE COURT:  Okay.  Anybody else?

16                        *(No response.)*

17             THE COURT:  All right.  Thank you.

18             We can get our microphone back here.

19                   *(Pause in the proceedings.)*

20             THE COURT:  You may hear the names of the

21   following other people or they may be called as witnesses:

22   Brad Lyon, Rhian Gittins, Blake Farmer, Catherine Montie,

23   and Bryan Vanegas.

24             Does anybody know any of those people?

25                 *(The prospective jurors responded.)*

*Day 1 of Jury Trial, January 23, 2024*

1    Her entity, her tattoo studio is High Voltage Tattoo, Inc.,

2    and I'm also going to ask you if you're familiar with

3    Miles Davis.

4            So why don't we do the same thing.  Let's start

5    off at the end of the row here with Juror No. 1 in case you

6    have any "yes" answers.

7            And I think we can probably go to the -- include

8    the next one, if you're familiar with the television shows

9    *Miami Ink* or *L.A. Ink*.  I think we heard some mention of

10   that earlier as well.

11           So we're at Juror No. 3.  All right.  Thanks.

12           THE PROSPECTIVE JUROR:  Yes, for me.  Familiar

13   with Kat Von D.  I've seen a bit of the shows.  Just know

14   her from TV and social media.

15           THE COURT:  All right.  And since you've seen her

16   shows and she's sitting here during this trial, she's one of

17   the parties, can you be a fair and impartial juror in this

18   case?

19           THE PROSPECTIVE JUROR:  Yes.

20           THE COURT:  Thank you.

21           THE PROSPECTIVE JUROR:  I actually also know her

22   from like her makeup and the tattoos on TV.

23           THE COURT:  Will that impact your decision?

24           THE PROSPECTIVE JUROR:  No.

25           THE COURT:  All right.  Thank you.

175

1    or pretending he could fly.

2    Q.    How much did you charge as a license fee for this; and

3    if we need to go back to the first page, we can.

4    A.    $7,000 with the understanding that there would be no

5    use of the photograph itself.  And this was after I had been

6    paid by the other client to create and to use the photo; and

7    if somebody approaches me today, I would grant another

8    license.

9    Q.    And this was done in what year?  This license?

10    A.    I can't see that on the screen.  Well, I can see that I

11    signed it in 2005.

12    Q.    Was that around the time of the license?

13    A.    That would be when I issued the license.

14    Q.    Did either that it was not an exact copy or that

15    additional elements were added affect your decision to enter

16    into this artistic reference license?

17    A.    No.  It's commonplace for people to contact me and

18    about artist reference licenses of one kind or another in

19    one medium or another.  It could be a sculpture or -- that's

20    going to go -- there's one in France, a sculpture in France

21    based on a photo.

22          Changing the mediums is one way of using a photo

23    as artistic reference but it didn't come to mind in terms

24    of, well, if you change it x percent, you don't need this

25    license.

```
 1              It was the longstanding practice here of

 2   requesting and receiving artist reference license to execute

 3   a copy or derivative work in another medium.

 4   Q.   Let's go to Exhibit 322.

 5              (The exhibit was displayed on the screen.)

 6   Q.   Mr. Sedlik, could you he tell us what we're looking at

 7   in Exhibit 322?

 8   A.   A painter, a very good -- a really excellent artist,

 9   Jay Johansen, approached me to request the right to make use

10   of my Miles Davis photo in, I think, a series of prints; and

11   I don't recall the specific circumstance.  This was only

12   three years ago but I've been pretty busy so I don't recall

13   every detail.

14              But I know that I had a discussion with him about

15   usage and we came to an agreement that he could create a

16   painting and part of -- well, I'll stop there.  It is a

17   license for artist reference to make a painting completely

18   different medium on canvas of my photograph and with all

19   kinds of color and other, changing quite a bit of the

20   photograph.

21   Q.   Is this license applied to the same image that's at

22   issue here?

23   A.   It does.

24   Q.   Let's go to Exhibit 34.

25              (The exhibit was displayed on the screen.)
```

1   professional costume designer.  And one of her -- one of the

2   people working on the shows found a T-shirt with my

3   Miles Davis photograph on it in a store, a used T-shirt

4   unrelated to my wife being on the show, and said:  Why don't

5   we have one of our characters, you know, wear this?

6           And my wife said:  That's my husband's photograph

7   and connected the production of *Yellowstone* with me.  They

8   asked her a favor.  My wife was on the show.  I granted them

9   the right to make use -- to have that T-shirt, not my

10  original photograph but the T-shirt with my photograph

11  appear in the television show and it did and, of course, my

12  wife was working on it.  I made it -- I put a $1500 fee.  I

13  credited the fee.

14  Q.   Let's go to the second page.

15          *(The exhibit was displayed on the screen.)*

16  Q.   The third page.

17          *(The exhibit was displayed on the screen.).*

18  Q.   Is this the picture of the T-shirt on the boy in

19  *Yellowstone*?

20  A.   Yeah.  He played a young thug and attacked a woman in

21  the show and wearing my shirt.

22  Q.   And what was the reason why you waived your license

23  fee?  Well, hold on for that.  Let's go to Exhibit 260.

24          *(The exhibit was displayed on the screen.)*

25  Q.   Do you recognize Exhibit 260?

```
 1              It has to be a magazine cover so it can't, you
 2    know, be a really pulled back wide shot.  It had to be in
 3    tight on him and say something about the person.  And I came
 4    up with that and a few other ideas that we have an exhibit
 5    on, I believe.
 6    Q.   Are there any subtle symbolic references in the work.
 7    I think you were just describing the fingers but --
 8    A.   Well, it would help me to refresh my memory, not that I
 9    don't know my work but if you can let me look at my work
10    while we're talking.
11    Q.   Absolutely.
12              (The exhibit was displayed on the screen.)
13    A.   I'll start answering.  So part of this was the aspect
14    of, you know, of course this shush gesture that he was
15    making.  I actually went in and placed his fingers exactly
16    in that arc.  I walked up to him, asked him if I could.  We
17    had a little bit of a relationship going on.  And I placed
18    his fingers in an arc to represent a musical notation.
19              I carefully had him position his finger and so I
20    was building subliminal things in like that arc of the
21    fingers.  Nobody will ever know, except the people in this
22    room, that I arranged Miles' fingers and I don't think
23    anybody ever did that to him before or ever did it afterward
24    but he really liked this idea.  He let me do that.  There's
25    that.
```

1            You do get an iconic feeling from the work and a

2    sense of moodiness and melancholy.  It's kind of a dark

3    portrait with shadows on him.  I, you know, I picked out the

4    wardrobe to keep it very dark in the image and, you know, it

5    says a lot of those things that I just mentioned, you know.

6    It just feels like his music to me.  It feels like him.

7            He was a very gracious person.  A lot of people

8    were intimidated by him but he was a really wonderful,

9    gracious person.

10   Q.  Did you intend to create a sculptural quality in the

11   image?

12   A.   I did.  My lighting method is to sculp people out of

13   darkness.  Sometimes that involves a very bright image in

14   the end and something I sculp them out of the background and

15   there's a lot of creative expression that goes into

16   achieving that.

17   Q.  Were there other intended purposes in creating this

18   photograph other than what you've just described?

19   A.   Well, I knew that I was going to license it and, of

20   course, that's the way I make my living; and so every time I

21   create an image, of course making the art is at the top

22   of -- like expressing myself is at the top of my list.

23           But then again, I can't afford to go do something

24   for, you know, in this case for no fee just on a barter

25   basis and to pay a portion of the expenses myself, or all

```
 1    LOS ANGELES, CALIF.; WEDNESDAY, JANUARY 24, 2024, 7:46 A.M.

 2                            -oOo-

 3       (The following was held outside the jury's presence:)

 4             THE COURT:  Good morning.

 5             MR. ALLEN:  Good morning, Your Honor.

 6             MR. GRODSKY:  Good morning, Your Honor.

 7             THE COURT:  Is there anything we need to discuss?

 8             MR. ALLEN:  Yes, Your Honor.

 9             I've had a chance to review your draft jury

10    instructions, at least some of them.  The good news is I

11    think that we may be withdrawing some of them.

12             THE COURT:  Okay.

13             MR. ALLEN:  That's always good for everybody.

14             There's some significant problems with the fair

15    use instructions.  Most importantly, the instructions do not

16    incorporate the Court's findings on the second and third

17    factor.

18             THE COURT:  That's deliberate.  I don't think I

19    can -- I don't think I can tell them what my findings were.

20    They need to balance.  They can't balance if I tell them --

21    it's not like a checkmark where it's a plus or a minus.

22    It's a weighing.

23             MR. ALLEN:  It is a weighing but there's already

24    been a factual determination and I'm concerned that if the

25    jury is not properly instructed, then we're just going to
```

1  Q.   And what was that conclusion?

2  A.   The outlines of the hair matched, the nose matched, the

3  eyes matched, the finger matched, the lips matched, the

4  location of the shoulder matched, the little tiny bit of the

5  ear that was there matched, the cascading fingers that I put

6  into place on my shoot day matched.

7        The little bit of the jaw matched, the highlight

8  on the forehead matched.  And after seeing that, the

9  creative heart of my photograph is basically captured here

10  in the sketch without the shading, I concluded that it is a

11  tracing in the same way that anybody would trace a

12  photograph on tracing paper laying it over a photograph and

13  using a pencil.

14  Q.   Are the proportions between all of the elements in the

15  photo the same in the photograph and in the traced image?

16  A.   When I overlaid it, I confirmed with that center

17  overlay to my satisfaction, even the shadow under the nose,

18  the shape of the shadow because of the way that I arranged

19  the light above, is exactly the same as the photograph.

20  Q.   I was referring more to the relationship between -- the

21  proportional relationship and space between the fingers.

22  Was that the same?

23  A.   Yes.  I can see in the center overlay that the tips of

24  the fingers, the lines around the tips of the fingers are

25  traced in place looking at my photograph through the tracing

1   paper and just drawing over my photograph.

2           Even the fingernails on his pinkie finger are

3   exactly over where I placed his pinkie myself with my own

4   hands.

5   Q.   Once you notify -- what has been your experience when

6   you notify someone that their work is infringing yours?

7   A.   *(No response.)*

8   Q.   Let me rephrase that.  What is your experience -- once

9   you notify someone that they are infringing your work, do

10  they take any actions?

11  A.   I pause because I want to make sure I give a complete

12  answer and I also have to leave time for objections so I

13  know the answer but it's not because I'm uncertain.

14          I don't notify people at the outset that they're

15  infringing.  I approach people in the manner that I

16  testified about yesterday, contacting them in a respectful

17  manner and mentioning -- pointing out that I created the

18  work, that I rely on the work to earn my living, that

19  they're using the work and that I don't have any record of a

20  license to them.

21          And most often, in almost every instance but not

22  all instances, I ask if they have a license because maybe

23  they bought a license from someone that I don't know about

24  and they believe they have a license.

25          I ask those questions without making accusations

1  Q.   Is Ms. Von D's rendering of your depiction of

2  Mr. Davis' smile lines similar?

3  A.   Are you referring to the labial folds at the side of

4  his face?

5  Q.   You know, I had to look that word up but yes.

6  A.   Yes.  Those are the lines that come off the corner of

7  the crease of his nose and down diagonally toward the

8  outside of the corner of his mouth are duplicated.

9  Q.   Is Ms. Von D's rendering of your depiction of the ear

10  on the left side of the portrait similar?

11  A.   Yes.  The ear was covered with hair when I began making

12  the photographs.  I walked in and up to Mr. Davis, requested

13  his permission to move his hair away from his ear so that I

14  could have some visual interest there, and it's duplicated

15  in the tattoo.

16  Q.   Is Ms. Von D's omission of the ear on the other side of

17  the portrait similar?

18  A.   Yes.  I turned his face to one side.  I didn't want to

19  have two ears in my photograph and felt that this was the

20  best presentation.

21  Q.   Is Ms. Von D's rendering of your depiction of the lips

22  similar?

23  A.   Yes.  The lips are in a certain shape that occurs when

24  you tense your face and purse your lips and I had him do

25  that at the moment that I captured the photograph.

286

1   Q.    Is Ms. Von D's rendering of your depiction of

2   Mr. Davis' forefinger similar?

3   A.    Yes.  I had him raise and lower his forefinger until

4   the side of his nail matched the crease between his lips.  I

5   was going for this musical note subliminal message that I

6   don't know if it really came across consciously but that was

7   my goal and that is duplicated in the tattoo.

8   Q.    Is Ms. Von D's rendering of your depiction of the

9   position at which the forefinger crosses the lips similar?

10  A.    Yes.

11  Q.    Is Ms. Von D's rendering of your depiction of the

12  middle finger similar?

13  A.    Yes.  Mr. Davis' fingers do not naturally take that

14  position.  I found when he makes a shush pose, I suppose you

15  could say, his fingers were all balled up so I requested his

16  permission to come in and position his fingers for the

17  photograph.

18          And I raised -- I separated his fingers out of a

19  ball, essentially a fist, and raised the middle finger up so

20  that it bisected the angle between his forefinger and the

21  ring finger so that there was a cascade of fingers.

22  Q.    What about the knuckles?

23  A.    The knuckles are duplicated in the tattoo.

24  Q.    What about the rendering of the pinkie finger?

25  A.    Counselor, this copy is pretty blurry on my screen and

1   your photograph depicted in the tattoo?

2   A.   Every choice of selecting and coordinating and

3   arranging the elements in this photograph results in the

4   original expression that comes out of all those subjective

5   creative choices.

6   Q.   Does your portrait evoke a sense of drama, moodiness,

7   or melancholy?

8   A.   Drama, yes.  Moodiness, yes.  Melancholy, yes.  But

9   melancholy is going to be in the eye of the beholder.  You

10  know, when you look at the Mona Lisa, some people think that

11  she's smiling and some people think that she's frowning.

12  And it depends on their mood and who they are and what their

13  life experience is.

14          But there is -- there's a sense of intensity and

15  melancholy.  That somebody might look at this and say it's a

16  beautiful, graceful portrait.  Other people might think it's

17  an intense, stern portrait.  It's really where are they

18  coming from?

19          And I -- I, you know, I created this depiction of

20  him and shaped it and, you know, like a sculptor and then

21  people can perceive that sculpture however they might.

22  Q.   Does that tattoo evoke the same sense of drama and

23  moodiness?

24  A.   Yes.

25  Q.   Does your portrait contemplate movement?

1   history.  It made sense for me.

2   Q.   Do you recall where you found those two artwork pieces

3   that you sent to Ms. Gittins?

4   A.   No, not really.  I mean, it was a Google search.  The

5   Google image search that yielded -- the album artwork, of

6   course, is on the album but the photo is, to this day,

7   available on a Google image search.

8   Q.   Was there anything in particular about Mr. Sedlik's

9   photograph that you liked?

10  A.   I liked that it was simple.  Most other ones had him

11  playing the trumpet which wouldn't be suitable for an

12  arm-piece, I didn't think.

13  Q.   So you didn't want a tattoo with a trumpet on it?

14  A.   No.

15  Q.   Did you like the position of Davis' hand?

16  A.   Yeah, sure.

17  Q.   Did you like his facial expression?

18  A.   Yeah.

19  Q.   And you wanted those elements in your tattoo?

20  A.   Yes.

21  Q.   You mentioned you were thinking about creating a larger

22  scheme of Davis tribute tattoos.  Did you ever conduct

23  further work on that scheme?

24  A.   No, we didn't.

25  Q.   So it was just the tattoo that you showed to the jury?

1   Q.   -- prior to the deposition other than reaching out to

2   him to get his email address for your lawyer; is that right?

3   A.   Yes.

4   Q.   So you had no communication with Mr. Farmer but you

5   consider him your friend.  Is that your testimony?

6   A.   Yes, yeah.  I have tons of friends I don't talk to all

7   the time.

8   Q.   Well, Ms. Von Drachenberg, it's not that you haven't

9   talked to him in a long -- it's not that you haven't talked

10  to him frequently, you hadn't talked to him in five to seven

11  years?

12  A.   Okay.  Yes.  Okay.

13  Q.   Mr. Farmer didn't ask you to make any changes to the

14  photo, did he?

15  A.   Umm, no.  The -- no, no.  I mean, he gave me creative

16  freedom is what -- you know, he just said:  Here.  Go with

17  it.

18  Q.   And Mr. Farmer texted the digital file of the photo to

19  your assistant Rhian; correct?

20  A.   Rhian, yes.

21  Q.   And that was sent on March 1st, 2017?

22  A.   I don't have the text in front of me but I'm sure it's

23  the screenshots we were looking at earlier.

24  Q.   And you didn't reach out to Mr. Farmer directly?  You

25  had your assistant do it; correct?

1    right?

2    A.    The ultimate work is not an image of him.  I think the

3    ultimate work was a painting.  I'm not sure who -- I don't

4    know much about Miles Davis so.  But I know that the album,

5    the *Bitches Brew* album is not a photograph.  It's a

6    painting, I believe.

7    Q.    I'm not talking about the album.  I'm talking about

8    Mr. Sedlik's photograph and the tattoo.  Okay?

9    A.    Uh-huh.

10   Q.    Both are of Miles Davis; correct?

11   A.    Yeah.  Yeah.

12   Q.    You didn't add any new people in there, did you?

13   A.    Oh, no, no, no.  No, no.  I added my own texture and

14   movement, yeah.

15   Q.    The pose of Miles Davis is the same?

16   A.    Yes, yes.

17   Q.    And it's the same perspective, isn't it?

18   A.    Yes, uh-huh.

19   Q.    And looking in the same direction?

20   A.    Yep.  It's a photo, yeah.

21   Q.    And the fingers are arranged the same?

22   A.    Yes.

23   Q.    And the lighting direction is the same?

24   A.    Yeah.

25   Q.    And the perspective is the same?

1   A.   Yes.

2   Q.   Doing your shading, you claim to have created shadows

3   and highlights; correct?

4   A.   Yeah, I did my own interpretation of the lighting.

5   It's not -- It's not -- I'm not a copy machine.  I can't --

6   physically can't make something exactly the same as a photo.

7   Q.   And the tattoo shadows and highlights match the shadows

8   and highlights of the photo, don't they?

9   A.   A lot of them, yeah.  I wouldn't say all of them,

10   though.

11          (Plaintiff's counsel conferred.)

12   Q.   307.  Sorry.  307.  Lot of numbers to keep track of.

13          (The exhibit was displayed on the screen.)

14   Q.   Okay.  So shadows exist when an object blocks the

15   pathway of light; isn't that right?

16   A.   Can you repeat that?

17   Q.   Shadows exist --

18   A.   Uh-huh.

19   Q.   -- when an object blocks the pathway of light?

20   A.   Okay, yeah.

21   Q.   You agree with that?

22   A.   Sure.

23   Q.   And I want you to look at the nose of Miles Davis in

24   the photo and the tattoo.

25   A.   Uh-huh.

1    Q.   You see that the shadows on the nose on the side are

2    the same in the tattoo and in the photo?

3    A.   Yeah, they're similar.  I feel like I --

4    Q.   And what about the shadows underneath the nose?

5    A.   Yeah, it's very similar.  I think I did a pretty good

6    job.

7    Q.   And let me just take it aside, Ms. Von Drachenberg.  I

8    think that your tattoo work is excellent but that's not why

9    we're here.

10   A.   Thank you.  Thank you.

11   Q.   And the shadows on the cheeks are exactly the same,

12   aren't they?

13   A.   I think they're similar, yes.

14   Q.   And the shadows around the eyes are exactly the same,

15   aren't they?

16   A.   Yeah.  I think it's very similar to his face and hands.

17   Q.   And you hadn't seen this photo before Mr. Farmer sent

18   it to you or your assistant?

19   A.   Not that I know of.  Like I said, I didn't really know

20   much about Miles Davis until this lawsuit.

21   Q.   And you didn't base your tattoo on anything other than

22   the photo, did you?

23   A.   No, I did.  I used that reference of that artwork that

24   you saw me at the lightbox.  You see how I had the record

25   artwork next to it.

424

```
1              It was -- that's where a lot of motion that you
2     see around the fingers and see how the -- instead of
3     recreating the hair as it was in the photo, I did my own
4     version where it looked like -- almost like smoke and
5     negative space that was going to lead into the album
6     artwork.  So, yeah, I did do my own like additional
7     interpretations.
8     Q.    But you didn't look at any other photos of Miles Davis
9     in putting together the tattoo?
10    A.    Oh, no, no, no.
11    Q.    And you didn't know what Miles Davis even looked like
12    well enough to tattoo without the photo; isn't that right?
13    A.    Right.
14    Q.    And so you just copied the photo to make the tattoo?
15    A.    I did my interpretation of the photo and did my
16    adjustments to it.
17    Q.    And you're a skilled tattooist, aren't you?
18    A.    I feel weird saying that I am but I think I'm pretty
19    good.
20    Q.    And you're able to take a piece of art and copy it into
21    another medium; is that right?
22    A.    I'm not a copy machine so I don't think I -- I mean, I
23    can point out all the things I feel I could have done better
24    actually but, you know, I try my best.
25    Q.    And -- well, copy machines don't copy photos onto skin,
```

*Day 2 of Jury Trial, January 24, 2024*

1   do they?

2   A.    They don't.

3   Q.    That's what a tattooist does; right?

4   A.    What -- I mean, if you like to reduce my job to that, I

5   guess.

6   Q.    Again, Ms. Von Drachenberg, you're an excellent

7   tattooist but that's not why we're here.  We're here because

8   you copied Mr. Sedlik's --

9            THE COURT:  Ask a question, Mr. Allen.

10  BY MR. ALLEN:

11  Q.    Photos are flat, aren't they?

12  A.    When printed on paper, yes.

13  Q.    And Mr. Farmer's arm is curved like a cylinder, isn't

14  it?

15  A.    Yes.

16  Q.    So between the shape and texture of Farmer's body, you

17  had to make adjustments in order to copy the photograph; is

18  that right?

19  A.    I think so.  I mean.

20  Q.    And you're also a recording artist, aren't you?

21  A.    Yeah, amongst other avenues.

22  Q.    So do you think that someone could take one of your

23  songs, change a few of the words and put out their

24  interpretation of your song without permission?  Would that

25  be okay?

```
 1   A.    People cover my songs all the time.

 2             THE COURT:  Let's just stop.

 3             MR. GRODSKY:  Objection; relevance.

 4             THE COURT:  Sustained.

 5   BY MR. ALLEN:

 6   Q.    Mr. Farmer came to you and told you that he wanted to

 7   eventually get a whole sleeve of Miles Davis inspired

 8   tattoos, didn't he?

 9   A.    That's right.

10   Q.    And isn't that the reason why the hairline is a little

11   bit different so that way you could incorporate other

12   tattoos later on?

13   A.    The hairline is different because it's my

14   interpretation of telling the story of this artist that

15   meant so much to him and using the artwork that he was

16   inspired by.  So, you know, tattooing is storytelling, too,

17   just like photography is.

18   Q.    Right.  But some of the reasons why it's a little bit

19   different around the edges is so that way you could add to

20   it later with other tattoos; isn't that right?

21   A.    Sure.  Parts of it, yeah.  Some of it is just also my

22   composition.  That's just how I -- I never do like a

23   floating head.  I always create a composition around a

24   portrait.

25   Q.    And because of that, you added what you referred to as
```

1    Q.    Let's go to page 2.

2              (The exhibit was displayed on the screen.)

3    Q.    Can you read the circle?  That's a post by High Voltage

4    Tattoo; correct?

5    A.    Yeah.  And it's in response to somebody named Lennie

6    Vox so it looks like maybe the question has been deleted

7    from Lennie Vox unless it's somewhere else.

8    Q.    No.  It's been deleted but can you read that post?

9    A.    So they wrote:  Nope, it's a hundred percent exactly

10   the same as the reference.  Portraits are traced directly

11   from actual photos.

12   Q.    So that's what your company said; right?

13   A.    Probably one of my shop helpers said that or whoever

14   was running the account that day.

15   Q.    So your company said that the tattoo is a hundred

16   percent exactly the same as the reference photo, doesn't it?

17   A.    Yeah.  I mean, I would say that was bad wording but --

18   because I don't agree with that.  I didn't write it.

19   Q.    But your company did; correct?

20   A.    It's probably one of my shop helpers.  I'm assuming.

21   That's who runs our social media most of the time or a

22   tattooer.

23   Q.    And your company said that you traced directly from the

24   photo; isn't that right?

25   A.    Right.  You have a video of me mapping it out.

1   Q.   And you've testified that your tattoo is free-hand;

2   right?

3   A.   The tattooing part is free-hand.  That's a tattoo term.

4   Free-hand is to like, you know -- you know, when like

5   someone is painting like a landscape and you put your easel

6   up and then you look at the tree and then you're doing that.

7   That's considered free-hand.

8   Q.   But the only thing that's free-hand that you did was

9   the shading; isn't that right?

10  A.   Which is 99 percent of the tattoo.

11  Q.   Ms. Von Drachenberg, yes or no?

12  A.   Oh, yes.

13  Q.   The only thing free-hand that you did in the tattoo is

14  the shading; is that right?

15  A.   Yes.  All right.  Most of it, yeah.  I think I did some

16  of the free-hand -- some of the lines are also free-hand

17  even though there's not really a lot of lines in portraits.

18  But like the wrinkles, there's no way that you can map out

19  all the wrinkles on Miles Davis' face.

20          So a lot of that was me just giving you the

21  sentiment of wrinkles under his eyes.  It was like, you

22  know, the -- the reflection that Mr. Sedlik referred to

23  earlier.  Like I didn't see that because it was just a

24  medium-res image from online.

25          So they were my interpretations of highlights.  So

*Day 2 of Jury Trial, January 24, 2024*

```
1   A.   Yes.  Sorry.  Yes.

2   Q.   So it's enticing someone to come get a tattoo of a

3   musician at High Voltage Tattoo, isn't it?

4   A.   Not at all.  What we like to do is we like to engage

5   with our fans and followers.  So we'll usually -- like, I

6   mean, I know for me personally I like to like sometimes ask

7   questions like:  Hey, what's your favorite horror movie?

8   Mine's this.

9        And it's not that I'm going to make you go see a

10  horror movie.  It's just -- that's called -- it's not

11  antisocial media.  It's like you socialize.  So that's just

12  being cute.

13       Especially considering that I -- I don't take

14  appointments.  I don't do walk-ins.  There's no place that

15  you can go online to book an appointment with me.  There's

16  no -- I can't sell you an appointment.  I just don't do

17  that.

18       So if you notice like:  Hey, how long is the wait

19  for a tattoo by you, there's no response because the truth

20  is that there is no way.  You can't get tattooed by me

21  unless you're my friend.

22  Q.   All right.  But you advertise and promote yourself and

23  your businesses a lot on your social media, don't you?

24  A.   I post for anything that I'm doing.  I like to share

25  with my fans and followers my life.
```

1    because I was like, when I sold my makeup line, we're not

2    supposed to have anything live anymore so this is probably

3    no longer up; right?

4    Q.   No, it's still up.

5    A.   Oh, it is?  Oh, I should take note of that.  Okay.

6    Q.   It says, "The Saint and Sinner pallet is finally here.

7    This limited edition beauty is available now at

8    katvonbeauty.com."

9    A.   Yeah.

10   Q.   Do you see that?

11   A.   Yes, I do.

12   Q.   And that's an advertisement, isn't it?

13   A.   I don't see it that way.  This is just me announcing

14   like my new creation that I'm releasing.

15   Q.   Someone can go to katvondbeauty, at least in 2017 --

16   A.   Yeah.  That doesn't exist anymore.

17   Q.   -- and click on it and then go purchase it, can't they?

18   A.   Yes, yes.

19   Q.   Let's go to the next page.

20            (The exhibit was displayed on the screen.)

21   Q.   And this is a post by you on -- very recently, March 7,

22   2023.

23   A.   Yeah, I auctioned off about a 130 pairs of my shoes to

24   my fans.

25   Q.   And it says, "Click the link in by bio to sign on the

473

1   sense that, you know, it was a format show where -- or

2   docu-series where people come in and get tattooed and you

3   hear their stories through the tattoos except they wanted it

4   to be all females with one male tattooer so they casted it

5   that way.

6          And I can't remember the exact date.  I know we

7   talked about it earlier.  I know it was April Fool's because

8   that's when I signed the lease for my tattoo shop but I

9   can't remember the year.

10  Q.  All right.  And can you tell us what you're

11  currently -- what, you know, what you're currently doing in

12  terms of employment or work?

13  A.  Well, my -- sadly, my tattoo shop after 12 years just

14  couldn't survive the lockdown so in November of -- two years

15  ago, I had to shut that down.

16         And since then, I've had a child.  So my little

17  boy is five and so we moved to Indiana.  That's where we

18  currently reside.  My husband and I.  And I home school my

19  son.  I'm pretty much a stay-at-home mom.  I still -- I'm

20  always going to be an artist so I'm always going to create

21  whether it's music or paintings, drawings, photography, and

22  perhaps tattooing.  I'm not sure if I'm going to continue

23  tattooing after all this.  But if I do, I will.  I'm always

24  going to be an artist.

25  Q.  Okay.  So you mentioned High Voltage and you talked

491

1          Like I did his pupils with the liner and other

2   than that, we jumped into the shading pretty quickly and

3   that's where all the free-hand shading starts.

4               *(Pause in the proceedings.)*

5   Q.   Let's put that up.

6          **(The exhibit was displayed on the screen.)**

7   Q.   All right.  Ms. Von D, I have put up Exhibit 307 and

8   I'm wondering if you could explain some of the differences

9   between your interpretation and Mr. Sedlik's photograph.

10  A.   Sure.  This is obviously showing more of the front view

11  since it's on Blake's arm.  As you guys saw earlier today,

12  it kind of wraps around.

13          And so you see like the center part is, you know,

14  my rendition of Mr. Sedlik's photograph; and then I did my

15  own interpretation of trying to create a composition.

16          So like I said before, I don't want it to look

17  like it's a totem pole.  Like people bring in photos all the

18  time, and then if I were to do it exactly like the photo, it

19  would just look like a block with like a head cut off

20  floating on your arm.

21          So I always suggest to the client that, you know,

22  to add some type of composition and that's where I started

23  putting like the negative space and you see like that

24  texture that kind of is a little bit smoky.

25          Like I mentioned before, a lot of that was in

| | |
|---|---|
| 1 | preparation for the rest of the tattoo.  We were going to -- |
| 2 | it was more inspired by the album artwork of *Bitches Brew* |
| 3 | more than this actual photo. |
| 4 | Q.   Did you add any shading or highlight to the fingers? |
| 5 | A.   No.  I probably just did less of it.  I think, you |
| 6 | know, as a tattooer I'm not trying to be a camera.  I want |
| 7 | you to see the human fingerprint.  This should feel like I |
| 8 | tattooed it versus just a sticker. |
| 9 | So as you can see like in the forehead and stuff, |
| 10 | I didn't get microscopic with the details.  I didn't do the |
| 11 | veins in his temple.  You know, the -- even the furrowed |
| 12 | brow, you know, I really didn't get as involved as the |
| 13 | photo.  I simplified a lot of that.  The eyes as well.  Like |
| 14 | on the highlights, they're definitely not the same.  I |
| 15 | think -- yeah. |
| 16 | Q.   Did you include the clothing in the -- the clothing |
| 17 | that Mr. Davis wore? |
| 18 | A.   No.  Like I said I was -- I even was guesstimating on |
| 19 | his jawline.  This is a much higher res image so you can |
| 20 | clearly see the jawline on it whereas mine doesn't even |
| 21 | include a jawline. |
| 22 | And then I think the other thing that sets like |
| 23 | portrait artists apart from each other is that like anybody |
| 24 | can learn how to tattoo, you know.  It doesn't take like a |
| 25 | genius or anything.  It's just a matter of practice. |

```
 1            MR. ALLEN:  So in the second instruction which
 2    just deals with the first factor, I understand the argument
 3    that -- and Mr. Grodsky made and the Court can decide that
 4    we're going to decide that it doesn't have to be
 5    educational.
 6            My point is that it leaves a vacuum as to what
 7    constitutes commerciality, and my point is at least in the
 8    second instruction that we include the concept from
 9    Worldwide Church, that it doesn't have to be money.  It can
10    be any benefit.
11            THE COURT:  All right.  I understand that now.
12            What else?
13            MR. GRODSKY:  I have two things, Your Honor.
14            A brief note about the jury instructions.  This is
15    the jury instruction on the first fair use factor.  It's the
16    last paragraph which reads, "For each social media post, you
17    must determine whether the post has a further purpose or
18    different character than the copyrighted work and then
19    balance the degree of difference against the commercial
20    nature of the post."
21            My only concern is that in the paragraph before
22    when you're talking about the tattoo, you specifically say
23    you have to decide whether the tattoo is of a commercial
24    nature.
25            And though it was a disputed issue as to the
```

1    which is in the middle of the page.  I can -- which is a

2    quote that you quoted from *Warhol*.

3        THE COURT:  Which, again, is from a case.  And I

4    can tell it was from a case although lawyers talk like this,

5    too but generally not to juries.

6        So I don't know about justification for conjuring

7    up the original work to shed light on even if I were to

8    agree that this is a concept so. . . .

9        MR. ALLEN:  It's really the concept that's

10   important and so we can obviously change the language.  The

11   point, though, is it needs to -- the purpose and this *Warhol*

12   made clear, that there needed to be a focus of that use on

13   the actual work, not the content or the subject matter of

14   the work.

15       And the Court repeatedly used the term

16   "justification."  So if someone is making a parody, it's

17   justified because they need to.  In order to parody it, they

18   need to use it.

19       If you're criticizing something, you need to

20   obviously use it to criticize it.  Otherwise, if it just

21   says for a different purpose, that leaves open the

22   possibility, well, she put it on social media and that's a

23   different purpose because Mr. Sedlik didn't post it on

24   social media.

25       That's not the test.  That's what *Warhol* said was

1    actually not transformative.

2           THE COURT:  And I think the problem is that I

3    don't even know what this means, even though I quoted it,

4    because I was quoting it.  That's why I put it in quotes.

5           But I missed, in the context of this case, and

6    giving it to a jury if I were to give it at all, it would

7    have to be different language because --

8           MR. ALLEN:  All right.  Let me --

9           MR. GRODSKY:  Let me just address this.

10          THE COURT:  Yes.

11          MR. GRODSKY:  I agree that the language would make

12   no sense to a jury.  But the problem is, first of all,

13   *Warhol* doesn't say -- *Warhol* does talk about what it means

14   to have justification and it does say that justification

15   relates to this and that the more justified your changes

16   are, the more likely it's to be transformative.

17          But it doesn't require justification.  It's one of

18   all the different things that *Warhol* said in its opinion

19   were ways you prove transformative use.

20          And so I don't think there's a way to change this

21   language.  You know, there's a lot of stuff in *Warhol* and in

22   our proposed instructions we all pull different parts of

23   *Warhol* that we wanted you to use and your decision is

24   creating -- it's sort of the general rule.

25          And I just don't think it's -- I don't think it's

```
1    correct to say there must be justification and I don't think
2    this language -- I think it's very confusing for a jury.
3              MR. ALLEN:  So let me propose something
4    differently.  Instead of this language, if it says something
5    to the effect of, that has a critical bearing which is
6    language from Warhol but a critical bearing --
7              THE COURT:  All right.
8              MR. ALLEN:  -- on the work itself not just the
9    subject of the work.
10             THE COURT:  That will mean nothing to a jury.  It
11   barely means anything to me.
12             MR. ALLEN:  Okay.  That relates to the photograph
13   and not to Miles Davis.  I mean, that's more specific and I
14   mean, that's how it applies in this case.  I mean, both
15   Warhol and Campbell make clear it's the relationship to the
16   copyrighted work itself not the subject matter of the work.
17             So if it says "and relates to the photograph,"
18   Mr. Sedlik's Miles Davis photograph and not Miles Davis.
19             MR. GRODSKY:  It is true that if you're trying to
20   prove fair use by parody or comment, it is true that that
21   parody or comment must be a parity of the work and not
22   something else.  That's satire and it's not protected.
23             But that's not the only way to prove fair use; and
24   if you are using this to tell a completely different story,
25   that is potentially something that is transformative.
```

1          MR. ALLEN:  Your Honor, this is a draft.  I mean,

2     we can delete the -- the quotation marks are meaningless.

3          THE COURT:  Okay.

4          MR. ALLEN:  And the third point is -- I think that

5     we found a case that found that -- a Ninth Circuit case

6     Mr. Linger found.  I think it was -- was it *Ford Motor*?

7     What was it called?

8          That where there's already been a finding by the

9     Court in a summary judgment ruling or a prior jury has found

10    an issue that it's -- that the jury has -- the new jury has

11    to be informed of that finding.  I think it was *White v.*

12    *Ford Motor Company*, 500 F.3d 963 at 973.  It's a Ninth

13    Circuit case from 2007.

14         And so we talked about this yesterday and so we've

15    drafted this language which identifies that the Court has

16    determined that the third factor weighs against fair use and

17    it's up to you, meaning the jury, to weigh how much the

18    third factor weighs against fair use both as an individual

19    factor and when weighing all the factors together.

20         So it leaves the discretion -- I think Your Honor

21    was trying to give the jury to weigh it how it wants but

22    also respects the fact that this issue has already been

23    decided by the Court and let me get the language that I got

24    about this also was from your order, 160 on page -- page 12,

25    where Your Honor said:  The reasoning applicable to the

1  LOS ANGELES, CALIF.; FRIDAY, JANUARY 26, 2024; 7:47 A.M.

2                              -oOo-

3      *(The following was held outside the jury's presence:)*

4          THE CLERK:  All rise.  This United States District

5  Court is again in session.

6              **DISCUSSION RE JURY INSTRUCTION**

7          THE COURT:  All right.  You may be seated.

8          Is there anything we need to discuss?

9          MR. ALLEN:  Just one thing, Your Honor, for the

10 record.

11         We received the final jury instructions last

12 night.  Thank you very much for the changes that you made.

13 We still object to the fact that the Court has not put into

14 the third factor, fair use factor, the information --

15         THE COURT:  Okay.  You object.  Let's go.  The

16 jurors are here.  I'd like to get started.

17         MR. ALLEN:  Okay.  We object that that instruction

18 for the third factor does not reflect the Court's prior

19 opinion and finding.

20         MR. GRODSKY:  Nothing from the defense, Your

21 Honor.

22         THE COURT:  Okay.

23         Ms. Cuneo, are you ready to go?

24         THE COURT REPORTER:  Yes, Your Honor.

25         THE COURT:  All right.

630

1    no doubt that the two works -- the photo and the tattoo --

2    are substantially similar.

3              Let's move to fair use.

4              It's defendant's burden to prove each factor.  So

5    Instruction No. 22 are the four factors.  Important, I'd

6    like to point out, is Factor 1, the purpose and character of

7    the use.

8              And you'll see in Instruction 21, it including

9    whether the use is of a commercial nature or is for a

10   nonprofit educational purposes.

11             Going to the first factor, the purpose and

12   character of the use -- that's Instruction No. 23 -- again,

13   burden on defendants to prove.

14             Let's talk about transformative use.  The Court's

15   already determined the tattoo is not transformative.

16             MR. GRODSKY:  Your Honor, I object to the slide.

17   It says something about Factor 3 that is not in the

18   instructions.

19             THE COURT:  All right.  Take that down.

20                     *(Pause in the proceedings.)*

21             MR. ALLEN:  A work that has a different purpose is

22   called transformative.  The different purposes include

23   criticism, comment, news reporting, teaching, scholarship,

24   and research about the original work which would be the

25   photo.

1   lot of the photo that you will see here.  There's lot that

2   was not.  I'm just going to say it's neutral.

3         And then Factor 4 we just discussed.  It weighs

4   heavily in favor and it is the single-most important factor.

5         So for the tattoo, evidence showed the tattoo is a

6   fair use.

7         Now let's talk about the line drawing.  Okay.  The

8   line drawing, commerciality again, there was no product sold

9   with the line drawing.  She didn't get any payment for it.

10  And this one does have a completely different purpose.

11        Miles Davis' photo is a photo that Mr. Sedlik

12  uses.  It celebrates Miles Davis.  It's used as something

13  that he sells his prints.  He sells his posters.

14        The line drawing is a tool.  It's a tool that's

15  used to size and place tattoos.  It is a completely

16  different purpose.  So that weighs -- Factor 1,

17  transformative, yes.  Noncommercial, yes.  Weighs heavily in

18  favor.

19        Factor 2 weighs against.

20        How much of the photograph was used?  That's

21  Factor 3.  Well, the reality is very little of the

22  photograph was used in this.  That factor weighs in favor.

23        And Factor 4, as we said, weighs heavily in favor.

24  The line drawing is a fair use.

25        Then we have the four-and-a-half-minute Instagram

1    story.  There's no evidence that it promoted anything.

2    There's no evidence there was advertising received.  There

3    was no link in this post to the sale of products and it has

4    a completely different purpose.  It was a compilation of

5    stories of Kat making videos.  This was a tiny part of a

6    much larger thing.

7            So Factor 1, not commercial, transformative,

8    weighs heavily in favor.

9            Factor 2, weighs against.

10           Factor 3, because it shows the tattoo, we'll say

11   it's neutral.

12           And Factor 4, we've already discussed, weighs

13   heavily in favor.

14           Then there's the Kat at the lightbox photo.

15   Again, not commercial, not promoted, no advertising received

16   in links to sales.

17           And by the way, the evidence that's best to show

18   what's commercial and not commercial is the post that they

19   keep on showing you, other social media posts.

20           Kat certainly has other social media posts where

21   she promotes things.  Those are social media posts that are

22   commercial.  And then there are social media posts that

23   promote nothing.  Those are not.

24           This also has a completely different purpose.

25   It's showing the process of making tattoos.

```
 1              Factor 1 weighs heavily in favor.
 2              Factor 2 weighs against.
 3              Factor 3 is neutral.
 4              Factor 4 weighs heavily in favor.
 5              It's a fair use.
 6              Then there's the post of Kat working on the
 7    tattoo.  For the same reasons it's not commercial and,
 8    again, the purpose of this is not to show Miles Davis but to
 9    show Kat's process of making tattoos.
10              Weighs heavily in favor.
11              Factor 2 against.
12              Factor 3 weighs against because they used the
13    photograph in the back.
14              But Factor 4 weighs heavily in favor.
15              It is a fair use.
16              Lastly, messy progress shot.  Not commercial for
17    the same reasons.  Completely different purpose.  Shows her
18    process and what a tattoo can look like before it's
19    finished.
20              Factor 1, heavily in favor.
21              Factor 2, against.
22              Factor 3, how much of the photograph was used?
23    Very little.  Weighs heavily in favor.
24              Factor 4, heavily in favor.
25              This is a fair use.
```