# EXHIBIT C

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY B. SEDLIK,<br>Plaintiff,<br><br>v.<br><br>KATHERINE VON<br>DRACHENBERG, et al.,<br>Defendants. | CV 21-1102 DSF (MRWx)<br><br>Order GRANTING in Part and<br>DENYING in Part Defendants'<br>Motion for Summary Judgment<br>and Partial Summary Judgment<br>(Dkt. 31); Order DENYING<br>Plaintiff's Motion for Summary<br>Judgment or Summary<br>Adjudication (Dkt. 37) |

Defendants Katherine Von Drachenberg (Kat Von D), Kat Von D, Inc. (KVD, Inc.), and High Voltage Tattoo, Inc. (High Voltage) move for summary judgment as to Plaintiff Jeffrey Sedlik's claims for copyright infringement and under Section 1202(a) and (b) of the Digital Millennium Copyright Act (DMCA). Dkt. 31 (KVD Mot.) at 8. Sedlik opposes. Dkt. 50 (Opp'n to KVD Mot.). Sedlik moves for summary judgment on his claims. Dkt. 37 (Sedlik Mot.) at 2. Defendants oppose. Dkt. 50 (Opp'n to Sedlik Mot.). The Court deems these matters appropriate for decision without oral argument. See Fed. R. Civ. P. 78; Local Rule 7-15. Defendants' motion is GRANTED in part and DENIED in part. Sedlik's motion is DENIED.

# I. UNDISPUTED FACTS

## A.   The Parties

Sedlik is a world-renowned, award-winning professional photographer and professor.  PSUF ¶¶ 1-2.[1]  Sedlik's work has been featured in numerous publications, and he has an extensive fine art repertoire.  Id. ¶¶ 3-4.

In 1989, Sedlik independently conceived and created the iconic photographic portrait depicting world-famous jazz musician Miles Davis (the Portrait) that is the subject of this litigation.  Id. ¶ 5.  Sedlik is the sole and exclusive owner of the copyright for the Portrait, which was published in Jazziz Magazine in 1989.  Id. ¶ 6.  The Portrait appears as follows:

---

[1] Citations to DSUF refer to Sedlik's Statement of Genuine Disputes, dkt. 50-2, which incorporates Defendants' proposed uncontroverted facts and Sedlik's responses to those facts.  Citations to PSUF refer to Defendants' Statement of Genuine Disputes, dkt. 42, which incorporates Sedlik's proposed uncontroverted facts and Defendants' responses to those facts.  Where the Court cites to a disputed fact, the Court has found the dispute was not valid or was irrelevant, unless otherwise indicated.  The Court has independently considered the admissibility of the evidence and has not considered facts that are irrelevant or based on inadmissible evidence.



Dkt. 35-17.

In creating the Portrait, Sedlik intended to comment on Miles Davis's use of "negative space" in his musical work, meaning his use of silence, low volumes, and pauses in between notes. DSUF ¶ 138.

Sedlik has offered and sold non-exclusive copyright licenses authorizing limited reproduction, distribution, display, and creation of derivative works of his Portrait for commercial and non-commercial purposes since its creation. PSUF ¶ 7. Sedlik registered his copyright with the United States Copyright Office, which issued a registration with an effective date of registration of July 6, 1994. Id. ¶ 8. Sedlik's copyright registration remains valid. Id. ¶ 9.

Kat Von D is a tattooist who has appeared on reality television shows such as "Miami Ink" and "LA Ink." Id. ¶ 10. Kat Von D has special expertise in inking black and gray portrait tattoos. DSUF ¶ 3. Kat Von D owns and operates High Voltage, which operated a tattoo shop in Los Angeles named "Kat Von D's High Voltage Tattoo."

PSUF ¶ 11.[2]  Kat Von D was an employee of High Voltage at all times relevant to this litigation.  Id. ¶ 12.  Other tattoo artists at High Voltage contributed a small percentage of their fees, which were used to cover the cost of the shop's rent, but kept the majority of their earnings.  DSUF ¶¶ 12-13.

Kat Von D owns and operates KVD, Inc., a corporation of which she is the CEO, Secretary, CFO, sole owner, and sole shareholder.  PSUF ¶ 13.  Kat Von D is also the sole employee of KVD, Inc.  Id. ¶ 15.  KVD, Inc. has never held an ownership interest in High Voltage.  DSUF ¶¶ 18-19.

Kat Von D has not been paid by a customer for inking a tattoo since 2012 and considers tattoos she inks to be a gift for those individuals.  Id. ¶¶ 4, 6.

## B.     The Miles Davis Tattoo

Over two sessions in 2017, Kat Von D inked a tattoo of Miles Davis (the Tattoo) on Blake Farmer, a lighting technician with whom Kat Von D had worked on a film project.  DSUF ¶¶ 20, 32.  Farmer considered Miles Davis an important figure, and had thought of getting a portrait tattoo of Miles Davis since Farmer was in college.  Id. ¶¶ 24-25.  Farmer played trumpet from the sixth grade through college, and developed a particular appreciation for Miles Davis while studying jazz music in college.  Id. ¶¶ 26-28.  Farmer also believed that he, like Davis, had a "rebellious spirit" and identified with Davis.  Id. ¶¶ 29-30.

To select the image that was used to ink the Tattoo, Farmer did a Google search and found a photograph of Miles Davis (the Portrait), then texted the image to Kat Von D's assistant.  Id. ¶¶ 33-34.  The photograph did not contain a copyright symbol.  Id. ¶ 36.  Farmer did not pay Kat Von D or High Voltage for inking the Tattoo.  Id. ¶ 31.

To ink the Tattoo, Kat Von D first created a line drawing on tracing paper, the purpose of which was to map out the image so that

---

[2] High Voltage's physical location closed in November 2021.  DSUF ¶ 8.

she could ink the Tattoo by a freehand method and to show Farmer the size of the tattoo. Id. ¶¶ 40-43. Kat Von D created the line drawing by placing both the Portrait and the tracing paper on a light box, and then tracing the outlines and contours. Id. ¶ 45. She then created a stencil using a thermal-fax machine. Id. ¶¶ 46-47. The line drawing appears below:



Dkt. 35-18. Kat Von D used the stencil to temporarily transfer the drawing onto Farmer's skin, after which she began inking the Tattoo. DSUF ¶¶ 48-51. Her goal in inking the Tattoo was to create a sentiment that both evoked melancholy and had movement in it. Id. ¶ 90.

## C. Social Media Posts

On March 18, 2017, Kat Von D and High Voltage posted to their social media accounts a photo showing Kat Von D in the middle of creating the Tattoo. PSUF ¶ 16. The image depicts Kat Von D in the process of inking the Tattoo, with a printout of the Portrait in the background as a reference. Id. ¶¶ 17, 31. Kat Von D and High Voltage posted a second photo to their social media accounts, which was a progress photo of a portion of the Tattoo. Dkt. DSUF ¶ 96; dkts. 35-19 – 35-22, 35-26 – 35-27. The social media posts appear below:

5

 

None of the Defendants obtained Sedlik's permission or a license prior to inking the Tattoo. PSUF ¶ 21.

On April 26, 2018, Kat Von D and High Voltage posted a photo of the completed Tattoo on their social media accounts:



PSUF ¶ 25; dkts. 35-23 – 35-25, 35-28 – 35-30.  The caption on Kat Von D's posts stated: "portrait I tattooed at @highvoltagetat."  Dkts. 35-23 – 35-25.  High Voltage's posts stated, "It still amazes us that @thekatvond can make a face as majestic & deep as this emerge from the flesh!!!"  Dkts. 35-28 – 35-30.  Kat Von D also posted a short video to her Instagram account showing her in the process of inking the Tattoo.  PSUF ¶ 26.

## II. LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "This burden is not a light one."  In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010).  But the moving party need not disprove the opposing party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Rather, if the moving party satisfies this burden, the party opposing the motion must set forth specific facts, through affidavits or admissible discovery materials, showing that there exists a genuine issue for trial.  Id. at 323-24; Fed. R. Civ. P. 56(c)(1).  A non-moving party who bears the burden of proof at trial as to an element essential to its case must make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element of the case or be subject to summary judgment.  See Celotex Corp., 477 U.S. at 322.

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  An issue of fact is a genuine issue if it reasonably can be resolved in favor of either party.  Id. at 250-51.  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury . . . could find by a preponderance of the evidence that the [non-movant] is entitled to a

verdict . . . ." Id. at 252. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248.

"[A] district court is not entitled to weigh the evidence and resolve disputed underlying factual issues." Chevron Corp. v. Pennzoil Co., 974 F.2d 1156, 1161 (9th Cir. 1992). Summary judgment is improper 'where divergent ultimate inferences may reasonably be drawn from the undisputed facts.'" Fresno Motors v. Mercedes Benz USA, LLC, 771 F.3d 1119, 1125 (9th Cir. 2014). Instead, "the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (simplified).

"[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits." Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001) (simplified). In doing so, the Court must consider the evidence submitted in support of both motions before ruling on each of them. Id.

## III. DISCUSSION

### A.   Evidentiary Objections

Sedlik objects to numerous statements made by Defendants in support of their motion for summary judgment, as well as some of the underlying evidence. Dkt. 50-3 (Evidentiary Objections). As an initial matter, the Court notes that Sedlik has submitted objections to the statements in Defendants' Separate Statement, rather than the underlying evidence. The Court considers the underlying evidence.

"A district court's ruling on a motion for summary judgment may only be based on admissible evidence." Oracle, 627 F.3d at 385. A party seeking to admit evidence bears the burden of proof to show its admissibility. Id. "At the summary judgment stage, [the Court does] not focus on the admissibility of the evidence's form. [The Court]

instead focus[es] on the admissibility of its contents." Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003).

Sedlik objects to Defendants' statements regarding whether Farmer brought a printout of the Portrait to High Voltage, and whether it contained Sedlik's name or a copyright symbol. Evidentiary Objections at 2. The Court does not rely on these statements.

Several of Sedlik's objections are to the relevance of the underlying evidence. See Evidentiary Objections at 3, 5. Generally, an objection to evidence on the ground that it is "irrelevant . . . [is] duplicative of the summary judgment standard itself" and thus "redundant" and unnecessary to consider here. Burch v. Regents of Univ. of Cal., 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); see also Anderson, 477 U.S. at 248 ("Factual disputes that are irrelevant or unnecessary will not be counted.").

Sedlik objects to statements made by Defendants' experts, Evidentiary Objections at 4-5, 8-9, but the Court does not rely on those statements.

## B.  Claim for Copyright Infringement

Sedlik moves for summary judgment on his copyright infringement claim. Sedlik Mot. at 2. Defendants also move for summary judgment, asserting that their use of the Portrait in creating the Tattoo was fair use. KVD Mot. at 7. The Court first addresses Sedlik's arguments.

### 1.  Liability

"A plaintiff bringing a claim for copyright infringement must demonstrate '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" Funky Films, Inc. v. Time Warner Entm't Co., L.P., 462 F.3d 1072, 1076 (9th Cir. 2006) (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991)), overruled on other grounds by Skidmore as Tr. For Randy Craig Wolfe Tr. v. Led Zeppelin, 952 F.3d 1051 (9th Cir. 2020). "[T]he second element has two distinct components: copying and unlawful

appropriation." <u>Rentmeester v. Nike, Inc.</u>, 883 F.3d 1111, 1117 (9th Cir. 2018) (internal quotation marks omitted), <u>overruled on other grounds by</u> <u>Skidmore</u>, 952 F.3d 1051. "The hallmark of 'unlawful appropriation' is that the works share *substantial* similarities." <u>Skidmore</u>, 952 F.3d at 1064 (citing <u>Newton v. Diamond</u>, 388 F.3d 1189, 1193 (9th Cir. 2004).

The Ninth Circuit applies a two-part test to determine whether a defendant's work is substantially similar to the plaintiff's work: the extrinsic test and the intrinsic test, both of which must be satisfied for the works to be found substantially similar. <u>Id.</u> The extrinsic test "compares the objective similarities of specific expressive elements in the two works," distinguishing between the protected and unprotected material in a plaintiff's work. <u>Id.</u> The intrinsic test considers "similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance." <u>Id.</u> (citing <u>Jada Toys, Inc. v. Mattel, Inc.</u>, 518 F.3d 628, 637 (9th Cir. 2008)).

Defendants do not dispute that Sedlik owns a valid copyright in the Portrait. PSUF ¶ 9. They also do not appear to dispute the "copying" prong, as they do not address it in their Opposition. However, Defendants do argue that they did not copy "protectible elements" of the Portrait under the extrinsic and intrinsic tests. Opp'n to Sedlik MSJ at 10.

### a. Extrinsic Test

Under the extrinsic test, the plaintiff first must identify the alleged similarity between his work and the defendant's work. <u>See</u> <u>Apple Computer, Inc. v. Microsoft Corp.</u>, 35 F.3d 1435, 1443 (9th Cir. 1994). Then, "the court must determine whether any of the allegedly similar features are protected by copyright." <u>Id.</u> Finally, the court must consider "whether the work is entitled to 'broad' or 'thin' protection." <u>Id.</u>

The Court first considers the elements of the Portrait that are allegedly similar to the Tattoo. Sedlik provides only a statement that the Tattoo copies the "*combination* of subject matter, pose, light and

shadow, camera angle, [and] juxtaposition of elements within the composition" that are present in the Portrait. Sedlik Mot. at 17. He further concludes that the "constituent elements and selection and arrangement of those visual elements in the Iconic Miles Davis Portrait remain completely unchanged in the tattoo, with only de minimis variation arising from the medium of reproduction." Id. In support of his argument, Sedlik cites his supplemental interrogatory responses, which describe in significant detail the steps Sedlik took to create the Portrait. Id.; see also dkt. 37-7 (supplemental interrogatory responses). As Defendants argue, this evidence does not comply with the Court's Order re Motions for Summary Judgment, see Opp'n to Sedlik Mot. at 12, but this is not the basis on which the Court denies Sedlik's motion. For the purpose of this motion only, the Court assumes Sedlik has met his burden of identifying elements in the Tattoo that he claims are similar to the Portrait.

The Court next considers whether any of the allegedly similar features are protected by copyright. Defendants argue some of the features are not protectible and cite several cases in support.

First, Defendants cite Rentmeester, a copyright infringement action by a renowned photographer against Nike. Rentmeester, 883 F.3d at 1115. Rentmeester photographed Michael Jordan "leaping toward a basketball hoop with a basketball raised above his head in his left hand, as though he is attempting to dunk the ball." Id. The photograph later appeared in *Life* magazine. Id. Afterward, Nike hired a photographer to produce its own image of Jordan, and Nike's photograph was similar to Rentmeester's photograph, though it had a different background, and Jordan wore different clothing and Nike shoes. Id.

In its analysis of the extrinsic test, the Ninth Circuit noted that while "photos can be broken down into objective elements that reflect the various creative choices the photographer made in composing the image"; they "cannot be dissected into protected and unprotected elements in the same way" as other works, such as novels, plays, and motion pictures. Id. at 1118-19. This is because none of the creative

11

choices made by a photographer in composing an image, such as camera angle or lighting, "is subject to copyright protection when viewed in isolation." <u>Id.</u> at 1119. "A subsequent photographer is free to take her own photo of the same subject, again so long as the resulting image is not substantially similar to the earlier photograph." <u>Id.</u> However, "[w]hat *is* protected by copyright is the photographer's selection and arrangement of the photo's otherwise unprotected elements." <u>Id.</u>

The Ninth Circuit found Nike's photograph of Jordan did not infringe on Rentmeester's photograph as a matter of law, because while the photographs were similar, they contained significant differences in Jordan's pose, the specific setting and backdrop, position of the basketball hoop, and Jordan's positioning within the frame of the photograph. <u>Id.</u> at 1122-23. While Jordan's pose was similar in Nike's photograph, the Ninth Circuit found that Rentmeester's copyright "does not confer a monopoly on that general 'idea' or 'concept'; he cannot prohibit other photographers from taking their own photos of Jordan in a leaping, *grand jeté*-inspired pose. Because the pose Rentmeester conceived is highly original, though, he is entitled to prevent others from copying the details of that pose as expressed in the photo he took." <u>Id.</u> at 1121. The circuit further stated: "Had Nike's photographer replicated those details in the Nike photo, a jury might well have been able to find unlawful appropriation even though other elements of the Nike photo, such as background and lighting, differ from the corresponding elements in Rentmeester's photo." <u>Id.</u>

In <u>Reece v. Island Treasures Art Gallery, Inc.,</u> 468 F. Supp. 2d 1197 (D. Haw. 2006), the plaintiff sought to enjoin the defendant from selling and displaying stained glass art that was similar to plaintiff's photograph in that they both "depict, from the same angle, a woman kneeling on Oahu's Kailua beach performing an 'ike motion from the hula noho (sitting) position." <u>Id.</u> at 1200-01. The court found the works were not substantially similar even though the women in each work had the same pose, similar clothing, and were depicted in the same orientation. <u>Id.</u> at 1204. While the 'ike movement depicted in the photograph was not protectible, the expression of those ideas, including

"the angle, timing, and lighting of the photograph, as well as the expression of the hula kahiko performance and dress," was protectible. Id. at 1206. The court examined the protectible elements, and determined that the images were not substantially similar because (1) the appearance of the dancers in the stained glass image was different because it lacked detail; (2) the dancer in the stained glass image had "no facial features, hand details, or muscular differentiation"; (3) [t]he mountains and ocean dominate the upper half of the stained glass, but not the photograph"; (4) [t]he dancers' hairstyles are notably different lengths and shapes"; and (5) "the sepia tone of the photograph is markedly contrasted by the vibrant colors of the stained glass." Id. at 1208.

In Bill Diodato Photography, LLC v. Kate Spade, LLC, 388 F. Supp. 2d 382, 384 (S.D.N.Y. 2005), a photographer claimed copyright infringement of his photograph from outside a bathroom stall of a woman's feet and a handbag resting on the floor. The court found that while the allegedly infringing photograph contained many similarities to the one taken by the plaintiff, the pose alone depicted in the original was not protectible. Id. at 394.

Drawing on these cases, Defendants argue that the subject matter and pose in the Portrait are not protectible. With respect to the positioning of Davis's fingers, Defendants argue "Sedlik does not and cannot own a legal monopoly [on] the idea of Miles Davis making a 'Sssh!' symbol with his fingers" because that pose is an idea. Opp'n to Sedlik Mot. at 17. The Court agrees that Davis's pose is not separately protectible. However, the selection and arrangement of the elements of the Portrait, including the lighting and camera angle, are protectible. See Rentmeester, 883 F.3d at 1119.

Sedlik argues Defendants' cited cases are inapposite because they do not sanction the copying of a work by using a *copy* of the original, rather than by recreating or closely replicating the original. Reply at 7. Sedlik cites Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 249 (1903) for the proposition that making a copy of a copyrighted image is itself copyright infringement. The Supreme Court in Bleistein

13

stated that "[o]thers are free to copy the original" work but that "[t]hey are not free to copy the copy." Id. at 249. The Court declines to address this argument because it was made for the first time in a reply brief. See Zamani v. Carnes, 491 F.3d 990, 997 (9th Cir. 2007) (a "district court need not consider arguments raised for the first time in a reply brief."). Additionally, this argument does not appear to be relevant to determining substantial similarity.

The Court next considers whether the Portrait is entitled to broad or thin protection. "A copyrighted work is entitled to thin protection when the range of creative choices that can be made in producing the work is narrow." Rentmeester, 883 F.3d at 1120. "[T]he greater the range of creative choices that may be made, the broader the level of protection that will be afforded to the resulting image." Id. (finding photograph was entitled to broad protection because the range of creative choices was "exceptionally broad" and "very few of those choices were dictated by convention or subject matter."). Here, the Court finds the Portrait is entitled to broad protection because there were a great number of choices involved in creating the Portrait, such as Davis's highly specific pose, facial expression, lighting and shadows, camera angle, and background for the image.

The Court next considers whether the Tattoo is objectively similar to the Portrait. The two works appear below:





     In his motion, Sedlik does not articulate the *nature* of the
similarities between the Portrait and the Tattoo, other than that there
are some.  Instead, he concludes that "[t]he two works are so
remarkably similar that the ordinary observer, unless she set out to
detect the disparities, would overlook them."  Sedlik Mot. at 17.  This
merely restates the standard for the extrinsic test and is not sufficient
to meet Sedlik's summary judgment burden as to substantial
similarity.  While the two works share some obvious similarities, it

does not take an expert to identify differences in the composition and selection and arrangement of the unprotectible features – such as the light and shading on Davis's face, the hairline and flowing hair on Davis's head, and background – that a reasonable jury could find to be more than de minimis.  Sedlik and Defendants both offer expert testimony comparing the two works, but neither Defendants' expert nor Sedlik (who authored a rebuttal report) purport to be an expert on comparing photographs and tattoos – or even to be an expert on <u>both</u> photography and tattoos.  <u>See</u> dkt. 34-2 (Friedman Report); dkt. 50-5 (Sedlik Rebuttal Report).[3]  The Court finds there is a triable issue of substantial similarity under the extrinsic test.  <u>See</u> <u>Apple</u>, 35 F.3d at 1443 (explaining expert testimony should be used "if necessary" to "determine whether any of the allegedly similar features are protected by copyright.").

        b.    <u>Intrinsic Test</u>

The Court next considers whether, under the intrinsic test, an ordinary, reasonable observer would find the two works to be substantially similar.  "The intrinsic test requires a more holistic, subjective comparison of the works to determine whether they are substantially similar in '"total concept and feel.'"  <u>Rentmeester</u>, 883 F.3d at 1118.  The Court finds a reasonable juror applying the intrinsic test could conclude that the works are not substantially similar in total concept and feel.  <u>See</u> <u>Swirsky v. Carey</u>, 376 F.3d 841, 845 (9th Cir. 2004), <u>as amended on denial of reh'g</u> (Aug. 24, 2004) ("subjective question [of] whether works are intrinsically similar must be left to the jury").  Because there are triable issues as to substantial similarity under both the extrinsic and intrinsic tests, the Court DENIES Sedlik's motion as to copyright infringement.

---

[3] The Court will address the motion to exclude Defendants' experts in a separate order.  The Court's ruling here would be the same whether or not the experts' reports are considered.

## 2. Fair Use

Defendants argue their use of the Portrait was fair. KVD Mot. at 13. The fair use doctrine "permits unauthorized use of copyrighted works 'for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research.'" Micro Star v. Formgen Inc., 154 F.3d 1107, 1112 (9th Cir. 1998) (quoting 17 U.S.C. § 107). "This listing was not intended to be exhaustive, or to single out any particular use as presumptively a 'fair' use." Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 561 (1985) (citation omitted). The Court must consider and weigh the determinative factors: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. But the "statutory factors are not exclusive." Sega Enters. Ltd. v. Accolade, Inc., 977 F.2d 1510, 1522 (9th Cir. 1992). "Rather, the doctrine of fair use is in essence 'an equitable rule of reason.'" Id. (quoting Harper & Row, 471 U.S. at 560).

Additionally, "[a]lthough defendants bear the burden of proving that their use was fair, they need not establish that each of the factors set forth in § 107 weighs in their favor. Instead, all factors must be explored, and the results weighed together in light of the purposes of copyright and the fair use defense." NXIVM Corp. v. Ross Inst., 364 F.3d 471, 476-77 (2d Cir. 2004) (citations omitted); see also Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 578 (1994) ("All [four statutory factors] are to be explored, and the results weighted together, in light of the purposes of copyright."). "Fair use is a mixed question of law and fact. If there are no genuine issues of material fact, or if, even after resolving all issues in favor of the opposing party, a reasonable trier of fact can reach only one conclusion, a court may conclude as a matter of law whether the challenged use qualifies as a fair use of the copyrighted work." Worldwide Church of God v. Phila. Church of God, Inc., 227 F.3d 1110, 1115 (9th Cir. 2000). Because the fair use inquiry

requires a case-by-case analysis, the Court addresses each of the four statutory factors.

>    a.   <u>Purpose and Character</u>

The first factor is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). Several principles may bear on this factor, including, as relevant here, transformation and commerciality. <u>See</u> <u>Monge v. Maya Mags., Inc.</u>, 688 F.3d 1164, 1173 (9th Cir. 2012).

Transformation, "a judicially-created consideration that does not appear in the text of the statute," <u>id.</u>, has been described as "the most important component of the inquiry into the 'purpose and character of the use.'" <u>L.A. News Serv. v. CBS Broad., Inc.</u>, 305 F.3d 924, 938 (9th Cir. 2002), <u>as amended</u>, 313 F.3d 1093 (9th Cir. 2002). "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." <u>Campbell</u>, 510 U.S. at 579. Transformation is a "key factor in fair use" but is often a "highly contentious topic." <u>Seltzer v. Green Day, Inc.</u>, 725 F.3d 1170, 1176 (9th Cir. 2013).

A work is transformative when it does not "merely supersede the objects of the original creation" but "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." <u>Id.</u> at 579 (internal quotation marks, alteration, and citation omitted). The question is whether the appropriation of the original leads to a "new creation," either through changes to the work itself or through placement of the work in "a different context." <u>Wall Data Inc. v. L.A. Cnty. Sheriff's Dep't</u>, 447 F.3d 769, 778 (9th Cir. 2006). A work can be transformative even where "the allegedly infringing work makes few physical changes to the original or fails to comment on the original." <u>Seltzer</u>, 725 F.3d at 1177. In <u>Seltzer</u>, the Ninth Circuit affirmed a finding that a band's use of artwork depicting a screaming face was transformative where it was used as a

video backdrop for a song about the hypocrisy of religion, and the original "clearly sa[id] nothing about religion."  Id.

A work's separate purpose "by itself, does not necessarily create new aesthetics or a new work that 'alters the first work with new expression, meaning or message.'"  Monge, 688 F.3d at 1176 (brackets omitted) (quoting Infinity Broad. Corp. v. Kirkwood, 150 F.3d 104, 108 (2d Cir. 1998)).  A "difference in purpose is not quite the same thing as transformation, and Campbell instructs that transformativeness is the critical inquiry under this factor."  Id. (quoting Infinity, 150 F.3d at 108).  However, making an exact copy of a protected work may be transformative provided "the copy serves a different function than the original work."  Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1165 (9th Cir. 2007); see also Kelly v. Arriba Soft Corp., 336 F.3d 811, 818-19 (9th Cir. 2002) (finding transformative use where the original purpose of the copied images was aesthetic, while the new purpose was to improve access to information).

Defendants argue the Tattoo is transformative for at least three reasons.

First, Defendants contend the Tattoo presents a "new expression, meaning, or message" that is personal to Farmer because it relates to his study of jazz music in college, and because he personally identifies with Davis and "remains an avid listener of jazz and Miles Davis's music."  KVD Mot. at 15.  Defendants also contend the Tattoo should be considered in conjunction with Farmer's other tattoos.  Id.  Defendants point out that in contrast to the personal significance Farmer apparently attaches to the Tattoo, Sedlik's purpose in creating the Portrait was to comment on Davis's use of silence and negative space in his music.  Id.  Sedlik argues Defendants' statements about the subjective meaning or purpose of the Tattoo are irrelevant to the issue of transformativeness and that Defendants have not established any material difference between the purposes of the Tattoo and the Portrait.  Opp'n to KVD Mot. at 9.  Sedlik further argues Farmer's personal motivation for getting the Tattoo is irrelevant and that to find otherwise would create an absurd result.  Id. at 7.  Courts do consider

19

the motivation of the parties in analyzing fair use, see, e.g., Seltzer, 725 F.3d at 1174, 1177 (considering plaintiff's and defendant's purposes in creating their respective works); Furie v. Infowars, LLC, 401 F. Supp. 3d 952, 973 (C.D. Cal. 2019) (considering defendant's purpose in creating work and finding triable issues as to transformativeness). However, Farmer is not a party to this action, and while Defendants have articulated how Farmer's subjective purpose differs from Sedlik's, Defendants have not cited authority that a work has a different meaning for the purpose of the fair use analysis simply because an individual who commissions a copy of the original attaches some different personal significance to it.

Second, Defendants argue that tattoos inherently create a new expression, meaning, or message as a result of being permanently imprinted on a human body because tattoos have personal meanings, which may not be immediately obvious to someone unfamiliar with the significance of the tattoo to its wearer. KVD Mot. at 16 (citing PSUF ¶¶ 121-22). As explained above, the subjective belief of the wearer of a tattoo as to the tattoo's purpose is not dispositive of transformativeness. Defendants also point to the Ninth Circuit's decision in Anderson v. City of Hermosa Beach, in which the court acknowledged that "a permanent tattoo 'often carries a message quite distinct' . . . and 'provide[s] information about the identity of the 'speaker.'" 621 F.3d 1051, 1067 (9th Cir. 2010) (alteration in original). In striking down a city's total ban on tattoos, the Ninth Circuit stated it disagreed with the city that "'[there is nothing inherently or distinctly expressive" about tattoos. Id. However, Anderson does not establish that the Tattoo inherently created a different meaning by virtue of its location on the human body.

Third, Defendants argue that the Tattoo is transformative because while Kat Von D used the Portrait as a reference, she inked the Tattoo in the "freehand" method and added her own interpretation to it: "one that added the appearance of movement by adding and shading waves of smoke around the perimeter of Miles Davis's hair and hand; created a sentiment of melancholy; and eliminated the stark, black background that dominates the Photograph." KVD Mot. at 17.

Defendants contend that by making these modifications to the Portrait, Kat Von D transformed it into a new, more melancholy aesthetic.  Id. The Court finds this argument more convincing, as Defendants have identified visual differences between the Portrait and the Tattoo resulting from Kat Von D's techniques in inking the Tattoo.  The Court finds Defendants have met their burden of showing the Tattoo has a purpose or meaning distinct from that of the Portrait by virtue of the way Kat Von D changed its appearance to create what she characterizes as adding movement and a more melancholy aesthetic. However, Sedlik disputes whether Kat Von D's rendering of the Tattoo was transformative by virtue of the small changes she made, see DSUF ¶ 91 (citing Sedlik Rebuttal Report at 13-15); Sedlik opines that all of the alleged dissimilarities between the Portrait and the Tattoo result from Kat Von D's replication of the Portrait onto a three-dimensional surface (Farmer's arm), Sedlik Rebuttal Report at 16.  The Court finds Sedlik has raised a triable issue as to transformativeness that is more appropriately left to a jury.

Defendants also argue their use of the Portrait was not commercial because neither Kat Von D nor High Voltage charged Farmer for inking the Tattoo and Kat Von D stopped tattooing for payment in 2012.  KVD Mot. at 17-18.  "There is no doubt that a finding that copying was not commercial in nature tips the scales in favor of fair use. But the inverse is not necessarily true, as many common fair uses are indisputably commercial."  Google LLC v. Oracle Am., Inc., 141 S. Ct. 1183, 1204 (2021).  Commerciality is not "dispositive of the first factor" of the fair use analysis.  Id.  Here, Sedlik disputes that Defendants' use of the Portrait was not commercial because Defendants "received and enjoyed indirect economic benefit in the form of advertising, promotion, and goodwill" by posting photos of the Tattoo on their various social media platforms.  Opp'n to KVD Mot. at 12.  The Court finds Sedlik has raised a triable issue as to whether Defendants' use was commercial.

Considering commerciality and transformativeness together, the Court finds triable issues remain as to both elements of the factor, and therefore the first factor cannot be determined as a matter of law.

b.    Nature of the Copyrighted Work

Under the second factor, the Court addresses two aspects of the work: the extent to which it is creative and whether it is unpublished. Harper & Row, 471 U.S. at 563-64.

Photos are generally viewed as creative, aesthetic expressions of a scene or image and have long been protected by copyright. See 17 U.S.C. § 102(a)(5) (extending copyright protection to "pictorial, graphic, and sculptural works"). The Ninth Circuit has recognized that individual photographs merit copyright protection. See, e.g., Ets-Hokin, 225 F.3d at 1074 ("Indeed, the idea that photography is art deserving [copyright] protection reflects a longstanding view of Anglo-American law."). Here, the Portrait is a photograph and is a creative work.

"[T]he unpublished nature of a work is a key, though not necessarily determinative, factor tending to negate a defense of fair use." Harper & Row, 471 U.S. at 554 (internal quotation marks and brackets omitted). "Under ordinary circumstances, the author's right to control the first public appearance of his undisseminated expression will outweigh a claim of fair use." Id. at 555. Here, the Portrait was published in an issue of Jazziz Magazine in 1989 that was widely published throughout the United States. DSUF ¶¶ 142-43. Because the Portrait was previously published several decades ago, this factor weighs in favor of fair use. See Seltzer, 725 F.3d at 1178 (finding fact that original work was "widely disseminated" weighed in favor of fair use).

c.    Amount and Substantiality of the Portion Used

In assessing the amount and substantiality of the portion used, courts consider not only "the quantity of the materials used" but also "their quality and importance." Campbell, 510 U.S. at 587. "While 'wholesale copying does not preclude fair use per se,' copying an entire work 'militates against a finding of fair use.'" Worldwide Church of God, 227 F.3d at 1118 (quoting Hustler Mag. Inc. v. Moral Majority Inc., 796 F.2d 1148, 1155 (9th Cir. 1986)). If the subsequent user of the

work "only copies as much as is necessary for his or her intended use, then this factor will not weigh against him or her." Kelly, 336 F.3d at 820-21. Thus, the use of an entire image may be reasonable if a more limited use would not serve the defendant's intended purpose. See Perfect 10, 508 F.3d at 1167-68 (finding the use of an entire image necessary when the defendant used the image in its search engine).

As discussed above, the Tattoo copied numerous elements from the Portrait. Defendants argue that Davis's pose in the Portrait is not meaningfully divisible from the rest of the image, and that tattoo artists generally need to have a reference when creating a tattoo. KVD Mot. at 19-20. However, as Sedlik points out, Defendants explained how Kat Von D created a line drawing on paper before inking the Tattoo, see Opp'n to KVD Mot. at 15-16, which suggests Kat Von D chose which elements from the Portrait to include in the Tattoo. Kat Von D presumably did not need to copy the pose from the Portrait in order express a sentiment of melancholy. See DSUF ¶ 77. The Court finds this factor weighs against fair use.

### d. Effect on the Potential Market

The fourth factor is "undoubtedly the single most important element of fair use." Harper & Row, 471 U.S. at 566. "[A] use that has no demonstrable effect upon the potential market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create." Sony, 464 U.S. at 450. "[O]ne need only show that if the challenged use 'should become widespread, it would adversely affect the *potential* market for the copyrighted work.'" Harper & Row, 471 U.S. at 568 (quoting Sony, 464 U.S. at 451). "Where the allegedly infringing use does not substitute for the original and serves a 'different market function,' such factor weighs in favor of fair use." Seltzer, 725 F.3d at 1179 (citing Campbell, 510 U.S. at 591). The Court must also "take into account the public benefits the copying will likely produce." Google, 141 S. Ct. at 1206.

There is no evidence that the Tattoo is a substitute for the primary market for the Portrait. Here, Sedlik testified at deposition

that no one has told him they would not buy a copy of the Portrait because they had seen the Tattoo or social media posts about the Tattoo. KVD Mot. at 20 (citing DSUF ¶¶ 153-54). The Portrait was originally taken in connection with a photoshoot for Jazziz Magazine, DSUF ¶ 136, not for use in the market for tattoos.[4] The Court finds that Defendants have pointed to sufficient evidence to meet their burden.

Sedlik attempts to raise a triable issue by arguing that he has offered evidence that he licensed the Portrait for use as a tattoo design. Opp'n to KVD Mot. at 17. Sedlik points to his deposition testimony, in which he stated he intended for his work to be licensed for use in various types of media. Id. (citing dkt. 50-18 (Sedlik Dep.) 24:10-13, 24:24-25:11, 30:7-31:2). Indeed, Sedlik listed in his deposition the various licenses he has given for the Portrait, ranging from use in television productions to a statue in a city in France. Sedlik Dep. 104:2-106:20. Sedlik also testified that he believed he licensed the Portrait for use in the making of a tattoo, id. 113:21-114:4, and that he has been approached several times by tattooists or their clients to request a license to use the Portrait in a tattoo and that he may have rejected at least some of their requests if he did not approve of the quality of their work, id. 114:5-22. The Court finds Sedlik has raised a triable issue as to whether there is a market for future use of the Portrait in tattoos.

---

[4] Defendants also point to expert testimony that the use of copyrighted and copyrightable source materials as reference materials for creating tattoos is pervasive within the tattoo profession, and that requiring tattooists to obtain licenses would stifle creativity and "disrupt the settled practices of the tattoo profession." KVD Mot. at 22. The Court is not convinced that tattooists, unlike other visual artists, should as a matter of law be immune from licensing requirements, or that the procedures of the tattoo industry cannot change to accommodate the time needed to obtain a license if required. To the extent Defendants' experts argue that tattoo artists should be able to commit what would otherwise be copyright violations, that opinion is inadmissible and the Court does not consider it in rendering its decision.

e.    Non-Statutory Factor

Defendants urge the Court to consider a non-statutory factor in addition to the four-factor test outlined above: "fundamental rights of bodily integrity and personal expression." KVD Mot. at 22. The Court may consider Defendants' arguments because the statutory factors are "not exclusive." Sega Enters. Ltd., 977 F.2d at 1522. However, because the Court finds triable issues as to the statutory factors, the Court need not address the non-statutory factor, and the issue of fair use as to the Tattoo and the associated social media posts is more appropriately left to a jury.

**3.    Partial Summary Judgment as to KVD, Inc.**

Defendants move in the alternative for summary judgment as to KVD, Inc. because KVD, Inc. is not liable for direct, vicarious, or contributory infringement. KVD Mot. at 25-27.

To prove direct infringement, Sedlik must demonstrate that each of the defendants "cause[d] the copying." Fox Broad. Co. v. Dish Network L.L.C., 747 F.3d 1060, 1067 (9th Cir. 2014). There is no evidence that KVD, Inc. caused the alleged copying of the Portrait; KVD, Inc. did not ink the Tattoo, nor did it post an image of the Tattoo or the Portrait on social media, as did Kat Von D and High Voltage. See DSUF ¶ 94.

Sedlik also cannot prevail on his claims against KVD, Inc. for vicarious or contributory infringement. A defendant is liable for vicarious infringement when it has "(1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity." Perfect 10, 847 F.3d at 673. Liability for contributory infringement occurs when the defendant "(1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement." Id. at 670. There is no evidence that KVD, Inc. had the ability to supervise the infringing conduct, for purposes of the vicarious infringement claim, nor that it induced the infringement, for purposes of the contributory infringement claim.

Sedlik argues KVD, Inc. is liable because it was in the business of "body art" and that Kat Von D was KVD, Inc.'s sole employee at the time of the creation of the Tattoo. Opp'n to KVD Mot. at 22. Sedlik does not explain how either of these facts indicates that KVD, Inc. had any role in the creation and sharing online of the Tattoo.

The Court DENIES Sedlik's and Defendants' motions for summary judgment as to the copyright infringement claims and GRANTS Defendants' motion as to the copyright infringement claims against KVD, Inc.

## C.  DMCA Claims

Sedlik and Defendants each move for summary judgment on Sedlik's DMCA claims. Sedlik Mot. at 20-21; KVD Mot. at 27. Sedlik moves for summary judgment on the falsification claim, while Defendants move for summary judgment on both claims: removal and falsification. Id.

### 1.  Falsification of CMI

Section 1202(a) of the DMCA provides,

No person shall knowingly and with the intent to induce, enable, facilitate, or conceal infringement--

> (1) provide copyright management information that is false, or

> (2) distribute or import for distribution copyright management information that is false.

17 U.S.C. § 1202(a).

The DMCA defines copyright management information (CMI) as "information conveyed in connection with copies or phonorecords of a work or performances or displays of a work, including in digital form," including, among other things, the title and name of the work and the name of the copyright owner. Id. § 1202(c).

Defendants argue Sedlik cannot establish liability because neither the Tattoo nor the related social media posts contain any CMI, and because Sedlik has not put forward evidence establishing the requisite mental state. KVD Mot. at 29. Sedlik's argument in response and in his own motion is that Kat Von D altered the CMI of the Portrait by "claiming to be the author" of the Portrait. Opp'n to KVD Mot. at 25; see also Sedlik Mot. at 20-21. Sedlik argues that the language of Defendants' social media posts suggests that Kat Von D was the creator of the Portrait. Sedlik Mot. at 20-21. The caption on Kat Von D's posts stated: "portrait I tattooed at @highvoltagetat." Dkts. 35-23 – 35-25. High Voltage's posts stated, "It still amazes us that @thekatvond can make a face as majestic & deep as this emerge from the flesh!!!" Dkts. 35-28 – 35-30. The Court finds a reasonable jury could find this language identified Kat Von D as the original creator of the Portrait, rather than Sedlik. While Sedlik argues Defendants had "intent to mislead the public," he does not put forward any evidence in support.

The Court finds Defendants have met their burden, and Sedlik has failed to meet his burden as to the claim for falsification in violation of the DMCA.

### 2. Removal of CMI

Section 1202(b) of the DMCA provides,

No person shall, without the authority of the copyright owner or the law--

    (1) intentionally remove or alter any copyright management information,

    (2) distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or

> (3) distribute, import for distribution, or publicly
> perform works, copies of works, or phonorecords,
> knowing that copyright management information has
> been removed or altered without authority of the
> copyright owner or the law, knowing, or, with respect
> to civil remedies under section 1203, having
> reasonable grounds to know, that it will induce,
> enable, facilitate, or conceal an infringement of any
> right under this title.

17 U.S.C. § 1202(b).

Sedlik claims Defendants knowingly removed, altered, and falsified CMI with the intent to induce, enable, facilitate, or conceal infringement. Dkt. 1 (Compl.) ¶ 10. Defendants argue that the version of the Portrait provided to Kat Von D did not contain Sedlik's name, a copyright symbol, a watermark, or any other CMI; Sedlik disputes this, but does not provide any evidence that any CMI was present on the image such that Kat Von D could remove it, or that she actually did so. See DSUF ¶¶ 36-39. Defendants argue that even if there was CMI, Sedlik has not pointed to any evidence that Kat Von D had the requisite intent. KVD Mot. at 28. The Court finds Defendants have met their burden, and Sedlik has failed to raise a triable issue as to the claim for removal in violation of the DMCA.

The Court GRANTS Defendants' motion as to the DMCA claims for falsification and removal of CMI and DENIES Sedlik's motion as to the falsification claim.

### D.    Partial Summary Judgment as to Remedies

Defendants move in the alternative for partial summary judgment as to remedies because Sedlik cannot establish actual damages or Defendants' profits. KVD Mot. at 29.

An infringer of copyright is liable for either (1) "the copyright owner's actual damages and any additional profits of the infringer" that "are attributable to the infringement and are not taken into account in

computing the actual damages," or (2) statutory damages. 17 U.S.C. § 504(a)-(b). "Actual damages are usually determined by the loss in the fair market value of the copyright, measured by the profits lost due to the infringement or by the value of the use of the copyrighted work to the infringer." Polar Bear Prods., Inc. v. Timex Corp., 384 F.3d 700, 708 (9th Cir. 2004). "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." Id. § 504(b).

Defendant argues Sedlik cannot prove actual damages because Sedlik cannot establish the market value of the Portrait and whether it decreased as a result of the Tattoo. KVD Mot. at 30. Sedlik does not address this argument, and indeed he has put forward no such evidence.

With respect to profits, it is undisputed that Farmer did not pay Kat Von D or High Voltage for inking the Tattoo, DSUF ¶ 31, so Sedlik cannot establish direct profits. As for indirect profits, Defendants argue Sedlik cannot prove evidence of Defendants' gross revenues because he did not request that information in discovery, and Defendants did not provide it. KVD Mot. at 30-31. Sedlik responds that he did request that information, and that therefore Defendants' argument that he will be unable to prove indirect profits is not accurate. Opp'n to KVD Mot. at 22; see also id. at 5 (describing requests for production regarding Defendants' revenue from publication of the Tattoo online). As explained above, a triable issue exists as to whether Defendants profited off their social media posts.

The Court GRANTS in part and DENIES in part Defendants' motion for partial summary judgment as to remedies.

## IV. CONCLUSION

The Court DENIES Sedlik's motion for summary judgment and GRANTS in part and DENIES in part Defendants' motion for summary judgment.

IT IS SO ORDERED.

Date: May 31, 2022

Dale S. Fischer
United States District Judge